Exhibit 2 Page 1 of 214

# EXHIBIT 2

Exhibit 2 Page 2 of 214

# CONFIDENTIAL

## SECOND AMENDMENT TO THE PRIVATE PLACEMENT MEMORANDUM

### DATED AS OF JUNE 23, 2015

Amending the Private Placement Memorandum dated November 13, 2013 and First Amendment to the Private Placement Memorandum Dated November 13, 2014

SOUTHPORT HOTEL EB-5, LP
(A Washington Limited Partnership)

**Minimum Offering of 12 Units of Limited Partnership Interest, or $6,000,000**
**Maximum Offering of 231 Units of Limited Partnership Interest, or US$115,500,000,**
**at US$500,000 per Unit**

The Private Placement Memorandum Dated November 13, 2013 (the "Private Placement Memorandum") and First Amendment thereto Dated November 13, 2014 ("First Amendment"), are hereby amended and supplemented as set forth below. All capitalized terms used herein and not defined herein shall have the meanings specified in the Private Placement Memorandum. The Private Placement Memorandum, First Amendment, and this Second Amendment, collectively shall constitute one and the same document.

1. The General Partner of Seattle Family, LP (General Partner of Southport Hotel EB-5, LP) has filed a certificate of amendment with the Secretary of State of Washington and changed its name to **Southport Management LLC** as of May 4, 2015. All references in the Private Placement Memorandum and supporting exhibits to "Southport Hotel Management LLC" are changed to "**Southport Management LLC**."

2. The Business Plan dated June 18, 2013 and Supplement to the Business Plan dated August 5, 2013 at **Exhibit D** are further supplemented with more current data, which includes: (1) the updated hotel operations pro forma reflecting higher expected revenues (derived from pp. 34-35 of an updated April 8, 2015 PKF study, available upon request); (2) revised budget reflecting increased costs from $134,571,760 to $152,479,805 (the same revised budget previously included as Ex. B to the Loan Agreement in **Exhibit E**); and (3) a cost disbursement timeline. As reflected in the revised budget, the total square footage has increased from 301,783 to 333,020 gross floor area to include larger common areas, ballrooms, and additional meeting space. Given that these revisions only tend to increase the number of jobs created by the Project, the Company deems the changes not material to immigration eligibility. These additional materials are now made part of the Offering Materials and included behind a new **Exhibit F** to the Private Placement Memorandum.

1

25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 2 of 214

Exhibit 2 Page 3 of 214

# CONFIDENTIAL

## FIRST AMENDMENT TO THE PRIVATE PLACEMENT MEMORANDUM

### DATED AS OF NOVEMBER 13, 2014

Amending the Private Placement Memorandum dated November 13, 2013

SOUTHPORT HOTEL EB-5,  LP
(A Washington Limited Partnership)

**Minimum Offering of 12 Units of Limited Partnership Interest, or $6,000,000
Maximum Offering of 231 Units of Limited Partnership Interest, or US$115,500,000,
at US$500,000 per Unit**

The Private Placement Memorandum Dated November 13, 2013 (the "Private Placement Memorandum"), is hereby amended and supplemented as set forth below.  All capitalized terms used herein and not defined herein shall have the meanings specified in the Private Placement Memorandum. The Private Placement Memorandum, as amended and supplemented by this First Amendment to Private Placement Memorandum, shall constitute one and the same document.

1. The Minimum Offering has now been subscribed, and Subscribers are instructed to wire their Capital Contributions directly to Southport Hotel EB-5, LP (to the General Partner's designated account) in accordance with the instructions below, which replace instructions in (iii) in Section X of the Private Placement Memorandum:

**Incoming Wire Instructions For East West Bank**

| | |
|---|---|
| Beneficiary Name: | Seattle Family LP dba Michael Christ |
| Beneficiary Account Number: | 8667004066 |
| Beneficiary Address (optional): | |
| Bank Routing Number (domestic wires): | 322070381 |
| Banking Routing/Swift Code (international wires): | EWBKUS66XXX |
| Receiving Bank Name: | East West Bank |
| Receiving Bank Address (branch address): | 135 N Los Robles Ave. Suite 600 Pasadena, CA 91101 |
| Other Information (Investor Name and Number in English): | |

1. The Beneficiary name and beneficiary account number must match for funds to be credited.

2. All Domestic wires *for* East West Bank should be wired to bank routing no: 322070381.

3. All International wires for East West Bank should be wired to Swift Code: EWBKUS66XXX.

4. Investors must provide their full name and investor # (in English) as Other Information with wire instructions provided to bank.

2. An Amended Signature Page is provided for the Limited Partnership Agreement at **Exhibit B** that includes an additional signature line.

A1
11/17/2014
25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 3 of 214

Exhibit 2 Page 4 of 214

3. All references in the PPM and attached Exhibits documenting the Loan to the Borrower, Hotel at Southport, LLC, having a lease interest in the Project property should be removed and amended as follows:

The Borrower previously owned a ground lease interest in the land for the Project. The Borrower has acquired direct ownership of substantially all of the land for the Project. Southport, LLC owns a parcel of land adjoining the land for the Project as well as a small portion of land for the Project. The Borrower and Southport, LLC are pursuing an adjustment of the lot line between the two adjoining parcels of land so that the Borrower will own all of the land for the Project. Until the lot line is modified, the Loan from Southport Hotel EB-5, LP will be secured by a Deed of Trust on both the land owned by Borrower and the adjoining land owned by Southport LLC. This Deed of Trust may be subordinated to a senior construction loan. Upon completion and recording of the lot line adjustment, the Deed of Trust will be modified to release the portion of the land owned by Southport, LLC and only grant a lien on the land comprising the Project.

4. An Amendment to the Loan Agreement dated November 10, 2014 is added to **Exhibit E,** which includes:

   a. a revised description of the property in Exhibit A (to incorporate land necessary for the Project including the portion owned by Southport, LLC),

   b. an updated budget in Exhibit B, which reflects an increase in total project cost from $134,571,760 to $152,479,805 driven primarily by the increase in size of the hotel from 301,783 sf to 333,020 sf. Revised budget also incorporates increase in furnishings driven by hotel $40,000 per door specifications, increased property insurance costs, increased consultant fees for mechanical and electrical consultants, and other adjustments noted in the annotations on the updated budget.

   c. a 2014 appraisal at Exhibit D to the Loan Agreement to replace the prior 2008 appraisal,

   d. and current construction plans in Exhibit E to the Loan Agreement.

2

25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 4 of 214

Exhibit 2 Page 5 of 214

No.: _____

Name of Offeree: _____

# CONFIDENTIAL

# PRIVATE PLACEMENT MEMORANDUM[1]

### SOUTHPORT HOTEL EB-5, LP
### (a Washington Limited Partnership)

### November 13, 2013[2]

**Minimum Offering of 12 Units of Limited Partnership Interest, or $6 million,
Maximum Offering of 231 Units of Limited Partnership Interest, or $115.5 million,
at $500,000 per Unit**

This Confidential Private Placement Memorandum (the "**Memorandum**") describes the offering (the "**Offering**") of units of limited partnership interest (defined below)(each a "**Unit**") of Southport Hotel Eb-5, LP a Washington limited partnership (the "**Partnership**"). The offering price of one Unit is $500,000 plus an administrative fee of $50,000.

The Partnership has been organized to finance, through a loan (the "**Loan**"), the improvement of certain real property located at 1053 Lake Washington Boulevard North, Renton, Washington 98056 (the "**Property**"), upon which Hotel at Southport, LLC will own, and SECO Development, Inc. will construct a 318,468 square foot, four star hotel with 353 guest rooms (a total of 212,502 square feet of guest rooms and guest lobby areas) ballrooms, convention space and meeting areas along with restaurant and retail space (the "**Project**"). The Partnership will loan to Hotel at Southport, LLC, a Washington limited liability company (the "**Borrower**"), funds raised in this Offering to deploy in at-risk job creating activity pursuant to the Business Plan attached hereto as **Exhibit C** (the "**Business Plan**").

Seattle Family, LP, a Washington limited partnership will serve as General Partner of the Partnership ("**Seattle Family**" or "**General Partner**"). Seattle Family, LP (formerly Southport Hotel, LP) has received approval to participate as a regional center ("**SFRC**") as well as approval of the Project under the EB-5 immigrant investor program (the "**EB-5 Program**") administered by the United States Citizenship and Immigration Service ("**USCIS**") in the state of Washington (the "**Territory**") for purposes of authorizing foreign investors to include both direct and indirect job creation from investment in participating developments toward qualification for the EB-5 Program, and it will be authorizing the Partnership to use its regional center designation under the EB-5 Program to raise capital for the development of the Project. SFRC is an approved regional center with approved exemplar. (W09002050/RCW1031910035).[3]

**NOTE:** Any capitalized terms used in this memorandum but not defined herein shall have the meanings set forth in the Partnership's Subscription Agreement or Limited Partnership Agreement (both terms defined below), attached hereto as **Exhibits A** and **B**, respectively.

---

1 Footnotes to this document reflect the limited nature of changes from the "v. 3 10/16/2013" version that USCIS approved in its November 14, 2013 revised regional center approval notice with exemplar project approval
2 The only changes to the consecutively numbered Offering package approved as exemplar are the changes reflected in footnotes on pages (lower left corner) 1, 2, 15, 16, 17, 18, 30, 32, 48, 51-53, 59, 76, 115, 116, 173-175, 200, and 212. Here we have dated the Offering Memorandum.
3 This paragraph has been amended to reflect USCIS approval of the Regional Center and project.

v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 6 of 214

There is affiliated and/or cross ownership, management and administration within the Partnership, the General Partner, and the Borrower. These relationships are described in the section of this Memorandum entitled "**Conflicts of Interest**."

**An investment in Units involves substantial risks including, but not limited to, the following:**

- Funds will be released into the Project prior to I-526 approval. Subscribers risk having their funds irrevocably committed to the project while their permanent residence eligibility could be denied. Although the Partnership agrees to make reasonable efforts to seek replacement investors in order to make refunds to such Subscribers, the Partnership may be unable to secure replacement investors, particularly in the event of a cancellation of the offering or a project-based denial of EB-5 Petitions triggering large-scale obligations.
- The minimum subscription amount is believed to be sufficient to complete costly pre-development planning but not sufficient to complete the project. This means that early Subscribers may invest money in the Project before the funds needed to complete the Project are received and risk investing in a Project that has insufficient funds to be completed. If the Project is not completed, investors could lose their investment and the immigration benefits they seek.
- The $50,000 Administrative Fee will be paid immediately out of escrow to the General Partner, who will use it for various expenses including compensation of marketing agents. If conditions occur giving rise to an obligation of the General Partner to refund some or all of the Administrative Fee, the General Partner may be unable to honor the refund because the funds are irretrievably spent. Such inability may be even more likely in the event of a cancellation of the offering or a project-based denial of EB-5 Petitions triggering large-scale refund obligations.
- The Partnership's success, and its ability to make distributions to its partners, is wholly dependent upon the Borrower's successful implementation of the Business Plan and there is no assurance the Partnership or Borrower will be successful in its business ventures.
- There is no assurance that investors or their family members will obtain or retain permanent resident status under the EB-5 Program (8 U.S.C. § 1153 (b)(5)(A) - (D); INA § 203(b)(5)(A) - (D) of the Immigration & Nationality Act (the "**Act**"), and failure to obtain or retain immigration benefits will not entitle investors to a refund of their investment.
- The Units will be highly illiquid; transferability of the Units is restricted, and the sale of Units prior to the sale or liquidation of the investment is prohibited.
- An investor could lose all or a substantial portion of his or her investment in the Partnership.
- The Partnership will not be diversified in its investments, and anticipates concentrating solely on the Project, as described below.
- Investors in the Partnership will be subject to U.S. taxation and various tax risks.
- Each investor seeking permanent residence through this investment will need to show that 10 new jobs for U.S. workers were created by each investor through the investment. Even if USCIS approves the investors' I-526 petitions and the business project associated with this offering is economically successful, some investors could be unable to remove conditions on their residence and thus become deportable if the project does not meet the targets of expenditures and revenues that are used by the economic analysis as assumptions and inputs into the economic model by which predictions were made.[4]

These and other risks are described more fully under the heading "Risk Factors" below.

---

[4] The final bulleted risk factor was added since USCIS approved the PPM.

v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 7 of 214

**NO PARTY, EXCEPT THE PARTNERSHIP AND THE GENERAL PARTNER, IS RESPONSIBLE FOR THE CONTENTS OF THE OFFERING MEMORANDUM, AND NO OTHER PARTY EXCEPT AUTHORIZED PARTNERSHIP SALES AGENTS WILL BE INVOLVED IN THE OFFERING OF LIMITED PARTNERSHIP UNITS UNDER THE OFFERING MEMORANDUM OR THE ACCEPTANCE OF SUBSCRIPTIONS FROM SUBSCRIBERS.**

_____

**The Units have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or any applicable U.S. state securities laws. These Units are being offered and sold pursuant to and in reliance upon exemptions from the registration requirements provided by the Securities Act and Regulation S promulgated thereunder and similar exemptions under certain U.S. state securities laws. The Partnership may also conduct a concurrent offering exempt from registration under Regulation D promulgated under the Securities Act.**

**Neither the Securities and Exchange Commission nor any U.S. state securities regulatory authority has approved or disapproved the offer and sale of the Units or determined if this Memorandum is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Units involve a high degree of risk and substantial restrictions on transferability. You should not invest in the Units unless you can bear the complete loss of your investment. See "Risk Factors" below.**

v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 8 of 214

## **TABLE OF CONTENTS**

**PAGE**

| | | |
|---|---|---|
| I. | LIST OF EXHIBITS | 1 |
| II. | NOTICES TO INVESTORS | 2 |
| III. | CONFIDENTIALITY AND UNDERTAKINGS | 5 |
| IV. | FORWARD-LOOKING STATEMENTS IMPORTANT FACTORS AND ASSOCIATED RISKS | 6 |
| V. | OVERVIEW OF STRUCTURE | 7 |
| VI. | THE OFFERING | 8 |

| | | | |
|---|---|---|---|
| | A. | General | 8 |
| | B. | The EB-5 Petition | 8 |
| | C. | The Project | 9 |
| | D. | The Subscription Procedure | 10 |
| | E. | Administrative Fee | 10 |
| | F. | Acceptance, Escrow and Closings | 11 |
| | G. | Risk Factors | 12 |
| | H. | Loan | 13 |
| | I. | Payment Of Offering Expenses and Administration | 14 |
| | J. | Partnership Organization and Governance | 14 |
| | K. | Regional Center Responsibilities | 15 |
| | L. | Suitability Standards | 15 |
| | M. | Miscellaneous | 16 |

| | | |
|---|---|---|
| VII. | IMMIGRATION RISK FACTORS AND OVERVIEW OF EB-5 INVESTOR ISSUES | 16 |

| | | | |
|---|---|---|---|
| | A. | Overview | 16 |
| | B. | Immigration Risk Factors | 17 |
| | C. | The EB-5 Petition Process | 26 |
| | D. | Regional Center | 27 |
| | E. | Approval of EB-5 Petition Not Guaranteed | 27 |
| | F. | Consular Processing or Adjustment of Status | 28 |
| | G. | Consular Processing | 28 |
| | H. | Visa Issuance Not Guaranteed | 29 |
| | I. | Admission After CLPR Visa Issued Not Guaranteed | 29 |
| | J. | Adjustment of Status | 29 |
| | K. | Travel During Adjustment of Status Processing | 30 |
| | L. | Employment During Adjustment of Status Processing | 31 |
| | M. | Adjustment of Status Cannot Be Guaranteed | 31 |
| | N. | Removal of Conditions | 32 |
| | O. | Removal of Conditions Not Guaranteed | 32 |

| | | |
|---|---|---|
| VIII. | RISK FACTORS | 33 |

i

Exhibit 2 Page 9 of 214

**TABLE OF CONTENTS**

**(CONTINUED)**

**PAGE**

A.    Risks Related to the Partnership's Proposed Business ...........................................33

B.    Special Risks Associated with the Project ...........................................................35

C.    Risks Related to the Offering .............................................................................37

D.    Tax Risks .........................................................................................................38

IX.    ADDITIONAL INFORMATION .......................................................................42

X.    HOW TO SUBSCRIBE ....................................................................................43

5    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 9 of 214

Exhibit 2 Page 10 of 214

## I.　　LIST OF EXHIBITS

Exhibit A　　-　　Subscription Agreement

Exhibit B　　-　　Limited Partnership Agreement

Exhibit C　　-　　Business Plan

Exhibit D　　-　　Form of Escrow Agreement

Exhibit E　　-　　Form of Loan Agreement [Attachments available upon request]

Exhibit 2 Page 11 of 214

## II.   NOTICES TO INVESTORS

THIS MEMORANDUM IS BEING PROVIDED TO EACH PROSPECTIVE INVESTOR ("**PROSPECTIVE INVESTOR**") IN CONNECTION WITH SUCH PROSPECTIVE INVESTOR'S INTEREST IN PURCHASING ONE OR MORE UNITS.  THE PURPOSE OF THIS MEMORANDUM IS TO FURNISH PROSPECTIVE INVESTORS WITH CERTAIN INFORMATION REGARDING A PROSPECTIVE INVESTMENT IN THE PARTNERSHIP AND CERTAIN OF THE RISKS ATTENDANT THERETO.  ALL OF THE INFORMATION CONTAINED IN THIS MEMORANDUM IS BASED ON THE CURRENT, GOOD FAITH INTENTIONS OF THE GENERAL PARTNER AND THE PARTNERSHIP.  INFORMATION REGARDING THE PROJECT CONTAINED IN THIS MEMORANDUM IS BASED ON INFORMATION AVAILABLE TO THE GENERAL PARTNER AND THE PARTNERSHIP AS OF THE DATE HEREOF AND BELIEVED BY THE PARTNERSHIP TO BE ACCURATE.   CAPITALIZED TERMS USED IN THIS MEMORANDUM BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS SET FORTH IN THE PARTNERSHIP'S SUBSCRIPTION AGREEMENT OR LIMITED PARTNERSHIP AGREEMENT, ATTACHED HERETO AS **EXHIBITS A** AND **B**, RESPECTIVELY.

THE UNITS OFFERED HEREBY ARE SPECULATIVE AND AN INVESTMENT IN THE UNITS INVOLVES A HIGH DEGREE OF RISK.  PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE INFORMATION SET FORTH HEREIN UNDER "**RISK FACTORS**" BELOW.  PROSPECTIVE INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT.

THE UNITS ARE RESTRICTED SECURITIES UNDER THE SECURITIES ACT AND APPLICABLE U.S. STATE SECURITIES LAWS.  ACCORDINGLY, THE INTERESTS MAY NOT BE SOLD, TRANSFERRED, OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE U.S. STATE SECURITIES LAWS OR AN OPINION OF COUNSEL ACCEPTABLE TO THE PARTNERSHIP AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.  ADDITIONALLY, THE TRANSFER OF UNITS WILL BE RESTRICTED UNDER THE PARTNERSHIP AGREEMENT.  ACCORDINGLY, INVESTORS WILL BE REQUIRED TO HOLD THE UNITS INDEFINITELY.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAVE BEEN NO CHANGES IN THE AFFAIRS OF THE PARTNERSHIP SINCE THE DATE HEREOF OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM.  THIS MEMORANDUM SUPERSEDES AND REPLACES ANY AND ALL INFORMATION DELIVERED OR MADE AVAILABLE BY OR ON BEHALF OF THE PARTNERSHIP TO THE RECIPIENTS OF THIS MEMORANDUM PRIOR TO THE DATE HEREOF.

Exhibit 2 Page 12 of 214

WITH RESPECT TO THE UNITS OR THIS MEMORANDUM, ONLY THE PARTNERSHIP HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR GIVE ANY INFORMATION OTHER THAN THOSE CONTAINED HEREIN; AND, IF GIVEN, SUCH REPRESENTATIONS AND INFORMATION ARE NOT TO BE RELIED UPON UNLESS GIVEN IN A WRITTEN MEMORANDUM FURNISHED BY THE PARTNERSHIP OR ITS GENERAL PARTNER. NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHOULD BE RELIED UPON IN CONNECTION WITH THIS OFFERING EXCEPT FOR THIS MEMORANDUM, AND ANY OTHER INFORMATION FURNISHED BY THE PARTNERSHIP IN RESPONSE TO A PROSPECTIVE INVESTOR'S REQUEST. NO MIGRATION BROKER, BROKER, DEALER, SALESMAN, OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM (WHETHER ORAL OR WRITTEN), AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE GENERAL PARTNER AND/OR THE PARTNERSHIP.

THE PARTNERSHIP, UPON WRITTEN REQUEST, WILL MAKE AVAILABLE TO A PROSPECTIVE INVESTOR AND/OR HIS OR HER ADVISORS ALL DOCUMENTS RELATING TO THIS OFFERING AND ANY ADDITIONAL INFORMATION REGARDING THE PARTNERSHIP, THE PROJECT, AND/OR THIS OFFERING TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. REQUESTS FOR SUCH DOCUMENTS OR INFORMATION SHOULD BE MADE IN WRITING TO:

**SOUTHPORT HOTEL EB-5, LP**
**1083 LAKE WASHINGTON BLVD. N, SUITE 50**
**RENTON, WASHINGTON 98056**
**ATTENTION: MICHAEL CHRIST**

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE PARTNERSHIP OR PROFESSIONALS ASSOCIATED WITH THIS OFFERING AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH HIS OR HER OWN PERSONAL ATTORNEY, ACCOUNTANT AND OTHER ADVISORS, AT HIS OR HER OWN EXPENSE, AS TO THE LEGAL, TAX, ECONOMIC, AND OTHER CONSEQUENCES OF AN INVESTMENT IN THE UNITS AND THE INVESTMENT'S SUITABILITY FOR HIM OR HER.

THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DOCUMENTS RELATING TO THIS INVESTMENT AND VARIOUS PROVISIONS OF RELEVANT STATUTES AND APPLICABLE REGULATIONS THEREUNDER. HOWEVER, SAID SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS, STATUTES, AND REGULATIONS.

Exhibit 2 Page 13 of 214

EACH PROSPECTIVE INVESTOR WHO SUBSCRIBES TO INVEST WILL BE REQUIRED TO REPRESENT AND WARRANT TO THE PARTNERSHIP IN HIS OR HER SUBSCRIPTION AGREEMENT THAT AMONG OTHER THINGS HE OR SHE: (1) IS BUYING THE UNITS FOR HIS OR HER OWN ACCOUNT AND NOT WITH ANY VIEW TO THE UNITS' DISTRIBUTION OR RESALE IN THE FORESEEABLE FUTURE; (2) POSSESSES SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS THAT HE OR SHE IS CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE UNITS; (3) IS ABLE TO BEAR THE ECONOMIC RISKS OF SUCH AN INVESTMENT; (4) COULD AFFORD A COMPLETE LOSS OF SUCH AN INVESTMENT; AND (5) UNDERSTANDS THE TERMS, RIGHTS, DUTIES, OBLIGATIONS, AND RESTRICTIONS CONTAINED IN THIS MEMORANDUM, THE PARTNERSHIP AGREEMENT, AND THE SUBSCRIPTION AGREEMENT. A SUBSCRIPTION MAY BE VOID, AT THE OPTION OF THE PARTNERSHIP, IF ANY REPRESENTATIONS MADE BY THE PROSPECTIVE INVESTOR IN HIS OR HER SUBSCRIPTION AGREEMENT OR THAT ARE OTHERWISE DELIVERED TO THE PARTNERSHIP ARE UNTRUE.

THE PARTNERSHIP RETAINS THE RIGHT, IN ITS SOLE DISCRETION, TO ACCEPT OR REJECT, IN WHOLE OR IN PART, ANY SUBSCRIPTION AND TO SELL FRACTIONAL UNITS.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANY PERSON RESIDING IN A JURISDICTION WHERE SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING THE OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

Exhibit 2 Page 14 of 214

### III.   CONFIDENTIALITY AND UNDERTAKINGS

The information contained in this Memorandum is confidential and proprietary to the Partnership.  By accepting delivery of this Memorandum, the Subscriber whose name appears on the cover page of this Memorandum is deemed to have acknowledged and agreed to the following:

- The information contained in this Memorandum will be used by the Subscriber solely for the purpose of deciding whether to proceed with a further investigation of the Partnership;

- **This Memorandum or information derived from this Memorandum will be kept in strict confidence by the Subscriber and will not, whether in whole or in part, be (i) reproduced or (ii) released or discussed by the Subscriber for any purpose other than an analysis of the merits of a potential investment in the Partnership by the Subscriber, provided that such release or discussion by Subscriber be limited to its legal and financial advisors who acknowledge and agree to honor the confidential nature of this Memorandum**; and

- Upon the written request of the Partnership, this Memorandum, and any other documents or information furnished to the Subscriber and any and all reproductions thereof and notes relating thereto will be promptly returned.

- If conflicts arise between information presented in the Partnership's business plan and the Memorandum, the information in this Memorandum will prevail.

- If conflicts arise between information presented in the English language Memorandum and the Memorandum translated into other languages, the information in the English language Memorandum will prevail.

10   25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 14 of 214

Exhibit 2 Page 15 of 214

## IV.    FORWARD-LOOKING STATEMENTS
## IMPORTANT FACTORS AND ASSOCIATED RISKS

This Memorandum contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21 E of the U.S. Securities Exchange Act of 1934, as amended, (the "**Exchange Act**").  These forward-looking statements include the plans and objectives of Partnership management for future operations, including plans and objectives relating to the future economic performance of the Project.  The forward-looking statements and associated risks set forth in this Memorandum include or relate to the successful implementation and operation of the business plan for the Project.

The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties.  These forward-looking statements are based on various assumptions regarding the Project and its proposed operations.  Such assumptions involve judgments with respect to, among other things, future economic, competitive and market conditions, and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership.  Although the Partnership believes that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in forward-looking information will be realized.  In addition, as disclosed elsewhere in this Memorandum and under "**Risk Factors**" below, the business and operations of the Project are subject to substantial risks, which increase the uncertainty inherent in such forward-looking statements.  In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should **not** be regarded as a representation by the Partnership, the General Partner, or any other person that the objectives or plans of the Project will be achieved.

THE WORDS "MAY," "ESTIMATE," "PLAN," "INTEND," "EXPECT," "PROPOSED," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS INVOLVE AND ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER FACTORS THAT COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE (FINANCIAL OR OPERATING) OF THE PARTNERSHIP, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM THE OUTCOMES, EXPRESSED OR IMPLIED, BY SUCH FORWARD-LOOKING STATEMENTS OR THE PROJECTIONS SET FORTH HEREIN.  SUBSCRIBERS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS, WHICH SPEAK ONLY AS OF THE DATE HEREOF.  THE PARTNERSHIP SPECIFICALLY DISCLAIMS ANY OBLIGATION TO RELEASE ANY REVISIONS TO THESE FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

Exhibit 2 Page 16 of 214

# V.  OVERVIEW OF STRUCTURE

## EB-5 FUNDS INVESTED IN SOUTHPORT HOTEL EB-5, LP



AMS 6/11/13

SOUTHPORT HOTEL EB-5, LP
PRIVATE PLACEMENT MEMORANDUM
PAGE 7 OF 48
v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 17 of 214

## VI.   THE OFFERING

### A.   General

This investment carries significant risks described in detail in **Section VIII** below.

The Partnership is offering for purchase to a limited number of individual investors on a limited and private basis limited partnership interests (each, a "**Unit**" and, collectively, the "**Units**"). The Offering Price of one Unit is $500,000, plus an Administrative Fee of $50,000. The total subscription price of $550,000 is payable only by wire transfer upon subscription. The Partnership is offering a minimum of Six Million Dollars ($6,000,000) of Units (i.e., 12 Units) ("**Minimum Offering Amount**") and a maximum of One Hundred Fifteen Million and Five Hundred Thousand Dollars ($115,500,000) of Units (i.e., 231 Units) (the "**Maximum Offering Amount**"). Each investor desiring to acquire one or more Units (collectively, the "**Subscribers**" and, each individually, a "**Subscriber**") shall execute and deliver a subscription agreement substantially in the form of **Exhibit A** hereto (the "**Subscription Agreement**"). Upon the Partnership's acceptance of such subscriptions and closing thereof, the Subscriber shall become a limited partner in the Partnership ("**Limited Partner**"). The relative rights and authorities associated with the Units offered hereby are described in the Limited Partnership Agreement (the "**Partnership Agreement**"), attached hereto as **Exhibit B**. The limited partners of the Partnership who own Units will have limited authority or control over the operation of the Partnership.

Any capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed in the Partnership Agreement.

All dollar amounts referred to herein are U.S. Dollars.

### B.   The EB-5 Petition

The Offering has been structured with the intent that each Subscriber, by becoming a Limited Partner in the Partnership and demonstrating the lawful source of his or her investment funds, will have made an investment that qualifies as the investment component required for a petition under section 203(b)(5) of the Immigration and Nationality Act ("**EB-5 Petition**") entitling the Subscriber, assuming the Subscriber otherwise satisfies the individual criteria for an immigrant visa, to seek first conditional and, ultimately, unconditional United States permanent residence.

Each Subscriber seeking an immigrant visa shall retain a U.S. immigration attorney to prepare and file an EB-5 Petition on behalf of and at the expense of each Subscriber, which shall be done promptly following acceptance of the subscription of the Subscriber and notification that preliminary conditions, described below, have been met. USCIS requires that an investor filing an EB-5 Petition demonstrate that he or she has irrevocably committed the capital contribution

13   25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 17 of 214

Exhibit 2 Page 18 of 214

other than an allowable condition that the EB-5 Petition becomes approved. Thus, the terms of this offering prohibit the filing of the EB-5 Petition until preliminary conditions have been satisfied.

If the United States Citizenship and Immigration Services ("**USCIS**") finds the Project not qualifying, the Subscriber will be unable to obtain the U.S. immigration benefits sought from the investment. Subscribers must be aware that there are numerous other factors that will lead to the grant or denial of the EB-5 Petition based upon the personal facts and circumstances of each Subscriber. See "**Immigration Risk Factors and Overview of EB-5 Investor Issues**" below for a non-exclusive list of such factors.

Unless determined otherwise in the discretion of the General Partner, all allocable jobs generated as a result of the EB-5 Program will be allocated on a "first-come/first-served" basis to each Subscriber in the order of the date and time of the completion by such Subscriber of the subscription procedures described in the Subscription Agreement as determined by the General Partner in its sole discretion. If the General Partner exercises its discretion to impose an alternative method of job allocation, the Partnership will provide to Subscribers a revised written job allocation order as part of the documentation to accompany the Subscribers' I-829 Petitions to Remove Conditions on Permanent Residence.

## C.      <u>The Project</u>

The Project is described in detail in the Business Plan furnished by the Borrower to the Partnership attached hereto as **Exhibit C**.

The Borrower is Hotel at Southport, LLC, a Washington limited liability company. The Borrower's sole member is 1 Min, LLC, a Washington limited liability company and is managed by SECO Development, Inc. Additional details about the ownership and governance of the Borrower are provided in the attached Business Plan.

The Partnership believes that the Business Plan accurately reflects the current status coupled with the Project's development potential. There are no assurances that facts and circumstances will not arise that will necessitate a modification of the Business Plan. The Business Plan includes a summary of an economic analysis forecasting indirect job creation in connection with the Project based on anticipated expenditures by the Borrower. The Business Plan contains financial projections related to the Project to which funds are to be loaned, which are subject to the "**Forward-Looking Statements - Important Factors and Associated Risks**" disclosure set forth above.

Exhibit 2 Page 19 of 214

**D.**     **The Subscription Procedure**

The Partnership will sell Units until the Maximum Offering Amount is reached or the Offering is cancelled.[5] If the Partnership cancels the Offering, it will make reasonable efforts to return without interest Capital Contributions that were released to the Partnership, but it may have limited ability to do so. If a Subscriber's I-526 petition is denied, the General Partner will return the Net Administrative Fee (as defined below) to the denied Subscriber (subject to return by marketing agents of amounts already distributed to them and other conditions), and the Partnership will make reasonable efforts to find replacement investors for those Subscribers. There is no assurance the Partnership will be able to find any such replacement investors or that any such investors would be willing to pay the same amount for the Units as paid by the Subscriber for such Units.

A Subscriber must (i) execute the Subscription Agreement attached as Exhibit A, including the spousal consent form (if Subscriber is an individual and married), Investor Questionnaire, Investor Acknowledgement and AML Form attached as exhibits to the Subscription Agreement, (ii) execute the signature page of the Partnership Agreement attached as **Exhibit B**, (iii) remit the Capital Contribution ($500,000 for each Unit subscribed) and the Administrative Fee ($50,000) to the Escrow Agent, (iv) sign and return the Acknowledgement of Receipt of Escrow Agreement, and (vi) complete a Form W-8 BEN.

Detailed instructions for subscribing to the Offering are provided at **Section X** at the end of this Memorandum.

**E.**     **Administrative Fee**

Each Subscriber shall pay to the Escrow Agent an Administrative Fee of Fifty Thousand U.S. Dollars ($50,000), payable by wire transfer upon subscription unless otherwise agreed. Each Subscriber's Administrative Fee will be used to pay for (i) agents in foreign countries responsible for identifying the investors, and (ii) processing EB-5 applications, offering and marketing expenses, compensation to financial advisors, legal, accounting, and administration expenses, and commissions and fees related to the Offering (collectively, the "**Administrative Expenses**").

The Escrow Agent will immediately release the full amount of the Administrative Fee to the General Partner to pay the Administrative Expenses. If the Subscriber's subscription is rejected, or the Offering is cancelled, the Administrative Fee will be refunded to the Subscribers by the General Partner (subject to return by marketing agents of amounts already distributed to them). If a Subscriber's I-526 petition is denied, the General Partner may withhold up to $25,000 of the

---

[5] The first three sentences of this paragraph have been deleted and this section revised to reflect the removal of the "Secondary Closing" and incorporate changes made to Section F below.

Exhibit 2 Page 20 of 214

Administrative Fee for Administrative Expenses and will return $25,000 (the "**Net Administrative Fee**") to the Subscriber (subject to return by marketing agents of amounts already distributed to them).

A Subscriber who opts to pursue his or her immigration application may incur additional, ancillary personal expenses such as personal legal and financial advisor expenses. Any Subscriber who makes misrepresentations to the Partnership or to the General Partner in the Subscription Agreement or otherwise will forfeit his or her Administrative Fee in its entirety and will be responsible for any damage to the Partnership resulting therefrom, even if the Subscriber's subscription is rejected.

## F.     Acceptance, Escrow and Closings[6]

Upon the completion of the subscription procedure of a Subscriber, the Partnership shall within a reasonable time (and not before the Minimum Offering has been received in escrow) give notice to an investor of his acceptance or rejection of the subscription. Acceptance will reflect that the parties have committed to the investor's becoming a limited partner in the Partnership upon closing of the Subscriber's subscription, which may be at a later time.

Capital Contributions will be held in escrow and distributed from escrow by East West Bank (the "**Escrow Agent**") at such times set forth in the Escrow Agreement, which is attached as **Exhibit D.** Upon the Partnership's receipt and acceptance of the Minimum Offering Amount in escrow on or before the first anniversary after receiving the initial subscription from a Subscriber (the "**Initial Condition**"), the Partnership will conduct the "**Initial Closing**" as to the subscriptions accepted at that time, the Escrow Agent shall release to the Partnership all Capital Contributions received in escrow, and the Escrow Agreement shall be terminated. All subsequent Subscribers will be instructed to pay their Capital Contributions directly to the Partnership without escrow (and to pay their Administrative Fees directly to the General Partner), and the General Partner will accept Subscribers and their Capital Contributions in its discretion from time to time (each such acceptance, a "**Subsequent Closing**" and together with the Initial Closing, the "**Closings**"). The Partnership must accept a subscription before conducting a Closing including that subscription. The Partnership will use Capital Contributions of Subscribers released to the Partnership only to make additional loans to the Borrower at such times and in such amounts as needed for the Borrower to complete development as described in the Business Plan.  If the conditions for a Closing are not met, the Partnership will immediately instruct the Escrow Agent (if applicable) to refund the Capital Contributions and the General Partner to refund Administrative Fees that were contributed with respect to such anticipated Closing to the relevant Subscribers, both without interest.

Upon acceptance and Closing of a Subscriber's subscription (and not before), the Subscriber must promptly file his or her I-526 petition with USCIS. Each Subscriber must file such I-526 through immigration counsel designated by the General Partner for such purpose, either as primary counsel for Subscriber at Subscriber's expense as secondary counsel cooperating with

---

6 This Section F has been modified to remove the "Secondary Condition" of raising an additional $41 million and to allow subscription proceeds to be paid directly to the Partnership without the use of escrow after the Minimum Offering Amount is raised.

16     25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 20 of 214

Exhibit 2 Page 21 of 214

Subscriber's primary counsel at the General Partner's expense. Each Subscriber agrees not to file an EB-5 Petition with USCIS until after the Partnership has given notice that the Initial Condition has been met (as applicable) and the Subscriber's subscription has been accepted and closed.[7] Upon satisfaction of the Initial Condition and acceptance of the Subscriber's subscription, the Partnership shall close on the Subscriber's subscription (as to each Subscription, its "**Closing**"), and the Subscriber shall be admitted as a limited partner in the Partnership. After the Initial Closing, the Partnership may immediately accept and close on subscriptions from Subscribers from time to time up to the Maximum Offering Amount.

Once deposited in escrow (or directly to the Partnership after the Minimum Offering Amount has been reached), a Subscriber's Capital Contribution will not be returned unless: (i) the Partnership in its discretion terminates or cancels the Offering; (ii) the Partnership rejects the Subscriber's Subscription; or (iii) the conditions for the Initial Closing are not met. In these events, the Escrow Agent shall cause a return to the Subscriber of the Capital Contribution without interest.

After a Subscriber's funds are released from escrow, if a Subscriber's or family member's I-526 Petition, immigrant visa, or admission as a conditional permanent resident is denied or revoked, and the Subscriber so requests in writing; then the Partnership will use reasonable efforts to replace the Subscriber and use the proceeds from such replacement Subscriber to refund the original Subscriber's Capital Contribution. If a Subscriber's I-526 petition is denied, the General Partner will return the Net Administrative Fee to such denied Subscriber (subject to return by marketing agents of amounts already distributed to them), the Administrative Fee will not be refunded in the event of denial or revocation of a Subscriber's immigrant visa or admission as a conditional permanent resident.

If the General Partner cannot confirm satisfaction of the Initial Condition by the deadline, the Partnership will cancel the Offering, reject all subscriptions that have not been subject to a Closing, and return all Capital Contributions without interest to the affected Subscribers, and the General Partner will return all Administrative Fees (subject to return by marketing agents of amounts already distributed to them and to other conditions) without interest to the affected Subscribers.

The Partnership may reject a subscription at any time until the later of acceptance of the subscription and satisfaction of the Initial Condition. Upon the later of acceptance of a subscription and satisfaction of the Initial Condition without rejection, the Partnership shall execute and deliver to the Subscriber the acceptance portion of the Subscription Agreement. The Maximum Offering Amount will not be exceeded. Promptly after the Closing of any Subscriber's Units, the Partnership will execute and deliver to each such Subscriber the acceptance portion of the Partnership Agreement evidencing such Subscriber's Units.

## G.    Risk Factors

An investment in the Units involves substantial risks and significant restrictions on transferability. An investment in the Partnership should be viewed as highly speculative and is

---

[7] This Section F has been modified to remove the "Secondary Condition" of raising an additional $41 million and to allow subscription proceeds to be paid directly to the Partnership without the use of escrow after the Minimum Offering Amount is raised. Changes to Section F continue on this page.

**SOUTHPORT HOTEL EB-5, LP**
**PRIVATE PLACEMENT MEMORANDUM**
**PAGE 12 OF 48**
v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 22 of 214

designed only for investors who intend to maintain their investment over a significant period of time and who can afford the loss of their investment. See "**Risk Factors**" below.

## H.    Loan

The Partnership will make a Loan to the Borrower to finance the Project, in a principal amount of all Capital Contributions received up to the Maximum Offering Amount of $115.5 million. The term of the Loan will be a minimum of five (5) years from the first advancement of funds under the Loan. The term of the Loan may be lengthened by agreement of the Partnership and Borrower, and must be lengthened to the expiration of the conditional residence of the Limited Partners in the Partnership as may be necessary to comply with USCIS policy.

The Loan to Borrower is documented in the Loan Agreement between Borrower and the Partnership (the "**Loan Agreement**"), the form of which is attached at **Exhibit E**. Other ancillary documents which are exhibits to the Loan Agreement are available upon request. Borrower will pay to the Partnership interest in the amount of three percent (3%) per year. The non-compounding interest will accrue annually beginning on March 1, 2017. No interest at all will be due or payable for the period up to March 1, 2017. Between years five and seven from the Loan's first disbursement, the Borrower shall seek to refinance or sell the Project ("**Capital Event**") based on market conditions. However, under no circumstances shall a Capital Event occur before the end of conditional residence of the Limited Partners unless USCIS policy authorizes an earlier point of acceptable repayment.[8]

**There shall be no principal or interest payments on the Loan until the first calendar quarter following the earlier of (i) the fifth anniversary after the first advance of Loan proceeds (but only if the Borrower has Net Cash Flow available for distribution) and (ii) a Capital Event.**

Within 120 days after a Capital Event, Borrower will pay Partnership an amount equal to a pro rata share of the proceeds from the Capital Event, calculated by dividing the Loan amount by the total costs expended for the Project (hard and soft costs [including working capital]). Such payments shall be applied 25% to accrued Interest and 75% to the outstanding principal.

Beginning on the first calendar quarter after the fifth anniversary of the first Loan disbursement, or the first calendar quarter after a Capital Event, whichever is sooner, Borrower shall make payments to the Partnership on a quarterly basis calculated from January 1, of 75% of the Borrower's Net Cash Flow until the entire outstanding Loan principal and interest is repaid in full. Such payments shall be applied 25% to accrued Interest and 75% to the outstanding principal.

No principal payments on the Loan will be made until the end of conditional residence for all Limited Partners unless USCIS policy has expressed an earlier point of acceptable repayment.[9]

The Loan will be secured by an interest in the Project as evidenced by the deed of trust included in the Loan Agreement at **Exhibit E**.

---

[8] Modified last four sentences from the version approved by USCIS to clarify restriction on timing of Capital Event and to make consistent with interest payment described in loan agreement.

[9] Modified to clarify the restriction on principal payment in accordance with the loan agreement.

Exhibit 2 Page 23 of 214

Upon an Event of Default as defined in the Loan Agreement, the Partnership may exercise any or all of the Rights provided as set forth in the Loan Agreement and supporting Loan Documents.

Borrower will have the right to incur additional indebtedness that will not be subordinated to the Loan and to which the Loan may be subordinated.

Loan terms are more fully set forth in the attached Form of **Loan Agreement at Exhibit E** and the **Business Plan at Exhibit C**.

## I.     Payment Of Offering Expenses and Administration

The General Partner will pay out of the $50,000 Administrative Fee, or its own funds from other sources, all costs of marketing this Offering to investors, including fees to registered broker-dealers, migration brokers, and authorized finders retained by the General Partner. The General Partner receives a management fee of one-third of Available Cash Flow as described in the Partnership Agreement ("**Management Fee**"). Otherwise, the General Partner will receive no compensation for serving as the General Partner and shall not be entitled to any compensation or reimbursement for management services provided to the Partnership.

The General Partner will pay the ordinary expenses of the Partnership with funds available from the Administrative Fees or from the Partnership's income from interest on the Loan. Since the interest and principal on the Loan will accrue and not be paid until and to the extent of refinancing of the Project to occur no earlier than five years from the initial disbursement of funds through the Loan, the General Partner will advance expenses as a loan to the Partnership, and such loan and the Management Fee will accrue with interest until and to the extent interest on the Loan is paid, at which time the General Partner may deduct such expenses and interest in the calculation of Available Cash Flow for distribution.

## J.     Partnership Organization and Governance

1.     Formation.

The Partnership is a limited partnership and was formed upon the filing and acceptance of the Certificate of Limited Partnership with the Secretary of State of the State of Washington on June 17, 2013 ("**Formation Date**"). The Partnership has a principal place of business located at 1083 Lake Washington Blvd. N, Suite 50, Renton, Washington 98056.

2.     General Partner

Seattle Family, LP, a Washington limited partnership, is the General Partner. The General Partner was initially formed as Southport Hotel, LP on June 22, 2010, and subsequently changed its name by filing the Amended Certificate of Limited Partnership with the Secretary of the State of Washington on May 28, 2013. The General Partner of Seattle Family, LP is Southport Hotel

19    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 23 of 214

Exhibit 2 Page 24 of 214

Management, LLC, a Washington limited liability company. SECO Development, Inc., a Washington corporation, will be responsible for developing the Project.

       3.   <u>Limited Partners.</u>

The Limited Partners are those investors who purchase one or more Units in the Partnership in this Offering and in the event of one or more Unit transfers, those persons who subsequently are admitted, in accordance with the Partnership Agreement, as substitute Limited Partners.

**K.**     **<u>Regional Center Responsibilities</u>**

The General Partner shall oversee all administrative matters involving the maintenance and compliance of the Regional Center under USCIS guidelines and shall assist Subscribers in providing information with respect to the processing of the I-526 petitions and the issuance of the I-829 approvals that will eventually be required in order for Limited Partners to gain U.S. permanent residence status. In particular, the General Partner shall provide necessary information with respect to confirmation of expenditure of funds, the Project development status, and job creation in order to support each EB-5 investor's I-526 & I-829 petitions. The Loan documents shall require Borrower to provide relevant information for this purpose and for regional center reports to USCIS.

**L.**     **<u>Suitability Standards</u>**

The purchase of the Units offered hereby is speculative and involves a high degree of risk. An investment in the Partnership is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment and can afford a total loss of their investment. Consequently, an investment in the Units offered hereby is not a suitable investment for all potential investors, and the sale of the Units hereunder will be made on a selected private basis to a limited number of investors who meet the standards set forth in the Subscription Agreement attached as **Exhibit A** and make the representations and warranties set forth in the Subscription Agreement. The Partnership may initially refuse or later reject Subscriptions, in whole or in part, in its sole discretion.

The suitability standards set forth in this Memorandum represent minimum suitability standards for investors. The satisfaction of such suitability standards by an investor does not necessarily mean that an investment in the Units is suitable for said investor. Subscribers are encouraged to consult their personal professional advisors to determine whether an investment in the Units is appropriate for them. The Offering will be made pursuant to an exemption from registration under Section 4(2) of the U.S. Securities Act, Regulation D promulgated thereunder, Regulation S, and exemptions available under applicable U.S. state securities laws and regulations. Subscribers desiring to invest in the Units will be required to make representations and warranties about their qualifications as described in the "Subscription" section of this Memorandum and in the Subscription Agreement.

Exhibit 2 Page 25 of 214

There is no established market for the Units. Because there are only a limited number of investors and restrictions on the transferability of the Units, a market in the Units will likely never develop. The Units cannot be resold unless the Limited Partner otherwise satisfies, to the Partnership's sole discretion, the restrictions on transfer set forth in the Partnership Agreement, and (i) the Units are subsequently registered under the Securities Act and applicable U.S. state securities laws, or (ii) an exemption from such registration is available.

**M.** **Miscellaneous**

1. <u>Reports to Investors</u>. The Partnership agrees to provide regular status reports and financial information about the Partnership to partners after the end of each fiscal year of the Partnership, such information as shall be necessary for the preparation by such Limited Partner of his federal income tax return, which shall include a computation of the distributions of such Limited Partner and the allocation to such Limited Partner of profits or losses, as the case may be; and a reasonable time after the end of each fiscal year of the Partnership, an annual report, which shall include an income statement for and balance sheet of the Partnership as of the fiscal year end.

2. <u>Certain Regulatory Matters</u>. The Partnership believes that it is not an "investment company" under the Investment Company Act of 1940, as amended (the "**Company Act**"). The Partnership, therefore, does not believe it is required, and does not intend, to adhere to certain investment policies under the Company Act.

3. <u>Tax Considerations</u>. The Partnership intends to operate as a partnership for U.S. federal income tax purposes. Accordingly, each Limited Partner of the Partnership will be required to report on his or her own annual tax return such partner's distributive share of the applicable Partnership's taxable income or loss.

4. <u>Foreign Investors</u>. Foreign investors should consult their tax advisors with respect to the U.S. federal and state and the foreign tax consequences of an investment in the Partnership, including the requirements with respect to withholding relative to amounts distributed to such Limited Partners.

**VII. IMMIGRATION RISK FACTORS
AND OVERVIEW OF EB-5 INVESTOR ISSUES**

**A.** **Overview**

Subscribers are directly affected by the U.S. immigration processes summarized below. Subscribers also could be indirectly affected by their failure to obtain or remove conditions from permanent residence and should familiarize themselves with the following information. This summary is not an exhaustive list of immigration considerations and Subscribers are strongly urged to discuss their individual facts and circumstances with immigration counsel.

**SOUTHPORT HOTEL EB-5, LP
PRIVATE PLACEMENT MEMORANDUM
PAGE 16 OF 48**
v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 26 of 214

The "EB-5 immigrant visa" preference category is intended to encourage the flow of capital into the United States economy and to promote employment of workers in the United States.  To accomplish these goals and so that foreign investors may obtain immigration benefits for having made an investment, the program mandates that: (i) foreign investors must make a minimum capital contribution of one million dollars ($1,000,000); (ii) that such minimum capital be deployed exclusively in job creating activities; and (iii) 10 full-time jobs must be created on account of each investor.  In certain rural areas or areas of high unemployment ("**Targeted Employment Area**"), the investment may be as low as $500,000.  The Project in this offering is in a Targeted Employment Area, so a minimum $500,000 investment is required.  Accordingly, investors must subscribe to at least *one (1) Unit*.

In addition to the return that investors hope to achieve on their investment, foreign investors and their qualifying family members are offered the prospect, but not the guarantee, of conditional lawful permanent residence in the United States.  Investors are responsible to apply for the lifting of their conditional status by filing an I-829 petition within two (2) years of receiving conditional status.  Neither the Partnership nor its General Partner is responsible to undertake this process on behalf of any individual investor.

The Offering has been structured so that investors may meet the investment requirements of the EB-5 Program (8 U.S.C. § 1153 (b)(5)(A) - (D); INA § 203(b)(5)(A) - (D) of the Immigration & Nationality Act (the "**Act**")) and qualify under this program to become eligible for admission to the United States of America as lawful permanent residents with their spouses and unmarried, minor children.  The program is administered primarily by U.S. Citizenship & Immigration Services (USCIS), an agency under the U.S. Department of Homeland Security.

Subscribers are subject to **IMMIGRATION RISKS** as discussed in this section and these risks should be carefully considered.

## B. Immigration Risk Factors

A SUBSCRIBER TO UNITS SHOULD CONSULT WITH LEGAL COUNSEL FAMILIAR WITH UNITED STATES IMMIGRATION LAWS AND PRACTICE. PURCHASE OF A UNIT DOES NOT GUARANTEE LAWFUL PERMANENT RESIDENCE IN THE UNITED STATES.  THE UNITS DESCRIBED IN THIS OFFERING MEMORANDUM INVOLVE A SIGNIFICANT DEGREE OF RISK RELATING TO IMMIGRATION MATTERS.  THE FOLLOWING LIST IS AMONG THE IMMIGRATION RISK FACTORS THAT A PROSPECTIVE INVESTOR SHOULD CONSIDER CAREFULLY BUT THIS LIST IS NOT EXHAUSTIVE AND DOES NOT PURPORT TO SUMMARIZE ALL RISKS ASSOCIATED WITH THE PURCHASE OF A UNIT.

1.   General.

While best efforts have been made to structure this Offering so that each investor may meet EB-5 immigrant visa requirements under 8 U.S.C. § 1153 (B)(5)(A) - (D); the Act § 203 (B)(5)(A) - (D) and qualify as "alien entrepreneurs," a preliminary step to becoming eligible for

Exhibit 2 Page 27 of 214

admission to the United States with such investor's spouse and qualifying children as lawful permanent residents, no representations can be made and no guarantees can be given with respect to the ability of this investment to guarantee or otherwise assure that an investor's application will be approved as an "alien entrepreneur," will be granted by USCIS, and will obtain conditional or unconditional lawful permanent resident status.

      2.   <u>Approval of Investments in the Offering</u>.

In adjudicating an EB-5 Petition, which must be filed with USCIS by Unit Subscribers to determine the suitability of the investment offered herein for immigration purposes under 8 U.S.C. § 1153 (B)(5)(A)-(D), INA § 203 (B)(5)(A)-(D), USCIS will be initially examining issues associated with the Project's qualification (unless the I-924 approval includes exemplar approval), may review unfavorably the Subscriber's proof of the source of capital invested, and may deny his or her EB-5 Petition. Investors will risk that USCIS will raise issues, cause delays through requests for evidence or notices of intent to deny, or deny any EB-5 Petition for a wide range of reasons.

      3.   <u>Attaining Lawful Permanent Residence</u>.

Even after approval of an investor's EB-5 Petition, there cannot be any guarantee that such investor or his or her spouse or any of his or her minor, unmarried children will be granted lawful permanent residence. The grant of such immigration status is dependent, among other things, upon the personal and financial history of each applicant. Any one of the several government agencies may determine in its discretion, sometimes without the possibility of appeal, that an applicant for lawful permanent residence is excludable from the United States. In limited instances, a waiver of a ground of exclusion may be available under the law, but adjudications of waiver applications are themselves made in the unreviewable discretion of the government.

      4.   <u>Grounds for Exclusion</u>.

Persons applying for lawful permanent residence must overcome the statutory presumption of inadmissibility. Applicants must demonstrate, affirmatively, that they are admissible to the United States. There are many grounds of inadmissibility that the government may cite as a basis to deny admission for lawful permanent residence. Various statutes, including, for example, Sections 212, 237 & 241 of the Act, the Antiterrorism & Effective Death Penalty Act of 1996 ("**AEDPA**") and the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 ("**IIRAIRA**") set forth grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa, entering the United States or adjusting to lawful permanent residence.

Some examples of aliens precluded from entering the United States include:

(a)    persons who are determined to have a communicable disease of public health significance;

SOUTHPORT HOTEL EB-5, LP<br>
PRIVATE PLACEMENT MEMORANDUM<br>
PAGE 18 OF 48<br>
v. 4 03/04/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 28 of 214

(b)      persons who are found to have, or have had, a physical or mental disorder and behavior associated with the disorder which poses or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur, or to lead to other harmful behavior;

(c)      persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(d)      persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed, or admits committing acts, which constitute the essential elements of same;

(e)      persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude;

(f)      persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

(g)      persons engaged in prostitution or commercialized vice;

(h)      persons who have committed in the United States certain serious criminal offenses, even if such offense was not prosecuted as a result of diplomatic immunity;

(i)      persons excludable on grounds related to national security, related grounds, or terrorist activities;

(j)      persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(k)      persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(l)      persons who are likely to become a public charge at any time after entry;

(m)      persons who were previously deported or excluded and deported from the United States;

(n)      persons who by fraud or willfully misrepresenting a material fact, seek to procure (or have procured) a visa, other documentation, or entry into the United States, or other benefit under the Immigration Act;

Exhibit 2 Page 29 of 214

(o)     persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(p)     certain aliens who have departed the United States to avoid or evade U.S. Military service or training;

(q)     persons who are practicing polygamists; and

(r)     persons who were unlawfully present in the United States for continuous or cumulative periods in excess of 180 days.

5.     <u>No Return of Funds if Petition, Visa or Adjustment of Status is Denied</u>.

Investors might not be able to obtain a refund of their Capital Contribution if their I-526 Petition is denied. While the Partnership may make reasonable efforts in good faith to attempt to identify and subscribe a replacement investor for an investor whose EB-5 Petition is denied, the Partnership might be unable to do so, particularly in the event of a cancellation of the offering or a project-based denial of EB-5 Petitions triggering large-scale obligations.

The $50,000 Administrative Fee will be paid immediately out of escrow to the General Partner, who will use it for various expenses including compensation of marketing agents. If conditions occur giving rise to an obligation of the General Partner to refund some or all of the Administrative Fee, the General Partner may be unable to honor the refund because the funds are irretrievably spent. Such inability may be even more likely in the event of a cancellation of the offering or a project-based denial of EB-5 Petitions triggering large-scale refund obligations.

Even after I-526 Petition approval, USCIS may revoke the petition for "what [it] deems to be good and sufficient cause," a standard which some courts have found to be so discretionary that it is not subject to court review. Petition revocation could result in inability to obtain conditional residence or even to remove conditions on residence.

In the event of cancellation of the offering, the General Partner, in the role of regional center, will notify USCIS of such cancellation, which could cause USCIS to deny or revoke EB-5 Petitions or to deny petitions to remove conditions from residence.

Following EB-5 Petition approval, an investor and his or her spouse and qualifying children must timely apply for an immigrant visa or adjustment to permanent resident status.  As part of that process, such investor will undergo medical, police, security, and immigration history checks to determine whether such investor or his or her spouse and qualifying children are inadmissible to the United States for any of the reasons mentioned above or for any other reason.  The visa or adjustment of status may be denied notwithstanding EB-5 Petition approval and the EB-5 Petition approval can be revoked.

If, following disbursement of the Capital Contribution from the Escrow Account to the Partnership, the EB-5 Petition is denied or revoked, or such investor or his or her spouse or any

25     25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 29 of 214

Exhibit 2 Page 30 of 214

of his or her children are denied a visa for conditional lawful permanent residence, denied adjustment of status to conditional lawful permanent residence, or denied removal of conditions from residence, such action will not entitle the investor to the return of the Capital Contribution or Administrative Fee paid to the Partnership or its affiliates.

In the event of denial of the I-526 Petition, upon written request of the Subscriber affected by such denial to transfer his or her Unit(s), the Partnership will use reasonable efforts to find a replacement investor and in the event such replacement investor is found, the denied investor shall be permitted to transfer his or her Unit(s) to the replacement investor. Only a portion of the Administrative Fee will be refunded under such circumstances.

There is no assurance however that the Partnership will be successful in identifying a substitute investor, so investors may not receive a refund even if they are unsuccessful in obtaining permanent resident status.

      6.   <u>Conditional Lawful Permanent Residence</u>.

Lawful permanent residence status granted initially to an investor, his or her spouse and his or her qualifying children is "conditional"; such investor, his or her spouse, and his or her qualifying children must seek removal of conditions before the second anniversary of lawful permanent admission to the United States. There cannot be any assurance that the USCIS will consent to the removal of conditions as to such investor, his or her spouse, and his or her qualifying children, each of whom must make a separate application to remove conditions. If such investor fails to have conditions removed, such investor, his or her spouse and his or her qualifying children will be required to leave the United States and may be placed in removal proceedings. Even if an investor succeeds in having conditions removed, his or her spouse and qualifying children, separately, must have conditions removed. Failure to have conditions removed as to an investor or an investor's family may require the investor to depart from the United States and such family members of the investor may be placed in removal proceedings. Examples of possible reasons for denial of an investor's petition to remove conditions from permanent residence include but are not limited to:

- failure to maintain such investor's investment for the required two years, such as through some kind of distribution or return of such investor's capital before the time for removal of conditions on such investor's residence, even if 10 jobs were created through the investment;

- failure of the Project to use all of the investor's invested capital in job creating activity at risk to such investor, according to technical requirements of USCIS (some of which are not clearly articulated and which could change over time), even if 10 jobs were created;

- failure of the Project to show that the investor's investment has created 10 new jobs for U.S. workers that can be allocated to such investor (which may result from failure to

Exhibit 2 Page 31 of 214

meet the Project's economic milestones that were used as assumptions in projection of the indirect jobs that would be created by the investor's investment); and

- even if the required 10 jobs were created, the Project's material departure from the business plan presented to USCIS in obtaining the investor's initial EB-5 Petition approval.

       7.   <u>Limited Regulations Regarding Removal of Conditions</u>.

USCIS regulations governing lawful permanent residence for investors do not state specifically all the criteria that USCIS must apply to determine eligibility for the removal of conditions to lawful permanent resident status. Courts have determined some standards to be followed by USCIS in some, but not all, circumstances. The Partnership may make certain management decisions in the absence of these specific eligibility criteria. The Partnership will seek as much information as possible from USCIS in an effort to assist investors in qualifying for the removal of conditions, where good business practices permit. This notwithstanding, each investor should become educated about the standards that will determine eligibility of an investor, and the spouse or qualifying children of the investor, to achieve unconditional lawful permanent residence in the United States pursuant to this program which currently is in a state of evolution.

       8.   <u>Numerical Quotas and Related Delays</u>.

Currently, ten thousand (10,000) EB-5 immigrant visas are allocated annually to alien investors, and the spouse and qualifying children of the investor, of which 3,000 are currently reserved for regional centers. EB-5 status is available on a first-come, first-served basis. If more visas are sought than are available, a delay in the availability of EB-5 lawful permanent resident status will result. There is no reliable means to predict if such a delay will occur or, if it occurs, how long an investor, or the spouse and qualifying children of the investor, will wait before visa status for them becomes available. Also, the availability of current EB-5 immigrant visas may end; the number of available EB-5 immigrant visas may decrease or increase; or the time it takes to acquire EB-5 status may increase significantly, regardless of numerical quotas. Other changes in the administration of the visa preference system may affect and even preclude the ability to obtain a visa for lawful permanent residence or to adjust to lawful permanent residence. Delay of visa availability or other processing to conditional residence will have the effect of delaying the date on which the investor and family must file a petition to remove conditions from residence. Such delay extends the period during which the investment enterprise has to create the jobs needed to be shown by the investor for removal of conditions from residence, but it also delays the date to which jobs created and to be counted might need to remain in existence in the event that USCIS refuses to credit jobs created but subsequently lost.

Exhibit 2 Page 32 of 214

9.      Active Participation in the Partnership's Business.

The EB-5 Program requires that an applicant is actively involved in the business affairs of the Partnership.  An investor's failure to be actively involved may jeopardize an investor's EB-5 Petition approval or result in the denial of lawful permanent residence status for such investor, his or her spouse, and his or her qualifying children.  The Partnership Agreement, reflecting the EB-5 regulations governing what level of participation is acceptable to meet the EB-5 criteria, mandates that each investor shall participate in the management of the Partnership only to the extent reflected therein.  The right to have policy input into certain decisions of the Partnership, as set forth in the Partnership Agreement, is expected to be sufficient to meet these requirements, but there is no guarantee that USCIS will not find otherwise.

10.      Risks Attendant to the EB-5, Fifth Preference Visa Status.

The EB-5 Program has many requirements that must be met to the satisfaction of USCIS. The failure to meet even one of these requirements to the satisfaction of USCIS may result in the denial or revocation of an EB-5 Petition.

11.      Family Relationships.

(a)      The spouse of an investor may accompany or follow to join an investor who has been granted conditional lawful permanent residence, provided that the investor and his or her spouse (deemed a "derivative beneficiary") were married at the time of the investor's first admission to the United States as a conditional lawful permanent resident or following adjustment of status to lawful permanent residence.  USCIS will not recognize common law marriages for the purpose of permitting a spouse to be a qualifying derivative beneficiary.  If the relationship is one of common law, the "spouse" of the investor may not acquire lawful permanent resident status on account of the relationship.

(b)      Children or step-children of an investor may accompany, or follow to join, an investor who has been granted conditional lawful permanent residence, provided that the investor can establish parentage or step-parentage at the time of the investor's first admission to the United States as a conditional lawful permanent resident or adjustment of status to lawful permanent residence.  Failure to comply with all applicable requirements may result in the separation of a child from the investor or the investor's spouse for protracted periods, in some instances for years, while other immigration opportunities are attempted in an effort to reunite the family.

(c)      A "child" is someone under the age of 21 years who is unmarried.  If a child becomes age 21 or marries before being admitted to the U.S. as a lawful permanent resident or adjusting to lawful permanent resident status, the former child, now deemed a son or daughter may not be eligible to accompany or follow to join the investor.  In some circumstances, the Child Status Protection Act may assist a son or daughter to qualify as a child by reducing the deemed age of the son or daughter to less than 21 years.  Marriage of the child, or failure to meet the requirements of the Child Status Protection Act, may result in the separation of a son or

Exhibit 2 Page 33 of 214

daughter from the investor or the investor's spouse for protracted periods, in some instances for years, while other immigration opportunities are attempted in an effort to reunite the family.

(d)    Under some circumstances, a child who becomes 21 years of age or marries while holding conditional lawful permanent resident status may remain eligible to remove conditions. Failure to meet qualifying conditions, most of which are not within the child's control, will result in the child being placed in removal proceedings and may require the child to depart the United States.

(e)    Upon the death of an investor before conditions are removed, a spouse and qualifying children of the investor are entitled to seek removal of conditions by submission of the same evidence demonstrating compliance with required criteria that USCIS requires of an investor seeking to remove conditions.  Failure of each member of the family to establish these criteria will result in the denial of the application to remove conditions, placement of the family members in removal proceedings, and their mandated departure from the United States.

(f)    It is unclear under USCIS procedures if a child who becomes a son or daughter before the death of the investor is entitled to seek removal of conditions.  USCIS regulations are silent on this matter.  If USCIS does not extend this benefit, such a son or daughter may be denied an application to remove conditions, will be placed in removal proceedings, and may be mandated to depart the United States.

12.    <u>TEA Determination</u>.

The Project is currently located in a Targeted Employment Area ("**TEA**") so, at this time, an investment of $500,000 will be required for investors to qualify under the EB-5 Program.  If an official determination is subsequently made that the Project is not located in a Targeted Employment Area, an investment of $1,000,000 will be required for investors who subscribe following such designation.  There is no certainty that the TEA designation will be approved until there is a final review and determination made in adjudicating each investor's EB-5 Petition.  Even if USCIS initially found the Project to be located in a TEA, it is subject to further review.

13.     <u>Delays in Project Development</u>.

Delays in the development of the Project could result in jobs not being created timely enough in accordance with applicable EB-5 Program guidelines.

14.    <u>Insufficient Number of Investors</u>.

Regional center designations are based on the full investment of many different investors in a single project.  Although some regional centers' projects are in great demand and even have waiting lists, that is not the case with all regional centers. If the Partnership does not attract a sufficient number of investors, the Project may not happen or may be delayed, which could result in the original investors being unable to remove conditions.

29    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 33 of 214

Exhibit 2 Page 34 of 214

15. <u>Regional Center Designation Changes.</u>

Regional center designation can be re-visited by USCIS when the business assumptions utilized in the econometric model are not realized. An I-526 petition may be approved based upon an economist's report using a recognized econometric model to predict the number of indirect and induced jobs that will be created based upon a specific dollar investment in a specific project in a specific geographical area in a specific industry in a specific timeframe with a specific number of tenants and other specific foundation facts. Although USCIS should not second guess the econometric report at the I-829 stage, USCIS will want proof that the assumptions relied upon in the report have actually occurred. If they have not occurred because of economic conditions, change of plans, construction delays, etc., investors are at risk that the condition removal petition will not be approved.

16. <u>Loss or Denial of Regional Center Designation.</u>

SFRC is an approved regional center, but a regional center may lose certification.[10] USCIS is in the process of developing standards to review regional centers. The results of any review process could lead to regional center decertification, which could result in loss of permanent residence or refusal to remove conditions for investors associated with that regional center.

17. <u>Adjudication that Investment is not "At-Risk".</u>

In order for an investor's EB-5 Petition to be approved, the investor's investment must be "at risk." If adjudication is made that the funds are not truly at risk at either the EB-5 Petition or I-829 petition stage, the EB-5 Petition will be denied. Although there can be no guaranteed right of redemption or specific return, some regional center investments are more risky than others; some have a greater chance of the investor getting his money back with some rate of return; and some are more speculative investments. Under the EB-5 Program, the investor is allowed to receive return of the investment money if the EB-5 Petition is not approved, but it is USCIS' position that there can be no guarantee of redemption of the investment if the I-829 petition is not approved.

18. <u>Risks Inherent in the Nature of the Adjudicating Agency.</u>

Even if none of the contingencies occurs, the investor is subject to the risk inherent in the nature of the adjudicating agency. It is not unusual for there to be contradictory adjudicatory results on identical projects. Often very complicated financial transactions are being adjudicated by immigration examiners with little or no financial background and with relatively minimal training. This can lead to – and has led to – decisions on individual petitions that may be difficult to comprehend. In addition, the agency has been known to adopt restrictive positions and change those positions without notice in the EB-5 area.

---

10 This sentence has been amended to reflect approval of the regional center.

30    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 34 of 214

Exhibit 2 Page 35 of 214

19.    Expiration of the Regional Center Program.

The regional center program was first created in 1992.  Since then it has been extended, most recently through September 30, 2015.  The Partnership relies on the regional center program so that employment created indirectly by investments in the Project may be counted towards the minimum number of jobs needed to qualify an investor, the investor's spouse, and the qualifying children of the investor to have conditions removed.  USCIS has indicated that an investor who obtains conditional residence before the next expiration of the regional center legislation will not be affected, and the investor's petition to remove conditions from permanent residence may be approved even after a legislative expiration.  It is expected that the investors in this project will obtain permanent residence long before September 30, 2015.  However, it is possible that USCIS could change its position after expiration of the legislation on September 30, 2015.  There is not reliable means to know if the regional center program will be further extended or made permanent.

20.    Change in Laws and Interpretations.

The immigration laws and the corresponding rules, regulations and USCIS interpretations related to the EB-5 program and the corresponding applications are in a constant state of flux, and there are no assurances that new laws and/or interpretations will result that will otherwise modify the disclosures and information set forth in this Memorandum.

**C.    The EB-5 Petition Process**

For investors seeking lawful U.S. permanent residence, the first step in the process is to file an EB-5 Petition, together with accompanying evidence in support of the program's requirements.  Subscribers must refrain from filing their EB-5 Petitions until their subscription is accepted and must file such Petitions promptly after acceptance.  USCIS adjudicates EB-5 Petitions by reviewing these criteria, among others:

1.    New Commercial Enterprise.

There must be evidence that shows that the enterprise is new, and authorized to transact business in the regional center's territory under the applicable terms and conditions of the EB-5 Program.

2.    Investment Capital.

The EB-5 Petition must be supported by evidence that the petitioner has invested the minimum required capital.  USCIS expects these funds to be in the U.S. and "at risk," connoting an irrevocable commitment to the enterprise.  The funds must be used by the enterprise exclusively to create employment.  Funds used to pay administrative costs or other obligations undertaken to promote the investment in the enterprise are not deemed "at risk."

Exhibit 2 Page 36 of 214

3. _Source of Capital_.

Evidence must support the legal acquisition of capital. Funds earned or obtained in the United States while the investor was in unlawful immigration status are not deemed to be lawfully acquired. If funds are not lawfully acquired, they may not be deemed "at risk."

4. _Managerial Role_.

The investor is expected to participate in the management of the new enterprise by assisting in the formulation of the enterprise's business policy and as otherwise set forth in the Partnership Agreement. Investors in an EB-5 enterprise must have all the rights and duties usually accorded to limited partners under the Revised Uniform Limited Partnership Act for the State of Washington. The rights of the Limited Partners under the Partnership Agreement are consistent with rights normally granted to limited partners under this Act.

5. _Employment Creation_.

There must be evidence that, as of the end of the two-year period of each EB-5 investor's conditional residence (deemed and projected by USCIS to be 2.5 years after adjudication of the EB-5 Petition), 10 full-time jobs will be created on account of each EB-5 investment. See the discussion below about qualifying jobs and investment in a regional center, which may permit counting employment created outside the qualifying enterprise.

## D. **Regional Center**

In further support of the EB-5 visa preference program, the U.S. Congress created a Program that provides for the authorization of regional centers by USCIS. Enterprises located within a regional center are not required to directly employ 10 workers for each EB-5 qualifying investment. It suffices if the investor demonstrates that at least 10 qualifying jobs will be created directly or indirectly on account of the investment.

SFRC has been approved by USCIS with an approved exemplar. The Project is believed to be a qualifying investment, and within the geographic scope, industry designation, and economic methodology for the approved regional center and exemplar.[11] An investment in a commercial enterprise situated within this regional center that fosters economic expansion through increased exports, greater regional productivity, job creation, or additional domestic capital investment qualifies for the broader ("direct or indirect") view of job creation.

## E. **Approval of EB-5 Petition Not Guaranteed**

The EB-5 Petition will be approved only if USCIS is satisfied that the foregoing criteria have been met. The determination of whether these criteria have been established is within the discretion of USCIS. It is also within the power, if not the discretionary authority, of USCIS to seek information about other aspects of the investment and the relationship of the investor to the enterprise. USCIS frequently reinterprets the meaning of qualifying criteria. There can be no

---

11 This paragraph has been updated to reflect the approval of the regional center and project.

Exhibit 2 Page 37 of 214

certainty that compliance with the foregoing criteria, supported by appropriate documentation, will lead to the EB-5 Petition's Approval.

If USCIS denies the EB-5 Petition, the investor may not proceed with the next step in the immigration process, which is consular processing or adjustment of status. Instead, the investor must decide whether to appeal the denial of the EB-5 Petition at his or her own cost and expense with consent of the General Partner or abandon the prospect of investing in the Partnership and obtaining lawful permanent resident status thereby.

### F.    Consular Processing or Adjustment of Status

Approval of the EB-5 Petition means that the alien and the alien's spouse and children under the age of 21 years may apply for admission as conditional lawful permanent residents ("**CLPR**"). Approval of the EB-5 Petition does not mean that the investor has been granted admission to the United States as a lawful permanent resident. Approval means that the investment documented by the EB-5 Petition has qualified the investor as an alien entrepreneur.

The application for admission is a separate and subsequent process that concerns issues common to all aliens who wish to live in the United States permanently. Admission as a CLPR may be sought using one of two methods: (1) consular processing or (2) adjustment of status.

### G.    Consular Processing

Consular processing is designed for aliens who are living outside of the United States, who prefer to process at a consulate for strategic reasons or as a matter of convenience or are ineligible to adjust status. Typically, the consular post, which is chosen at the time the EB-5 Petition is filed, is in the country of last residence (i.e., the last principal actual dwelling place). In very limited instances, usually involving a recognized hardship, a different consular post may process for lawful permanent residence.

Before issuing an immigrant visa, the consular post must determine if each alien is admissible to the United States. EB-5 Petition approval does not by itself establish admissibility. An alien is admissible if he or she proves that no grounds of inadmissibility exist and the alien has proper travel documents. See the discussion on "**Immigration Risk Factors**" above for a list of many of the grounds of inadmissibility. Waivers are available for certain grounds of inadmissibility, but the grant of a waiver is in the discretion of the government, and aliens seeking waivers experience lengthy delays in adjudication of waiver applications. Subscribers should consult with independent immigration counsel to determine if any grounds of inadmissibility may affect the investor's admission or the admission of the investor's spouse or qualifying children to the United States.

If the consular post finds that the investor is admissible, it will issue a CLPR visa to the investor. The consular post will also determine if the spouse and the qualifying children of the investor are admissible. A determination of admissibility must be made as to each visa applicant. There is

Exhibit 2 Page 38 of 214

no guarantee that an investor or the investor's family will be granted a CLPR visa. If the investor is denied a CLPR visa, applications by the spouse and qualifying children of the investor for such a visa will be denied.

Consular processing begins when USCIS transmits the EB-5 Petition approval to the National Visa Center ("NVC") of the Department of State. At appropriate intervals, the NVC issues instructions and appointment packages and requests required documents and information. In time, the alien will be instructed to provide fingerprints and a physical examination and to report to a consular interview. CLPR visas usually are issued shortly after the interview unless the consul detects problems in the visa application, the underlying EB-5 Petition, or during the interview process. Visa applicants should allow about twelve months to complete consular processing, although times for processing vary greatly among consular posts.

**H.      Visa Issuance Not Guaranteed**

Decisions by consuls are discretionary and unreviewable. Consular officers may question USCIS' approval of an immigrant petition and return it to USCIS for possible revocation. Consular officers may find a visa applicant inadmissible or may find that the applicant has failed to submit sufficient evidence to establish admissibility. These and other factors that a consul may, with unreviewable discretion, elect to consider could result in the denial of a visa.

Visa applicants should not change any living, employment, schooling, or other lifestyle arrangements in their country of residence before they are issued a CLPR visa based upon an approved EB-5 Petition.

**I.      Admission After CLPR Visa Issued Not Guaranteed**

After issuance, CLPR visas remain valid for six (6) months. During this period, the holder of the visa must use it to apply for admission to the United States at a designated port of entry. The port of entry is frequently in an international airport. When the alien arrives at the port of entry, he or she will present the CLPR visa to a Customs and Border Protection officer who has the authority to admit the investor to the United States as a CLPR. This process is known as "inspection." Generally, possession of a valid immigrant visa will result in an admission unless the inspecting officer suspects fraud, the alien's travel documents are not in order, or the alien has become inadmissible in the time between the date of visa issuance and the date admission is sought. Possession of a CLPR visa does not guarantee admission to the United States.

**J.      Adjustment of Status**

The Adjustment of Status ("AOS") procedure is designed to permit aliens who have been admitted to the United States as non-immigrants or who have been paroled into the country to apply for admission as permanent residents without leaving the country. These non-immigrants must establish that they are admissible permanently, meeting the same standards as aliens who

Exhibit 2 Page 39 of 214

use consular processing to obtain a permanent resident visa. See the discussion above on Consular Processing and the section entitled "**Immigration Risk Factors**."

Aliens seeking AOS must also comply with requirements peculiar to the AOS process. Aliens who do not meet these additional requirements will be required to use consular processing to obtain a CLPR visa, which will necessitate a departure from the United States. Aliens admitted in certain non-immigrant statuses may encounter more difficulties (and may not be successful) adjusting their status than aliens admitted in other non-immigrant statuses. Subscribers should consult with immigration counsel regarding these issues before the EB-5 Petition is filed.

An alien investor, or the investor's spouse or qualifying children who are eligible for CLPR, may not be eligible for AOS for many reasons, including if they: (1) were employed in the U.S. without authorization; (2) were not in lawful status on the date their AOS application was filed or if they failed to maintain lawful status thereafter; (3) were ever out of status during earlier admissions to the U.S.; (4) are admitted in certain non-immigrant statuses, such as "A", "G" or "J" (unless the two-year foreign residency requirement does not apply or a waiver of the requirement has been obtained); (5) have been in removal proceedings in the ten years prior to seeking AOS; (6) were admitted under the visa waiver program at the time AOS is sought; or (7) obtained CLPR as the spouse of a U.S. citizen or as the son or daughter of a spouse of a U.S. citizen and have not abandoned this CLPR prior to seeking AOS; or (8) are inadmissible. There may be additional reasons why an alien may not adjust status, which is a benefit granted at the discretion of USCIS.

Subscribers should consult with immigration counsel to determine if they, their spouse, and their qualifying children are eligible for AOS.

During AOS processing, the applicant will be required to submit to a medical examination and will receive instructions from USCIS regarding biometric data collection and an interview. The interview may be waived by USCIS, but the waiver should not be expected. USCIS uses profiling information to determine who will be interviewed and it also interviews some AOS applicants to maintain the integrity of its screening process. There is no formal process to request the waiver of an interview. If the investor is interviewed, the spouse and qualifying children of the investor also may be required to attend the interview.

**K.      Travel During Adjustment of Status Processing**

An alien investor who leaves the United States without advance permission while an AOS application is pending is deemed to have abandoned that application unless the applicant has been admitted in, and continues to hold, valid H or L non-immigrant status pending adjudication of the AOS application. Alien investors admitted to the United States in any non-immigrant status who have obtained Advance Parole during the AOS process should consult with immigration counsel before traveling. Re-admission to the U.S. using the Advance Parole document may jeopardize the non-immigrant status of the alien's family members who did not travel. The consequences, if any, of this situation should be examined prior to travel.

35      25-80007-FPC      Doc 15-2      Filed 02/19/25      Entered 02/19/25 15:21:59      Pg 39 of 214

Exhibit 2 Page 40 of 214

**L.     Employment During Adjustment of Status Processing**

Applicants for AOS who wish to work in the United States must obtain employment authorization unless they have been admitted to the U.S. in a non-immigrant status that confers employment authorization that does not end before AOS is granted.  Self-employment requires employment authorization.

Employment authorization applications currently take 60-90 days to be adjudicated. Processing times may be longer if an applicant is subjected to an extended background check. Employment authorization is usually granted during the time required to complete the AOS process, but not longer than one year.  It may be necessary to re-apply for employment authorization if the AOS process is not completed within a year.  To avoid a lapse in employment authorization, re-applications should be made sufficiently in advance of the expiry of existing authorization. Employment without authorization at any time in the U.S. is a violation of immigration status and may jeopardize the right to adjust status.

**M.     Adjustment of Status Cannot Be Guaranteed**

AOS is granted at the discretion of USCIS and the decision is unreviewable.  An alien whose AOS application has been denied may request that the case be re-opened or re-considered by the same office that denied the AOS.  If the request to re-open or re-consider the case is denied or, if after such a review, the alien fails to convince this office to reverse its original decision, the alien may renew the AOS before an immigration judge.

Aliens admitted in unexpired non-immigrant status who are denied AOS or CLPR are usually entitled to remain in the U.S. in that status and may seek an extension of that non-immigrant status or seek a change to a different non-immigrant status for which they are qualified.  At such time as the alien's non-immigrant status expires, the alien is expected to depart the U.S.  If at the time of the denial of AOS, the alien's non-immigrant status was expired, the alien is expected to depart the U.S.  Failure to depart timely is a violation of U.S., immigration law and regulation, which may affect the ability of the alien to qualify for future immigration benefits.

If an alien investor is admitted to the U.S., in a non-immigrant status (pending AOS), the spouse and children of the alien investor are frequently admitted for a time coincident with the authorization of the investor to remain in the U.S.  If AOS is not granted to the alien investor and the investor's non-immigrant status expires, the status of the spouse and children will be deemed to have expired at the same time.  They, too, will be expected to depart the U.S. at that time.

AOS applicants should not make any permanent connections to the United States or change any permanent living, employment, schooling, or other lifestyle arrangements in their country of residence before they are issued AOS based upon an approved EB-5 Petition.

Exhibit 2 Page 41 of 214

**N.   Removal of Conditions**

Approval of an AOS application or the grant of an immigrant visa, followed by entry into the U.S. in EB-5 status, means that the investor and the spouse and qualified children of the investor have been granted CLPR for two years.  The "conditions" must be removed so that the aliens may reside in the U.S. indefinitely.  Failure to remove the conditions results in the termination of CLPR status and will likely result in the commencement of removal (deportation) proceedings.

Removal of conditions is sought by the filing of a petition in the 90-day period immediately preceding the second anniversary of the grant of CLPR status.  In support of the petition, the alien investor must demonstrate full investment in the enterprise and compliance with the requirement that 10 jobs have been created as a result of the investment.  The investor must also demonstrate maintenance of the investment continuously since becoming a CLPR.  The General Partner will provide documentation, upon request by an investor, as reasonably necessary and available in support of such investor's application for removal of conditions.

USCIS currently has jurisdiction to decide a petition to remove conditions.  It is authorized to approve a petition, seek additional written information before deciding the petition, refer the petition to a local office where information will be elicited in an interview, or, it may deny the petition.  If the petition is referred for an interview, the local office of USCIS may decide the petition after the interview.

During the pendency of the petition, aliens admitted in CLPR Status remain in valid status even if the petition is not decided before the expiry of the two year period of admission.  CLPR is extended in one year increments or until the petition to remove conditions is adjudicated.  Unfortunately, some USCIS offices have been reluctant to extend CLPR status, presumably in ignorance of the law.  Aliens have also experienced difficulty obtaining advance permission to travel during this period.  This difficulty is not experienced in all instances and it may abate as local USCIS offices become more familiar with the law.  Delays and improper denials of documents evidencing extended CLPR status and Advance Parole cannot be ruled out. Denial of such documents does not end the lawful status granted by statute.

**O.   Removal of Conditions Not Guaranteed**

There cannot be any assurance that USCIS will not change the requirements for removal of conditions after investors are granted CLPR status through investment in the Project.  There cannot be any assurance that an investor will be able to demonstrate to the satisfaction of USCIS that the Project is operating within its business plan, that it has created the requisite jobs at the time required by USCIS, or that any other requirements for the removal of conditions have been met.

37   25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 41 of 214

Exhibit 2 Page 42 of 214

## VIII.   RISK FACTORS

THE PURCHASE OF UNITS INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO CAN BEAR THE RISK OF LOSS OF THEIR ENTIRE INVESTMENT AND WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT.  IN ADDITION TO ALL OTHER INFORMATION SET FORTH ELSEWHERE IN THIS MEMORANDUM, INCLUDING THE EXHIBITS HERETO, A PROSPECTIVE INVESTOR SHOULD CAREFULLY CONSIDER THE FOLLOWING RISKS, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX, AND FINANCIAL ADVISORS WITH RESPECT THERETO, BEFORE MAKING A DECISION TO PURCHASE UNITS.   THE ORDER IN WHICH THE FOLLOWING RISKS ARE PRESENTED DOES NOT CORRELATE TO THE MAGNITUDE OF THE RISKS DESCRIBED.  FURTHERMORE, THE FACT THAT THE FOLLOWING RISK FACTORS ARE ENUMERATED IN NO WAY IMPLIES THAT THESE ARE THE ONLY RISK FACTORS ASSOCIATED WITH THIS INVESTMENT AND ARE MERELY ILLUSTRATIVE OF THE TYPES OF RISKS INVOLVED IN THIS TYPE OF INVESTMENT.

### A.   Risks Related to the Partnership's Proposed Business

1.   The Project has no Operating History.  The success of the investment will be directly dependent upon the Borrower's timely repayment of the Loan.  Such timely repayment of the Loan is dependent upon the Project's success and Borrower's business operations.  The Partnership, the General Partner, and the Borrower were recently organized and have a limited history of operation upon which investors can evaluate their likely performance.  The Project, therefore, should be considered in its development stage, and its operations are subject to all of the risks inherent in the establishment of a new business enterprise including, but not limited to, hurdles or barriers to the implementation of its business plans.  Further, because there is a limited history of operations, there is also a limited operating history from which to evaluate the General Partner's or Borrower's ability to manage the operations and achieve their goals or the likely performance of the Project.  No assurances can be given that the Project can operate profitably.

2.   Limited Partners Will Bear a Significant Financial Risk.  Purchasers of Units will be providing a significant portion of the risk capital to the Partnership and will be investing at a time when the success of the Project remains uncertain.  Accordingly, Limited Partners will incur substantially all of the capital risk related to the Project.

3.   The General Partner, Partnership and their other Affiliates will be Subject to Conflicts of Interest.  The General Partner of the Partnership has  total control over the operation of the Partnership and its cash distributions.  The General Partner, Partnership, and Borrower are related parties and have total control over the cash distributions and could affect the Loan's potential repayment.  This could result in one or more conflicts of interest between the interests of the Limited Partners and the General Partner and other affiliates of the

38    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 42 of 214

Exhibit 2 Page 43 of 214

Partnership, or the Regional Center. The potential conflicts of interest include, but are not limited to, the following:

(a)     The General Partner, Borrower, and/or other affiliates of the Partnership or Borrower are not prohibited from acquiring and operating other projects for their own respective accounts, provided same is not directly competitive with the Project.

(b)     The General Partner, Borrower, and/or other affiliates of the Partnership or Borrower will not be required to disgorge any profits or fees or other compensation they may receive from any other business they own separate from the Project and operate for their own benefit, and Limited Partners will not be entitled to receive or share in any of the profits, return, fees, or compensation from any such other business.

(c)     The General Partner, Borrower, and/or other affiliates of the Partnership or Borrower are not required to devote all of their time and efforts to the affairs of the Project, and this could result in a conflict of interest for the time and attention of the General Partner and such other affiliates.

(d)     The Project, the Partnership, and the prospective investors have not been represented by separate counsel in connection with the formation of the Partnership, the drafting of the Partnership Agreement, Subscription Documents, this Offering, or the Loan Documents.

4.     <u>The Partnership's Success is Wholly Dependent Upon the Timely Repayment of the Loan by the Borrower, Which is Dependent on the Successful Implementation of the Business Plan</u>.  The success of the Partnership will largely depend upon the Borrower's success in implementing the Project's business plan.  There can be no assurance that the Borrower will be able to successfully implement the business plan, or carry out that business plan as circumstances require.  The Borrower may require additional financing to implement its business plan.  <u>If conflicts arise between information presented in the Partnership's business plan and the Memorandum, the information in this Memorandum will prevail.</u>

5.     <u>The General Partner's Liability will be Limited</u>.  Unless fraud, deceit, or a wrongful taking is involved, the General Partner shall not be liable or obligated to any Limited Partner or the Partnership for any mistake of fact or judgment made by the General Partner in managing and carrying out the purposes, business and affairs of the Partnership, including all matters relating to the immigration results or consequences to any Limited Partner, that result in any loss, liability, or damage to the Partnership or its Partners.  Moreover, the Partnership shall indemnify the General Partner, its agents, owners, members, officers, and directors, and each of their affiliates, will not be liable to the Partnership or any Limited Partners for any damages, losses, liabilities, or expenses (including reasonable legal fees, expenses, and related charges and costs of investigation) unless one of those parties is guilty of fraud, deceit, gross negligence, or willful misconduct.  Thus, Limited Partners will have limited recourse against those parties.  The Partnership Agreement also provides that the Partnership will indemnify, hold harmless, and waive any claim against the General Partner, its agents, and its affiliates, for any and all losses, damages, liability claims, causes of action, omissions, demands and expenses, or any

39     25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 43 of 214

Exhibit 2 Page 44 of 214

other act or failure to act arising from or out of the performance of their duties to the Partnership under the Partnership Agreement or as a result of any action which the General Partner and/or their designated agents are requested to take, or refrained from taking, by the Partnership unless such loss has arisen as a result of their negligence or willful or wanton misconduct.

6.  <u>The Partnership will have no Diversification of its Investment</u>.  The Partnership will only invest its capital in providing financing to the Borrower; thus the Partnership's capital will not be diversified.  The Partnership's portfolio will not be as diversified among a wide range of types of securities, countries or industry sectors as other investment vehicles.  Accordingly, the investment portfolio of the Partnership may be subject to more rapid change in value than would be the case if the Partnership were required to maintain a wider diversification among types of securities and other instruments.

7.  <u>Susceptibility to Weather Hazards; Uninsured Losses</u>.  The Borrower has obtained insurance which is customarily obtained for similar properties.  However, there are certain types of losses (generally of a catastrophic nature, such as earthquakes and wars) which are either uninsurable or may from time to time not be economically insurable.  Should such an accident or disaster occur to the Project, the Partnership could lose a portion or all of its invested capital and anticipated income from the Project and the Partners could lose their entire investment.

8.  <u>Distributions by the Partnership are Not Guaranteed</u>.  Payment of distributions and the amounts thereof will be dependent upon returns received by the Partnership from the successful Capital Event and resulting repayment of the principal and interest on the Loan by the Borrower.  The Loan will be secured by an interest in the Project and assignment of leases and rents.  No assurances can be given that the full amount of the Loan will be repaid by the Borrower when due; that the collateral for the Loan will yield sufficient funds for the Partnership to recover the amount of any unpaid principal or the interest on the Loan in the event that the Borrower defaults on the Loan; or that a Capital Event and subsequent operations by the Borrower can generate sufficient revenues to provide the Borrower with an adequate source for payment of the Loan.  No assurances can be given that the Borrower or Partnership will operate profitably or be able to declare and pay any distributions to the Limited Partners, or that Limited Partners will earn a positive return on their investment or receive a return of any or all of their investment.

**B.**   **<u>Special Risks Associated with the Project</u>**

1.  <u>Permit Approvals</u>.  Although the Borrower has obtained, or intends to obtain or cause to be obtained, all required permits as set forth in the business plan to develop the Project in accordance with the Business Plan, there are no assurances that the business plan may not have to be modified and, accordingly, that additional or modified permits will need to be obtained.

2.  <u>Timing of Completion</u>.  Included in the Business Plan at **Exhibit C** is a time schedule for the completion of improvements, acquisition of equipment, and substantial

Exhibit 2 Page 45 of 214

stabilization of the Project. There are no assurances that such time schedule can be satisfied, and if the timing for the completion of development is delayed by any significant degree, then the cost of developing the Project will increase accordingly. In addition to economic consequences of delays, the inability of the Borrower to create the necessary number of new jobs within the time frame necessary for the investors' removal of conditions from U.S. permanent residence could jeopardize their continued residence in the U.S., as described above concerning immigration risk factors.

3. <u>Cost Overruns</u>. Cost overruns may be encountered as a result of numerous factors, including not only the delay in the development process, but also the failure of certain contracted parties to complete their work in accordance with the contracted amount, necessitating the substitution of subcontractors and potential increases in pricing. Furthermore, unforeseen issues may be encountered that otherwise will require an increase in the development budget that have not otherwise been reserved for in the contingency fund.

4. <u>Failure to Raise Financing</u>. The budget for funding the Project includes no allowance for alternative financing. The Partnership believes that it will successfully raise all of the additional capital necessary from EB-5 investors to fund the Project. It is possible, however, that the Partnership will fail to raise sufficient capital, or that the proceeds from this Offering, plus capital available from alternative sources, will be inadequate to satisfy all capital requirements, or that such financing may be untimely received, requiring the Partnership to obtain alternative financing, including short and long term debt financing, or equity financing, in addition to this Offering. The terms of such alternative financing arrangements may be better or worse for the Partnership than the terms of this Offering, and may result in subsequent investors having superior rights to Subscribers in this Offering. Failure to obtain necessary financing when needed could result in failure of the Project, loss of all investment funds, and denial or revocation of U.S. immigration benefits for the investor and family.

5. <u>The Investment in the Project is Speculative</u>. The Partnership's investment in the Project will be subject to the risks generally incident to the ownership of real property, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; excessive building resulting in an over-supply; relative appeal of particular types of properties to tenants, lenders and investors; reduction in the cost of operating competing properties; decrease in employment, reducing the demand for properties in the area; the possible need for unanticipated renovations; adverse changes in interest rates and availability of mortgage funds; changes in real estate tax rates and other operating expenses; changes in governmental rules and fiscal policies, acts of God, including earthquakes, which may cause uninsured losses; the financial condition of tenants of the Project; environmental risks; condemnation of the Project and other factors which are beyond the control of the Partnership and the General Partner. Liquidation or dissolution of the Partnership may be delayed until all purchase money loans which the Borrower may extend to a buyer of the Project is repaid or sold. Decreases in actual rental income from expected amounts, or increases in operating expenses, among other factors, could result in the Borrower's inability to meet all its cash obligations. Any decrease in rental income received by the Borrower

Exhibit 2 Page 46 of 214

following a Capital Event may reduce, and possibly eliminate, the amount of cash available for distribution to the Partners, since operating expenses, such as property taxes, utility costs, maintenance, and insurance are unlikely to decrease significantly, and other expenses such as advertising and promotion may increase. If the income from the Project is not sufficient to meet operating expenses or debt service, the Borrower may have to dispose of the Project on disadvantageous terms in order to raise needed funds.

      6.   <u>The Partnership's Investment is Illiquid</u>.  The Project may not be easy to liquidate or refinance.  If the Partnership is unable to generate sufficient income or to liquidate the Project, Limited Partners will not receive any distributions.

      7.   <u>Future Market Value of the Project</u>. The economic future of the Project, future manufacturing activity, interest rates, demographic changes, changes in tax laws, and numerous other factors will determine the Project's future market value. There is no assurance that the Project will increase in value or even maintain its current value.

**C.**    <u>**Risks Related to the Offering**</u>

      1.   <u>The Units are Subject to Significant Restrictions on Transferability</u>.  The Units are being offered without registration under the Securities Act and applicable U.S. state securities laws in reliance upon various exemptions under the Securities Act, including the exemption of Regulation S promulgated under the Securities Act, and available exemptions under applicable U.S. state securities laws.  Concurrently the Partnership may also offer and sell securities exempt from registration under the Securities Act pursuant to Regulation D promulgated under the Securities Act.  Such federal and U.S. state securities laws severely restrict the transferability of the Units offered hereby.  Accordingly, an investment in the Units will be highly illiquid.  The Units are considered "restricted securities" under the Securities Act and applicable U.S. state securities laws and cannot be resold or otherwise transferred unless they are registered under the Securities Act and any applicable U.S. state securities laws or an opinion of counsel acceptable to counsel to the Partnership has been delivered to the effect that such registration or qualification is not required.  Consequently, a holder of Units may not be able to liquidate his or her investment, and each investor's ability to control the timing of the liquidation of his or her investment in the Partnership will be restricted. Subscribers should be prepared to hold their Units indefinitely.  In addition, an investor should be able to withstand a total loss of his or her investment in the Partnership.

      2.   <u>The Partnership Agreement has not been Negotiated at Arm's-Length</u>.  The General Partner has generally established the terms of the Partnership Agreement, which was not negotiated on an arm's-length basis and has been and will be organized by parties subject to conflicts of interest.  In addition, legal counsel for the Partnership and the General Partner have not acted as counsel for or represented the interests of the prospective investors.  No separate counsel has been retained to act on behalf of the Limited Partners.  This Memorandum was prepared based on information furnished by the Partnership.  Prospective investors should consult with their own legal counsel with respect to their investment in the Partnership.

42   25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 46 of 214

Exhibit 2 Page 47 of 214

3.    <u>Distributions to Limited Partners</u>.  The costs of developing, selling, and operating the Borrower are not guaranteed by any party, nor will there be any guaranty of profit on the investment.  Return of the Capital Contributions and the interest thereon will be directly dependent upon the Borrower's successful operations and execution of a Capital Event, generating sufficient profits to permit distributions to be made to its Limited Partners.

4.    <u>Risks from Insufficient Subscription</u>.  Failure of the Partnership to fully subscribe the requisite capital to fund the Project could increase the possibility that the Borrower will not be financially successful, which could result in investors not being successful in retaining their permanent resident status (see "**Immigration Risk Factors**").

## D.    <u>Tax Risks</u>

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR NO. 230, BE ADVISED THAT ANY FEDERAL TAX ADVICE IN THIS COMMUNICATION, INCLUDING ANY ATTACHMENTS OR ENCLOSURES, WAS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER. SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED BY THIS MEMORANDUM.  EACH PERSON SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**NO ATTEMPT IS MADE HEREIN TO DISCUSS OR EVALUATE THE FEDERAL STATE, LOCAL, OR FOREIGN TAX EFFECTS ON ANY PROSPECTIVE INVESTOR. EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT HIS OR HER OWN TAX ADVISOR CONCERNING THE EFFECTS OF FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX LAWS ON AN INVESTMENT IN THE UNITS AND ON THE PROSPECTIVE INVESTOR'S INDIVIDUAL TAX SITUATION.**

There are various federal income tax risks associated with an investment in the Units.  Some, but not all, of the various risks associated with the federal income tax aspects of the Offering of which prospective investors should be aware are set forth below.  The effect of certain tax consequences on a Limited Partner will depend, in part, on other items in the Limited Partner's tax return.

This Memorandum does not address all of the U.S. federal income tax consequences to the Investors of a Unit in the Partnership, and does not address any of the state or local tax consequences of such an investment to any Investor, or all of the United States or foreign tax consequences of such an investment to any Investor.  Each prospective investor is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership, and as to any applicable state, local and foreign taxes.

*United States Tax Status*

Exhibit 2 Page 48 of 214

The Partnership will be classified for U.S. federal income tax purposes as a partnership rather than an association taxable as a corporation under currently applicable tax laws. This advice, however, is not binding on the IRS or the courts, and no ruling has been, or will be, requested from the IRS. No assurance can be given that the IRS will concur with such opinions or the tax consequences set forth below.

Accordingly, the Partnership will not pay U.S. federal income taxes, but each Limited Partner will be required to report his or her distributive share (whether or not distributed) of the income, gains, losses, deductions and credits of the Partnership. It is possible that the Limited Partners could incur income tax liabilities without receiving from the Partnership sufficient distributions to defray such tax liabilities. The Partnership's taxable year will be the calendar year, or such other year as required by the Code. Tax information will be distributed to each Limited Partner as soon as reasonably practicable after the end of the year.

Prospective investors should recognize that many of the advantages and economic benefits of an investment in the Units depend upon the classification of the Partnership as a partnership (rather than as an association taxable as a corporation) for federal income tax purposes. A change in this classification would require the Partnership to pay a corporate level tax on its income, which would reduce cash available to fund distributions to Limited Partners or for internally funding growth of the Partnership; prevent the flow-through of tax benefits, if any, for use on Limited Partners' personal tax returns; and could require that distributions be treated as dividends, which together could materially reduce the yield from an investment in the Partnership. In addition, such a change in the Partnership's tax status during the life of the Partnership could be treated by the IRS as a taxable event, in which event the Limited Partners could have tax liability without receiving a cash distribution from the Partnership to enable them to pay such a tax liability. The continued treatment of the Partnership as a partnership is dependent on present law and regulations, which are subject to change, although there is no current legislation in existence or presently contemplated that would otherwise affect the Partnership's classification as a partnership for United States income tax purposes.

Any audit of items of income, gain, loss or credits of a Limited Partner is likely to be administered at the Partnership level. The decisions made by the Partnership with respect to such matters will be made in good faith, consistent with the Partnership's fiduciary duties to the Limited Partners, but may have an adverse effect upon the tax liabilities of the Limited Partners.

*Certain U.S. Tax Considerations for Foreign Investors*

No Federal income tax ruling will be requested from the IRS with respect to any of the income tax consequences or Federal estate tax consequences attributable to the Partnership's activities or the Investor's ownership of a Unit. It will be the responsibility of each Limited Partner to prepare and file all appropriate tax returns that he or she may be required to file as a result of his or her participation in the Partnership.

The U.S. federal income tax treatment of a non-resident alien investing as a Limited Partner in the Partnership ("**non-U.S. Partner**") is complex and will vary depending on the

44    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 48 of 214

Exhibit 2 Page 49 of 214

circumstances and activities of such Limited Partner and the Partnership. Each non-U.S. Partner is urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income, estate, and other tax consequences of an investment in the Partnership. The following discussion assumes that a non-U.S. Partner is not subject to U.S. federal income taxes as a result of the Limited Partner's presence or activities in the United States other than as a Limited Partner in the Partnership and the Limited Partner's pursuit of U.S. permanent residence in connection with the investment.

A non-U.S. Partner will generally be subject to U.S. federal withholding taxes at the rate of thirty percent (30%) (or such lower rate provided by an applicable tax treaty) on its share of Partnership income from dividends, interest (other than interest which constitutes portfolio interest within the meaning of the Code), and certain other income.

The Partnership will be deemed to be engaged in a U.S. trade or business. A non-U.S. Partner's share of Partnership income and gains will be deemed "effectively connected" with such a U.S. trade or business of the Partnership (including operating income from the Partnership) will be subject to tax at normal graduated U.S. federal income tax rates. A non-U.S. Partner generally will be required to file a U.S. federal income tax return with respect to the non-U.S. Partner's share of the Partnership's effectively connected income. The Partnership will be required to withhold U.S. federal income tax with respect to the non-U.S. Partner's share of Partnership income that is effectively connected income.

A non-U.S. Partner's share of the Partnership's gain from the sale of the Project will be subject to U.S. capital gains taxes since same constitutes a United States real property interest, in which case such gain would be deemed to be "effectively connected income" and subject to the treatment described in the previous paragraph.

As the interest in the Partnership constitutes a United States real property interest, each non-U.S. Partner is subject to U.S. estate tax on his or her interest in the Partnership if, at the time of death, the non-U.S. Partner remains a non-U.S. resident. Currently, under the Internal Revenue Code, a non- U.S. Partner may pass, free of U.S. estate tax, the first $60,000 of U.S. sitused assets. The value in excess of this $60,000 exemption will be subject to federal estate tax at a 35% rate.

When the Investor becomes a permanent resident, the Investor will become subject to U.S. federal income tax on his or her world-wide income and will be required to file U.S. tax returns. The United States charges income tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions may eliminate some but not all of the risk of double taxation. Each state in the United States has its own separate income tax system. All but four states raise revenue through a state income tax. Investors should consider the tax effects of becoming a U.S. resident before investing.

This Memorandum does not address all of the U.S. federal income tax consequences to the Limited Partners of an investment in the Partnership, and does not address any of the state or local tax consequences of such an investment to any Limited Partner, or all of the United States

Exhibit 2 Page 50 of 214

or foreign tax consequences of such an investment to any Limited Partner that is not a United States person or entity. Each prospective investor is advised to consult its own tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership and as to applicable state, local, and foreign taxes. Special considerations may apply to Limited Partners who are not United States persons or entities, and such investors are advised to consult their tax advisors with regard to the United States, state, local, and foreign tax consequences of an investment in the Partnership.

It is anticipated that, upon the approval of a Limited Partner's EB-5 Petition and the issuance of a temporary resident visa, such Limited Partner will automatically become a United States taxpayer and not be subject to the tax treatment afforded non-resident persons unless such Limited Partner's tax status would change in the future.

*Possible Tax Law Changes*

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Investors should recognize that the U.S. federal income tax treatment of an investment in Units may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statements made above.

Exhibit 2 Page 51 of 214

# IX. ADDITIONAL INFORMATION

Prior to the consummation of the Offering, the Partnership and/or General Partner will provide to each prospective investor, and such prospective investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and to obtain any additional information that the Partnership may possess or can obtain without unreasonable effort or expense, and which is necessary to verify the accuracy of the information furnished to such prospective investor. Any such questions should be directed to:

> **Southport Hotel Eb-5, LP**
> **1083 Lake Washington Blvd. N, Suite 50**
> **Renton, Washington 98056**
> **Attention: Michael Christ**

No other persons have been authorized to give information or to make any representations concerning this Offering and if given or made, such other information or representations must not be relied upon as having been authorized by the General Partner or the Partnership.

All prospective investors either read and understand English or have had this Memorandum, Subscription Agreement, the Partnership Agreement, and all other documents related thereto translated by a trusted advisor into a language that the investor does understand. However, a prospective investor agrees that only this Memorandum, the Subscription Agreement, Partnership Agreement, and the other documents related hereto and thereto in English shall have any legal force or effect, and any document translated by any person or entity other than the Partnership shall have no force or effect and shall not bind the Partnership, General Partner, or any of their respective affiliates.

Exhibit 2 Page 52 of 214

## X.    HOW TO SUBSCRIBE

ANY INVESTOR WHO WISHES TO SUBSCRIBE FOR UNITS MUST DELIVER THE FOLLOWING ITEMS TO THE PARTNERSHIP BY TRACKED PHYSICAL DELIVERY SERVICES TO:

**Southport Hotel Eb-5, LP**
**1083 Lake Washington Blvd. N, Suite 50**
**Renton, Washington 98056**
**Attention: Michael Christ**
**E-mail: Mchrist@secodev.com**

(i)    A COPY OF THE SUBSCRIPTION AGREEMENT (ATTACHED HERETO AS **EXHIBIT A**), INCLUDING SPOUSAL CONSENT (IF APPLICABLE), INVESTOR QUESTIONNAIRE, INVESTOR ACKNOWLEDGEMENT AND AML FORM ATTACHED AS **EXHIBITS 1, 2, 3 AND 4** THERETO, SIGNED BY THE INVESTOR AND SPOUSE (IF APPLICABLE);

(ii)    A COPY OF THE COUNTERPART SIGNATURE PAGE TO THE PARTNERSHIP'S PARTNERSHIP AGREEMENT (ATTACHED HERETO AS PART OF **EXHIBIT B**) SIGNED BY THE INVESTOR;

(iii)    PROOF OF PAYMENT TO THE ESCROW AGENT AS SPECIFIED BELOW, NET OF ANY TRANSFER COSTS OR BANK FEES, IN THE AMOUNT OF $550,000 PURSUANT TO THE FOLLOWING TRANSFER INSTRUCTIONS

| | |
|---|---|
| Partnership Name: | East West Bank<br>[*Account Detail to be Provided*] |
| Credit To: | [*Account Detail to Be Provided*] |

[Following subscription of the Minimum Offering Amount, the General Partner will provide alternate account information for payment directly to the Partnership.][12]

(iv)    COMPLETED FORM W-8BEN, AVAILABLE FOR DOWNLOAD AT http://www.irs.gov/pub/irs-pdf/fw8ben.pdf, INSTRUCTIONS AVAILABLE FOR DOWNLOAD AT http://www.irs.gov/pub/irs-pdf/iw8ben.pdf.

(v)    A COPY OF THE SIGNED ACKNOWLEDGEMENT OF RECEIPT OF ESCROW AGREEMENT.

---

[12] Modified to allow transfers directly to the Partnership without the use of escrow once the Minimum Offering Amount has been subscribed.

Exhibit 2 Page 53 of 214

**Exhibit A- Subscription Agreement**

Exhibit 2 Page 54 of 214

### Exhibit A to Confidential Private Placement Memorandum for
### Southport Hotel Eb-5, LP

### SUBSCRIPTION AGREEMENT[1]

In making an investment decision, investors must rely on their own examination of the Partnership and the terms of the offering, including the merits and risks involved. The Units (defined in Section 1 below) have not been recommended, approved, or disapproved by the United States Securities and Exchange Commission ("SEC"), any state securities commission, or any other regulatory authority within the United States or any foreign jurisdiction. None of the foregoing authorities have passed upon, or endorsed the merits of, this Offering or the accuracy or adequacy of this document. Any representation to the contrary is a criminal offense.

The Units have not been registered with the SEC pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or under the securities laws of any U.S. state or foreign jurisdiction, and are being offered and sold in reliance upon certain exemptions from registration provided by the Securities Act, including the exemptions provided by Regulation S promulgated under the Act, and applicable U.S. state and foreign laws. The Units are subject to restrictions on transferability and resale, and may not be transferred or resold except as permitted under the Securities Act, and applicable U.S. state and/or foreign securities laws, pursuant to registration or exemption thereunder.

There is no public or other market for the Units, nor is it likely that any such market will develop. Therefore, investors must expect to be required to retain ownership of the securities and to bear the financial risks of this investment for an indefinite period of time.

THIS SUBSCRIPTION AGREEMENT (this "Subscription Agreement") is entered into by Southport Hotel Eb-5, LP, a Washington Limited Partnership (the "Partnership"), and the individual identified as "Subscriber" on the Signature Page hereto (the "Subscriber"). All references to the "Partnership Agreement" shall mean that certain Limited Partnership Agreement, the form of which is attached as **Exhibit B** to the Confidential Private Placement Memorandum. All capitalized terms used but not defined herein shall have the definition ascribed to them in the Limited Partnership Agreement.

### W I T N E S S E T H :

WHEREAS, the Subscriber desires to acquire a membership Unit in the Partnership; and

WHEREAS, the Partnership desires to sell the Unit to the Subscriber in accordance with the terms hereof and the provisions of the Limited Partnership Agreement;

---

[1] Footnotes to this document reflect the limited nature of changes from the v.3 10/16/2013 version that USCIS approved in its November 14, 2013 revised regional center approval notice with exemplar project approval. This subscription agreement has not significantly changed from exemplar approval, but was modified in December 2014 to accommodate separate offerings pursuant to Regulation D and Regulation S exemptions.

Exhibit 2 Page 55 of 214

**NOW, THEREFORE,** in consideration for the foregoing, and of the covenants and agreements hereinafter set forth, the parties hereby agree as follows:

**1. <u>Subscription</u>.** Subject to the terms and conditions hereof and the provisions of the Limited Partnership Agreement, the Subscriber hereby irrevocably subscribes for a Unit of membership interest in the Partnership (hereinafter, the "<u>Unit</u>") and agrees to be admitted into the Partnership as a member upon Closing of the subscription (as defined below).[2]

**2. <u>Capital Contribution and Administrative Fee</u>.** For each Unit, Subscriber shall pay the Partnership the purchase price of (i) Five Hundred Thousand Dollars (US$500,000) (the "<u>Capital Contribution</u>"); plus (ii) an additional Administrative Fee of Fifty Thousand Dollars (US$50,000) (the "<u>Administrative Fee</u>"), representing the marketing, administrative, and offering expenses. Seattle Family, LP, a Washington limited partnership and the General Partner of the Partnership ("<u>General Partner</u>") will use the Administrative Fee in part to compensate (i) agents in foreign countries responsible for identifying the investors, and (ii) processing EB-5 applications, offering and marketing expenses, compensation to financial advisors, legal, accounting, and administration expenses, and commissions and fees related to the Offering ("<u>Administrative Expenses</u>"). Any portion of the Administrative Fee not spent on syndication and startup expenses for the Partnership may be applied to ongoing expenses as directed by the General Partner. The General Partner reserves the right, in its sole discretion, to discount the Administrative Fee for any particular Subscriber.

The Escrow Agent will immediately release the full amount of the Administrative Fee to the General Partner to pay the Administrative Expenses without escrow. If the Subscriber's subscription is rejected, or the Offering is cancelled, the Administrative Fee will be refunded to the Subscribers by the General Partner (subject to return by marketing agents of amounts already distributed to them). If a Subscriber's I-526 petition is denied, the General Partner may withhold up to $25,000 of the Administrative Fee for Administrative Expenses and will return $25,000 to the Subscriber (the "<u>Net Administrative Fee</u>) to the Subscriber (subject to return by marketing agents of amounts already distributed to them).

**3. <u>Acceptance or Rejection of Subscription Agreement from Subscriber</u>.** The General Partner may reject the Subscriber or terminate the subscription at any time prior to a Closing (as defined below) for any reason whatsoever in its sole and absolute discretion. In the event that the Partnership rejects or terminates the subscription, (i) the Subscriber shall immediately return to the Partnership all documents provided to the Subscriber, including, but not limited to, the Confidential Private Placement Memorandum to which this Subscription Agreement is attached as Exhibit A (the "<u>Memorandum</u>") provided to the Subscriber, this Subscription Agreement, and the Limited Partnership Agreement, and (ii) the Partnership shall return or destroy all signature pages to documents executed by the Subscriber, and subject to the terms hereof, instruct East West Bank (the "<u>Escrow Agent</u>") under that certain Escrow Agreement by and between Escrow Agent and Subscriber, of even date herewith (the "<u>Escrow Agreement</u>"), accordingly.

---

[2] Modified to incorporate lack of escrow after Minimum Offering Amount subscribed, and admission to Partnership based on Closing rather than release from escrow.

Exhibit 2 Page 56 of 214

**4.**      <u>Procedures, Closing, and Escrow.</u> [3]

     a.      To commence the subscription process, the Subscriber shall deliver the following to the Partnership by tracked physical delivery services to: Southport Hotel Eb-5, LP, 1083 Lake Washington Blvd. N, Suite 50, Renton, Washington 98056, Attention: Michael Christ:

     (i)      a copy of this Subscription Agreement fully executed by the Subscriber;

     (ii)      if the Subscriber is married, the Spousal Consent and Intervention attached as <u>Exhibit 1</u> to this Subscription Agreement, fully completed and executed by the spouse of the Subscriber;

     (iii)      a copy of the investor questionnaire attached as <u>Exhibit 2</u> to this Agreement (the "<u>Investor Questionnaire</u>"), fully completed and executed by the Subscriber;

     (iv)      a copy of the Counterpart Signature Page to the Limited Partnership Agreement in the form attached as <u>Exhibit B</u> to the Memorandum, executed by the Subscriber;

     (v)      a completed current IRS Form W-8BEN. (Members are responsible for completing and filing a Form W-7 to obtain an ITIN or a Form SS-5 to obtain a Social Security Number to comply with the Partnership's tax reporting purposes.)

     (vi)      a copy of the signed Acknowledgement of Receipt of Escrow Agreement.

     (vii) proof of payment of the Capital Contribution (net of any banking or transactional fees imposed by any party) and Administrative Fee (net of any banking or transactional fees imposed by any party) by wire transfer of immediately available funds to the account(s) of the Escrow Agent (or the Partnership) as set forth in the subscription instructions in the Memorandum.

     b.      The General Partner may reject any subscription for any reason up until the time of a Closing. The Partnership may continue to solicit subscriptions until it receives the "<u>Maximum Offering Amount</u>" from Subscribers of US$115,500,000 (i.e., 231 Units). The "<u>Minimum Offering Amount</u>" will be $6,000,000 (i.e., 12 Units). The offering will be conducted in multiple stages to coincide with the anticipated phase of loaning funds to the Borrower as set forth below.

     c.      Unless the Partnership rejects the Subscriber's subscription, the Partnership shall close on the Subscriber's subscription (as to each Subscription, its "<u>Closing</u>"). The "<u>Initial Closing</u>" is contingent on the Partnership subscribing the Minimum Offering Amount from Subscribers on or before the first anniversary after receiving the initial subscription from a Subscriber ("<u>Initial Condition</u>"). After the Initial Closing, the Partnership will accept Subscribers and their Capital Contributions in its discretion from time to time without having the subscription amounts placed into escrow up to the Maximum Offering Amount (each, a

---

[3] This Section 4 is modified in multiple places to allow for subscription proceeds to be received by the Partnership without escrow following subscription of Minimum Offering Amount.

Exhibit 2 Page 57 of 214

"Subsequent Closing" and together with the Initial Closing, the "Closings"). The Subscriber shall be admitted as a limited partner in the Partnership upon the later of (i) fulfillment of the Initial Condition with respect to Subscribers subscribing prior to the Initial Closing, and (ii) acceptance by the Partnership.[4]

      d.      Each Closing of sales of the Units will occur promptly after the conditions to each Closing are attained. The amounts required for any Closing may be satisfied using financing from private non-EB-5 investors or lenders. Following the Closing, the funds shall be released from escrow according to Section 5 below. If, before acceptance of a subscription, the General Partnership rejects a subscription for any reason, or the conditions for a Closing are not met, the Partnership will immediately instruct the Escrow Agent to refund the Capital Contributions and the General Partner to refund the Administrative Fees that were contributed with respect to such Closing to the relevant Subscribers, both without interest, and this Subscription Agreement shall terminate and be of no further force and effect as to the rejected Subscribers.[5] Each Subscriber who desires to obtain an immigrant visa shall retain a U.S. immigration attorney to prepare and file such petitions on behalf of and at the sole cost and expense of each Subscriber. After Closing, if a Subscriber or a Subscriber's family member's I-526 petition, immigrant visa, admission as a conditional permanent resident, or adjustment of status to conditional permanent resident is denied or revoked, in accordance with the Limited Partnership Agreement, upon written request of the investor affected by such denial to withdraw, the Partnership will use reasonable efforts to replace the Subscriber and use the proceeds from such replacement Subscriber to refund the original Subscriber's Capital Contribution, without interest. If a Subscriber's I-526 petition is denied, the General Partner will return the Net Administrative Fee to such denied Subscriber (subject to return by marketing agents of amounts already distributed to them), the Administrative Fee will not be refunded in the event of denial or revocation of a Subscriber's immigrant visa or admission as a conditional permanent resident.

      e.      Notwithstanding any other provision in this Agreement, any Subscriber who makes misrepresentations to the General Partner or the Partnership in the Subscription Agreement or otherwise shall forfeit his or her Administrative Fee in its entirety and will be responsible for any damage to the Partnership resulting therefrom, even if the Subscriber's subscription is rejected.

      f.  Subscriber shall execute, complete and deliver to the Partnership simultaneously with the deliveries set forth in Section 4(a) above such forms, certificates, documents or agreements as may be required or requested by the General Partner.

      **5.**      **Disposition of Capital Contribution and Administrative Fee.**[6] Until the Minimum Offering Amount has been subscribed, the Escrow Agent will receive both the Administrative Fee and Capital Contribution paid by a Subscriber. Follow the Initial Closing, escrow will be terminated and the Partnership will receive the Capital Contributions and Administrative Fees paid by Subscribers in the account(s) designated by the General Partner. Upon the Initial Closing, the Escrow/Partnership will dispose of escrowed funds as follows:

      a.      The Escrow Agent shall immediately transfer the Administrative Fee to pay fees for migration brokers, registered broker dealers, and other offering and marketing expenses.

      b.      The Escrow Agent shall transfer Capital Contributions upon the fulfillment of the Initial Condition with respect to the Initial Closing.

---

[4] Modified to remove the Secondary Condition and Secondary Closing, so that after the Minimum Offering Amount is raised, funds are paid directly to the Partnership without escrow.

[5] Modified to remove the "subject to return by marketing agents" parenthetical because after satisfaction of the Minimum Offering Amount, a Subscriber's Administrative Fee will not be spent by General Partner until after the subscription is accepted.

[6] This section modified to allow for the termination of escrow once Minimum Offering Amount is subscribed.

Exhibit 2 Page 58 of 214

c.　　Once the Partnership has closed on the Subscriber's subscription, the Subscriber will have no right to receive a refund of any portion of the Capital Contribution, or to terminate the Subscription. Examples of events not giving rise to right of refund include a denial of an I-526 petition for a Subscriber who consented to an early release from escrow, revocation of I-526 for any Subscriber, State Department refusal of an immigrant visa for the Subscriber or any family member; denial of admission to the U.S. at a port of entry for the Subscriber or any family member; USCIS denial of adjustment of status to permanent residence within the U.S. for the Subscriber or any family member; termination of Subscriber's or any family member's permanent residence; denial of the Subscriber's or any family member's petition to remove conditions on permanent residence; removal of the Subscriber or any family member from the U.S.; finding of abandonment of the Subscriber's or any family member's residence or processing toward permanent residence; denial of citizenship application of the Subscriber or any family member; or failure of the Subscriber to receive return of, or return on, investment. Following cancellation of Offering, the General Partner will refund Subscribers' Administrative Fees (subject to return by marketing agents of amounts already distributed to them) to the extent the General Partner has funds available. In the event of an I-526 denial, the General Partner will refund the Net Administrative Fee to the denied Subscriber (subject to return by marketing agents of amounts already distributed to them).

d.　　Transfers of a Subscriber's Capital Contribution shall be made to the Partnership's Capital Account, and transfers of a Subscriber's Administrative Fee shall be made to the accounts designated by the General Partner.

**6.　　Representations and Warranties of Subscriber**. As a material inducement for the Partnership to accept Subscriber's subscription and to admit Subscriber as an investor pursuant to the Limited Partnership Agreement, Subscriber hereby represents and warrants to the Partnership that:

a.　　All documents and other papers delivered by or on behalf of the Subscriber in connection with this Subscription Agreement, the Limited Partnership Agreement, or the transactions contemplated therein are true, complete, and authentic. No representation, warranty, covenant, or agreement of the Subscriber contained in this Subscription Agreement or in the Limited Partnership Agreement, and no document or other paper furnished by or on behalf of the Subscriber to the Partnership pursuant to this Subscription Agreement or the Limited Partnership Agreement, or in connection with the transactions contemplated therein, contains an untrue statement of material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not false or misleading.

b.　　Subscriber has all necessary rights and authority to make such investment in the Unit and to execute and deliver this Subscription Agreement, the Limited Partnership Agreement, and the Escrow Agreement. This Subscription Agreement is a valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms except as the enforceability hereof may be affected by bankruptcy, insolvency, or similar laws affecting creditor's rights generally, or by court-applied equitable remedies.

Exhibit 2 Page 59 of 214

c.      Subscriber has the legal capacity to enter into this agreement, and is acquiring the Unit solely for his or her own account for investment and not with a view to distribution or resale. Subscriber will not sell, hypothecate, pledge, or otherwise dispose of the Units in whole or in part unless the Unit either have been registered under the Securities Act or the applicable law of any U.S. state or foreign jurisdiction or is exempt from the registration requirements of any applicable securities law, in the sole and absolute discretion of the Partnership and the Partnership's counsel.

d.      Subscriber recognizes that investment in the Partnership involves certain risks, and the Subscriber understands all of the risk factors related to the purchase of a Unit in the Partnership. Said risks include, but are not limited to, the types of risks outlined in the Memorandum, and the fact that the Partnership cannot predict with any level of certainty all possible problems or issues with which it may be confronted during its operations. There exists the possibility that events or conditions not presently foreseeable, and which may be beyond the control of the Partnership, could have an adverse impact upon the Partnership to carry out its business activities and its ability to meet its objectives. For example, the Congress of the United States and the United States Citizenship and Immigration Services may change applicable laws, regulations, or their interpretations thereof in a manner that is detrimental to the Subscriber and the Partnership. Subscriber acknowledges that there is no guarantee than an investment in the Partnership will result in the Subscriber's obtaining permanent residence in the United States. Moreover, the Partnership cannot guarantee or predict the time required for the processing of visa petition or applications.

e.      Subscriber has sufficient knowledge and experience in business and financial matters to evaluate the Partnership, its proposed activities, and the risks and merits of this investment, including but not limited to those risks described in the Memorandum. Subscriber has the ability to accept the high risk and lack of liquidity inherent in this type of investing.

f.      Subscriber has received and read the Limited Partnership Agreement and is familiar with its terms. Subscriber has also received and read the Memorandum and the exhibits and schedules attached thereto. The undersigned acknowledges that the terms of the undersigned's investment in the Partnership are as provided in the Limited Partnership Agreement, which supersedes any summary or description included in the Memorandum.

g.      Subscriber has had the opportunity to ask questions of, and receive answers from, the Partnership concerning the terms, conditions, and proposed activities of the Partnership, and to obtain any additional information necessary to verify the accuracy of the information contained in the Memorandum and other information provided. Subscriber acknowledges that the Partnership has given him or her, and all of his or her advisors and attorneys, access to all information relating to the business of the Partnership that he, she, or they have requested. Subscriber further acknowledges that any such information provided was for informational purposes only and to provide Subscriber the opportunity to inquire about purchasing the Unit.

h.      Subscriber has been advised to consult with his or her own business advisors concerning the business and other risks associated with this subscription, to consult with his or her own attorney regarding legal matters concerning the Partnership and this subscription, and to

55    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 59 of 214

Exhibit 2 Page 60 of 214

consult with an independent tax adviser regarding the tax consequences of participating in the Partnership.

i.      Subscriber understands that the Units have not been registered under the Securities Act or the applicable laws of any other U.S. state or foreign jurisdiction (and that no such registration is contemplated) and that the Units are being sold in reliance upon the exemptions from the registration requirements under the Securities Act provided and Regulations S and D promulgated thereunder. Subscriber further understands that it is not anticipated that there will be any market for its Unit in the Partnership and the Subscriber must therefore bear the economic risk of this investment for the term of the Partnership.

j.      Subscriber represents that he or she has a net worth, either individually or upon a joint basis with Subscriber's spouse, of at least U.S. $1,000,000, exclusive of personal residence, or (b) has had an individual income in excess of U.S. $200,000 for each of the two most recent years, or a joint income with the undersigned Subscriber's spouse in excess of U.S. $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

k.      Subscriber represents that he or she (a) is a bona fide resident of the country set forth in his or her address below; (b) agrees that if his or her principal residence changes prior to acceptance of his or her subscription, he/she will promptly notify the Partnership; (c) is not a "U.S. Person," as such term is defined in Regulation S promulgated under the Securities Act; (d) is not a citizen or resident alien of the United States; (e) did not receive an offer to subscribe to the Partnership in the United States; and (f) did not execute this Subscription Agreement and make any payments for this subscription from within the United States. [7]

l.      Subscriber shall indemnify and hold harmless the General Partner, Partnership, and each of their respective partners, members, officers, directors, employees, consultants, attorneys, agents, and representatives from and against all liability, costs, and expenses, including attorneys' fees, arising by reason of or in connection with (i) any misrepresentation or any breach of any representation, warranty, or covenant of Subscriber made herein, in the Limited Partnership Agreement, or in any other document furnished by Subscriber to any of the foregoing in connection with this transaction; (ii) any failure by Subscriber to fulfill any of his or her obligations, representations, or warranties set forth herein or therein; or (iii) the sale or distribution (or the attempted sale or distribution) of the Unit acquired by Subscriber in violation of the Securities Exchange Act of 1934, as amended; the Securities Act; or any other applicable state, federal, or foreign jurisdictional law. This Subscription Agreement and the representations and warranties contained herein, the Limited Partnership Agreement, or any other agreement or

---

[7] Removed alternate provision in 6(k) related to Reg D offering for which there is a separate subscription agreement.

**SOUTHPORT HOTEL EB-5, LP**
**SUBSCRIPTION AGREEMENT**
**PAGE 7 OF 23**
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 61 of 214

other document furnished by Subscriber to any of the foregoing shall be binding upon the heirs, legal representatives, successors, and assigns of Subscriber.

m. Subscriber warrants and represents that all information and documents which are required to be provided by Subscriber for the purposes of filing the EB-5 investor case for US Permanent Residence will be true and correct in every aspect, and any documents will be true originals or true and faithful copies of the original documents and any additional documents which may be requested at any future time.

n. Subscriber is in compliance with all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act"), the U.S. Bank Secrecy Act (the "BSA") and all other anti-money laundering laws and applicable regulations adopted to implement the provisions of such laws, including policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under Section 5318 of the BSA. Subscriber is not, and shall not, be a person: (i) acting, directly or indirectly, on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any of the U.S. Office of Foreign Assets Control ("OFAC") lists; (ii) listed on, residing in, or having a place of business in a country or territory named on any of such lists, or which is designated as a Non-Cooperative Jurisdiction by the Financial Action Task Force on Money Laundering ("FATF"), or whose funds are from or through such a jurisdiction; (iii) that is a "Foreign Shell Bank" within the meaning of the USA Patriot Act; or (iv) residing in, or organized under the laws of, a jurisdiction designated by the U.S. Secretary of the Treasury under Sections 311 or 312 of the USA Patriot Act as warranting special measures due to money-laundering concerns.

o. The Subscriber further represents and warrants that the Subscriber is not acquiring the Unit for the account or benefit of any U.S. person, nor is the undersigned a U.S. person who is purchasing the Unit in a transaction with the present intention of dividing his or her participation in the Partnership with others, or reselling or otherwise participating, directly or indirectly, in a distribution of the Unit, and the undersigned shall not make any sale, transfer, or other disposition of the Unit in violation of the Securities Act or the General Rules and Regulations promulgated thereunder by the SEC.

p. The Subscriber also understands and agrees that stop transfer instructions will be noted on the appropriate records of the Partnership and that there will be placed on any certificate for the Unit, or any substitutions therefore, for a period of at least one year, a legend stating in substance:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE PARTNERSHIP THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED ONLY (A) OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH APPLICABLE LOCAL LAWS AND REGULATIONS, OR (B) WITHIN THE UNITED STATES, EITHER (1) IF PURSUANT TO AN EFFECTIVE

Exhibit 2 Page 62 of 214

REGISTRATION STATEMENT UNDER THE U.S. SECURITIES ACT, OR (2) THE TRANSACTION IS EXEMPT OR NOT SUBJECT TO REGISTRATION AFTER PROVIDING A LEGAL OPINION OR OTHER EVIDENCE SATISFACTORY TO THE PARTNERSHIP THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION REQUIREMENTS UNDER THE U.S. SECURITIES ACT.

q.      The Subscriber hereby acknowledges that if he or she is a "non-resident alien," as such term is defined in the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder (the "Code"), if applicable, the undersigned may be subject to various withholding taxes and other levies, duties, or fees upon any distributions from the Partnership pursuant to the Code and any applicable treaty, understanding, accord, accommodation, or such other diplomatic convention regarding taxation between the United States and the country in which the undersigned resides.

r.      The Subscriber represents and warrants to the Partnership that since the earlier of (a) such time as the Subscriber first contacted the Partnership or was contacted by any person regarding the transactions contemplated hereby, or (b) thirty (30) days prior to the date hereof, neither the Subscriber nor his or her respective agents, associates, representatives, or affiliates engaged in or effected, in any manner whatsoever, directly or indirectly, any (i) short sales of equity of the Partnership or (ii) hedging transaction that established a net short position with respect to the equity of the Partnership.

s.      This Subscription Agreement was executed by the undersigned outside the United States and shall be binding upon the Partnership only when approved and accepted by the Partnership.

t.      The Subscriber understands and acknowledges that the General Partner has engaged foreign migration brokers to market the Offering in compliance with applicable laws in exchange for a marketing fees. The General Partner and the Partnership may enter into additional agreements with marketing agents from time to time without notice to subscribers on terms and conditions determined by the General Partner in its discretion.  Subscriber is encouraged to and should contact the General Partner if Subscriber desires any additional information concerning such fees.

**7.      Covenants of the Subscriber.**

The Subscriber agrees:

a.      if the Subscriber desires to apply for immigration to the U.S., to diligently and promptly prepare an I-526 Petition, including gathering and preparing proof of source of funds, and preparing, filing, and prosecuting the I-526 Petition and Immigrant Visa Application Process (as defined in the Memorandum) promptly upon notice from the General Partner of acceptance his or her subscription and direction to file such I-526 Petition and not before such notice and direction, understanding that this may require certain the first twelve Subscribers to refrain from filing the I-526 petition until the Minimum Offering Amount has been raised; and to file such I-526 through immigration counsel designated by the General Partner for such purpose, either as

Exhibit 2 Page 63 of 214

primary counsel for Subscriber at Subscriber's expense or as secondary counsel cooperating with Subscriber's primary counsel at the General Partner's expense;[8]

      b.    to promptly provide to the Partnership such information and documents as the General Partner may require, including a copy of a driver's license, National identity card, and passport identity page, and confirming that the funds to be invested by the Subscriber for the subscription of the Units were lawfully obtained (which requirement may be met by the Subscriber providing a letter addressed to the Partnership from a recognized and qualified firm of accountants or other professionals licensed to practice in the jurisdiction in which the undersigned resides, in form and substance, and from a firm of accountants or other professionals acceptable to the Partnership and/or the US Citizenship and Immigration Service), together with such other documents as the Partnership may reasonably require;

      c.    to provide promptly to the Partnership information and copies of the Subscriber's passport and such other documents that the Partnership deems appropriate in order for the Partnership to satisfy its "know your customer" requirements; to provide only accurate information to U.S. immigration authorities in all aspects of processing for U.S. permanent residence, and to promptly send to the Partnership copies of all notices of action, including receipt, request for evidence, notice of intent to deny, denial, certification, approval, and any other action on the Subscriber's and the Subscriber's family's applications and petitions associated with the Subscription, including I-526, immigrant visa application, adjustment of status application, immigrant visa and entry stamp, I-551 permanent resident card, and I-829; and

      d.    to diligently file and prosecute an I-829 Petition within 21 to 24 months after the date conditional resident status is obtained.

      e.    if Subscriber is a Non-Resident Alien under U.S. tax law, to execute and deliver to the Partnership, if requested by the Partnership, an IRS Form W-8 BEN certifying that he or she is a Non-Resident Alien.

      f.    to notify the General Partner immediately upon any relevant changes to Subscriber's contact information, including email address, telephone number, and residence address, including U.S. residence address after Subscriber becomes a U.S. conditional resident.

      **8.**    **Translation.** Subscriber either reads and understands English or has had this Subscription Agreement, the Limited Partnership Agreement, and all other documents related thereto translated by a trusted advisor into a language that Subscriber does understand. However, Subscriber agrees that only this Agreement, the Limited Partnership Agreement, and the other documents related hereto and thereto in English shall have any legal force or effect, and any document translated by any person or entity other than the Partnership shall have no force or effect and shall not bind the Partnership, General Partner, or any of their respective affiliates.

      **9.**    **Survival.** All representations, warranties, and covenants contained in this Subscription Agreement including, without limitation, the indemnification contained in Section 6(l) above, shall survive the termination of this Subscription Agreement.

---

[8] Section 7a has been modified to clarify that no I-526 petitions will be filed until Minimum Offering Amount raised and to require Subscribers to use appropriate qualified immigration counsel to assist with filing the I-526 petitions.

Exhibit 2 Page 64 of 214

10.    **Counterparts.** This Subscription Agreement may be signed in any number of counterparts, all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the same counterpart.

11.    **Applicable Law.** This Subscription Agreement, the rights and obligations of the parties hereto, and any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the United States of America and the State of Washington (but not including the choice of law rules thereof).

**[Signatures follow on next page.]**

Exhibit 2 Page 65 of 214

**SIGNATURE PAGE FOR SUBSCRIPTION AGREEMENT**
**Southport Hotel EB-5, LP**

**IN WITNESS WHEREOF**, the Subscriber agrees to, executes, and delivers this Subscription Agreement as of the date set forth below.

**SUBSCRIBER**:

Print Name In Native language: _____

Print Name In English Characters: _____

Signature: _____

**Partnership's Acknowledgement of Receipt of Subscription:**

The Partnership hereby acknowledges receipt of Subscriber's subscription agreement, and Escrow Agent's receipt of Subscriber's Capital Contribution, and Administrative Fee. This acknowledgement does not constitute acceptance of the subscription. Executed this ___ day of _____, 201_.

Southport Hotel Eb-5, LP

      By:    Seattle Family, LP - General Partner

          By:  Southport Hotel Management, LLC – General Partner

              _____
                By:  Michael Christ, Member

Exhibit 2 Page 66 of 214

**ACCEPTANCE OF SUBSCRIPTION BY PARTNERSHIP AND ADMISSION OF SUBSCRIBER AS AN INVESTOR:**

As of the date set forth below, the Partnership hereby acknowledges receipt of the Subscriber's Capital Contribution from the Escrow Agent and the admission of the Subscriber as an investor in the Partnership. The Subscriber's executed counterpart of the Limited Partnership Agreement shall be deemed effective as of the date below.

Date Subscription Accepted and Subscriber becomes an investor upon release of Capital Contribution from Escrow Agent to Partnership:

     _____ day of _____, 20\_\_\_\_.

Southport Hotel Eb-5, LP

       By:    Seattle Family, LP - General Partner

           By:  Southport Hotel Management, LLC – General Partner

           _____

              By:  Michael Christ, Member

Exhibit 2 Page 67 of 214

**EXHIBIT 1 TO SUBSCRIPTION AGREEMENT OF SOUTHPORT HOTEL EB-5, LP**

**SPOUSAL CONSENT AND INTERVENTION**

THIS SPOUSAL CONSENT AND INTERVENTION ("Spousal Consent") is entered into as of _____.

WHEREAS, the undersigned is the spouse of _____, a subscriber ("Subscriber") for an interest (the "Unit") in Southport Hotel Eb-5, LP, a Washington Limited Partnership ("Partnership");

WHEREAS, pursuant to that certain Subscription Agreement, by and between the Subscriber and the Partnership, dated _____ ("Subscription Agreement"), the Subscriber desires to subscribe for the Unit in the Partnership and to be admitted as an investor in the Partnership;

WHEREAS, it is a condition precedent of the Partnership's acceptance of such Subscription Agreement that Subscriber, by execution of the Subscription Agreement, and Subscriber's spouse, by execution of this Spousal Consent, each agrees to be bound by the terms and conditions of the Limited Partnership Agreement of the Partnership, as may be amended from time to time; and

WHEREAS, the undersigned desires to express his or her consent to be bound by the terms and conditions of the Limited Partnership Agreement of the Partnership to the extent that such spouse, through community property rights or otherwise, has any rights in such Unit;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the undersigned, the undersigned does hereby agree as follows:

1.      **Warranties and Covenants.** The undersigned hereby represents, warrants, and covenants that he or she:

a.      has received and read the Subscription Agreement and the Limited Partnership Agreement, including all amendments and exhibits thereto (collectively, "Documents") in their entirety;

b.      clearly understands that Subscriber has agreed on the terms and provisions with respect to Subscriber's Units and in which the undersigned may have, but does not hereby claim, a community property or other interest;

c.      expressly consents to Subscriber's execution of the Documents, and joins in, accepts, and consents to the terms and provisions thereof and agrees to abide and to be bound thereby, and to execute and deliver all documents and to do all things reasonably necessary to carry out and complete the Document's purposes;

**SOUTHPORT HOTEL EB-5, LP**
**SUBSCRIPTION AGREEMENT**
**Page 14 of 23**
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 68 of 214

d.     has been provided the opportunity to ask questions of, and receive answers from, his or her spouse and/or his or her own legal or financial advisors, concerning such Documents and to obtain any additional information relevant thereto, to the extent that such additional information can be acquired without unreasonable effort or expense;

e.     has not been denied access to, or otherwise had any that no requested information, oral or written, withheld; and

f.     understands, agrees, and acknowledges that the foregoing provision are not intended to and cannot be construed as conferring or creating any community property interest in favor of Spouse in the Capital Contribution, the Administrative Fee, the Units or the Partnership.

2.     **Appointment as Attorney In Fact**

The undersigned hereby appoint Subscriber, as its attorney-in-fact to: (a) represent the undersigned, the Subscriber and their community property interests, if any, in all matters with regard to the Units, the Partnership and the Documents; (b) bind the undersigned's interest, if any, jointly with Subscriber's on his or her execution of the Documents and any document relating to the Units, the Partnership or the Limited Partnership Agreement; and (c) do, on the undersigned's behalf, all things reasonably necessary to carry out and complete the purposes of the Documents, all without my further consent or authorization; the foregoing appointment being coupled with an interest and expressly made irrevocable.

3.     **Miscellaneous.**

a.     This Spousal Consent, the rights and obligations hereunder, and any claims or disputes relating hereto shall be governed by and construed in accordance with the laws of the State of Washington (but not including the choice of law rules thereof).

b.     All the terms of this Spousal Consent shall be binding upon and shall inure to the benefit of, and be enforceable by and against, the undersigned and his or her respective heirs and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Spousal Consent on the date first above written.

_____

Printed Name: _____

**SOUTHPORT HOTEL EB-5, LP**
**SUBSCRIPTION AGREEMENT**
**Page 15 of 23**
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 69 of 214

**EXHIBIT 2** **TO SUBSCRIPTION AGREEMENT OF SOUTHPORT HOTEL EB-5, LP**

**INVESTOR ELIGIBILITY QUESTIONNAIRE**

The following information is furnished to Southport Hotel Eb-5, LP, a Washington limited partnership, and its General Partner, Seattle Family, LP, a Washington limited partnership, in order to assist in determining whether the undersigned is qualified to invest in a private securities offering targeted to EB-5 immigrant investors (the "Offering") who are "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Act")).  The Offering is being made pursuant to and in reliance upon exemptions from the registration under the Act, including, without limitation, those exemptions provided by Regulation S promulgated thereunder, and other similar exemptions under any applicable state securities laws.

THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT THE GENERAL PARTNER AND PARTNERSHIP WILL RELY UPON THE INFORMATION FURNISHED HEREIN FOR PURPOSES OF DETERMINING THE EXEMPTION FROM REGISTRATION THAT THE OFFERING RELIES UPON FOR THE UNDERSIGNED'S INVESTMENT, AND THAT THE SECURITIES ISSUED TO THE UNDERSIGNED ARE NOT REQUIRED TO BE REGISTERED UNDER THE ACT. INFORMATION PROVIDED IN THIS QUESTIONNAIRE WILL BE TREATED CONFIDENTIALLY; PROVIDED, HOWEVER, THAT THE UNDERSIGNED EXPRESSLY PERMITS THE GENERAL PARTNER AND THE PARTNERSHIP TO PRESENT THIS QUESTIONNAIRE TO SUCH PARTIES, INCLUDING ANY GOVERNMENT AGENCIES, AS THEY MAY DEEM APPROPRIATE FROM TIME TO TIME IN AND ITS SOLE DISCRETION IN ORDER TO ESTABLISH THAT THE OFFERING IS EXEMPT FROM REGISTRATION UNDER THE ACT AND OTHER APPLICABLE SECURITIES LAWS, OR AS MAY OTHERWISE BE REQUIRED BY LAW.

**ALL FIELDS MUST BE COMPLETED:**

**Name**:_____ Date of Birth:_____

　　　　　　　(Full legal name of the investor)

**Principal Residence Address**:_____ City:_____

Province/State:_____ Zip/Postal Code:_____ Country:_____

Telephone Number:_____ Email:_____

**Unexpired Photo Government ID Number**:_____ Type of ID:_____

Issuance Date of ID:_____ Expiration Date of ID:_____

Country Issuing ID:_____ State/Province Subdivision:_____

**Note**: *A copy of the unexpired photo government ID described above and the IRS Form W-8 BEN included with the subscription materials for the Offering must be duly executed and delivered by the undersigned to the issuer.*

**Occupation**:_____ Number of Years:_____

v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 70 of 214

Current Employer:_____  Position/Title:_____
Business Address:_____  City:_____
Province/State:_____ Zip/Postal Code:_____ Country:_____
Business Telephone Number:_____ Email:_____
Business Facsimile:_____
Business or Professional Education and Degree:_____

**Please check Yes or No to indicate whether any of the following classes apply to you or any family member who you intend to immigrate with you. For any "yes" answer, please provide an explanation on a separate sheet including clarification of which person(s) are covered by the covered class.**

| U.S. ADMISSIBILITY VERIFICATION | yes | no |
|---|---|---|
| Someone who has a communicable disease of public health significance; who has failed to present documentation of having received vaccinations in accordance with U.S. law; who has or has had a physical or mental disorder that poses or is likely to pose a threat to the safety or welfare of the foreign national or others; or who is a drug abuser or addict. | | |
| Someone convicted of, or who admits having committed, a crime involving moral turpitude or violation of a law relating to a controlled substance or who is the spouse, son or daughter of such traffickers who knowingly has benefited from the trafficking activities in the past five years; who has been convicted of 2 or more offenses for which the aggregate sentences were 5 years or more; who is coming to the United States to engage in prostitution or commercialized vice or controlled substance; who has committed a serious criminal offense in the United States and who has asserted immunity from prosecution; who, while serving as a foreign government official and within the previous 24-month period, was responsible for or directly carried out particularly severe violations of religious freedom; or whom the President has identified as a person who plays a significant role in sever form of trafficking in persons, who otherwise has knowingly aided, abetted, assisted or colluded with such a trafficker in severe forms of trafficking in persons, or who is the spouse, son or daughter of such a trafficker who knowingly has benefited from the trafficking activities within the past five years. | | |
| Someone who seeks to enter the United States to engage in espionage, sabotage, export control violations, terrorist activities, the overthrow of the Government of the United States or other unlawful activity; who is a member of or affiliated with the communist or other totalitarian party; who participated in Nazi persecutions or genocide; who has engaged in genocide; or who is a member or representative or a terrorist organization as currently designated by the U.S. Secretary of State. | | |
| Someone who is likely to become a public charge. | | |

Exhibit 2 Page 71 of 214

| U.S. ADMISSIBILITY VERIFICATION | yes | no |
|---|---|---|
| Someone who seeks to enter for the purpose of performing skilled or unskilled labor who has not been certified by the Secretary of Labor; who is a graduate of a foreign medical school seeking to perform medical services who has not passed the NBME exam or its equivalent; or who is a health care worker seeking to perform such work without a certificate from the CGFNS or from an equivalent approved independent credentialing organization. | | |
| Someone who failed to attend a hearing on deportation or inadmissibility within the last 5 years; who seeks or has sought a visa, entry into the United States, or any immigration benefit by fraud or misrepresentation; who knowingly assisted any other individual to enter or try to enter the United States in violation of law; who, after November 30, 1996, attended in student (F) visa status a U.S. public elementary school or who attended a U.S. public secondary school without reimbursing the school; or who is subject to a civil penalty under INA 274C. | | |
| Someone who is permanently ineligible for U.S. citizenship; or who departed the United States to evade military service in time of war. | | |
| Someone who was previously ordered removed within the last 5 years or ordered removed a second time within the last 20 years; who was previously unlawfully present and ordered removed within the last 10 years or ordered removed a second time within the last 20 years; who was convicted of an aggravated felony and ordered removed; who was previously unlawfully present in the United States for more than 180 days but less than one year who voluntarily departed within the last 3 years; or who was unlawfully present for more than one year or an aggregate of one year within the last 10 years. | | |
| Someone who is coming to the United States to practice polygamy; who withholds custody of a US. citizen child outside the United States from a person granted legal custody by a U.S. court or intentionally assists another person to do so; who has voted in the United States in violation of any law or regulation; or who renounced U.S. citizenship to avoid taxation. | | |
| Someone who is a former exchange visitor who has not fulfilled the 2-year foreign residence requirement. | | |
| Someone determined by the Attorney General to have knowingly made a frivolous application for asylum. | | |

67    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 71 of 214

Exhibit 2 Page 72 of 214

| U.S. ADMISSIBILITY VERIFICATION | yes | no |
|---|---|---|
| Someone who has ordered, carried out or materially assisted in extrajudicial and political killings and other acts of violence against the Haitian people; who has directly or indirectly assisted or supported any of the groups in Columbia known as FARC, ELN, or AUC; who through abuse of a governmental or political position has converted for personal gain, confiscated or expropriated property in Cuba, a claim to which is owned by the United States, has trafficked in such property or has been complicit in such conversion, has committed similar acts in another country, or is the spouse, minor child or agent of an individual who has committed such acts; who has been directly involved in the establishment or enforcement of population controls forcing a woman to undergo an abortion against her free choice or a man or a woman to undergo sterilization against his or her free choice; or who has disclosed or trafficked in confidential U.S. business information obtained in connection with U.S. participation in the Chemical Weapons Convention or is the spouse, minor child or agent of such a person. | | |
| Have you ever been convicted of any offense or crime? (If yes, please explain in space provided below) | | |
| Have you ever been refused admission to the United States at a port-of-entry? (If yes, please explain in space provided below) | | |

**Additional Information**:

1. I am a legal resident of the country that is set forth above in the section of this questionnaire where I answered questions about my principle residence address; I am not a "U.S. Person" as such term is defined in Regulation S promulgated under the Act.
   Check One:      True ☐      Untrue ☐

2. I am not a citizen or resident alien of the United States.
   Check One:      True ☐      Untrue ☐

3. I did not receive an offer to invest in the Offering from within the geographic area of the United States; I did not execute the subscription agreement for the Offering or make any payments for the Offering from within the United States; and I agree to and shall execute and deliver to the issuer in the Offering an IRS Form W-8 BEN certifying that I am a nonresident alien as defined by the U.S. Internal Revenue Service.
   Check One:      True ☐      Untrue ☐

4. I certify that the funds to be invested by me in the Offering were earned in compliance with all applicable laws, and that such funds will be transferred in compliance with all applicable laws and, more specifically, via a wire transfer from an established financial institution where I have

SOUTHPORT HOTEL EB-5, LP
SUBSCRIPTION AGREEMENT
Page 19 of 23
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

68      25-80007-FPC      Doc 15-2      Filed 02/19/25      Entered 02/19/25 15:21:59      Pg 72 of 214

Exhibit 2 Page 73 of 214

an account to the escrow account set up for the Offering.

Check One:               True ☐         Untrue ☐

5. Please describe how you earned the funds you will invest in the Offering, including the source of those funds and the name(s) and address(es) of the financial institution from which those funds will be wired to the escrow account (*Please provide as much detail as possible and add additional pages as necessary. Further, if property will be sold to create the funds, please describe the property and indicate where it is located*).

_____

_____

6. I certify that I hold or have held citizenship and/or residency in the following countries:

_____

7. My native language is: _____. I speak and read the following language(s) fluently:_____ _____

8. I have never done business or participated in a business or residual ownership of a business in Iran, North Korea, Syria, Northern Sudan, Cuba, Burma or Myanmar.

Check One:               True ☐         Untrue ☐

*If "Untrue", describe with specificity which country(ies) and what business you have done or participated in there*:_____

9. I am not a senior military, governmental or political official in a non-U.S. country or closely associated with an immediate family member of such an official.

           Check One:               True ☐       Untrue ☐[9]

---

[9] Removed additional requests for detailed level of prior investment covered by other aspects of questionnaire.

**SOUTHPORT HOTEL EB-5, LP**
**SUBSCRIPTION AGREEMENT**
**Page 20 of 23**
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 74 of 214

**Statement as to "Accredited Investor" Status**:

I hereby certify that am qualified to invest as an accredited investor by reason of at least one of the following (*check ALL items that apply – all amounts are in U.S. Dollars*):

☐   My net worth (either individually or with my spouse, if any), including investments and all property and other assets, except for my primary residence, home furnishings and automobiles, exceeds $1,000,000.

☐   My individual annual income was at least $200,000 in each of the two most recent years, and I expect to my individual annual income to be at least $200,000 in the current year.

☐   My annual income, jointly with my spouse, was at least $300,000 in each of the two most recent years, and I expect our joint annual income to be at least $300,000 in the current year.

☐   **None of the Above Apply.**

_____

Exhibit 2 Page 75 of 214

**ADDITIONAL INVESTOR REPRESENTATIONS:**

(1) I have such knowledge and experience in financial, tax and business matters that I am capable of analyzing the information made available to me in connection with the offering of the investments to evaluate the merits and risks of the investment and to make an informed investment decision.
Initial here:_____

(2) Any purchases of the investment will be solely for my account, and not for the account of any other person or with a view to any resale or distribution thereof.
Initial here:_____

(3) I understand that my investment in the Offering (i) is not guaranteed to result in my receiving an immigrant visa within any specific period of time or at all and (ii) may result in my loss of some or all of the capital that I invest and, further, that no assurance has been given me that my investment will earn a positive return.
Initial here:_____

To the best of my knowledge and belief, the information supplied by me in this questionnaire is true, complete and accurate in all respects as of the date set forth below. In addition, I agree to and shall notify Seattle Family, LP in writing (at the address set forth below) of any change in the foregoing information prior to the consummation of my purchase of securities in the Offering.

Signature: _____

Print Name: _____

Date: _____

Exhibit 2 Page 76 of 214

**EB-5 INVESTOR ANTI-MONEY LAUNDERING INFORMATION FORM**
*(Please fill out and return with requested documentation.)*

**The following is required in accordance with the AML provision of the USA PATRIOT ACT.**

INVESTOR NAME: _____

LEGAL ADDRESS: _____

_____

**IDENTIFICATION, DOCUMENTATION AND SOURCE OF FUNDS:**

1. Please submit a copy of a non-expired, photo government identification for the investor showing his or her name, date of birth and signature:

   Foreign Driver's License   or   Valid Passport   or   National ID Card issued by a foreign government

   *(Circle one or more)*

   Note: Documents that are written in a language that is not English must be accompanied by an English translation prepared by an accredited translator.

2. Please advise where the funds were derived from to make the proposed investment:

   Investments   or   Savings   or   Proceeds of Sale   or   Other _____

   *(Circle one or more)*

3. I hereby certify that I am not, and am not affiliated with, a "Specially Designated National" or "Blocked Person" listed on the Specially Designated Nationals List published by the U.S. Department of the Treasury's Office of Foreign Assets Control, which may be accessed at: http://sdnsearch.ofac.treas.gov/.

Signature: _____

Print Name: _____

Date: _____

**SOUTHPORT HOTEL EB-5, LP**
**SUBSCRIPTION AGREEMENT**
**Page 23 of 23**
v. 5 12/16/2014 (with only footnoted changes since USCIS approval of 10/16/2013 version)

Exhibit 2 Page 77 of 214

**Exhibit B-Limited Partnership Agreement**

25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 77 of 214

Exhibit 2 Page 78 of 214

# Southport Hotel Eb-5, LP
# Limited Partnership Agreement

8/7/2013

Exhibit 2 Page 79 of 214

This Agreement is made by and among Seattle Family, LP, a Washington Limited Partnership ("General Partner") seeking designation as a regional center under the Eb-5 pilot program, and each of the persons set forth in Schedule A attached hereto and designated as limited partners (the "Limited Partners"). The Limited Partners and the General Partner are collectively referred to as the "Partners."

## DEFINITIONS

The following terms used in the Agreement shall have the meaning specified below:

"**Act**" means the Uniform Limited Partnership Act under the Revised Code of Washington, as amended from time to time.

"**Adjusted Capital Contribution**" means, with respect to each Partner, the aggregate capital contributed to the Partnership by such Partner reduced, from time to time, (i) by any return of a Capital Contribution, and (ii) by the aggregate distributions of Net Proceeds from a Capital Event made to such Partner.

"**Administrative Fee**" means a fee of $50,000 USD which the General Partner shall charge or cause to be charged to each Limited Partner who acquires an Interest in the Offering to defray expenses related to the Offering. The Administrative Fee is separate from and in addition to a Limited Partner's Capital Contribution and shall not constitute Partnership income or revenue. The Administrative Fee shall be paid directly to the General Partner.

"**Agreement**" means this Agreement, as it may be amended from time to time.

"**Assignee**" means a person who has acquired all or any portion of a Limited Partner's Interest in the Partnership and has not been admitted as a Limited Partner.

"**Available Cash Flow**" means funds provided from operation of the Partnership (including payments of Loan Interest and Loan Principal) after deducting funds used to pay all expenses and debts of the Partnership, including administrative and operational expenses, debt payments, capital improvements , and less the amount set aside by the General Partner, in the exercise of its sole discretion, for additional reserves.

"**Capital Account**" means that as defined in Section 3.5 herein.

"**Capital Contribution**" means the total amount of money contributed to the Partnership by each Partner.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

2

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 80 of 214

**"Capital Event"** means the refinance, sale, exchange or other disposition of Southport Hotel Project.

**"Capital Interest"** means an Interest or Partnership Interest of a Partner in the Partnership at any particular time expressed as a percentage, the numerator of which is a Partner's Adjusted Capital Contribution and the denominator of which is all of the Adjusted Capital Contributions to the Partnership.

**"Net Proceeds from a Capital Event"** means the net proceeds derived by the Partnership from a Capital Event after payment or allowance for the expenses incurred in connection with such Capital Event and after payment or allowance for existing indebtedness, the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

**"General Partner"** means Seattle Family, LP and/or any other person/entity admitted as a general partner pursuant to this Agreement. Seattle Family is an approved regional center under the Eb-5 pilot program with an approved exemplar.[1]

**"Interest"** or **"Limited Partnership Interest"** or **"Partnership Interest"** means the ownership interest (Capital Interests) of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in the Agreement and under the Act, together with the obligations of such Partner to comply with all the terms and provisions of the Agreement and the Act.

**"Loan Interest"** shall mean funds paid to SPH-Eb-5 from Hotel at Southport, LLC as interest payments pursuant to the loan agreement between SPH-Eb-5 and Hotel at Southport dated June 7, 2013.

**"Loan Principal"** shall mean funds paid to SPH-Eb-5 from Hotel at Southport, LLC as principal payments pursuant to the loan agreement between SPH-Eb-5 and Hotel at Southport dated June 7, 2013.

**"Offering"** shall mean that certain offering and sale of Limited Partnership Interests by SPH-Eb-5 to investors

**"Offering Documents"** means the subscription agreement, private placement memorandum, investor questionnaire, and subscription booklet  offering the sale of Limited Partnership Interests exclusively through the Eb-5 Immigrant Investor Program administered by the USCIS for the purpose of raising funds to be loaned by SPH-Eb-5 to Hotel at Southport, LLC to develop the Project

---

[1] This sentence has been updated to reflect the approval of the regional center.

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 81 of 214

**"Partnership Property"** shall mean any personal or real property, including money, in which the Partnership owns an interest.  Partnership Property shall not extend to any real or personal property interest held by a General Partner, Limited Partner, or Hotel at Southport, LLC.

**"Person"** means any natural person, partnership, corporation, association or other legal entity.

**"Profit or Loss"** means the income or loss of the Partnership as determined by the method of accounting chosen by the General Partner and permitted by the Code.

**"Southport Hotel Project"** shall mean the hotel development project at 1053 Lake Washington Blvd N, Renton, WA 98056.

**"SPH-Eb-5"** shall mean Southport Hotel Eb-5, LP, the entity into which all Eb-5 investors shall be admitted as limited partners for the purpose of obtaining permanent residence in the United States.

**"HOTEL AT SOUTHPORT, LLC"** shall mean the job creating entity that will borrow the funds raised by SPH-Eb-5 and use them to build the hotel at 1053 Lake Washington Blvd N, Renton, WA 9806.

## SECTION 1:  FORMATION OF LIMITED PARTNERSHIP

1.1.  **Formation.** The General Partner formed SPH-Eb-5, a Washington limited partnership (the "Partnership"), in June 2013 by filing a Certificate of Limited Partnership with the Secretary of State for the State of Washington.

1.2.  **Name.** The name of the Partnership is Southport Hotel Eb-5, LP (SPH-Eb-5).   The General Partner may change the name of the Partnership to adopt such trade or fictitious names

1.3.  **Principal Office of the Partnership.** The principal office of the Partnership shall be at 1083 Lake Washington Blvd N, Suite 50, Renton, WA  98056.  The Partnership may maintain offices at such other locations as determined by the General Partner.

1.4.  **Name and Place of Residence of Each Partner.** The name, address, Capital Contribution and Partnership Interest of each Partner is designated on Schedule A.

1.5.  **Term.** The term of the Partnership shall be perpetual.

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 82 of 214

1.6. **Designated Agents for Service of Process.** The Partnership elects and appoints Thomas W. Read, of Alston Courtnage & Bassetti LLP, 1420 Fifth Avenue, Suite 3650, Seattle, Washington 98101-4011 as the designated agent for service of process.

### SECTION 2:  PURPOSE, BUSINESS AND POWERS OF THE LIMITED PARTNERSHIP

2.1. **Purpose and Business of the Partnership.** The business of the Partnership shall be to raise financing from accredited Eb-5 investors and loan such funds directly to Hotel at Southport, LLC to develop the Southport Hotel Project.

2.2. **Powers.** The Partnership is hereby authorized to perform any act that the law normally permits a limited partnership to engage in.  It is specifically authorized to loan the funds raised from accredited Eb-5 investors directly to Hotel at Southport, LLC, pursuant to the Loan Agreement attached hereto.

### SECTION 3:  CAPITAL CONTRIBUTIONS

3.1. **Capital Contributions.**  Each of the Partners' Capital Contributions is set forth on Schedule A.

3.2. **Additional Capital Contribution.**  The Limited Partners have no obligation to make additional Capital Contributions. The General Partner has no obligation to the Partnership or the Partners to make additional Capital Contributions.

3.3. **Return and Withdrawal of Capital.** No Partner shall have the right to demand or withdraw any of such Partner's Capital Contribution (or the capital interest reflected in such Partner's Capital Account).

3.5. **Partner Capital Accounts.**  An individual Capital Account shall be maintained for each Partner in accordance with the requirements of the Code. Except as required by the Code, the Capital Account of each Partner shall consist of his Capital Contribution, as increased by Partnership profits and decreased by the amount of all cash distributed to such Partner, the amount of all losses allocated after the date hereof to such Partner, and any amounts charged under Section 9.7 to such Partner.

3.6. **Interest on Capital Contributions.** No interest shall be paid to a Partner on Capital Contributions.

5

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 83 of 214

## SECTION 4: MANAGEMENT FEE

**4.1.** **General Partner's Fees.** The General Partner will receive a management fee. Such management fee shall consist of 1/3 of all Available Cash Flow derived from Loan Interest.

## SECTION 5: ALLOCATIONS AND DISTRIBUTIONS

**5.1.** **Allocation of Income, Gain, Deductions and Loss.** Except for any special allocations required or permitted by the Code to ensure that all allocations hereunder have substantial economic effect, all items of income, gain, deductions and loss shall be allocated to the Partners pro rata. Any non-cash items of income or expense (such as depreciation or amortization) will also be allocated pro rata.

**5.2.** **Distributions of Available Cash Flow Derived from Loan Interest.** Available Cash Flow derived from Loan Interest shall be distributed pro rata amongst the Limited Partners, subject to the management fee set forth in Section 4.1 above, pursuant to the following:

    a. Loan Interest paid from the net proceeds of a Capital Event, shall be distributed within 180 days after the occurrence of such Capital Event.

    b. Loan Interest paid from the proceeds of any event other than a Capital Event, shall be distributed quarterly, beginning the first calendar quarter after the occurrence of a Capital Event.

**5.3.** **Distributions of Available cash Flow Derived from Loan Principal.** Available Cash Flow Derived from Loan Principal shall be distributed pro rata amongst the Limited Partners only after the end of the conditional residence period of the Limited Partners according to USCIS policy.

**5.4.** **Deficit Capital Accounts at Liquidation.** The Limited Partners shall have no liability to the Partnership, to the General Partners, or to the creditors of the Partnership on account of any deficit balance in their Capital Accounts upon liquidation of the Partnership, provided, however, that any Partner for whom any charges have been made to his Capital Account by reason of the obligations described in Section 9.7 is required to pay to the Partnership the amount of any negative balance in his Capital Account, but such payment shall not exceed the sum of the obligations under Section 9.7. Should an allocation of losses result in a negative Capital Account balance, the Partnership may use reasonable curative allocations to bring such Limited Partner's

6

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 84 of 214

Capital Account to zero. This Section 5.4 will survive the termination of a Partner's status as a Partner. A Partner must also pay any attorneys' or accountants' fees actually and reasonably incurred by the Partnership or a General Partner in collecting amounts under this proviso from the Partner.

## SECTION 6: EXPENSES

**6.1. Partnership Expenses.** Except as otherwise specifically provided in this Agreement, the Partnership will pay all expenses related to its operations, including all expenses incurred by the Partnership in the ordinary course of business or in connection with the fulfillment of statutory or other compliance requirements relating to the EB-5 Program; provided however that under no circumstances shall the Partnership use any of the Capital Contributions to pay for the Partnership's administrative or operating expenses. The General Partner shall pay all ordinary course expenses of the Partnership from unused funds generated by the Administrative Fees, Management Fee, Available Cash Flow and any available funds other than Limited Partners' Capital Contributions; provided, however, that the General Partner shall have no liability for extraordinary expenses, which may include without limitation: (1) All costs of borrowed money, including (1) repayment of advances to the Partnership made by a Partner or the General Partner which shall be repaid, without interest; (2) any insurance policy required to protect the assets of the Partnership; and (3) Legal fees incurred in connection with any threatened or actual litigation, including any examination, audits, or enforcement action, by regulatory agencies, or other extraordinary legal action. To the extent that any extraordinary operating expenses are paid by the General Partner, such operating expenses shall be reimbursed by the Partnership. The extraordinary operating expenses shall be paid only with proceeds from Administrative Fees, at the General Partner's sole discretion, and they shall not be paid with any portion of the Capital Contribution of any Limited Partner. If any extraordinary expenses are paid with proceeds from Administrative Fees, such amounts shall be considered a loan from the General Partner to the Partnership as authorized pursuant to Section 7.8 below.

## SECTION 7: POWERS, RIGHTS AND OBLIGATIONS OF GENERAL PARTNERS

**7.1. General Authority and Powers of the General Partner.** Each General Partner shall possess and enjoy and may exercise all the rights and powers of a general partner as provided under the Act, including the full and exclusive power and authority to act for and to bind the Partnership, including the sale, loan, refinance, encumbrance or other disposition of Partnership Property without the consent of the Limited Partners.

**7.2. Additional Authority and Powers of the General Partner.** In addition to the rights and powers normally granted under the Act, the General Partner shall also have the

7

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 85 of 214

exclusive right and power to manage, operate and control the Partnership and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Partnership, to sign any documents required on behalf of the Partnership, without the signatures or consents of Limited Partners, to carry out the duties of the General Partner in furthering the business and affairs of the Partnership. The scope of the General Partner's power and authority shall encompass all matters connected with or incident to the business of the Partnership, including but not limited to the power and authority:

(1) To loan the funds raised from Eb-5 investors to Hotel at Southport, LLC for the purpose of developing the Southport Hotel Project.

(2) To appoint representatives to act as Managers to manage the day-to-day operations of the Partnership;

(3) To execute, acknowledge and deliver any and all instruments to effectuate any of the foregoing powers and any other powers granted to the General Partner under the laws of the State of Washington or other provisions of this Agreement;

(4) To enter into and to execute agreements for employment or services, as well as any other agreements and all other instruments the General Partner deems necessary or appropriate;

(5) To enter into such agreements and contracts with parties and to give such receipts, releases and discharges, with respect to the business of the Partnership, which the General Partner, in its sole discretion, deems advisable or appropriate;

(6) To purchase, at the expense of the Partnership, such liability and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Partnership, General Power, or management; however, the General Partner shall not be liable to the Partnership or the other Partners for failure to purchase any insurance, including earthquake insurance, unless such act or omission constitutes gross negligence or willful misconduct by a General Partner;

(7) To sue and be sued, complain, defend, settle, and/or compromise, with respect to any claim in favor of or against the Partnership, in the name and on behalf of the Partnership;

8

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 86 of 214

(8) To issue Partnership Interests to new Limited Partners and admit same into the Partnership as Partners; and

(9) The General Partner shall operate the Partnership in a manner that is designed to comply with legal and policy requirements of the EB-5 Program administered by USCIS.  In particular, the General Partner shall:

    a. deploy the Capital Contribution by each Limited Partner only towards job creating activity reasonably expected to be deemed "at-risk" activity by the USCIS, through investment by the Partnership in the Project and keep such funds invested in the Project until the end of such Limited Partner's period of conditional residence;

    b. not use reserve accounts designed to evade "at risk" investment requirements, and not enter agreements for redemption (including return on investment) of each Limited Partner's Capital Contribution during such Limited Partner's period of conditional residence;

    c. not redeem a Limited Partner's Capital Contribution other than at fair market rates or as set forth in this Agreement during such Limited Partner's period of conditional residence;

    d. maintain an ongoing business deploying capital to job-creating activity through investment by the Partnership in the Project until the later of (1) end of the period of conditional permanent residence for the Limited Partners or (2) five years from the advance of funds under the Loan.

    e. follow the Business Plan for the Project as submitted for approval to USCIS, consulting with counsel and considering amended filings to USCIS before implementing any changes that could be considered material and avoiding to the extent commercially feasible any changes that could be considered material;

    f. track, maintain records, and share data and records with USCIS, and with Limited Partners preparing petitions to remove conditions from residence, concerning the Project, including the expenditure of funds, employment of workers, completion of construction, operation of facilities and enterprises; and

    g. obtain approval of the U.S. Treasury Department's Office of Foreign Assets Control, or confirmation of no need for approval, before accepting a subscription from an investor who is a native or citizen or whose capital derives from a country subject to U.S. embargo or similar restriction, such as Iran.

**7.3.  Right of Public to Rely on Authority of General Partner.** No person, firm or corporation dealing with the Partnership or any Partnership or joint venture for which the

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 87 of 214

Partnership is a general partner or otherwise authorized to act, shall be required to inquire into the authority of the General Partner to take any action, make any decision, or sign and deliver any document, instrument or deed. **The General Partner does not require an authorizing resolution from the Partners in order to loan Partnership funds to Hotel at Southport LLC.**

**7.4.** **Time Devoted to Partnership; Other Ventures.** The General Partner shall devote so much of its time to the business of the Partnership to conduct the Partnership's business. General Partners may engage in business ventures and activities of any nature and description independently or with others, whether or not in competition with the business of the Partnership, and neither the Partnership nor any of the other Partners shall have any rights in and to such independent ventures and activities or the income or profits derived there from by reason of the acquisition of Interests in the Partnership.

**7.5.** **Liability of General Partners to Limited Partners and Partnership.** In carrying out their duties and exercising the powers hereunder, the General Partners shall exercise reasonable skill, care and business judgment. A Partner shall not be liable to the Partnership or the Limited Partners for any act or omission performed or omitted by them in good faith pursuant to the authority granted to them by this Agreement unless such act or omission constitutes gross negligence or willful misconduct by that General Partner. In exercising their powers hereunder, the General Partners recognize their fiduciary responsibility to the Partnership as set forth in Section 7.7 hereof. The General Partner shall be entitled to rely on the advice of counsel and public accountants experienced in any matter at issue, and shall not be liable, responsible or accountable in damages or otherwise to the Partnership, or any Limited Partner for any action taken or failure to act on behalf of the Partnership in good faith and in reliance on any such advice.

**7.6.** **Indemnification.** The Partnership shall indemnify and hold harmless the General Partner from any loss or damage, including attorneys' fees actually and reasonably incurred by them, by reason of any act performed by them on behalf of or in furtherance of the interests of the Partnership; provided, however, that such indemnification or agreement to hold harmless shall be recoverable only out of the assets of the Partnership and not from the Limited Partners. The foregoing indemnity shall extend only to acts or omissions performed or omitted by a General Partner in good faith and in the belief that the acts or omissions were in the Partnership's interests, or not opposed to the best interests of the Partnership and which are not a result of negligence or willful or wanton misconduct on the part of that General Partner.

10

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 88 of 214

**7.7.** **Fiduciary Responsibility.** The General Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership only to the extent and under the circumstances required by the Act.

7.8. **Loan Funds.** The General Partner shall have the right to loan funds to the Partnership to cover any cash shortfalls.

### SECTION 8:  STATUS AND RIGHTS OF LIMITED PARTNERS

**8.1.** **Management.** Except as specifically provided herein, no Limited Partner shall control the Partnership's business or management or have any right or authority to act for or on the behalf of, or otherwise bind, the Partnership. Notwithstanding the above, the Limited Partners may form an advisory committee to consult with and advise the General Partner with respect to the following Partnership business:

(1) The dissolution and winding up of the Partnership;

(2) The admission or removal of a General Partner;

(3) Any other advisory rights that may be required under 8 C.F.R.204.6(j)(5)(iii) as determined by an applicable governmental authority, including those rights, powers, and duties normally granted to limited partners under the Act.

**8.2.** **Limitation of Liability.**  No Limited Partner shall have any personal liability whatsoever, whether to the Partnership, to any Partners or to the creditors of the Partnership, for the debts or obligations of the Partnership or any of its losses beyond his Capital Contribution set forth opposite his name in Schedule A.  This Section 8.2 will survive the termination of a Partner's status as a Partner.

**8.3.** **Death or Incapacity of Limited Partner.** The death or legal incapacity, dissolution, termination, merger, consolidation or bankruptcy of a Limited Partner shall not cause dissolution of the Partnership.  The rights of such Limited Partner to share in the profits and losses of the Partnership, to receive distributions from the Partnership and to assign an Interest in the Partnership shall, on the happening of such an event, devolve upon such Limited Partner's executor, administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Partnership shall continue as a Partnership. However, in any such event such legal representative or successor, or any Assignee of such legal representative or successor shall be admitted to the Partnership as a Limited Partner only in accordance with and pursuant to all of the terms and conditions of this Agreement.

11

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 89 of 214

**8.4.** **Recourse of Limited Partners.** Each Limited Partner shall look solely to the Partnership for all distributions with respect to the Partnership and his Capital Contribution thereto and share of profits and losses thereof and shall have no recourse therefore, upon dissolution or otherwise, against the General Partners, Management, or any other Limited Partner.

**8.5.** **No Right to Property.** No Limited Partner shall have any right to demand or receive any distribution from the Partnership in any form other than cash, upon dissolution or otherwise.

**8.6.** **Voting Rights of Limited Partners.** The Limited Partners owning Interests constituting in the aggregate at least two-thirds of the Interests of all Limited Partners may, in accordance with Section 11.2 hereof, remove the General Partner for cause and admit a substitute General Partner.

(a) "Cause" shall mean:

    i. An intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of the General Partner's performance of its role as general partner of the Partnership;

    ii. Intentional damage to company assets;

    iii. Willful and continued failure to substantially perform the General Partner's duties to the Partnership for more than three (3) months (other than as a result of incapacity due to physical or mental illness); or

    iv. Willful conduct by the General Partner that is demonstrably and materially injurious to the Company, monetarily or otherwise.

(b) For purposes of this Section 8.6(a), an act, or a failure to act, shall not be deemed willful or intentional unless it is done, or omitted to be done, in bad faith or without a reasonable belief that the action or omission was in the best interest of the Partnership. Failure to meet performance standards or objectives, by itself, does not constitute Cause.

**8.7.** **Meetings of Limited Partners.**

(1) Meetings of the Limited Partners to vote upon any matters on which the approval or consent of the Limited Partners is required or on which the Limited Partners are authorized to take action under this Agreement may be called at any time by the General Partner.  Such meetings shall be called by the General Partner within ten (10) days after receipt of a written request for such a meeting signed by one or more Limited Partners owning Interests constituting in the aggregate more than 30% of the Interests of all Limited

12

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 90 of 214

Partners. Any such request shall state the purpose of the proposed meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement. Meetings shall be held at the principal office of the Partnership or at such place as may be designated by the General Partner or, if the meeting is called upon the written request of Limited Partners, as designated by such Limited Partners.

(2) Notification of any meeting to be held pursuant to this Section 8.7 shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting, to each Limited Partner at his record address, or at such other address which he may have furnished in writing to the General Partner. Such notice shall be in writing; shall state the place, date and hour of the meeting; and shall indicate that the notice is being issued at or by the direction of the Partner or Partners calling the meeting. The notice shall state the purpose or purposes of the meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement. If a meeting is adjourned to another time and place, and if an announcement of the adjournment of time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting. No notice of the time, place or purpose of any meeting of Limited Partners need be given to any Limited Partner who attends in person or is represented by proxy, except for a Limited Partner attending a meeting for the express purpose of objecting at the beginning of the meeting to the transaction or any business on the ground that the meeting is not lawfully called or convened, or to any Limited Partner entitled to such notice who, in a writing executed and filed with the records of the meeting, either before or after the time thereof, waives such notice.

(3) For the purpose of determining the Limited Partners entitled to notice of, or to vote at, any meeting or any adjournment thereof, or to vote by written consent without a meeting, the General Partners or the Limited Partners requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Limited Partners. Such date shall not be more than sixty (60) days nor less than ten (10) days before any such meeting or submission of a matter to the Limited Partners, the date on which notice of the meeting or submission of the matter to the Limited Partners for a vote by written consent is mailed shall be the record date for such determination of Limited Partners.

(4) Each Limited Partner may authorize any person or persons to act for him by proxy with respect to any matter in which a Limited Partner is entitled to

13

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 91 of 214

participate, whether by waiving notice of any meeting, or voting or participating at a meeting. Each proxy must be signed by the Limited Partner. No proxy shall be valid after the expiration of twelve (12) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable by the Limited Partner executing it.

(5) Any matter for which the approval or consent of the Limited Partners is required or for which the Limited Partners are authorized to take action under this Agreement or under applicable law may be approved or action may be taken by the Limited Partners without a meeting and shall be as valid and effective as action taken by the Limited Partners at a meeting assembled, if written consents to such action by the Limited Partners are signed by the Limited Partners owning Interests constituting in the aggregate the Interests required to approve or otherwise authorize such action, and such written consents are delivered to the General Partners.

(6) Personal presence of the Limited Partners shall not be required at any meeting, provided an effective written consent to or rejection of the action proposed to be taken at such meeting is submitted to the General Partner. Attendance by a Limited Partner and voting in person at any meeting shall revoke any written consents or rejections of such Limited Partner submitted with respect to action proposed to be taken at such meeting.

(7) Failure to vote either in person, by proxy or by written consent at a duly called meeting upon receipt of notice as provided for in this Section 8 on matters for which approval of the Limited Partners are required by this Agreement shall be counted as an affirmative vote.

## SECTION 9: BOOKS AND RECORDS, ACCOUNTING, REPORTS AND STATEMENTS AND TAX MATTERS

**9.1.    Books and Records.** The General Partner shall, at the expense of the Partnership, keep and maintain, or cause to be kept and maintained, the books and records of the Partnership. All books and records of the Partnership shall be kept at the principal office of the Partnership.

**9.2.    Annual Accounting Period.** All books and records of the Partnership shall be kept on the basis of an annual accounting period ending December 31 of each year, except for the final accounting period which shall end on the date of termination of the Partnership. All references herein to the "fiscal year of the Partnership" are to the annual accounting

14

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 92 of 214

period described in the preceding sentence, whether the same shall consist of twelve months or less.

**9.3.    Reports to Limited Partners.** The General Partner shall send to each Limited Partner the following:

(1) After the end of each fiscal year of the Partnership, such information as shall be necessary for the preparation by such Limited Partner of his federal income tax return which shall include a computation of the distributions of such Limited Partner and the allocation to such Limited Partner of profits or losses, as the case may be; and

(2)  A reasonable time after the end of each fiscal year of the Partnership, an annual report, which shall include an income statement for and balance sheet of the Partnership as of the fiscal year end.

**9.4.    Right to Examine Records.** Limited Partners shall be entitled, upon written request directed to the General Partner, to review the records of the Partnership at all reasonable times and at the location where such records are kept by the Partnership.

**9.5.    Tax Returns.** The General Partner shall cause the Partnership to prepare and file a United States Partnership Return of Income and all other tax returns required to be filed by the Partnership for each fiscal year of the Partnership.  The General Partner shall be the tax matters partner for the Partnership.

**9.6.    Tax Elections and Adjustments.** The General Partner is authorized to cause the Partnership to make, forego or revoke such elections or adjustments for federal income tax purposes as it deems necessary or advisable in its sole discretion, provided that any such election is consistent with the Partnership's status as a partnership, and provided further that such elections or adjustments are consistent with federal income tax rules and principles, including but not limited to, in the event of a transfer of all or part of the Limited Partnership Interest of any Partner, an election pursuant to Section 754 of the Code to adjust the basis of the assets of the Partnership or any similar provision enacted in lieu thereof. The Partners will, upon request, supply any information necessary to properly give effect to any such election or adjustment.

**9.7.    Tax ID Number and Federal Income Tax Withholding.**  Each Partner shall obtain from the U.S. Internal Revenue Service a social security number, U.S. international taxpayer identification number, or employer identification number, as applicable; and each Partner shall be liable to the Partnership for any and all penalties assessed against the Partnership by reason of a Partner's failure timely to provide the Partnership with his

15

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 93 of 214

social security number, U.S. international taxpayer identification number, or employer identification number, as applicable, and such penalties may be deducted from a Partner's distribution payments. In the event any of the Partners are subject to federal income tax withholding or tax assessed by Washington State, the General Partner is authorized to withhold any sums so required even if such withholding conflicts with any of the terms and conditions of this Agreement or otherwise affects distributions, allocations or payments to the Partners. In the event that the General Partner learns of a withholding obligation subsequent to the distribution to which the withholding obligation relates, the General Partner will issue an invoice to the Partner. If the invoice is not paid within sixty (60) days, the Managing General Partner will charge the amount plus interest against the Partner's Capital Account. This Section 9.7 will survive the termination of a Partner's status as a Partner.

## SECTION 10:  TRANSFERS OF LIMITED PARTNERSHIP INTERESTS; WITHDRAWAL AND ADMISSION OF LIMITED PARTNERS

**10.1.    General Prohibition.** Limited Partners may not voluntarily, or involuntarily, directly or indirectly, sell, transfer, assign, pledge or otherwise dispose of, or mortgage, pledge, hypothecate or otherwise encumber, or permit or suffer any encumbrance of, all or any part of his Interest in the Partnership at any time.   Any purported sale, transfer, assignment, pledge or encumbrance shall be null and void and of no force or effect whatsoever.

**10.2.    No Withdrawal of Limited Partner.** No Limited Partner shall have the right to withdraw from the Partnership except as expressly provided below.

**10.3    Termination of Partnership Interest Upon Denial of I-526 Petition**. In the event USCIS denies a Limited Partner's I-526 petition, initial application for immigrant visa, or initial application for adjustment of status, upon written request of the Limited Partner affected by such denial to withdraw, the Partnership will direct the Escrow Agent to refund such denied Limited Partner's Capital Contribution from escrow, or, if the denied Limited Partner's Capital Contribution has already been release to the Partnership, will use reasonable efforts to find a replacement investor to purchase a Unit, and in the event such replacement investor is found, the denied Limited Partner shall be permitted to withdraw from the Partnership, and the Limited Partner's Unit shall be redeemed by the Partnership for a purchase price equal to the Capital Contribution of the replacement investor.   Upon payment to the denied Limited Partner of such amount either through replacement investor or through the refund from escrow, the Interest of the denied Limited Partner shall be terminated and the denied Limited Partner shall not be entitled to any distributions under this Agreement following the date of termination.   No Limited

16

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 94 of 214

Partner, including a denied Limited Partner shall be entitled to receive any interest with respect to his Capital Contribution.

The General Partner will refund a denied Limited Partner's Administrative Fee. In the event a Limited Partner's I-526 application is denied, 50% of their $50,000 Administrative Fee shall be refunded to them within 60 days after the General Partner receives notice of such denial (subject to return by marketing agents of amounts already distributed to them).

Requests for withdrawal shall be acted upon by the General Partner in the order in which they are received. A denied Limited Partner will not be redeemed if a replacement Limited Partner is not available for such purpose. A Limited Partner may retract a withdrawal request at any time before repayment of the Capital Contribution.

### SECTION 11: TRANSFERS OF GENERAL PARTNERSHIP INTERESTS; WITHDRAWAL AND ADMISSION OF GENERAL PARTNERS

**11.1.** **Withdrawal of General Partners.** The General Partner may not withdraw from the Partnership

**11.2.** **Removal, Bankruptcy, Dissolution, Death or Incompetency of General Partners.** A General Partner shall cease to be a General Partner of the Partnership upon the removal, bankruptcy, dissolution, death or incompetency of the General Partner and the General Partner may be removed by a vote of the Limited Partners, as provided in Section 8.6 above, only for cause.

**11.3.** **Transfer by General Partners; Admission of Additional or Successor General Partners.** A General Partner may not transfer his Interest, or any part thereof, except to an entity controlled by, controlling, or under common control with, the General Partner or its beneficial owner.

### SECTION 12: DISSOLUTION, WINDING UP AND TERMINATION\

**12.1.** **Events Causing Dissolution.** The Partnership shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of any of the following events:

    (1) Repayment of the entire loan principal and relevant interest to the Partnership; or

    (2) Entry of a decree of judicial dissolution pursuant to the Act;

17

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 95 of 214

**12.2.** **Winding Up.** Upon dissolution of the Partnership for any reason, the General Partner, or any other party (the "Liquidator") designated by vote or written consent of Limited Partners owning Interests constituting in the aggregate a majority of the Interests of all Limited Partners, if required, shall commence to wind up the affairs of the Partnership and to liquidate its assets. The Partners shall continue to share income, gains, expenses, losses and all other items during the period of liquidation in the same proportion as before the dissolution. The Liquidator shall have the full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Partnership Property pursuant to such liquidation. Pending such sales, the Liquidator or such other party shall have the right to continue to operate and otherwise deal with the assets of the Partnership. A reasonable time shall be allowed for the orderly winding up of the business of the Partnership and the liquidation of its assets and the discharge of its liabilities to creditors so as to enable the Liquidator to minimize the normal losses attendant upon a liquidation, having due regard to the activity and condition of the relevant markets for the Partnership Property and general financial and economic conditions. Any Partner may be a purchaser of the Property of the Partnership upon liquidation, including, without limitation, any liquidation conducted pursuant to a judicial dissolution or otherwise under judicial supervision; provided, however, that the purchase price and terms of sale are fair and reasonable to the Partnership.

**12.3.** **Certificate of Cancellation; Report; Termination.** Upon the dissolution and commencement of winding up of the Partnership, the General Partner shall execute and file a certificate of cancellation of the Partnership. Within a reasonable time following the completion of the liquidation of the Partnership's assets, the General Partner or such other party shall prepare and furnish to each Partner, at the expense of the Partnership, a statement that sets forth the assets and liabilities of the Partnership as of the date of complete liquidation and the amount of each Partner's distribution pursuant to Section 5 hereof. Upon completion of the liquidation and distribution of all Partnership funds, unless reinvestment is elected pursuant to Section 12.4, the Partnership shall terminate and the Managing General Partner shall have the authority to execute and file all documents required to effectuate the termination of the Partnership.

**12.4** **Termination of the Partnership; Reinvestment.** Limited Partners may request to reinvest in order to participate in a new loan to be identified by the General Partner, who shall make a good faith effort to identify one or more new loan opportunities that may serve the investment interests of the Limited Partners who wish to continue their investment. If the General Partner determines that no such loan is available on favorable terms, or if in its sole discretion the General Partner determines that the Partnership should terminate after the end of the period of conditional residence for all Limited Partners, the General Partner may distribute the Limited Partnership interests in accordance with this Agreement and terminate the Partnership.

18

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 96 of 214

### SECTION 13: MISCELLANEOUS

**13.1. Amendments.** Except as otherwise provided by law, this Agreement may be amended in any respect by the General Partner without the written approval or consent of Limited Partners owning Interests in the Partnership; provided however, that:

    (1) Without the consent of Limited Partners to be adversely affected by the amendment, this Agreement may not be amended so as to change the Capital Contributions required, or rights and interests in profits, losses and distributions of any Partner; and

    (2) In the case of any provision hereof which requires the action, approval or consent of a specified Interest of Limited Partners, such provision may not be amended without the consent of the Limited Partners owning such specified Interests.

**13.2. Notices.** Section 12.2Notices. All notices required or permitted by this Agreement shall be in writing and will be deemed to have been duly given if sent via (i) hand delivery; (ii) United States Postal Service (with postage thereon prepaid); (iii) nationally recognized overnight courier (with delivery charges prepaid); (iv) facsimile followed by a copy by mail; or (v) e-mail followed by a copy by mail, in each case, to the street address, facsimile number, or e-mail address, if any, set forth immediately below in this Section 13.2 if to the Partnership or to the General Partner, or if to a Limited Partner to the address set forth on Exhibit A (or such other street address, facsimile number, or e-mail address, if any, as shall subsequently be provided by notice by a party to the other parties). Such notice shall be effective (a) at the time of delivery, if hand delivered or sent by email; (b) two business days after being deposited in the United States Mail, if sent via United States Postal Service; (c) one day after being deposited with a nationally recognized overnight courier, if sent by a nationally recognized overnight courier; or (d) upon written confirmation of transmission of facsimile transmission plus mailing a copy if sent by facsimile.

If to the General Partner, then to:
Seattle Family, LP
1083 Lake Washington Blvd. North, Suite 50
Renton, Washington 98056
ATTN: Michael Christ
Email: Mchrist@secodev.com

If to the Partnership, then to:

19

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 97 of 214

Southport Hotel Eb-5, LP
1083 Lake Washington Blvd. North, Suite 50
Renton, Washington 98056
ATTN: Lisa Collins
Email: LCollins@secodev.com

**13.3.** **Governing Law; Survival of Rights; Severability of Provisions.** This Agreement shall be governed by the laws of Washington and shall, subject to the restrictions on transfer set forth herein, bind and inure to the benefit of the heirs, executors, personal representatives, successors and assigns of the parties hereto. If any provision of this Agreement is held to be invalid, the remainder of this Agreement shall not be affected thereby.  Venue for any legal proceeding concerning this Agreement shall be in King County, Washington.

**13.4.** **Entire Agreement.** This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby cancelled. This Agreement may not be modified or amended other than pursuant to Section 13.1 above and Section 13.8 below.

**13.5.** **No Waiver.** The failure of any Partner to seek redress for violation or to insist on strict performance, of any covenant of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

**13.6.** **Translations.**  Any translations of this Agreement to any other language besides English are for informational purposes only and are not legally binding in any way.  Indeed, any signature to a translated copy of this Agreement does not bind any party.

**13.7.** **Eb-5 Job Allocation.**   Unless determined otherwise in the discretion of the General Partner, all jobs shall be allocated amongst the Eb-5 members on a first-come-first-served basis from the date they complete all subscription steps including delivery of Capital Contribution and Administrative Fee to Escrow Agent.

**13.8.** **Limited Power of Attorney.**

(1)     The General Partner shall at all times during the existence of the Partnership have a special and limited power of attorney as the attorney-in-fact for each Limited Partner with power and authority to act in the name and on the behalf of each Limited Partner to make, execute, swear to, verify, acknowledge, correct and file the following documents and any other documents deemed by the General Partner to be necessary for the business of the Partnership:

20

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 98 of 214

(a)     This Agreement, and any amendments thereto;

(b)     Any Certificate of Limited Partnership for the Partnership and amendments thereto required or permitted or deemed advisable by the General Partner to be made or filed on behalf of the Partnership, and any and all certificates or other instruments necessary to qualify the Partnership as a partnership;

(c)     Any other instrument or document that may be required to be filed by the Partnership under the laws of any state or by a governmental agency or which the General Partner deems advisable to file; and

(d)     Any instrument or document which may be required to effect the continuation of the Partnership and admission of an additional or substitute General or Limited Partner, or the dissolution and termination of the Partnership (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement).

(e)     Execute any and all documents necessary to enable the General Partner to carry out powers of the General Partner including but not limited to granting Partnership Property as security for Partnership obligations and sale or conveyance of Partnership Property.

(2)     This power of attorney is a special power of attorney coupled with an interest, is irrevocable, shall survive the death of each Limited Partner and is limited to those matters herein set forth.

**13.9    Purchase for Investment Only.**  Each Limited Partner hereby represents and warrants to the General Partner and to the Partnership that his acquisition of his interest in the Partnership is made as principal for his account for investment purposes only, or as fiduciary for an account for investment purposes only, and not with a view to the resale or distribution of such interest, except insofar as the Securities Act of 1933, as amended, and any applicable securities law of any state or other jurisdiction permit such acquisition to be made for the account of others or with a view to the resale or distribution of such interest without requiring that such interest, or the acquisition, resale or distribution thereof be registered under the Securities Act of 1933, as amended, or any applicable securities law of the United States, any state or other jurisdiction.

**IN WITNESS WHEREOF** the parties hereto have executed this Operating Agreement effective on the day and year first above written.

21

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 99 of 214

GENERAL PARTNER:

SEATTLE FAMILY, LP, a Washington limited partnership

By: SOUTHPORT HOTEL MANAGEMENT LLC, General Partner,

By:

_____

Michael P. Christ, Member


_____

Print Limited Partner Name


Limited Partner Signature: _____     _____

Date

22

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 100 of 214

## SCHEDULE A

**MANAGEMENT FEE**
Management Interest in Exchange for Services as General Partner

**General Partner**

Seattle Family, LP

**Total:** 1/3 of Available Cash Flow derived from Loan Interest

**CAPITAL INTERESTS**
Partnership Interest with Capital Contribution

Limited Partner 1 .4329% $500,000 USD
Limited Partner 2 .4329% $500,000 USD
Limited Partner 3 .4329% $500,000 USD
Limited Partner 4 .4329% $500,000 USD
Etc.

**Total** 100% $115,500,000 USD

23

v. 3 10/16/2013 (with only footnoted changes since USCIS approval)

Exhibit 2 Page 101 of 214

**Exhibit C-  Business Plan**

Exhibit 2 Page 102 of 214

# Southport Hotel Eb-5, LP

## Business Plan

In support of an Application for EB-5 Designation
under the USCIS Immigrant Investor Program
For $115,500,000 in EB-5 investor funding

> This business plan was submitted to USCIS as part of Seattle Family LP's application for designation as a regional center. That application was granted on November 14, 2013, and the application specifically approved this business plan and other documents associated with the Southport Hotel project. The business plan has not been edited to reflect the approval other than to add this cover notation. References in the business plan to a pending application should be viewed in light of the regional center and project approval. In addition, minor edits were made to pp.17-18 of the plan (see footnotes pp.17-18) to clarify the summarized terms of the Loan and to correct references to borrowing and lending entities.

Submitted by:

Michael Christ

SECO Development, Inc.

1083 Lake Washington Blvd. N. #50

Renton, Washington, 98056

Phone: 425.282.5833

June 18, 2103

Exhibit 2 Page 103 of 214

# Southport Hotel Eb-5, LP

## Table of Contents

I.     Executive Summary ................................................................ 3

II.    The Project ......................................................................... 5

     A.   Project Description ........................................................ 5

     B.   Ownership ................................................................... 11

     C.   Management .................................................................. 11

III.   The EB-5 Investment ............................................................. 12

     A.   Description .................................................................. 12

     B.   Regional Center Affiliation ............................................. 12

     C.   How the EB-5 Funds Flow to Job Creation ............................. 13

     D.   Ownership Structure ....................................................... 14

     E.   Management .................................................................. 15

     F.   Investment Terms and Conditions ....................................... 15

     G.   Escrow Information ........................................................ 16

         1.   Escrow Agent ......................................................... 16

     H.   Loan Structure ............................................................. 17

     I.   Exit Strategy ............................................................... 18

IV.   Financial Information ........................................................... 19

     A.   Project Cost/Development Budget ....................................... 19

     B.   Sources and Uses of Funds ............................................... 20

     C.   Development Timeline ..................................................... 20

     D.   Cost Disbursement Timeline ............................................. 20

     E.   Pro Forma Operating Projections ....................................... 27

V.    Economic Impact Analysis ....................................................... 30

     A.   Job Creation ................................................................ 30

     B.   Household Earnings, Gross Regional Product and Output ........... 31

VI.   Targeted Employment Area ("TEA") ........................................... 32

VII.   Project Feasibility .............................................................. 32

1

Exhibit 2 Page 104 of 214

| | | |
|---|---|---|
| A. | Development Team | 32 |
| 1. | Developer – SECO Development, Inc. | 32 |
| 2. | General Contractor – Sellen Construction Company | 34 |
| 3. | Architect - MulvannyG2 | 35 |
| B. | Market Area | 36 |
| 1. | King County, WA | 36 |
| 2. | City of Seattle, WA | 42 |
| 3. | City of Renton, WA | 45 |
| 4. | Project Site | 46 |
| C. | Tourism, Travel and Hospitality Industry Overview | 46 |
| D. | Hotel Branding | 56 |
| E. | Competition | 56 |
| F. | Project Marketing Strategy | 59 |
| G. | EB-5 Investor Activity | 59 |
| 1. | Projected EB-5 Investor Activity | 59 |
| 2. | Job Analysis and I-829 Petitions Forecast | 60 |
| VIII. | Summary and Conclusion | 64 |
| IX. | Contact Information | 65 |
| X. | Addendum | 66 |
| A. | Sellen Construction Hard Cost Estimate | 66 |
| B. | Itemization of Project Costs | 67 |
| C. | Operating Results of Comparable Hotels | 70 |

Exhibit 2 Page 105 of 214

# Southport Hotel Eb-5, LP

## I. Executive Summary

| | |
|---|---|
| **THE PARTNERSHIP** | Southport Hotel Eb-5, LP ("SH-Eb-5" or "the Partnership") is a limited partnership formed pursuant to the laws of the State Washington in June 2013. SH-Eb-5 is in part owned by Seattle Family, LP, a proposed new regional center, formed for the purpose of obtaining regional center designation and sponsoring various projects across King, Snohomish, and Pierce counties in the state of Washington. Each investment in SH-Eb-5 is intended to allow every investor to file an application for lawful permanent resident status in the United States pursuant to 8 U.S.C. §1153 (b)(5) (the "Immigration Act" or the "Act"). <br><br> Investors will make an equity investment in Southport Hotel Eb-5, LP, which will then use the proceeds of the investment to loan money to Hotel at Southport, LLC (the Company" or the "Owner") for subsequent use in the development, construction and operations of a real estate project at 1053 Lake Washington Blvd. N, Renton, Kings County, WA 98056 ("Southport Hotel Project"). |
| **THE PROJECT** | SH-Eb-5 will loan the EB-5 capital to fund the development and operation of the Southport Hotel Project. The Southport Hotel Project will consist of a 12-story, 353-key internationally-branded hotel which will include a restaurant, indoor meeting and pre-function space, a spa, pool, and fitness center (collectively the "Project"). <br><br> **All of the components above listed will be departments of the hotel and will be operated by, or on behalf of, the Owner. There are no tenants.** |
| **THE REGIONAL CENTER** | SH-Eb-5 is sponsored by a new regional center, Seattle Family ("SFRC"). SFRC's application for regional center designation is submitted together with this business plan by principal, Michael Christ. |
| **EB-5 INVESTMENT OFFERING ORGANIZATION AND STRUCTURE** | The Partnership will accept 231 EB-5 investors as limited partners with all the rights and responsibilities accorded under the Washington Uniform Partnership Act, as adopted by the State of Washington in satisfaction of the "policy formulation" requirement of 8 C.F.R. 204.6(j)(5)(iii). The General Partner of the Partnership is Seattle Family, LP (the "General Partner") which is owned by Southport Hotel Management, LLC ("SHM") and operated by a team of professionals employed by SHM. Seattle Family, LP is the legal name of Seattle Family Regional Center. (See Section III-D, EB-5 |

3

Exhibit 2 Page 106 of 214

| | |
|---|---|
| | Investment, Ownership). |
| **PROJECT COSTS AND CAPITALIZATION** | Total project cost is $134,571,760. The Partnership will raise up to $115.5 million in EB-5 capital.   Additional funding for the project is $19 million in traditional construction loan financing (and or additional investment by Michael Christ and investors). A complete description of the capitalization and the sources & uses of funds is available in Section IV-B: Financial Information – Sources and Uses of Funds. |
| **PROJECT DEVELOPMENT SCHEDULE** | This project is already underway using Owner's capital to cover costs to date. Zoning and many other components of the project have been completed (see Section IV-C, Financial Information - Development Timeline.)  Soft opening of the facility is estimated for January 2017, with an official grand opening date estimated as April 2017. |
| **PROJECT JOB CREATION** | It is expected that the full requisite employment need for the EB-5 investors (2,310 jobs) will be achieved before the I-829 petitions will be submitted. |
| **TEA DESIGNATION** | The Project will be located at 1053 Lake Washington Blvd N, Renton, Kings, County, WA 98056.  The Project site is located within Census Tract 253.01, and is part of a contiguous thirteen-tract area in King County which qualifies as a Targeted Employment Area due to the 2011 average unemployment rate of 14.6%, above the threshold of 13.35%. See Section VI – Targeted Employment Area for TEA Status information |
| **FINANCIAL PROJECTION & MARKET OUTLOOK** | Operating projections indicate strong profitability as indicated in Section IV–E, Financial Information – Operating Projections.<br><br>Market conditions appear favorable for all components of the Project as indicated in Section VII-C, Project Feasibility – Hotel Industry Overview. |
| **EXECUTIVE EXPERIENCE** | Strong management skills, as indicated in the complete description of the management team and their experience for both the Partnership and the Job-Creating Project.  Details are available in Section VII-A, Project Feasibility – Development Team. |

4

Exhibit 2 Page 107 of 214

## II. The Project

### A. Project Description

SH-Eb-5 will loan the EB-5 capital to Hotel at Southport, LLC, the job creating entity, for the purpose of developing and operating the Southport Hotel Project. The Southport Hotel Project is part of a larger mixed-use Master Plan which will include a hotel, office space and residential units.

The Project will consist of a 12-story, upper/upscale full-service hotel. The hotel will be branded with an internationally recognized brand, such as Hyatt or a Starwood Hotels brand such as W Hotels or St. Regis. This will be the highest-quality hotel in the south Seattle region, and one of the only full-service hotels in the city according to the May 29, 2013 Market Demand and Financial Analysis report prepared by PKF Consulting, USA (see Exhibit).

The hotel will be a total of 318,468 square feet and will include 353 guestrooms, a restaurant, 29,571sf of meeting and pre-function space, a spa, a pool, and a fitness center.



**Rendering of Southport Hotel**

The restaurant (6,930sf), kitchen (5,405sf), two divisible ballrooms (an 8,000sf main ballroom and a 5,510sf junior ballroom), one meeting room (1,380sf), pre-function space (8,130sf) and back-of-house facilities including storage rooms, a banquet kitchen, laundry and housekeeping will all be located on the ground floor.

5

Exhibit 2 Page 108 of 214



**First Floor Plan**

The 6,650sf hotel lobby and guest reception area will be located on the second floor (street level), along with administrative and hotel back-office area. The design provides for a bird's-eye view of the restaurant and both ballrooms below.

6

Exhibit 2 Page 109 of 214



**Second Floor Plan**

The spa (9,345sf), pool area (3,445sf) and exercise room (2,546sf) are all located on the third floor, along with five meeting rooms totaling 6,551sf. Remaining third floor improvements consist of two large terraces totaling 18,461sf.

7

Exhibit 2 Page 110 of 214



**Third Floor Plan**

8

Exhibit 2 Page 111 of 214

Guestrooms will be located on the fourth through twelfth floors. Each floor on the fourth through seventh floor will have 47 guest rooms. The eighth through twelfth floors will each have 33 guest rooms.



**Fourth through Seventh Floor Plans**



**Eighth through Twelfth Floor Plans**

9

Exhibit 2 Page 112 of 214

The square footages for each level are as follows:

| First Floor | 53,654 sf | |
|---|---|---|
| Second Floor | 15,277 sf | |
| Third Floor | 44,889 sf | |
| Fourth Floor | 26,332 sf | 47 bays |
| Fifth Floow | 26,332 sf | 47 bays |
| Sixth Floor | 26,332 sf | 47 bays |
| Seventh Floor | 26,332 sf | 47 bays |
| Wighth Floor | 19,864 sf | 33 bays |
| Ninth Floor | 19,864 sf | 33 bays |
| Tenth Floor | 19,864 sf | 33 bays |
| Eleventh Floor | 19,864 sf | 33 bays |
| Twelfth Floor | 19,864 sf | 33 bays |
| Totals | 318,468 sf | 353 bays |

The Project will be located on a Lake Washington waterfront site at 1053 Lake Washington Blvd., Renton, WA in King County, WA 98056, which is easily accessible from I-405.  This site is also easily accessible from the Seattle Tacoma Airport ("Sea-Tac Airport"), Seattle, and Bellevue.



**Site Location**



10

Exhibit 2 Page 113 of 214

## B.   Ownership



(1)  Hotel at Southport, LLC (the "Company") was formed to own the job-creating project.  It is 100% owned by its Managing Member, 1 Min, LLC.

(2)  1 Min, LLC controls and owns 100% of the Company.

(3)  Michael Christ, Managing Member of 1 Min, LLC is also the owner and sole proprietor of SECO Development, Inc. Background information on Mr. Christ is located in Section VII-A, Project Feasibility-Development Team.

(4)  Southport One, LLC ("Southport One") owns the land on which the Project will be built.  It is ultimately controlled by Michael Christ, through his sole-ownership of Southport One Hotel, LLC, its sole Member.   A 99-year land lease, with an option to extend or purchase at the 2008 appraised value will be entered into by Southport One and the Company.

## C.   Management

During the construction phase, the Project will be managed by SECO Development which will be hired by the Company to develop the hotel.  See Section VII-A, Project Feasibility-Development Team.  Once the construction is complete and a Certificate of Occupancy has been issued, the hotel will be operated by the Company.  A management company may be engaged to manage the property on the Company's behalf, *but all employees will work for the Company, and all business risk will be that of the Company, not that of the hotel management company.*

Exhibit 2 Page 114 of 214

## III. The EB-5 Investment

### A. Description

SH-Eb-5 is a limited partnership formed pursuant to the laws of Washington. Its purpose is to raise funds through the Eb-5 program and loan such funds to the Company for developing, constructing, and operating the Southport Hotel Project. The Eb-5 program grants lawful permanent resident status in the United States to those who make qualifying investments under the provisions of the U.S. Immigration and Nationality Act (see 8 U.S.C. §1153(b) (5)(A)(i)-(iii) and (C)). SH-Eb-5 will invest in a USCIC qualified business. Said investment is projected to create the required number of jobs in a targeted employment area ("TEA"), through the Company's development of the Southport Hotel Project. SH-Eb-5 shall be operated and partly-owned by its General Partner (Seattle Family, LP) and partly-owned by 231 qualified EB-5 immigrant investors.

### B. Regional Center Affiliation

This project will be sponsored by a new regional center, the Seattle Family Regional Center ("SFRC"), the application for which is being submitted concurrently.

The requested target industries of the proposed regional center coincide with the industry clusters of the subject Project; specifically, the construction and development of hotels that involve:
- Commercial and Institutional Building Construction (NAICS 236220)
- Furniture, Fixtures and Equipment purchases (NAICS 4232)
- Legal Services (NAICS 541110)
- Architectural, Engineering and Related Services (NAICS 5413)
- Hotels (except Casino Hotels) and Motels (NAICS 721110)
- Restaurants and Other Eating Places (NAICS 7225)
- Parking Lots and Garages (NAICS 812930-Other Personal Services)

The requested Geographic Scope of the Regional Center includes the Washington counties of Snohomish, Pierce and King based on the commuting patterns for SFRC's first identified project, the development and operations of the Southport Hotel Project.



**Seattle Family Regional Center Geographic Area**

12

Exhibit 2 Page 115 of 214

### C.   How the EB-5 Funds Flow to Job Creation



Exhibit 2 Page 116 of 214

### D.   Ownership Structure



(1)   Southport Hotel Eb-5, LP was formed in the state of Washington (the "Partnership").  The Partnership is the New Commercial Enterprise[1] into which the EB-5 investors will make their "at risk" capital investment.  It is will be owned by up to 231 qualified EB-5 investors (the Limited Partners) and by Seattle Family, LP (the General Partner).

(2)   Up to 231 EB-5 investors will become Limited Partners in Southport Hotel Eb-5, LP

---

[1] The EB-5 program has presented a broad definition of what constitutes a "new" commercial enterprise into which the immigrant investor can invest the required amount of capital and help create jobs.

The EB-5 program defines "new" as "established after November 29, 1990." See 8 C.F.R. § 204.6(e). The immigrant investor can invest the required amount of capital in a commercial enterprise that was established after November 29, 1990 to qualify for the EB-5 Program, provided the other eligibility criteria are met.

In addition, under the EB-5 Program, a "new" commercial enterprise also means a commercial enterprise that was established before November 29, 1990 and that will be restructured or expanded through the immigrant investor's investment of capital.

Taken directly from USCIS EB-5 Immigrant Investor Program Quarterly Stakeholder Engagement on May 1, 2012.

112   25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 116 of 214

Exhibit 2 Page 117 of 214

(3) Seattle Family, LP is the legal name of the Seattle Family Regional Center. SFRC will be the General Partner of the Partnership. It was formerly known as Southport Hotel, LP (I-924 applicant).

(4) Southport Hotel Management, LLC is the General Partner of Seattle Family, LP.

(5) Michael Christ, through his 100% ownership of Southport Hotel Management, LLC ultimately controls the Partnership.

## E.   Management

Management of Southport Hotel Eb-5, LP is provided by its general partner, Seattle Family, LP, which is ultimately controlled by Michael Christ. As stated above, background information on Mr. Christ is available in section VII-A, Project Feasibility-Development Team.

Management will:

1. Oversee the marketing of the investment to qualified domestic and foreign EB-5 investors.
2. Liaison with escrow agent to assure that all investor funds are safe until such time as those funds are needed to be advanced for actual construction of the Southport Hotel Project.
3. Review all construction draw requests issued by the Project to assure that project is being constructed on time and within budget.
4. Liaison on a regular basis with all investors to keep them informed as to the status of their investment and the project.
5. Assist, when necessary, in providing the required information for use in preparation of EB-5 Investor I-526 Petitions and I-829 Petitions and any other USCIS required documentation necessary for the investor to obtain a conditional and ultimately, a permanent Green Card.
6. Oversee the maintenance of current information for all investors in compliance with USCIS regulations and guidelines.
7. Assure the establishment of the proper tracking systems to monitor investor funds, I-526 and I-829 applications.

## F.   Investment Terms and Conditions

A summary of the terms and conditions of the investment includes, but may not be limited to the following:

- The new commercial enterprise into which the EB-5 investors will be admitted as limited Partners will be Southport Hotel Eb-5, LP.

- All EB-5 immigrant investors who file I-526 petitions in a commercial enterprise located in a Regional Center district must meet the requirements of 8CFR 204.6.

- The minimum investment amount is $550,000 for one (1) Unit (the "Subscription Amount"). Of the Subscription Amount, $500,000 thereof shall constitute a capital contribution to the Partnership and represents the minimum capital investment required by the USCIS EB-5 Pilot Program to fund a project designated as being in a TEA and the remaining $50,000 shall be payable to Seattle Family, LLC, the General Partner, to defray Offering-related expenses, including legal, migration costs, marketing and

15

Exhibit 2 Page 118 of 214

promotional fees (the "Subscription Fee"). The administrative fee of $50,000 per Unit shall not constitute or be deemed a capital contribution.

- The investment is subject to the approval of Seattle Family, LP as a USCIS designated regional center. The application has been filed with USCIS and is awaiting approval.

- All investors must be accredited investors as defined as set forth by Securities Exchange Commission Rule 501(a).

- SH-Eb-5 may, at its discretion, accept subscription proceeds prior to USCIS approval of SFRC as a USCIS designated Regional Center. All proceeds shall be safely held in an escrow account until advanced into the project, but shall be fully refunded in the event the required approval is not received.

- The General Partner shall have the rights given it under state law and as set out in the Operating Agreement.

- Each investor is responsible for retaining his or her own legal counsel if they require guidance or assistance in fulfilling the necessary requirements to become a qualified investor in SH-Eb-5.

- All investors shall be deemed "Members" in SH-Eb-5 and shall have the rights given to them as such by state Law, and by the underlying Operating Agreement.

- The offering is limited to $127,050,000 and 231investors ($115,500,000 in capital and $11,550,000 in administrative fees). This amount has been determined based on the Economic Impact analysis prepared by Barnhart Economic Services, LLC

- Investor funds are considered non-refundable and "fully at risk" once the investor has successfully filed their Form I-526 petition with USCIS.

- Return of investor capital is not guaranteed, however, SH-Eb-5 will follow identified exit strategies to return the capital based on prevailing market conditions.

## G. Escrow Information

### 1. Escrow Agent

The Escrow Agent will be East West Bank, a full-service commercial bank serving consumers and businesses throughout the U.S. and in Greater China. East West Bancorp (Nasdaq: EWBC) is a publicly owned company with $22.5 billion in assets and is traded on the Nasdaq Global Select Market under the symbol "EWBC". The Company's wholly owned subsidiary, East West Bank, is one of the largest independent banks headquartered in California. East West is focused exclusively on the United States and Greater China markets and operates over 120 locations worldwide, including in the United States markets of California, New York, Georgia, Massachusetts, Texas and Washington. In Greater China, East West's presence includes a full service branch in Hong Kong and representative offices in Beijing, Shenzhen and Taipei. Through a wholly-owned subsidiary bank, East West's presence in Greater China also includes full service branches in Shanghai and Shantou and a representative office in Guangzhou. For more information on East West Bancorp, visit the Company's website at www.eastwestbank.com.

Exhibit 2 Page 119 of 214

## H.    Loan Structure[2]

SH-Eb-5 will market units only to qualified investors. As stated, proceeds from the sale of units will be loaned to the Company. The loan will be evidenced by a properly executed loan agreement. The complete terms and conditions of the loan are completely detailed in the Private Placement Memorandum and loan agreement, but the basic terms are as follows:

**Borrower:**    Hotel at Southport, LLC

**Lender:**    Southport Hotel Eb-5, LP

**Amount**:    Assuming that SH-Eb-5 raises the Maximum Offering Amount and that the Escrow Condition is satisfied as to each Subscriber, the amount available under the Loan shall be $115,500,000.

**Collateral:**    Deed of Trust on improvements, assignment of development agreement, and assignment of Borrower's 99-year lease on the property.

**Terms of Loan:**    Borrower shall not be required to make any payments whatsoever on the Loan until the earlier of (i) the fifth anniversary after the first advance of Loan proceeds and (ii) the occurrence of a Capital Event.  However, under no circumstances shall a Capital Event occur or Loan Principal payments be made before the end of conditional residence of the Limited Partners unless USCIS authorizes an earlier point of acceptable repayment.  Borrower will begin making payments on the Loan's Interest and principal pursuant to the terms below:

1. Borrower shall pay Lender's pro rata share of net proceeds from the Capital Event within 120 days of said Capital Event.  Lender's pro rata share of the Capital Event's net proceeds shall be calculated by the total Loan principal divided by the total cost for completing the Improvements (hard and soft costs) plus any additional capital contributions into Borrower.  Lender's share of the net proceeds from the Capital Event shall be applied 25% to accrued Interest and then 75% to the principal.

2. Beginning on the first calendar quarter after the fifth anniversary of the first Loan disbursement, Capital Event, Borrower shall pay Lender, on a quarterly basis calculated from January 1, 75% Net Cash Flow until the Loan principal and Interest is repaid in full.  Such payments shall be applied 25% to accrued Interest and then 75% to the principal.

**Interest Rate**:    3% simple interest per annum, calculated from March 1, 2017.

**Sources of Repayment:**

1. <u>Primary</u>- Refinancing or sale of the development

2. <u>Secondary</u>- Cash flow from hotel operations

---

[2] Since USCIS approved this document as exemplar, edits were made to Terms of Loan section to clarify timing and restrictions on principal repayment and occurrence of Capital Event.  Also, added the start date to Interest Rate calculation.

Exhibit 2 Page 120 of 214

**Disbursement**
**Requirements:**   To assure funds are invested into the project pursuant to the projected budgets contained in this business plan, the Borrower must submit to the Lender the following documentation:[3]

a.   Draw requests stating the amount of funds necessary to pay contractors for construction work that has been satisfactorily completed in accordance with the construction budget.
b.   Authorization for payment of requested construction draws stating that the required construction work has been satisfactorily completed.

**Other Terms & Conditions:** See exhibit, "Loan Agreement"

## I.   Exit Strategy

According to the guidelines of USCIS relating to investments made within an approved EB-5 project, an "investment within such a project must be fully at risk", and that there is no guarantee that the capital will be returned.

Primary Source of Repayment:

It is the Developer's intent that Hotel at Southport, LLC will seek a conventional refinance loan approximately five (5) years after Hotel at Southport, LLC borrows the funds from SH-Eb-5.

Secondary Source of Repayment:

In the event refinancing does not provide funds sufficient to repay the loan from SH Eb-5 in its entirety, Hotel at Southport , LLC shall make quarterly payments on the loan until repaid in full. Such payments shall be 75% of Hotel at Southport's net cash flow.

---

[3] Since USCIS approved this document as exemplar, the references to "WTLP" and "WT-EB-5" were corrected in this sentence to reflect "Borrower" and "Lender."

Exhibit 2 Page 121 of 214

## IV. Financial Information

### A. Project Cost/Development Budget

The following cost schedule is a summary of the May 23, 2013 conceptual estimate provided by Sellen Construction on May 23, 2013. The full schedule is included in the Addendum.

| Project Costs | | |
|---|---|---|
| **Component** | **Amount** | **$/GSF** |
| **Site Work** | **1,000,000** | **3.14** |
| **Direct Construction Costs (Sellen)** | | |
| Foundations | 2,660,699 | 8.35 |
| Substructure | 1,232,248 | 3.87 |
| Superstructure | 9,331,006 | 29.30 |
| Exterior Closure | 10,222,596 | 32.10 |
| Roofing | 1,964,145 | 6.17 |
| Interior Construction | 22,071,761 | 69.31 |
| Elevator Systems | 2,420,000 | 7.60 |
| Plumbing | 6,826,369 | 21.44 |
| HVAC | 5,490,311 | 17.24 |
| Fire Protection | 1,005,349 | 3.16 |
| Electrical | 7,377,703 | 23.17 |
| General Conditions | 6,164,340 | 19.36 |
| Hoisting | 2,517,611 | 7.91 |
| Equipment | 279,400 | 0.88 |
| Sitework | 3,600,000 | 11.30 |
| **Sub-Total Direct Costs** | **83,163,035** | **261.14** |
| Construction Contingency | 1,247,453 | 3.92 |
| GC Fee | 2,532,330 | 7.95 |
| **Sub-Total** | **86,943,321** | **273.00** |
| B & O Taxes and Liability Insurance | 1,191,039 | 3.74 |
| **Sub-Total** | **88,134,360** | **276.74** |
| Washington State Sales Tax @ 9.5% | 8,372,764 | 26.29 |
| **Total** | **96,507,124** | **303.04** |
| **Parking Cost** | | |
| Parking Stalls | 6,088,320 | 19.12 |
| Washington State Sales Tax @ 9.5% | 578,390 | 1.82 |
| **Total** | **6,666,710** | **20.93** |
| **Soft Costs** | | |
| Consultants | 3,757,748 | 11.80 |
| Misc. Costs | 865,000 | 2.72 |
| Permits, Utility Fees & Assessments | 1,496,635 | 4.70 |
| Insurance & Taxes | 2,836,101 | 8.91 |
| Developer Costs | 3,477,732 | 10.92 |
| Construction Financing | 5,814,708 | 18.26 |
| Development Loan Interest | 250,000 | 0.79 |
| **Total** | **18,497,924** | **58.08** |
| **Furniture, Fixtures & Equipment** | **8,900,000** | **27.95** |
| **Reserves & Working Capital** | **3,000,000** | **9.42** |
| **TOTAL PROJECT COST** | **134,571,760** | **422.56** |

19

Exhibit 2 Page 122 of 214

## B. Sources and Uses of Funds

| Source of Funds | | | Use of Funds | | |
|---|---|---|---|---|---|
| EB-5 Investors | 115,500,000 | 86% | Site Work | 1,000,000 | 1% |
| Bank Financing | 19,071,760 | 14% | Direct Costs (Hard) | 96,507,124 | 14% |
| | | | Parking Costs | 6,666,710 | 7% |
| | | | Soft Cost | 18,497,924 | 2% |
| | | | F, F & E | 8,900,000 | 7% |
| | | | Reserves & Working Capital | 3,000,000 | 2% |
| Total Sources | 134,571,760 | 100% | Total Costs | 134,571,760 | 100% |

Note: Schedule does not total due to rounding.

Up to $115.5 million of the Project cost will be funded by a loan from Southport Hotel Eb-5, LP. Additional funding for the project is $19 million in traditional construction loan financing (and/or additional investment by Michael Christ and investors. Lending institutions have already indicated their interest in loaning the additional $19 million necessary to fill the gap left after Eb-5 investors contribute $115.5 million. Hotel at Southport, LLC is also actively engaged in seeking out other investors to help supplement funds raised through the Eb-5 program.

## C. Development Timeline

The following timeline has been estimated based upon the best information available at this time. ***These dates may change due to the timing of the first EB-5 funds (or bridge loan) being released to the project. The specific dates provide a tangible example from which a projection of job creation can ultimately be drawn.***

| Projected Date | Action Item |
|---|---|
| | |
| Done | Land acquisition |
| Done | Submit site development permit application |
| 9/14 | Submit building permit application |
| 10/14 | Site development permit approval |
| 11/14 | Building permit approval |
| 3/15 | Close construction loan |
| 11/14 | Start construction |
| 12/16 | Construction complete |
| 1/17 | Soft opening |
| 4/17 | Grand opening |

## D. Cost Disbursement Timeline

The following Cost Disbursement Timeline has been estimated based upon the best information available at this time. ***As with the Development Timeline, the timing of EB-5 funds (or bridge***

20

Exhibit 2 Page 123 of 214

*loan) being released to the project may affect the actual dates.  The specific dates provide a tangible example from which a projection of job creation timing can ultimately be drawn.*

119    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 123 of 214

Exhibit 2 Page 124 of 214

**SOUTHPORT HOTEL BUDGET**
Mulvanny G2 Scheme dated 3-23-07
353 Room Luxury Hotel

| | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 |
| **CONSTRUCTION** | | | | | | | | | | | | | | |
| **Site Work** | | | | | | | | | | | | | | |
| Offsite traffic improvements (LW.Blvd. road, bridge, etc) | 200,000 | 200,000 | 200,000 | 200,000 | | | | | | | | | | |
| **Total Site Work** | 200,000 | 200,000 | 200,000 | 200,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **General Contractor (Sellen Construction)** | | | | | | | | | | | | | | |
| Direct Construction Costs (301,783 SF enclosed space) | 831,635 | 831,635 | 1,247,453 | 1,663,270 | 1,663,270 | 2,494,907 | 3,326,542 | 4,158,177 | 4,989,812 | 5,405,630 | 5,821,448 | 6,237,265 | 6,653,083 | 6,237,265 |
| Construction Contingency at 1.5% | 12,475 | 12,475 | 18,712 | 24,949 | 24,949 | 37,424 | 49,898 | 62,373 | 74,847 | 81,084 | 87,322 | 93,559 | 99,796 | 93,559 |
| General Contractor Fee | 25,323 | 25,323 | 37,985 | 50,647 | 50,647 | 75,970 | 101,293 | 126,616 | 151,940 | 164,601 | 177,263 | 189,925 | 202,586 | 189,925 |
| **Construction Cost Subtotal** | 869,433 | 869,433 | 1,304,150 | 1,738,866 | 1,738,866 | 2,608,300 | 3,477,733 | 4,347,166 | 5,216,599 | 5,651,316 | 6,086,033 | 6,520,749 | 6,955,466 | 6,520,749 |
| B&O Taxes and Liability Insurance | 11,911 | 11,911 | 17,865 | 23,821 | 23,821 | 35,731 | 47,641 | 59,552 | 71,463 | 77,417 | 83,372 | 89,328 | 95,283 | 89,328 |
| Washington State Sales Tax @ 9.5% | 83,728 | 83,728 | 125,591 | 167,455 | 167,455 | 251,183 | 334,911 | 418,638 | 502,366 | 544,230 | 586,093 | 627,957 | 669,821 | 627,957 |
| **Construction Cost Total** | 965,072 | 965,072 | 1,447,606 | 1,930,142 | 1,930,142 | 2,895,214 | 3,860,285 | 4,825,356 | 5,790,428 | 6,272,963 | 6,755,499 | 7,238,034 | 7,720,570 | 7,238,034 |
| **Parking Cost** | | | | | | | | | | | | | | |
| Parking (300 stalls) | 200,000 | 500,000 | 500,000 | 338,320 | | | | | | | | | | |
| Washington State Sales Tax @ 9.5% | 19,000 | 47,500 | 47,500 | 32,140 | | | | | | | | | | |
| **Total Parking Costs** | 219,000 | 547,500 | 547,500 | 370,460 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **SOFT COSTS** | | | | | | | | | | | | | | |
| **Consultants** | | | | | | | | | | | | | | |
| Architectural (site studies to SEPA thru CA) | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| Architectural production of marketing materials | | | | | | | | | | | 7,143 | 7,143 | 7,143 | 7,143 |
| Architectural Reimbursable & extra services | | | | | | | | | | | | | | |
| Structural w/CA, piling | | | | | | | | | | | | | | |
| Civil | | | | | | | | | | | | | | |
| Landscape | | | | | | | | | | | | | | |
| Envelope Consultation (shop dwgs/const review) | | | | | | | | | | | | | | |
| Soils Study/Geotech Report, piling criteria | | | | | | | | | | | | | | |
| ALTA Survey, bound,topo,easements,updates | | | | | | | | | | | | | | |
| Misc Consultants; (lvdw, elevator, acoustical, energy calc) | | | | | | | | | | | | | | |
| Mechanical Consultant | | | | | | | | | | | | | | |
| Electrical Consultant | | | | | | | | | | | | | | |
| Signage & Graphics design | | | | | | | | | | | | | | |
| City / Zoning Consultant | | | | | | | | | | | | | | |
| Traffic Engineer | | | | | | | | | | | | | | |
| Restaurant/Kitchen Designer | | | | | | | | | | | | | | |
| Interior design services, FF&E selection & spec Lobby & Amenity | | | | | | | | | | | | | | |
| Interior designer CA & purchase of FF&E, Supervise installation | | | | | | | | | | | | | | |
| **Misc Costs** | | | | | | | | | | | | | | |
| Renderings & Models | | | | | | | | | | | | | | |
| Environmental Phase I | | | | | | | | | | | | | | |
| Environmental Phase II | | | | | | | | | | | | | | |
| Legal & Accounting | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 |
| Structural Inspections | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 |
| Geotech Field Services | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 |
| Waterproofing/Envelope Inspection | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 |
| Window/envelope testing | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 |
| Printing, Courier Expenses | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 |
| Photos/aerials | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 |
| Travel & entertainment expense Allow | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 |
| **Permits, Utility Fees and Assessments:** | | | | | | | | | | | | | | |
| Design Review/Preapp/Filing Fees | | | | | | | | | | | | | | |
| Building Permit/Plan Check | | | | | | | | | | | | | | |
| Restaurant/bar TI Improvement Permits | | | | | | | | | | | | | | |
| UD/Latecomer Fees/Mitigation (parks,traffic,schools) | 100,000 | | | | | | | | | | | | | |
| Water Meters | | | | | | | | | | | | | 4,367 | 4,367 |
| Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | | | | | | | | | | | 7,143 | 7,143 | 7,143 | 7,143 |
| Natural Gas | | | | | | | | | | | 3,571 | 3,571 | 3,571 | 3,571 |
| Dewatering discharge fees Allow | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | | | | |
| Ongoing Site Utilities charges during const | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 |
| Power Service and Transformer | | | | | | | | | | | 7,143 | 7,143 | 7,143 | 7,143 |
| Restaurant, Liquor & Health, & Other Permits & Impact Fees | | | | | | | | | | | | | | |
| Bond premiums & Misc city/state licenses | | | | | | | | | | | | | | |
| **Furnishings (Allowance)** | | | | | | | | | | | | | | |
| Van, pickup, automobile | | | | | | | | | | | | | | |
| **Insurance & Taxes:** | | | | | | | | | | | | | | |
| RE taxes on land during predev & construction period | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 29,658 | 59,316 | 59,316 |
| Property Insurance thru occupancy | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 |
| Builders Risk Insurance | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 |
| **Developer Costs** | | | | | | | | | | | | | | |
| Project Management & Administration | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
| Developer Overhead & Project Mgmt | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
| **Construction Financing:** | | | | | | | | | | | | | | |
| Appraisal | | | | | | | | | | | 25,000 | | | |
| Title Ins. & Endorsements | | | | | | | | | | | 25,000 | | | |
| Construction Review & Inspections | | | | | | | | | | | 2,143 | 2,143 | 2,143 | 2,143 |
| Lender Legal & Environmental Fees, & Loan Closing Costs | | | | | | | | | | | 20,000 | | | |
| Construction Loan Fee | | | | | | | | | | | 350,000 | | | |
| Permanent Loan Fee | | | | | | | | | | | | | | |
| Construction Interest (net of capitalized rev) | | | | | | | | | | | | | | |
| Draw rate during 26 mo. construction period | | | | | | | | | | | 22,292 | 40,125 | 53,500 | 66,875 |
| Development Loan Interest | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | | | | |
| Preopening and Working Capital | | | | | | | | | | | | | | |
| Reserve for shortfall | | | | | | | | | | | | | | |
| **Soft Cost Total** | 315,152 | 215,152 | 215,152 | 215,152 | 215,152 | 215,152 | 215,152 | 215,152 | 215,152 | 215,152 | 657,500 | 255,337 | 302,536 | 315,911 |
| **Total Project Costs** | 1,699,224 | 1,927,724 | 2,410,258 | 2,715,755 | 2,145,294 | 3,110,366 | 4,075,437 | 5,040,508 | 6,005,580 | 6,488,115 | 7,413,002 | 7,493,371 | 8,023,106 | 7,553,946 |

Exhibit 2 Page 125 of 214

# SOUTHPORT HOTEL BUDGET

**Mulvanny Q2 Scheme dated 3-23-07**
**353 Room Luxury Hotel**

| | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 |
| **CONSTRUCTION** | | | | | | | | | | | | | | |
| **Site Work** | | | | | | | | | | | | | | |
| Offsite traffic improvements (LW Blvd. road, bridge, etc) | | | | | | | | | | | | | | |
| **Total Site Work** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **General Contractor (Sellen Construction)** | | | | | | | | | | | | | | |
| Direct Construction Costs (301,783 SF enclosed space) | 5,821,448 | 5,197,722 | 4,573,995 | 3,950,268 | 3,326,542 | 2,494,907 | 1,871,180 | 1,455,362 | 1,039,545 | 831,632 | | | | |
| Construction Contingency at 1.5% | 87,322 | 77,966 | 68,610 | 59,254 | 49,898 | 37,424 | 28,068 | 21,830 | 15,593 | 12,474 | | | | |
| General Contractor Fee | 177,263 | 158,271 | 139,278 | 120,286 | 101,293 | 75,970 | 56,977 | 44,316 | 31,654 | 25,322 | | | | |
| Construction Cost Subtotal | 6,086,033 | 5,433,958 | 4,781,883 | 4,129,808 | 3,477,733 | 2,608,300 | 1,956,225 | 1,521,508 | 1,086,792 | 869,429 | 0 | 0 | 0 | 0 |
| B&O Taxes and Liability Insurance | 83,372 | 74,440 | 65,507 | 56,574 | 47,641 | 35,731 | 26,798 | 20,843 | 14,888 | 11,913 | | | | |
| Washington State Sales Tax @ 9.5% | 586,093 | 523,298 | 460,502 | 397,706 | 334,911 | 251,183 | 188,387 | 146,523 | 104,660 | 83,728 | | | | |
| **Construction Cost Total** | 6,755,499 | 6,031,696 | 5,307,892 | 4,584,088 | 3,860,285 | 2,895,214 | 2,171,410 | 1,688,874 | 1,206,340 | 965,070 | 0 | 0 | 0 | 0 |
| **Parking Cost** | | | | | | | | | | | | | | |
| Parking (300 stalls) | | | | 500,000 | 750,000 | 1,000,000 | 1,000,000 | 900,000 | | | | | | |
| Washington State Sales Tax @ 9.5% | | | | 47,500 | 71,250 | 95,000 | 95,000 | 85,500 | | | | | | |
| **Total Parking Costs** | 0 | 0 | 0 | 547,500 | 821,250 | 1,095,000 | 1,095,000 | 985,500 | 0 | 0 | 0 | 0 | 0 | 0 |
| **SOFT COSTS** | | | | | | | | | | | | | | |
| **Consultants** | | | | | | | | | | | | | | |
| Architectural (site studies to SEPA thru CA) | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 15,827 | | | | |
| Architectural production of marketing materials | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | | | | |
| Architectural Reimbursable & extra services | | | | | | | | | | | | | | |
| Structural w/CA, piling | | | | | | | | | | | | | | |
| Civil | | | | | | | | | | | | | | |
| Landscape | | | | | | | | | | | | | | |
| Envelope Consultation (shop dwgs/const review) | | | | | | | | | | | | | | |
| Soils Study/Geotech Report, piling criteria | | | | | | | | | | | | | | |
| ALTA Survey, bound,topo,easements,updates | | | | | | | | | | | | | | |
| Misc Consultants; (indiv, elevator, acoustical, energy calc) | | | | | | | | | | | | | | |
| Mechanical Consultant | | | | | | | | | | | | | | |
| Electrical Consultant | | | | | | | | | | | | | | |
| Signage & Graphics design | | | | | | | | | | | | | | |
| City / Zoning Consultant | | | | | | | | | | | | | | |
| Traffic Engineer | | | | | | | | | | | | | | |
| Restaurant/Kitchen Designer | | | | | | | | | | | | | | |
| Interior design services, FF&E selection & spec Lobby & Amenity | | | | | | | | | | | | | | |
| Interior designer CA & purchase of FF&E, Supervise installation | | | | | | | | | | | | | | |
| **Misc Costs** | | | | | | | | | | | | | | |
| Renderings & Models | | | | | | | | | | | | | | |
| Environmental Phase I | | | | | | | | | | | | | | |
| Environmental Phase II | | | | | | | | | | | | | | |
| Legal & Accounting | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | 6,579 | | | | |
| Structural Inspections | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | 10,577 | | | | |
| Geotech Field Services | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | 1,974 | | | | |
| Waterproofing/Envelope Inspection | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | 2,885 | | | | |
| Window/envelope testing | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | | | | |
| Printing, Courier Expenses | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | 658 | | | | |
| Photos/aerials | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | | | | |
| Travel & entertainment expense Allow | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | | | | |
| **Permits, Utility Fees and Assessments:** | | | | | | | | | | | | | | |
| Design Review/Preapp/Filing Fees | | | | | | | | | | | | | | |
| Building Permit/Plan Check | | | | | | | | | | | | | | |
| Restaurant/bar TI Improvement Permits | | | | | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | | | | |
| LID/Latecomer Fees/Mitigation (parks,traffic,schools) | | | | | | | | | | | | | | |
| Water Meters | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | 4,367 | | | | |
| Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | | | | |
| Natural Gas | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | 3,571 | | | | |
| Dewatering discharge fees Allow | | | | | | | | | | | | | | |
| Ongoing Site Utilities charges during const | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | 385 | | | | |
| Power Service and Transformer | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | 7,143 | | | | |
| Restaurant, Liquor & Health, & Other Permits & Impact Fees | | | | | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | | | | |
| Bond premiums & Misc city/state licenses | | | | | 833 | 833 | 833 | 833 | 833 | 833 | | | | |
| **Furnishings (Allowance)** | | | 1,093,750 | 1,093,750 | 1,093,750 | 1,093,750 | 1,093,750 | 1,093,750 | 1,093,750 | 1,093,750 | | | | |
| Van, pickup, automobile | | | | | | | | | 50,000 | 100,000 | | | | |
| **Insurance & Taxes:** | | | | | | | | | | | | | | |
| RE taxes on land during predev & construction period | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | 59,316 | | | | |
| Property Insurance thru occupancy | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | | | | |
| Builders Risk Insurance | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | 48,077 | | | | |
| **Developer Costs** | | | | | | | | | | | | | | |
| Project Management & Administration | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
| Developer Overhead & Project Mgmt | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
| **Construction Financing:** | | | | | | | | | | | | | | |
| Appraisal | | | | | | | | | | | | | | |
| Title Ins. & Endorsements | | | | | | | | | | | | | | |
| Construction Review & Inspections | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | 2,143 | | | | |
| Lender Legal & Environmental Fees, & Loan Closing Costs | | | | | | | | | | | | | | |
| Construction Loan Fee | | | | | | | | | | | | | | |
| Permanent Loan Fee | | | | | | | | | | | | | | |
| Construction Interest (net of capitalized rev) | | | | | | | | | | | | | | |
| Draw rate during 26 mo. construction period | 80,250 | 93,625 | 107,000 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 |
| **Development Loan Interest** | | | | | | | | | | | | | | |
| Preopening and Working Capital | | | | | | | | | | | | 250,000 | 250,000 | 250,000 | 250,000 |
| Reserve for shortfall | | | | | | | | | | | | 400,000 | 300,000 | 250,000 |
| **Soft Cost Total** | 329,286 | 342,661 | 1,449,786 | 1,454,245 | 1,458,411 | 1,458,411 | 1,458,411 | 1,458,411 | 1,508,411 | 1,558,238 | 419,421 | 819,421 | 719,421 | 669,421 |
| **Total Project Costs** | 7,084,785 | 6,374,357 | 6,757,678 | 6,585,833 | 6,139,946 | 5,448,625 | 4,724,821 | 4,132,786 | 2,714,751 | 2,523,308 | 419,421 | 819,421 | 719,421 | 669,421 |

25-80007-FPC Doc 15-2 Filed 02/19/25 Entered 02/19/25 15:21:59 Pg 125 of 214

Exhibit 2 Page 126 of 214

**SOUTHPORT HOTEL BUDGET**
Mulvanny G2 Scheme dated 3-23-07
353 Room Luxury Hotel

| | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 |

**CONSTRUCTION**
Site Work
 Offsite traffic improvements (LW.Blvd. road, bridge, etc)

| Total Site Work | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

General Contractor (Sellen Construction)
 Direct Construction Costs (301,783 SF enclosed space)
 Construction Contingency at 1.5%
 General Contractor Fee

| Construction Cost Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

 B&O Taxes and Liability Insurance
 Washington State Sales Tax @ 9.5%

| Construction Cost Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Parking Cost
 Parking (300 stalls)
 Washington State Sales Tax @ 9.5%

| Total Parking Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**SOFT COSTS**
Consultants
 Architectural  (site studies to SEPA thru CA)
 Architectural production of marketing materials
 Architectural Reimbursable & extra services
 Structural w/CA, piling
 Civil
 Landscape
 Envelope Consultation (shop dwgs/const review)
 Soils Study/Geotech Report, piling criteria
 ALTA Survey, bound,topo,easements,updates
 Misc Consultants; (hvlw, elevator, acoustical, energy calc)
 Mechanical Consultant
 Electrical Consultant
 Signage & Graphics design
 City / Zoning Consultant
 Traffic Engineer
 Restaurant/Kitchen Designer
 Interior design services, FF&E selection & spec Lobby & Amenity
 Interior designer CA & purchase of FF&E, Supervise installation
Misc Costs
 Renderings & Models
 Environmental Phase I
 Environmental Phase II
 Legal & Accounting
 Structural Inspections
 Geotech Field Services
 Waterproofing/Envelope Inspection
 Window/envelope testing
 Printing, Courier Expenses
 Photos/aerials
 Travel & entertainment expense  Allow
Permits, Utility Fees and Assessments:
 Design Review/Preapp/Filing Fees
 Building Permit/Plan Check
 Restaurant/bar TI Improvement Permits
 LID/Latecomer Fees/Mitigation (parks,traffic,schools)
 Water Meters
 Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits
 Natural Gas
 Dewatering discharge fees  Allow
 Ongoing Site Utilities charges during const
 Power Service and Transformer
 Restaurant, Liquor & Health, & Other Permits & Impact Fees
 Bond premiums & Misc city/state licenses
Furnishings (Allowance)
 Van, pickup, automobile
Insurance & Taxes:
 RE taxes on land during predev & construction period
 Property Insurance thru occupancy
 Builders Risk Insurance
Developer Costs
 Project Management & Administration

| | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

 Developer Overhead & Project Mgmt

| | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 | 28,981 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Construction Financing:
 Appraisal
 Title Ins. & Endorsements
 Construction Review & Inspections
 Lender Legal & Environmental Fees, & Loan Closing Costs
 Construction Loan Fee
 Permanent Loan Fee
Construction Interest (net of capitalized res)
 Draw rate during 26 mo. construction period

| | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Development Loan Interest
Preopening and Working Capital

| | 250,000 | 250,000 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Reserve for shortfall

| | 200,000 | 150,000 | 125,000 | 50,000 | 25,000 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Soft Cost Total | 619,421 | 569,421 | 294,421 | 219,421 | 194,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Total Project Costs | 619,421 | 569,421 | 294,421 | 219,421 | 194,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 | 169,421 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 126 of 214

Exhibit 2 Page 127 of 214

**SOUTHPORT HOTEL BUDGET**
Mulvanny G2 Scheme dated 3-23-07
353 Room Luxury Hotel

| | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 |

**CONSTRUCTION**

Site Work
Offsite traffic improvements (LW.Blvd. road, bridge, etc)

| Total Site Work | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

General Contractor (Sellen Construction)
Direct Construction Costs (301,783 SF enclosed space)
Construction Contingency at 1.5%
General Contractor Fee

| Construction Cost Subtotal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

B&O Taxes and Liability Insurance
Washington State Sales Tax @ 9.5%

| Construction Cost Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

Parking Cost
Parking (300 stalls)
Washington State Sales Tax @ 9.5%

| Total Parking Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|

**SOFT COSTS**

Consultants
Architectural  (site studies to SEPA thru CA)
Architectural production of marketing materials
Architectural Reimbursable & extra services
Structural w/CA, piling
Civil
Landscape
Envelope Consultation (shop dwgs/const review)
Soils Study/Geotech Report, piling criteria
ALTA Survey, bound,topo,easements,updates
Misc Consultants; (hvite, elevator, acoustical, energy calc)
Mechanical Consultant
Electrical Consultant
Signage & Graphics design
City / Zoning Consultant
Traffic Engineer
Restaurant/Kitchen Designer
Interior design services, FF&E selection & spec Lobby & Amenity
Interior designer CA & purchase of FF&E, Supervise installation
Misc Costs
Renderings & Models
Environmental Phase I
Environmental Phase II
Legal & Accounting
Structural Inspections
Geotech Field Services
Waterproofing/Envelope Inspection
Window/envelope testing
Printing, Courier Expenses
Photos/aerials
Travel & entertainment expense  Allow
Permits, Utility Fees and Assessments:
Design Review/Preapp/Filing Fees
Building Permit/Plan Check
Restaurant/bar TI Improvement Permits
LID/Latecomer Fees/Mitigation (parks,traffic,schools)
Water Meters
Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits
Natural Gas
Dewatering discharge fees  Allow
Ongoing Site Utilities charges during const
Power Service and Transformer
Restaurant, Liquor & Health, & Other Permits & Impact Fees
Bond premiums & Misc city/state licenses
Furnishings (Allowance)
Van, pickup, automobile
Insurance & Taxes:
RE taxes on land during predev & construction period
Property Insurance thru occupancy
Builders Risk Insurance

Developer Costs

| Project Management & Administration | 28,981 | 28,981 | 28,981 | 28,981 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Developer Overhead & Project Mgmt | 28,981 | 28,981 | 28,981 | 28,981 | | | | | | |

Construction Financing:
Appraisal
Title Ins. & Endorsements
Construction Review & Inspections
Lender Legal & Environmental Fees, & Loan Closing Costs
Construction Loan Fee

| Permanent Loan Fee | | | | | | | | | | 1,000,000 |
|---|---|---|---|---|---|---|---|---|---|---|

Construction Interest (net of capitalized res)

| Draw rate during 26 mo. construction period | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 |
|---|---|---|---|---|---|---|---|---|---|---|

Development Loan Interest
Preopening and Working Capital
Reserve for shortfall

| Soft Cost Total | 169,421 | 169,421 | 169,421 | 169,421 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 1,111,458 |
|---|---|---|---|---|---|---|---|---|---|---|

| Total Project Costs | 169,421 | 169,421 | 169,421 | 169,421 | 111,458 | 111,458 | 111,458 | 111,458 | 111,458 | 1,111,458 |
|---|---|---|---|---|---|---|---|---|---|---|

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 127 of 214

Exhibit 2 Page 128 of 214

27

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 128 of 214

Exhibit 2 Page 129 of 214

### E. Pro Forma Operating Projections

| Southport Hotel LP | | PROFORMA | STATEMENT OF INCOME | | | | | | 5/31/2013 | |
|---|---|---|---|---|---|---|---|---|---|---|
| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| ROOM COUNT | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 |
| ROOMS AVAILABLE | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 |
| ROOMS OCCUPIED | 83,749 | 87,615 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 |
| OCCUPANCY | 65.00% | 68.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% |
| AVERAGE DAILY RATE | $186.00 | $197.00 | $203.00 | $209.00 | $215.00 | $221.00 | $228.00 | $235.00 | $242.00 | $249.00 |
| **GROSS REVENUES** | | | | | | | | | | |
| ROOMS | 15,578,000 | 17,259,000 | 18,832,000 | 19,389,000 | 19,946,000 | 20,502,000 | 21,152,000 | 21,801,000 | 22,450,000 | 23,100,000 |
| FOOD & BEVERAGE | 6,607,000 | 7,182,000 | 7,785,000 | 8,019,000 | 8,259,000 | 8,507,000 | 8,762,000 | 9,025,000 | 9,296,000 | 9,575,000 |
| PARKING | 848,000 | 914,000 | 997,000 | 1,027,000 | 1,058,000 | 1,089,000 | 1,122,000 | 1,156,000 | 1,190,000 | 1,226,000 |
| SPA | 471,000 | 508,000 | 554,000 | 570,000 | 588,000 | 605,000 | 623,000 | 642,000 | 661,000 | 681,000 |
| OTHER DEPARTMENTS | 189,000 | 203,000 | 222,000 | 228,000 | 235,000 | 242,000 | 249,000 | 257,000 | 265,000 | 272,000 |
| TOTAL REVENUES | 23,693,000 | 26,066,000 | 28,390,000 | 29,233,000 | 30,086,000 | 30,945,000 | 31,908,000 | 32,881,000 | 33,862,000 | 34,854,000 |
| **DEPARTMENTAL EXPENSE** | | | | | | | | | | |
| ROOMS | 4,470,000 | 4,705,000 | 4,985,000 | 5,134,000 | 5,288,000 | 5,447,000 | 5,610,000 | 5,779,000 | 5,952,000 | 6,131,000 |
| FOOD & BEVERAGE | 5,175,000 | 5,499,000 | 5,839,000 | 6,014,000 | 6,195,000 | 6,380,000 | 6,572,000 | 6,769,000 | 6,972,000 | 7,181,000 |
| PARKING | 424,000 | 457,000 | 498,000 | 513,000 | 529,000 | 545,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| SPA | 424,000 | 457,000 | 498,000 | 513,000 | 529,000 | 545,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| OTHER DEPARTMENTS | 160,000 | 173,000 | 188,000 | 194,000 | 200,000 | 206,000 | 212,000 | 218,000 | 225,000 | 232,000 |
| TOTAL DEPARTMENTAL EXPENSES | 10,653,000 | 11,291,000 | 12,008,000 | 12,368,000 | 12,741,000 | 13,123,000 | 13,516,000 | 13,922,000 | 14,339,000 | 14,770,000 |
| **DEPARTMENTAL PROFIT** | | | | | | | | | | |
| ROOMS | 11,108,000 | 12,554,000 | 13,847,000 | 14,255,000 | 14,658,000 | 15,055,000 | 15,542,000 | 16,022,000 | 16,498,000 | 16,969,000 |
| FOOD & BEVERAGE | 1,432,000 | 1,683,000 | 1,946,000 | 2,005,000 | 2,064,000 | 2,127,000 | 2,190,000 | 2,256,000 | 2,324,000 | 2,394,000 |
| PARKING | 424,000 | 457,000 | 499,000 | 514,000 | 529,000 | 544,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| SPA | 47,000 | 51,000 | 56,000 | 57,000 | 59,000 | 60,000 | 62,000 | 64,000 | 66,000 | 68,000 |
| OTHER DEPARTMENTS | 29,000 | 30,000 | 34,000 | 34,000 | 35,000 | 36,000 | 37,000 | 39,000 | 40,000 | 40,000 |
| TOTAL DEPARTMENTAL PROFITS | 13,040,000 | 14,775,000 | 16,382,000 | 16,865,000 | 17,345,000 | 17,822,000 | 18,392,000 | 18,959,000 | 19,523,000 | 20,084,000 |
| **OVERHEAD** | | | | | | | | | | |
| ADMINISTRATIVE AND GENERAL | 2,188,000 | 2,296,000 | 2,403,000 | 2,475,000 | 2,548,000 | 2,624,000 | 2,703,000 | 2,785,000 | 2,868,000 | 2,954,000 |
| MARKETING AND PROMOTION | 1,997,000 | 2,073,000 | 2,150,000 | 2,214,000 | 2,280,000 | 2,348,000 | 2,419,000 | 2,492,000 | 2,566,000 | 2,643,000 |
| PROPERTY OPERATION & MAINT. | 1,112,000 | 1,146,000 | 1,180,000 | 1,216,000 | 1,252,000 | 1,290,000 | 1,328,000 | 1,368,000 | 1,409,000 | 1,451,000 |
| UTILITY COSTS | 993,000 | 1,023,000 | 1,054,000 | 1,085,000 | 1,118,000 | 1,151,000 | 1,186,000 | 1,222,000 | 1,258,000 | 1,296,000 |
| TOTAL OVERHEAD | 6,290,000 | 6,538,000 | 6,787,000 | 6,990,000 | 7,198,000 | 7,413,000 | 7,636,000 | 7,867,000 | 8,101,000 | 8,344,000 |
| **GROSS OPERATING PROFIT** | 6,750,000 | 8,237,000 | 9,595,000 | 9,875,000 | 10,147,000 | 10,409,000 | 10,756,000 | 11,092,000 | 11,422,000 | 11,740,000 |
| **LESS:** | | | | | | | | | | |
| PROPERTY TAXES | 1,124,000 | 1,158,000 | 1,192,000 | 1,228,000 | 1,265,000 | 1,303,000 | 1,342,000 | 1,382,000 | 1,424,000 | 1,467,000 |
| INSURANCE | 199,000 | 205,000 | 211,000 | 217,000 | 224,000 | 230,000 | 237,000 | 244,000 | 252,000 | 259,000 |
| MANAGEMENT FEES | 711,000 | 782,000 | 852,000 | 877,000 | 903,000 | 928,000 | 957,000 | 986,000 | 1,016,000 | 1,046,000 |
| LAND LEASE (10 Years) | 1,281,875 | 1,281,875 | 1,281,875 | 1,281,875 | 1,281,875 | 1,465,000 | 1,648,125 | 1,831,250 | 2,014,375 | 2,197,500 |
| FF&E RESERVE | 592,000 | 782,000 | 1,136,000 | 1,169,000 | 1,203,000 | 1,238,000 | 1,276,000 | 1,315,000 | 1,354,000 | 1,394,000 |
| EBIDTA | 2,842,125 | 4,028,125 | 4,922,125 | 5,102,125 | 5,270,125 | 5,245,000 | 5,295,875 | 5,333,750 | 5,361,625 | 5,376,500 |

Exhibit 2 Page 130 of 214

| Southport Hotel LP | PROFORMA | STATEMENT OF INCOME | | | | | | 5/31/2013 | |
|---|---|---|---|---|---|---|---|---|---|
| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| ROOM COUNT | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 |
| ROOMS AVAILABLE | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 | 128,845 |
| ROOMS OCCUPIED | 83,749 | 87,615 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 | 92,768 |
| OCCUPANCY | 65.00% | 68.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% | 72.00% |
| AVERAGE DAILY RATE | $186.00 | $197.00 | $203.00 | $209.00 | $215.00 | $221.00 | $228.00 | $235.00 | $242.00 | $249.00 |
| GROSS REVENUES | | | | | | | | | | |
| ROOMS | 15,578,000 | 17,259,000 | 18,832,000 | 19,389,000 | 19,946,000 | 20,502,000 | 21,152,000 | 21,801,000 | 22,450,000 | 23,100,000 |
| FOOD & BEVERAGE | 6,607,000 | 7,182,000 | 7,785,000 | 8,019,000 | 8,259,000 | 8,507,000 | 8,762,000 | 9,025,000 | 9,296,000 | 9,575,000 |
| PARKING | 848,000 | 914,000 | 997,000 | 1,027,000 | 1,058,000 | 1,089,000 | 1,122,000 | 1,156,000 | 1,190,000 | 1,226,000 |
| SPA | 471,000 | 508,000 | 554,000 | 570,000 | 588,000 | 605,000 | 623,000 | 642,000 | 661,000 | 681,000 |
| OTHER DEPARTMENTS | 189,000 | 203,000 | 222,000 | 228,000 | 235,000 | 242,000 | 249,000 | 257,000 | 265,000 | 272,000 |
| TOTAL REVENUES | 23,693,000 | 26,066,000 | 28,390,000 | 29,233,000 | 30,086,000 | 30,945,000 | 31,908,000 | 32,881,000 | 33,862,000 | 34,854,000 |
| DEPARTMENTAL EXPENSE | | | | | | | | | | |
| ROOMS | 4,470,000 | 4,705,000 | 4,985,000 | 5,134,000 | 5,288,000 | 5,447,000 | 5,610,000 | 5,779,000 | 5,952,000 | 6,131,000 |
| FOOD & BEVERAGE | 5,175,000 | 5,499,000 | 5,839,000 | 6,014,000 | 6,195,000 | 6,380,000 | 6,572,000 | 6,769,000 | 6,972,000 | 7,181,000 |
| PARKING | 424,000 | 457,000 | 498,000 | 513,000 | 529,000 | 545,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| SPA | 424,000 | 457,000 | 498,000 | 513,000 | 529,000 | 545,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| OTHER DEPARTMENTS | 160,000 | 173,000 | 188,000 | 194,000 | 200,000 | 206,000 | 212,000 | 218,000 | 225,000 | 232,000 |
| TOTAL DEPARTMENTAL EXPENSES | 10,653,000 | 11,291,000 | 12,008,000 | 12,368,000 | 12,741,000 | 13,123,000 | 13,516,000 | 13,922,000 | 14,339,000 | 14,770,000 |
| DEPARTMENTAL PROFIT | | | | | | | | | | |
| ROOMS | 11,108,000 | 12,554,000 | 13,847,000 | 14,255,000 | 14,658,000 | 15,055,000 | 15,542,000 | 16,022,000 | 16,498,000 | 16,969,000 |
| FOOD & BEVERAGE | 1,432,000 | 1,683,000 | 1,946,000 | 2,005,000 | 2,064,000 | 2,127,000 | 2,190,000 | 2,256,000 | 2,324,000 | 2,394,000 |
| PARKING | 424,000 | 457,000 | 499,000 | 514,000 | 529,000 | 544,000 | 561,000 | 578,000 | 595,000 | 613,000 |
| SPA | 47,000 | 51,000 | 56,000 | 57,000 | 59,000 | 60,000 | 62,000 | 64,000 | 66,000 | 68,000 |
| OTHER DEPARTMENTS | 29,000 | 30,000 | 34,000 | 34,000 | 35,000 | 36,000 | 37,000 | 39,000 | 40,000 | 40,000 |
| TOTAL DEPARTMENTAL PROFITS | 13,040,000 | 14,775,000 | 16,382,000 | 16,865,000 | 17,345,000 | 17,822,000 | 18,392,000 | 18,959,000 | 19,523,000 | 20,084,000 |
| OVERHEAD | | | | | | | | | | |
| ADMINISTRATIVE AND GENERAL | 2,188,000 | 2,296,000 | 2,403,000 | 2,475,000 | 2,548,000 | 2,624,000 | 2,703,000 | 2,785,000 | 2,868,000 | 2,954,000 |
| MARKETING AND PROMOTION | 1,997,000 | 2,073,000 | 2,150,000 | 2,214,000 | 2,280,000 | 2,348,000 | 2,419,000 | 2,492,000 | 2,566,000 | 2,643,000 |
| PROPERTY OPERATION & MAINT. | 1,112,000 | 1,146,000 | 1,180,000 | 1,216,000 | 1,252,000 | 1,290,000 | 1,328,000 | 1,368,000 | 1,409,000 | 1,451,000 |
| UTILITY COSTS | 993,000 | 1,023,000 | 1,054,000 | 1,085,000 | 1,118,000 | 1,151,000 | 1,186,000 | 1,222,000 | 1,258,000 | 1,296,000 |
| TOTAL OVERHEAD | 6,290,000 | 6,538,000 | 6,787,000 | 6,990,000 | 7,198,000 | 7,413,000 | 7,636,000 | 7,867,000 | 8,101,000 | 8,344,000 |
| GROSS OPERATING PROFIT | 6,750,000 | 8,237,000 | 9,595,000 | 9,875,000 | 10,147,000 | 10,409,000 | 10,756,000 | 11,092,000 | 11,422,000 | 11,740,000 |
| LESS: | | | | | | | | | | |
| PROPERTY TAXES | 1,124,000 | 1,158,000 | 1,192,000 | 1,228,000 | 1,265,000 | 1,303,000 | 1,342,000 | 1,382,000 | 1,424,000 | 1,467,000 |
| INSURANCE | 199,000 | 205,000 | 211,000 | 217,000 | 224,000 | 230,000 | 237,000 | 244,000 | 252,000 | 259,000 |
| MANAGEMENT FEES | 711,000 | 782,000 | 852,000 | 877,000 | 903,000 | 928,000 | 957,000 | 986,000 | 1,016,000 | 1,046,000 |
| LAND LEASE (10 Years) | 1,281,875 | 1,281,875 | 1,281,875 | 1,281,875 | 1,281,875 | 1,465,000 | 1,648,125 | 1,831,250 | 2,014,375 | 2,197,500 |
| FF&E RESERVE | 592,000 | 782,000 | 1,136,000 | 1,169,000 | 1,203,000 | 1,238,000 | 1,276,000 | 1,315,000 | 1,354,000 | 1,394,000 |
| EBIDTA | 2,842,125 | 4,028,125 | 4,922,125 | 5,102,125 | 5,270,125 | 5,245,000 | 5,295,875 | 5,333,750 | 5,361,625 | 5,376,500 |

28

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 130 of 214

Exhibit 2 Page 131 of 214

The Proforma Statement of Income is as calculated by PKF Consulting USA in the Market Demand and Financial Analysis report dated May 29, 2013 (attached as an Exhibit). This is the result of the research and analyses conducted to estimate the potential future operating performance of the Project. Two competitive markets were identified, with more reliance placed on the hotels within the primary set, upper midscale to upper upscale hotels located in Renton, SeaTac, and Tukwila in determining the occupancy and average daily rates likely to be attainable by the Project.

Occupancy levels for hotels within the primary competitive market have increased steadily since the recession of 2009, from 68.0 percent that year to 77.6 percent in 2012. ADRs have not yet returned to their pre-recessionary levels, although modest growth has occurred in 2011, 2012, and year-to-date April 2013. PKF projects that the primary competitive market will achieve an occupancy rate of 75 percent in 2013, before reaching its stabilized level of 74.0 percent in 2014. In line with historical performance, PKF projects ADR to grow at inflationary rates for the duration of our projection period.

PKF estimates that if the proposed Subject were open today (2013), it would achieve a hypothetical year-end ADR of $170, growing at 3.0 percent each year (in line with its projection for the overall market). This will result in an ADR of $186 upon opening in 2017, after applying a customary 2.5 percent introductory discount. Due to its higher rate structure relative to the competitive market, PKF projects that it will achieve an occupancy rate below its fair share of demand. Specifically, PKF projects an occupancy rate of 65 percent for its first year of operation as it is introduced into the local market, increasing to 68 percent in 2018 and stabilizing at 72 percent thereafter. The following table reflects PKF's estimate of occupancy, ADR, and revenue per available room ("RevPAR") for the Subject's first ten years of operation.

| Proposed Hotel - Renton, WA Projected Performance | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Hypothetical ADR | Market Growth | Introductory Discount | Actual ADR | Percent Change | Occupancy | RevPAR | Percent Change |
| 2013 | $170.00 | 3.0% | - | - | - | - | - | - |
| 2014 | $175.00 | 3.0% | - | - | - | - | - | - |
| 2015 | $180.00 | 3.0% | - | - | - | - | - | - |
| 2016 | $185.00 | 3.0% | - | - | - | - | - | - |
| 2017 | $191.00 | 3.0% | 2.5% | $186.00 | - | 65.0% | $120.90 | - |
| 2018 | $197.00 | 3.0% | 0.0% | $197.00 | 5.9% | 68.0% | $133.96 | 10.8% |
| 2019 | $203.00 | 3.0% | 0.0% | $203.00 | 3.0% | 72.0% | $146.16 | 9.1% |
| 2020 | $209.00 | 3.0% | 0.0% | $209.00 | 3.0% | 72.0% | $150.48 | 3.0% |
| 2021 | $215.00 | 3.0% | 0.0% | $215.00 | 2.9% | 72.0% | $154.80 | 2.9% |
| 2022 | $221.00 | 3.0% | 0.0% | $221.00 | 2.8% | 72.0% | $159.12 | 2.8% |
| 2023 | $228.00 | 3.0% | 0.0% | $228.00 | 3.2% | 72.0% | $164.16 | 3.2% |
| 2024 | $235.00 | 3.0% | 0.0% | $235.00 | 3.1% | 72.0% | $169.20 | 3.1% |
| 2025 | $242.00 | 3.0% | 0.0% | $242.00 | 3.0% | 72.0% | $174.24 | 3.0% |
| 2026 | $249.00 | 3.0% | 0.0% | $249.00 | 2.9% | 72.0% | $179.28 | 2.9% |
| Source: PKF Consulting | | | | | | | | |

In preparing the projections, PKF relied on the actual financial performance of five full-service hotels in the secondary competitive market, as those properties were considered to be highly comparable to the Project with regard to quality and amenities offered. The comparable financial statements are included in the Addendum. For reasons of confidentiality, their identities were not disclosed.

Exhibit 2 Page 132 of 214

## V. Economic Impact Analysis

Barnhart Economic Services, LLC was commissioned by SECO Development, Inc. to evaluate the economic and employment (job creation) impacts of the construction and operation of a luxury hotel project known as Southport, located in Renton, Washington. The study was undertaken in support of an application to the U.S. Citizenship and Immigration Service (USCIS) EB-5 Immigrant Investor Regional Center Program, for a project within the Seattle Family, LP Regional Center (formerly known as the Southport Hotel LP Regional Center, application pending). The analysis was conducted with a regional economic model for the three-county Seattle-Tacoma-Bellevue, WA Metropolitan Statistical Area (MSA) constructed with the Impact Analysis for Planning (IMPLAN) input-output analysis and social accounting software and associated 2010 county data (MIG, Inc.). The report showing the results of this study, *Economic Impacts of Construction and Operations of a Hotel and Convention Center (Southport) in Renton, Washington within the Southport Hotel LP Regional Center* is attached as an Exhibit.

### A. Job Creation

Job creation estimates were based on hotel construction expenditures and operating revenues. For construction expenditures, this was broken down on an annual basis. An itemized list of the specific line item expenses, broken down by year of the expense is included on pages 21 through 24 of the economic report and summarized below. The following table is as shown on page 24 of the Barnhart report:

| Applicable / Sector | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| **Applicable for EB5** | **$6,027,906** | **$43,385,573** | **$59,096,020** | **$695,546** | **$579,622** | **$0** | **$109,784,668** |
| 369-Arch/Eng | $3,430,763 | $417,865 | $489,120 | $0 | $0 | $0 | |
| 367-Legal/Account | $92,105 | $78,947 | $78,947 | $0 | $0 | $0 | |
| 34-Nonresidential Construction | $2,490,038 | $42,888,761 | $49,627,953 | $695,546 | $579,622 | $0 | |
| 319-Wholesale Trade/FFE | $15,000 | $0 | $8,900,000 | $0 | $0 | $0 | |
| **Non-Applicable for EB5** | **$1,559,277** | **$7,139,060** | **$8,967,922** | **$4,337,500** | **$1,337,500** | **$1,445,833** | **$24,787,092** |
| Contingency | $15,593 | $580,066 | $651,794 | $1,500,000 | $0 | $0 | |
| Fees | $209,936 | $571,163 | $213,901 | $0 | $0 | $1,000,000 | |
| Financing | $0 | $312,417 | $1,181,458 | $2,837,500 | $1,337,500 | $445,833 | |
| Insurance | $253,654 | $711,923 | $711,923 | $0 | $0 | $0 | |
| Permitting | $831,635 | $14,286 | $105,714 | $0 | $0 | $0 | |
| Taxes | $248,458 | $4,949,206 | $6,103,131 | $0 | $0 | $0 | |
| **Grand Total** | **$7,587,183** | **$50,524,633** | **$68,063,942** | **$5,033,046** | **$1,917,122** | **$1,445,833** | **$134,571,759** |

For operations, job creation was based on operating revenue as indicated in the consolidated pro forma annual income and expense for the Southport Hotel Project. Revenues in the second full year of operations (2018), when the buildings are projected to reach stabilized occupancy, were taken as representative of ongoing operations and were used for the economic impact analysis. However, due to the time period the project spans, job creation estimates were also provided annually from 2016-2018.

Exhibit 2 Page 133 of 214

As indicated in the Barnhart report, the employment multipliers for the Project economic sectors evaluated in the Seattle-Tacoma-Bellevue, WA Metropolitan Statistical Area were used  The following table is shown on page 26 of the Barnhart report.

| *Implan* Industry Sector | NAICS Industry Sectors | Direct Effects | Indirect Effects | Induced Effects | Total Effects |
|---|---|---|---|---|---|
| 34-Construction of new nonresidential commercial and health care structures | 2362 Commercial and Institutional Building Construction | 6.7444 | 2.1527 | 10.2415 | 19.1387 |
| 367-Legal services | 5411 Offices of Lawyers | 7.1156 | 1.0785 | 13.0967 | 21.2907 |
| 369-Architectural, engineering, and related services | 5413 Architectural, Engineering, and Related Services | 8.7149 | 2.6258 | 12.3536 | 23.6943 |
| 319-Wholesale trade businesses | 4232 Furniture and Home Furnishing Merchant Wholesalers | 5.6347 | 1.3100 | 13.2017 | 20.1465 |
| 411-Hotels and motels, including casino hotels | 7211 Hotels (except Casino Hotels) and Motels | 9.8738 | 2.6081 | 11.4675 | 23.9494 |
| 413-Food services and drinking places | 7225 Restaurants and Other Eating Places | 17.1558 | 2.1570 | 10.9714 | 30.2842 |
| 422-Other personal services | 8129 Parking Lots and Garages | 9.8738 | 2.6081 | 11.4675 | 23.9494 |

Over the Construction and Operations period 2014-2018, total applicable employment impacts of the project were estimated at 2,313 full-time jobs, consisting of 1,776 jobs in development/construction and 537 jobs in operations according to the Barnhart report. Because construction activities last for at least two years, all job impacts are applicable for EB5 purposes, as per USCIS guidance.

| | Construction and Operations 2014-2018 | | | | |
|---|---|---|---|---|---|
| | Impact Type | Employment | Labor Income | Value Added | Output |
| **Construction 2014-2018** | Direct Effect | 624 | $43,825,975 | $52,908,392 | $103,805,527 |
| | Indirect Effect | 198 | $13,042,347 | $18,928,862 | $33,185,096 |
| | Induced Effect | 955 | $57,932,316 | $92,688,757 | $139,433,241 |
| | Total Effect | 1776 | $114,800,639 | $164,526,011 | $276,423,864 |
| **Operations 2018** | Direct Effect | 248 | $7,569,423 | $12,848,552 | $22,709,809 |
| | Indirect Effect | 53 | $3,181,883 | $5,065,601 | $8,209,555 |
| | Induced Effect | 237 | $14,562,302 | $22,882,906 | $34,319,254 |
| | Total Effect | 537 | $25,313,608 | $40,797,060 | $65,238,617 |
| **Total 2014-2018** | | 2313 | $140,114,247 | $205,323,071 | $341,662,481 |

## B.  Household Earnings, Gross Regional Product and Output

Over the period from 2014 to 2018 the project will generate a total of $140.11 million in labor income (household earnings), $205.32 million in value added contribution to Gross Regional Product, and $341.66 million in output or revenues within the study region.

31

Exhibit 2 Page 134 of 214

## VI.    Targeted Employment Area ("TEA")

The subject property is located in Census Tract 53.01 in King County, WA.  As the figure below shows, this area is part of a contiguous thirteen tract area in King County, using data provided by the Employment Security Department of Washington State which had an unemployment rate of 14.6% in 2011, as calculated by the Census Share method described in the Local Area Unemployment Statistics handbook of the U.S. Bureau of Labor Statistics.    This local unemployment rate exceeds 150% of the national unemployment rate of 8.9 percent in 2011, so the area qualifies as a Targeted Employment Area (TEA), for which EB-5 investors are allowed to invest $500,000 individually, rather than $1 million, which provides a competitive advantage for marketing of the project to foreign investors.



## VII.   Project Feasibility

### A.    Development Team

Michael Christ of SECO Development has assembled the following team to develop the Project.

#### 1.    Developer – SECO Development, Inc.

Since its inception, SECO has developed more than 3,000 residential units, together with 160,000sf of associated retail, two retirement facilities, two hotels, and 800,000sf of office space.

As owner and sole proprietor of SECO Development, Inc., Michael Christ's experience stretches over two decades including completing developments both internationally and locally with over ten concentrated years as a significant landowner in Bellevue's Central Business District and the City of Kirkland, both in the state of Washington.

SECO has successfully developed over 50 acres of urban mixed–use projects and infill developments as well as large scale master planned communities and urban villages.

Exhibit 2 Page 135 of 214

Projects completed to date include the master planning and entitlement of 11.5 acres in the Central Business District of Bellevue, Washington. The site was developed into five separate phases, on which SECO built 361 units comprised of 191 luxury suites to serve the professional travelers working in Bellevue and The Gardens at Town Square, a 171 unit luxury independent and assisted living senior's community and completed the master planning for two hotels. SECO initially obtained all the discretionary permits, built the roads, brought in the utilities and commenced construction on the first phase in just one year, with phase two starting six months later.

**Southport,** in Renton, Washington, consists of 17.5 acres that have been master planned and entitled. This development will contain 778,000gsf of office space, a 353-room luxury waterfront hotel, and 383 residential units. Within one year, SECO completed the entire Environmental Impact Statement, concluded the environmental assessments, and had commenced construction on the first phase.

**Juanita Village** is an 11.4 acre mixed-use development in Kirkland, Washington. When complete the village will consist of over 580 residential units with 63,000gsf of neighborhood retail uses. Juanita Village was inherited from a National REIT that had been working on the development for two and one-half years and had not been able to move forward due to neighborhood opposition. Within eight months, SECO had received unanimous approval from the city council, support from the community, and commenced construction of the first phase.

**Island Square** is a 2.61 acre mixed-use community in downtown Mercer Island that hosts 235 luxury residential units and 40,000sf of retail and office space.

Select photos of completed projects:


Oakwood Apartments


The Gardens at Town Square

Exhibit 2 Page 136 of 214



The Shelby



Chelsea at Juanita Village



Juanita Village

## 2.    General Contractor – Sellen Construction Company

Sellen has been in continuous operations as a general contractor since their founding more than 65 years ago as John H. Sellen Construction Company. Their name changed to Sellen Construction Company, Inc., in 1952. Sellen Construction Company is the largest locally owned commercial construction firm in the Pacific Northwest.

Its clients have included Microsoft, Amazon.com, AT&T, Russell Investments, The Bill and Melinda Gates Foundation, and Vulcan Inc.  Notable projects include the Fairmont Olympic Hotel in Seattle, the U.S. Bank Center in Seattle, Amazon's Headquarters in Beacon Hill, and the Key Center in Bellevue.

Exhibit 2 Page 137 of 214



Amazon Headquarters



U.S. Bank Center



Fairmont Olympic Hotel



Key Center

### 3.   Architect - MulvannyG2

According to the Mulvanny G2 Architecture website, the company began as a hardworking firm in Bellevue, Washington in 1971.  Today they are a hardworking global firm creating renowned retail, commercial, civic, and mixed-use buildings for clients in 19 time zones.  Notable projects include the 462,000sf Dalian Hengli Headquarters mixed-use project under construction in Dalian, China, Escala at 4th and Virginia in Seattle.

35

Exhibit 2 Page 138 of 214





Dalian Hengli Headquarters                                    Escala

## B.    Market Area

### 1.    King County, WA





Washington State in the U.S.                    King County within Washington State

## History

Counties are the oldest local form of local government, and King County was established by the Oregon Provisional Government which was organized by early settlers.  King County was part of Thurston County until December 22, 1852.  I t was named after William R. King, who had just

36

Exhibit 2 Page 139 of 214

been elected Vice President under President Franklin Pierce.[2]  Seattle was made the County Seat on January 11, 1853[3].

The diverse backgrounds of the individuals that settled King County fueled strong opinions that called for local choice, local option and local control. From the 1840s to 1870s, the settlers came largely from New England and the Midwest. Key states included Iowa, Minnesota, Michigan, Indiana, Missouri and Illinois. In general, these people were politically liberal and abolitionists. They tended to favor prohibition and other controls over the sale and consumption of alcohol, as well as most other activities they viewed as socially disruptive. In the 1860s and 1870s, many people from the Southeast migrated to the region. These new settlers tended to be more politically conservative and often unsympathetic with the abolitionists. Upon completion of the railroad to King County in 1883, another wave of settlers migrated to this area.  These new settlers, including many foreign-born immigrants, came from ethnic and class backgrounds very different from the early pioneers.

In 1897 gold was discovered in Alaska and the Klondike Gold Rush brought many more people into King County since Seattle was a major jumping-off point for those rushing to the gold fields. Suppliers and outfitters made fortunes on the miners heading to Alaska.  After the rush was over, people returned to Seattle to settle down.  The population surge was a major factor influencing the course of government.  By 1889 the county's population was 40,788. In 1890, it was 63,989[4]; and by 1900 it had climbed to 110,053[5]. Seattle's population of 42,837 in 1890 nearly doubled during the next decade.

The Alaska-Yukon Pacific Exposition in 1909 brought nationwide attention to the Pacific Northwest and King County was again inundated with a new wave of settlers, these seeking new business interests and adventure. By 1910, the city had 237,194 residents.

## Demographics

The U.S. Office of Management and Budget defines all of King County as part of the Seattle – Tacoma-Bellevue WA Metropolitan Statistical Area (MSA).  This area includes the city of Seattle, King County, and Pierce County within the Puget Sound Region. MSAs are defined as geographical regions with a relatively high population density at its core and close economic ties throughout the area.  They are commonly commuter areas close to a major city.  The Seattle – Tacoma-Bellevue WA MSA has an estimated population of 3,500,026 people.

King County has the highest population of any county in Washington State.  The early influence of ship and rail transportation combined with the Klondike Gold Rush served to build thriving communities that continued to grow at exceptional rates.  In July, 2011 the U.S. Census Bureau estimated King County's population at 1,969,722 people, a 2.0% increase over the 2010 Census statistic[6].  A large portion of King County's population resides in Seattle.  Seattle had a July, 2011 estimated population of 620,778 people, also up 2.0% from the 2010 count[7].  The liberal politics of King County continue to draw people who are impressed by the business opportunities, public services, and school systems.  There are more high school graduates and Bachelor degree holders in King County than the rest of the state.  Income rates, both median and per capita, exceed state levels.  Residents of King County living below the poverty level in King County are fewer than in the rest of the state.  Homeownership rates are lower in King County due to the high number of

---

[2] http://your.kingcounty.gov/kc150/1850s.htm
[3] http://your.kingcounty.gov/kc150/1850s.htm
[4] http://www.census.gov/prod/www/abs/decennial/
[5] http://www.census.gov/population/cencounts/wa190090.txt
[6] http://quickfacts.census.gov/qfd/states/53/53033.html
[7] http://quickfacts.census.gov/qfd/states/53/5363000.html

Exhibit 2 Page 140 of 214

rental properties in population-dense Seattle and the transient nature of a high percentage of student population.

King County reports a white population of 64.4%, black population of 6.5% American Indian and Alaska Native persons represented 1.1% of the population. Asians represented 15% of the population. Native Hawaiian and Other Pacific Islander person represent 0.8% of the population. Persons reporting two or more races represented 4.7%[8]. These demographics paint King County residents as a very diverse group.

| State & County Quick Facts | King County | Washington County |
|---|---|---|
| High school graduates, % of persons age 25+ (2006-2010) | 91.9% | 89.8% |
| Bachelor's degree or higher, % of persons age 25+ (2006-2010) | 45.7% | 31.4% |
| Homeownership rate (2006-2010) | 59.6% | 64.4% |
| Per capita money income in past 12 months (2010 dollars) | $39,313 | $30,481 |
| Median household income (2006-2012) | $70,567 | $58,890 |
| Persons below poverty level, percent 2006-2010 | 10.5% | 12.5% |

## Geography

King County covers a land area of 2,115.57 square miles with a population density of 912.9 persons per square mile[9]. It ranks 11th in size of Washington's 39 counties. Seattle is the county seat of King County and the state's largest city. It covers a land area of 83.94 square miles with a population density of 7,250.9 persons per square mile[10]. King County includes the Vashon Island and Maury Island in Puget Sound. The highest point in King County is Mount Daniel which is 7,959 feet above sea level.

## Education

King County has twenty K-12 school districts. King County also has access to an extensive network of higher education and trade training institutions: Antioch University (Seattle Branch), Ashmead College, Bellevue Beauty School, Bryman College, Cornish College of the Arts, DeVry University (Seattle), Gene Juarez Academy of Beauty, Greenwood Academy of Hair, Kaplan College (Renton), Keller Graduate School of Management, National Personal Training Institute (Seattle), Pima Medical Institute, Seattle Institute of Oriental Medicine, Argosy University (Seattle), Bastyr University, Brenneke School of Massage, Cascadia Community College, City University, Cortiva Institute, DigiPen Institute of Technology, Edmonds Community College, Gene Juarez Academy of Beauty, Green River Community College, Highline Community College, International Academy of Design and Technology, Keller Graduate School of Management, Le Cordon Blue College of Culinary Arts (Seattle), Pima Medical Institute, Seattle Community College (North Campus), Shoreline Community College, Seattle Midwifery School, and the Tacoma Community College exist within commuting distance in addition to the three major area universities, the University of Washington, Bellevue College and Seattle University.

The University of Washington is in Seattle. The university was founded in 1861, is one of the oldest state universities on the West Coast. Students can choose from over 250 degree programs

---

[8] http://quickfacts.census.gov/qfd/states/53/53033.html
[9] http://quickfacts.census.gov/qfd/states/53/53033.html
[10] http://quickfacts.census.gov/qfd/states/53/5363000.html

Exhibit 2 Page 141 of 214

offered at 18 separate colleges and schools. Additionally, the university operates two notable medical centers, Harborview Medical Center and UW Medical Center. Ranking organizations like *U.S. News & World Report*, which ranked the university as one of 2010's top 50 schools, consistently recognize UW's programs. The University of Washington's Seattle Campus, notes that it has several award-winning faculty members, including six Nobel Prize winners and ten genius grant winners from the MacArthur Foundation. The university serves more than 92,000 students annually. The university also operates satellite campuses in Tacoma and Bothell[11].

Bellevue College is situated on a 98-acre campus approximately fifteen miles north of the Project. The main campus features 12 educational buildings, though students can also study at the North Campus, also in Bellevue, or one of 25 additional continuing education sites. Bellevue College offers bachelor's and associates degrees, as well as certificate, continuing education and adult education programs. Microsoft, which is headquartered in nearby Redmond, WA, recognized Bellevue College as an information technology (IT) showcase school in 2006. Nearly 1,700 students at Bellevue College hail from outside the United States, representing over 60 countries. There are also approximately 1,600 early-entry Running Start students arriving from over 20 school districts[12] Annual enrollment numbers for Bellevue College hover around 37,000 students[13].

Seattle University is a Catholic Jesuit university and the Pacific Northwest's largest independent university. Situated on a 48-acre campus in Seattle's Capitol Hill and First Hill neighborhoods, more than 60 undergraduate programs, along with 31 graduate programs and 21 certificate programs, are offered at the university's eight colleges and schools. These colleges and schools include a School of Law and a School of Theology and Ministry. The student body at Seattle University is among the most diverse among Western universities, with all 50 states and 76 countries represented. *U.S. News & World Report* has repeatedly listed Seattle University among the West's top ten universities, while *The Princeton Review* regularly includes it in its *Best Colleges* guide. Fall enrollment for 2012 included 7,484 students. [14]

## Industry and Business

Unemployment rates for King County are fairly low at 6.5% compared to the state seasonally adjusted rate of 8.2%; however, unemployment rates are higher in neighboring counties: Snohomish County (7.1%) and Pierce County (8.0%)[15].

---

[11] http://www.washington.edu/discover/
[12] http://bellevuecollege.edu/about/college/
[13] http://bellevuecollege.edu/about/college/facts/
[14] http://www.seattleu.edu/about/facts/
[15] https://fortress.wa.gov/esd/employmentdata/reports-publications/economic-reports/monthly-employment-report/map-of-county-unemployment-rates

Exhibit 2 Page 142 of 214



Industry employment trends for the Seattle –Tacoma-Bellevue WA MSA, as applies to the industries impacted by the project are as follows:

Construction employment trends from November, 2002 through November, 2012 show that the MSA still not increased construction employment levels to its November, 2007 high of 126.4 thousand jobs, nor has the MSA reached the November, 2002 rate of 92.2 thousand jobs. Preliminary construction job counts for November, 2012 are estimated at 89.7 thousand jobs[16].



---

*Most recent data available[16]

http://data.bls.gov/timeseries/SMU53426602000000001?data_tool=XGtable

Exhibit 2 Page 143 of 214

Leisure and Hospitality Trends from November, 2002 through November, 2012 show an increase in jobs in the Leisure and Hospitality industry. The MSA has just recently exceeded the November, 2007 high of 161.9 thousand jobs[17].



Financial Activity industries jobs have taken the heaviest hit since November, 2002 (102.7 thousand jobs), plummeting in November of 2010 (89.7 thousand jobs) with little recovery since (89.5 thousand jobs estimated as of November, 2012)[18].



---

[17] http://data.bls.gov/timeseries/SMU53426607000000001?data_tool=XGtable
[18] http://data.bls.gov/timeseries/SMU53426605500000001?data_tool=XGtable

41

Exhibit 2 Page 144 of 214

## Housing

RE/Max Northwest Realtors (Bothell, Kirkland, Mill Creek and Seattle – Washington offices[19]) project a critical housing shortage in Seattle and surrounding areas. Pending sales have out-paced new listings for the past twelve months.  Buyers have expressed frustration with low inventory choices.  Well priced homes in select areas have received multiple offers.  Current active listings have dropped below 2006-2007 inventory levels.  Foreclosures, which are at a three-year low, are not expected to significantly raise inventory numbers[20].



There are fewer homes listed in King County than at any time since the beginning of the housing crisis, putting upward pressure on prices.  Despite the reduced inventory, sales volume was up 23% for houses and 43% for condos in February compared to a year earlier (April 2011)[21]. The resulting consequence of the housing shortage is the increased need for apartments and condos.

## 2.    City of Seattle, WA

Renton, in which the Project is located, is a suburb of Seattle, Washington.

Seattle is a major coastal seaport and the seat of King County, in the U.S. state of Washington. With an estimated 620,778 residents as of 2011[22], Seattle is the largest city in the Pacific Northwest region of North America and the largest city on the West Coast north of San Francisco. The Seattle metropolitan area of around 4 million inhabitants is the 15th largest metropolitan area in the United States.



---

[19] http://www.house-hunters.com/getagent/Pages.php?Page=0000056349&aid=008500161&temp=1008&aname=Jess+%26+Julie+Lyda&aimg=1&agent_hasfeat=3&
[20] http://www.snohomishcountymarketstatistics.com/2012/10/critical-housing-shortage-on-horizon-in.html
[21] http://www.apartmentinsightswa.com/press.html
[22] http://quickfacts.census.gov/qfd/states/53/5363000.html

Exhibit 2 Page 145 of 214

The city is situated on a narrow isthmus between Puget Sound (an inlet of the Pacific Ocean) and Lake Washington, about 100 miles (160 km) south of the Canada–United States border. A major gateway for trade with Asia, Seattle is the 8th largest port in the United States and 9th largest in North America in terms of container handling.[23]

## History

The Seattle area had been inhabited by Native Americans for at least 4,000 years before the first permanent white settlers. Arthur A. Denny and his group of travelers, subsequently known as the Denny Party, arrived at Alki Point on November 13, 1851. The settlement was moved to its current site and named "Seattle" in 1853, after Chief Si'ahl of the local Duwamish and Suquamish tribes.

Logging was Seattle's first major industry, but by the late 19th century the city had become a commercial and shipbuilding center as a gateway to Alaska during the Klondike Gold Rush. By 1910, Seattle was one of the 25 largest cities in the country.[9] However, the Great Depression severely damaged the city's economy. Growth returned during and after World War II, due partially to the local Boeing Company, which established Seattle as a center for aircraft manufacturing. The city developed as a technology center in the 1980s. The stream of new software, biotechnology, and internet companies led to an economic revival, which increased the city's population by almost 50,000 between 1990 and 2000. More recently, Seattle has become a hub for "green" industry and a model for sustainable development.

## Geography

With a total area of 83.9 square miles, Seattle lies in the geographical co-ordinates of 47.37 North latitude and 122.20 West longitude. It is the northernmost city with at least 500,000 people in the United States. The topography of Seattle is hilly. Seattle lies on seven hills including Capitol Hill, First Hill, West Seattle, Beacon Hill, Magnolia, Denny Hill and Queen Anne. The Kitsap and the Olympic peninsulas along with the Olympic Mountains lie to the west of Puget Sound, while the Cascade Range and Lake Sammamish lie to the east of Lake Washington. The lush green forests and the numerous water bodies have provided livelihood for many hunting and gathering communities.

## Climate

Seattle's climate is usually described as oceanic or temperate marine, with mild, wet winters and warm, dry summers. Like much of the Pacific Northwest, it falls within a cool/mild wet winter, and dry-summer subtropical zone, with cool summer Mediterranean characteristics.

## Economy

Seattle's economy is driven by a mix of older industrial companies, and "new economy" Internet and technology companies, service, design and clean technology companies. The city's gross metropolitan product was $231 billion in 2010, making it the 12th largest metropolitan economy in the United States. The Port of Seattle, which also operates Seattle–Tacoma International Airport, is a major gateway for trade with Asia and cruises to Alaska, and is the 8th largest port in

---

[23] http://www.portseattle.org/About/Publications/Statistics/Seaport/Pages/default.aspx

Exhibit 2 Page 146 of 214

the United States in terms of container capacity.] Though it has been affected by the recent recession, Seattle has retained a comparatively strong economy, and remains a hotbed for start-up businesses, especially in green building and clean technologies: it was ranked as America's No. 1 "smarter city" based on its government policies and green economy. February 2010, the city government committed Seattle to becoming North America's first "climate neutral" city, with a goal of reaching zero net per capita greenhouse gas emissions by 2030.

## Demographics

According to the 2010 census, Seattle had a population of 608,660 and the racial and ethnic composition was as follows:

White: 69.5% (Non-Hispanic Whites: 66.3%) , Asian: 13.8% (4.1% Chinese, 2.6% Filipino, 2.2% Vietnamese, 1.3% Japanese, 1.1% Korean, 0.8% Indian, 0.3% Cambodian, 0.3% Laotian, 0.2% Indonesian, 0.2% Thai), Black or African American: 7.9%, American Indian and Alaska Native: 0.8%, Native Hawaiian and Other Pacific Islander: 0.4%, Other race: 2.4%, Two or more races: 5.1%, Hispanic or Latino (of any race): 6.6% (4.1% Mexican, 0.3% Puerto Rican, 0.2% Guatemalan, 0.2% Salvadoran, 0.2% Cuban).

| Quick Facts[24] | Seattle | Washington |
|---|---|---|
| Living in same house 1 year & over, percent, 2007-2011 | 77.1% | 82.3% |
| Foreign born persons, percent, 2007-2011 | 17.5% | 12.8% |
| Language other than English spoken at home, percent age 5+, 2007-2011 | 21.8% | 17.8% |
| High school graduate or higher, percent of persons age 25+, 2007-2011 | 92.4% | 89.8% |
| Bachelor's degree or higher, percent of persons age 25+, 2007-2011 | 55.8% | 31.4% |
| Veterans, 2007-2011 | 34,321 | 601,507 |
| Mean travel time to work (minutes), workers age 16+, 2007-2011 | 25.0 | 25.5 |
| Housing units, 2010 | 308,516 | 2,885,677 |
| Homeownership rate, 2007-2011 | 48.0% | 64.4% |
| Housing units in multi-unit structures, percent, 2007-2011 | 50.4% | 25.7% |
| Median value of owner-occupied housing units, 2007-2011 | $453,000 | $283,200 |
| Households, 2007-2011 | 282,480 | 2,602,568 |
| Persons per household, 2007-2011 | 2.05 | 2.50 |
| Per capita money income in the past 12 months (2011 $), 2007-2011 | $41,695 | $30,481 |
| Median household income, 2007-2011 | $61,856 | $58,890 |
| Persons below poverty level, percent, 2007-2011 | 13.2% | 12.5% |

## Education

Of the city's population over the age of 25, 53.8% (vs. a national average of 27.4%) hold a bachelor's degree or higher, and 91.9% (vs. 84.5% nationally) have a high school diploma or

---

[24] http://quickfacts.census.gov/qfd/states/53/5363000.html

Exhibit 2 Page 147 of 214

equivalent.[25] A United States Census Bureau survey showed that Seattle had the highest percentage of college and university graduates of any major U.S. city.[26]

The public school system is supplemented by a moderate number of private schools: five of the private high schools are Catholic, one is Lutheran, and six are secular.

Seattle is home to the University of Washington, as well as its professional and continuing education unit, University of Washington Educational Outreach. A study by Newsweek International in 2006 cited UW as the twenty-second best university in the world.[27] Seattle also has a number of smaller private universities including Seattle University and Seattle Pacific University, the former a Catholic institution, the latter Free Methodist; universities aimed at the working adult, like City University and Antioch University; colleges, such as North Seattle Community College, Seattle Central Community College, and South Seattle Community College; and a number of arts colleges, such as Cornish College of the Arts, Pratt Fine Arts Center, and The Art Institute of Seattle.

### 3.    City of Renton, WA

Renton is a city in King County, Washington, United States. Situated 11 miles southeast of downtown Seattle, Washington, Renton straddles the southeast shore of Lake Washington, at the mouth of the Cedar River. While long an important salmon fishing area for Native Americans, Renton was first settled by people of European descent in the 1860s, and its early economy was based on coal mining, clay production, and timber export. Today, Renton is best known as the final assembly point for the Boeing 737 family of commercial airplanes, but it is also home to a growing number of well-known manufacturing, technology, and service companies, including Boeing, Paccar, Parallels, Inc. and Providence Health & Services.

According to the U.S. Census Bureau, Renton had a 2012 estimated population of 95,448.[28] Renton currently contains the 8th largest population in the state, and the 4th largest in King County.

The city has a total area of 23 square miles (61 km²) of which, 22+ square miles (60 km²) is land and 0.42 square miles (1.09 k) is water.  The population density is 3,993 per square mile.

The median value of homes in Renton is $312,100, higher than the $283,200 state average. Wages too are higher, with the 2007-2011 per capital income at $31,121 vs. $30,481 for the state.  The median household income (2007-2011) was $64,829 in Renton, as compared to $50,890 for the state overall.  Persons living below the poverty level (2007-2011) was 10.8% of the population, as compared to 12.5% in Washington state as a whole.

---

[25] US Census Bureau (2008). "S1501. Education Attainment: Seattle City, Washington".
[26] "ACS: Ranking Table – Percent of People 25 Years and Over Who Have Completed a Bachelor's Degree". United States Census Bureau.
[27] http://web.archive.org/web/20070315053646/http://www.msnbc.msn.com/id/14321230/
[28] http://quickfacts.census.gov/qfd/states/53/5357745.html

Exhibit 2 Page 148 of 214

### 4. Project Site

The project site is 187,460sf and is owned by Southport One, LLC. According to the King County Property Department of Assessments, it is recorded as parcel number 052305-9075 and has a tax assessed value of $5,248,000.



Parcel Map of Subject Site

## C. Tourism, Travel and Hospitality Industry Overview

### International Tourism Trends

**The UN World Tourism Organization (UNWTO) 2013 overview of international travel findings:**

International tourist arrivals surpassed 1 billion for the first time in history in 2012, up from 996 million in 2011, with demand holding well throughout the year and concluding with a stronger-than-expected fourth quarter.

UNWTO Secretary-General Taleb Rifai reported on January 30th, 2013 that: "2012 saw continued economic volatility around the globe, particularly in the Eurozone, yet international tourism managed to stay on course. The sector has shown its capacity to adjust to the changing market conditions and, although at a slightly more modest rate, is expected to continue expanding in 2013." Looking back at the past year, the UNWTO reported that growth was stronger in emerging economies with tourism arrivals for Asia and the Pacific up seven per cent while Africa and the Americas saw a six and four per cent increase in arrivals, respectively[29].

**Lodging Magazine Travel Forecast from Nov. 17 2012:**[30]

Travel in the United States is expected to continue to grow in 2013 according to a recent forecast released by the U.S. Travel Association.

---

[29] *International tourism rebounding from global economic crisis, says UN*: M2 Presswire – 01/30/2013
[30] http://www.lodgingmagazine.com/PastIssues/PastIssues/Travel-Forecast-Slow-Growth-2635.aspx

46

Exhibit 2 Page 149 of 214

"For 2013, the number of trips taken by Americans is expected to increase to a new record high," says David Huether, senior vice president of research and economics for the U.S. Travel Association. "But the growth we expect next year is going to be at a slower pace than over the past few years."[31]

The forecast for next year also shows an increase in international spending, demonstrating that that international market is a key factor in revitalizing the U.S. economy.

"There is going to be some slowdown in international spending, but it's still going to grow in excess of seven percent next year," says Huether. "In 2013, we expect international spending to account for an excess of 15 percent of travel spending in the United States. If we look a little further out into 2014, we expect it to be 15.5 percent. International spending is becoming more and more important and it's going to help the industry weather some of the slowdown we expect to see going forward."[32]

The total number of trips in 2012 is expected to rise by approximately two percent or 36 million, to reach a total of 2.04 billion trips. In 2013, the number of trips is expected to grow by about 1.1 percent, adding an additional 23 million trips.

The travel industry will also continue to be a major source of U.S. employment and is expected to add 98,000 American jobs by the end of 2013, and increase the number of people employed by the travel industry to 7.6 million according to the same article.

**U.S. Travel Association comments on March 7th, 2013 Commerce Department Announcement:**

Washington, D.C. - David Huether, senior vice president of research and economics at the U.S. Travel Association, provides analysis on the March 7th, 2013 Commerce Department announcement that the U.S. trade deficit widened in January.

"The travel industry generated a trade surplus of $4.6 billion in January, which was up 39 percent from a year earlier. The reason is that while travel imports (spending by Americans on international travel) have edged up just one percent since January 2012, travel exports (spending by international travelers to and within the U.S.) have increased 10.5 percent, which is more than three times faster than the 3.3 percent rise in total U.S. exports during this time.

"This faster export growth underscores the increasing importance of travel to our economy, with travel exports accounting for nearly a quarter (23%) of the rise in total U.S. exports over the past 12 months ending January 2013. The travel industry now comprises nearly eight percent of total U.S. exports, up from seven percent just two years ago.

"Going forward, enacting policies that boost international visitation to the U.S., such as expanding the Visa Waiver Program and improving international traveler facilitation at U.S. ports of entry, will help the travel industry be a continuing source of economic growth and job creation for our country."[33]

---

[31] Ibid.
[32] http://www.lodgingmagazine.com/PastIssues/PastIssues/Travel-Forecast-Slow-Growth-2635.aspx
[33] U.S. Travel Association: *Travel Continues to Lead Export Growth Accounts for 23 Percent Rise in U.S. Exports*: March, 2013 Press Release. http://www.ustravel.org/news/press-releases/travel-continues-lead-export-growth The US Travel Association

Exhibit 2 Page 150 of 214

## National Tourism, Travel, and Hospitality Trends

**PKF-HR's 2013 Forecast for the U.S. Hotel Market:**

Net Operating Income (NOI) for the average hotel in the PKF-HR Trends® sample (sample size: approximately 6,500 hotels) grew by 10.2 percent in 2012. Resort hotels enjoyed the greatest gain in NOI (10.6%), followed by limited-service (10.6%) and full-service (9.8%) properties. Lagging in profit growth were convention hotels (5.7%), suite hotels with F&B (7.7%), and suite hotels without F&B (8.1%). Resort hotels benefited from the greatest increase in ADR, while convention hotels were impacted by the lag in the recovery of the group market segment.

Based on the March 2013 edition of Hotel Horizons®, PKF-HR is forecasting double-digit growth in NOI for U.S. hotels through 2015. Strong growth in ADR will be the main catalyst of bottom-line improvement, along with limited growth in expenses. PKF-HR's outlook for restrained increases in expense growth is driven by Moody's Analytics' forecasts for modest increases in inflation, as well as subdued growth in variable operating costs attributable to the slowdown in the pace of occupancy gains

R. Mark Woodworth, president of PKF-HR said, "Our forecast of a 1.8 percent increase in demand for 2013 is somewhat muted compared to the 3.0 percent increase recorded by Smith Travel Research (STR) in 2012. However, when you combine the 1.8 percent growth in lodging demand with a projected increase in supply of just 0.8 percent, occupancy levels will rise to 62.0 percent. This will take the U.S. lodging industry past the long-run average occupancy level of 61.9 percent, a significant milestone."

Smith Travel Research reported a 39.9 percent increase in hotels construction year over year in February 2013, and a 10.1 percent rise in hotel rooms in the active pipeline compared with February 2012. The company predicted a 1.5 percent increase in supply in 2014, but a 2.8 percent increase in demand, a 4.6 percent increase in average daily rate (ADR) and 6 percent in RevPAR, according to Jeff Higley, vice president of digital media and communications.

Supply of new hotels is very limited, as occupancy rates are rising, PKF reported. Luxury hotel chains, such as the Ritz-Carlton and Four Seasons, experienced 11.2 percent growth in 2011 in RevPAR in 2011, and PKF predicted 7.8 percent in 2012 and 6.9 percent in 2013.

The 6.1 percent pace of RevPAR growth forecast for 2013 is less than the 6.8 percent increase achieved in 2012. However, to put it in perspective, the 2013 growth rate is more than double the long-run average of 2.9 percent[34].

provides widely-respected, industry-leading economic data, information, analysis and travel trends to benefit its members and support industry efforts involving advocacy and promotion.

[34] *U.S. Hotel Guests Spend More to Rent Rooms, But Not on Much Else:* Business Wire Consumer Health: 05/07/2013. Headquartered in San Francisco, PKF Consulting USA, LLC (www.pkfc.com) is an advisory and real estate firm specializing in the hospitality industry. PKF Consulting USA, LLC is owned by FirstService Corporation (FSRV) and is a subsidiary of Colliers International. The firm operates two companies: PKF Consulting USA and PKF Hospitality Research, LLC. The firm has offices in New York, Boston, Indianapolis, Chicago, Philadelphia, Washington DC, Atlanta, Jacksonville, Orlando/Tampa, Dallas/Houston, Los Angeles, Bozeman, and San Francisco. 2012 U.S. Hotel Operating Performance Change - 2011 to 2012 Annual

Exhibit 2 Page 151 of 214

**The Pyramid Hotel Group Hotel Industry Overview: Spring 2013**

The Pyramid Hotel Group *Hotel Industry Overview* uses information from STR, Deutsche Bank, Sun Trust Robinson Humphries. Nationally, RevPAR had a stronger than expected first quarter of 2013 despite the Easter holiday which held down the March numbers. As predicted, most of the growth is coming from ADR, as occupancies approach or exceed the peak levels for this cycle. Most sectors had a strong start to the second quarter, enjoying the easy year over year comparison, although the trend has moderated in the past couple of weeks. Boston, as would be expected, slowed down due to the impact of the April 15 bombing and subsequent business disruptions and will be watched carefully if this affects results during the traditionally strong graduation period and summer season. New York is also showing a slowdown but it is really returning towards more normal levels after a huge first quarter that was driven in part by Sandy-related activity. Washington is showing surprising resilience in the face of the sequesterization, although occupancy is starting to slip, and San Francisco has been exceptionally strong over the past few weeks. Other top performing markets in recent weeks have been smaller areas such as Atlanta and Minneapolis.

The Upper Upscale segment has been the biggest beneficiary of the Easter calendar shift in the second quarter. Group business is traditionally non-existent during the week leading up to Easter, which also usually includes Passover. It came back very strongly in the first two weeks of April, with 40 to 50% pickup compared to last year. It has since fallen back, averaging about a 5% decrease for each of the last three weeks. Group booking pace has generally been reported as steady to moderately increasing after a very slow start to the year.

| | Q2 2013 YTD (thru 5/4) | | | Q1 2013 | | | 2012 Total Year | | |
|---|---|---|---|---|---|---|---|---|---|
| | ADR | Occ. | RevPAR | ADR | Occ. | RevPAR | ADR | Occ. | RevPAR |
| <u>Industry Total</u> | **3.8%** | **1.9%** | **5.8%** | **5.3%** | **1.7%** | **7.8%** | **4.1%** | **2.6%** | **6.9%** |
| **Luxury** | 4.1% | 1.8% | 6.0% | 7.7% | 4.3% | 12.5% | 4.2% | 3.4% | 7.9% |
| **Upper Upscale** | 5.3% | 2.6% | 8.0% | 4.6% | 2.0% | 6.7% | 4.2% | 2.5% | 6.9% |
| **Resort** | 3.9% | (0.6%) | 3.3% | 8.9% | 2.0% | 11.2% | 4.0% | 3.2% | 7.4% |
| <u>**Key Markets**</u> | | | | | | | | | |
| **NY** | 2.3% | (0.4%) | 1.9% | 8.1% | 7.6% | 16.7% | 2.6% | 3.4% | 6.2% |
| **Boston** | 3.9% | (1.6%) | 2.1% | 2.5% | 2.9% | 5.7% | 7.2% | 1.6% | 9.2% |
| **DC** | 5.1% | (0.3%) | 5.1% | 4.6% | 1.3% | 6.4% | (0.5%) | 0.5% | 0.5% |
| **Chicago** | 2.1% | 2.1% | 4.5% | 3.3% | (0.1%) | 3.6% | 5.9% | 4.4% | 11.2% |
| **SF** | NA | NA | 25.0% | NA | NA | 6.5% | 11.8% | 0.8% | 12.7% |
| **LA** | 7.5% | 2.1% | 9.7% | 5.6% | 3.3% | 9.1% | 5.0% | 4.8% | 11.0% |

*Source: Smith Travel Research, Deutsche Bank, Sun Trust Robinson Humphries*

Exhibit 2 Page 152 of 214

As usual, the public company higher-end brands have generally followed the national trends, although there are two anomalies. Hyatt, for example, reported relatively weak results, citing the impact of renovations and loss of group business, although they said that their group booking pace is starting to pick up. The Westin brand also looked a little weak, but there were no direct comments from management or the analysts. Group shifts may have impacted this brand as well.

| | Q1 2013 | | | Rolling 4 Quarters | | |
|---|---|---|---|---|---|---|
| | ADR | Occ | RevPAR | ADR | Occ | RevPAR |
| **Marriott Full Serv.** | 5.0% | 0.7% | 5.7% | 4.2% | 1.8% | 6.1% |
| **Ritz-Carlton** | 6.9% | 1.8% | 8.9% | 5.5% | 1.2% | 6.9% |
| **Sheraton** | 4.0% | 2.0% | 6.0% | 3.4% | 2.3% | 5.7% |
| **Westin** | 3.5% | 0.3% | 3.9% | 3.8% | 1.0% | 4.9% |
| **Luxury Collection** | 7.6% | 5.0% | 13.0% | 5.2% | 2.5% | 7.9% |
| **W** | 4.8% | 1.2% | 6.0% | 3.7% | 1.2% | 4.9% |
| **Le Meridian** | 6.6% | 2.5% | 9.3% | 3.8% | 0.6% | 4.2% |
| **Hyatt** | 3.6% | (1.0%) | 2.6% | 4.4% | 0.8% | 5.2% |
| *Source: Company earnings releases* | | | | | | |

Many industry analysts and public companies are upping their forecasts for the year, or at least narrowing the band, driven by the strong first quarter performance and the assumption that the government cutbacks will be mitigated. RevPAR is now generally seen as growing in the 6 to 8% range for the next couple of quarters, about 50 to 100 bp higher than previously thought. It is expected, however, to slow modestly in the 4th quarter when the comparisons are tougher. It is also expected that group will continue to grow at a slower rate than transient, as the volume of business already on the books is relatively flat compared to the prior year all the way through the first quarter of 2014. The performance of the hotel industry keeps defying the malaise of the overall economy. Demand is still growing; supply is still over the horizon, so no worries, right? That seems to be the consensus of industry experts at most of the conferences this year[35].

**STR Projects Performance Increases During 2013 & 2014: Hotel News Resource: Jan. 23, 2013[36]**

The U.S. hotel industry expects to see performance increases during 2013 and 2014, according to the most recent forecast from STR, in partnership with Tourism Economics.

---

[35] Pyramid Hotel Group currently manages and provides services to: 53 total properties, 38 hotels, 15 resorts, and more than 20,000 rooms in 29 metropolitan areas across 25 states, Washington D.C., Hawaii and the Caribbean, all major brands, 17 spas, 20 golf courses, over 1.66 million square feet of meeting space. http://pyramidhotelgroup.com/pyramid/hotel-industry-overview-spring-2013/
[36] http://www.hotelnewsresource.com/article68954.html

Exhibit 2 Page 153 of 214

Overall, in 2013 occupancy is expected to rise 0.8 percent to 61.9 percent, average daily rate is forecasted to increase 4.9 percent to US$111.27 and revenue per available room is expected to grow 5.7 percent to US$68.86.

The forecasted ADR would surpass the 2008 peak level (US$107.41), and the projected RevPAR would surpass the 2007 peak level (US$65.56). Supply in 2013 is forecasted to rise 1.0 percent, and demand is projected to be up 1.8 percent.

The forecast for 2014 includes:

- a 1.3-percent increase in occupancy to 62.7 percent;
- a 4.6-percent rise in ADR to US$116.43;
- a 6.0-percent growth in RevPAR to US$72.97.

In 2014, supply (+1.5 percent) and demand (+2.8 percent) are both projected to increase. Industry executives also expect the hospitality industry to perform well in 2013.[37]

### State and Local Tourism, Travel, and Hospitality Trends

Tourism is a $16.4 billion industry that supports nearly 150,900 jobs, contributes $1.8 billion in local and state tax revenues and ranks fourth in Gross Domestic Product (GDP) produced in Washington. In 2012, 10.2 million visitors spent $5.9 billion in Seattle and King County, contributing $479 million in state and local tax revenues. Direct visitor spending benefits hotels, retailers, restaurants, attractions, transportation services and other businesses, and supports jobs for more than 53,500 people in the Seattle region[38].

| Visitor Volume | Seattle-King | Washington |
|---|---|---|
| Total Over Night Visitors | 10.2 Million | 35.6 Million |
| **Visitor Expenditures** | **(rounded)** | |
| Food Service | $1.5 Billion | |
| Lodging | $1.2 Billion | |
| Local Transportation and Gas | $710 Million | |
| Arts/Recreation/Entertainment | $593 Million | |
| Visitor Air Transportation | $1.3 Billion | |
| Total Visitor Expenditures | $5.9 Billion | $16.9 Billion |
| **Tourism Industry Employment** | | |
| Total direct employment | 53,500 Jobs | 153,300 Jobs |
| Total direct earnings from travel spending | $2.5 Billion | $4.7 Billion |
| **State/Local taxes paid by visitors** | | |
| Lodging Taxes | $94 Million | |
| Auto Rental | $41 Million | |
| State Gas | $15 Million | |
| B&O | $22 Million | |
| Local Sales | $96 Million | |
| State Sales | $188 Million | |
| Passenger Facility Charges | $23 Million | |
| Total State/Local  taxes paid by visitors | $479 Million | $1 Billion |

*Source: Dean Runyan Associates for Visit Seattle[39]*

---

[37] *US Hospitality Executives Expect Industry to Perform Well in 2013* http://www.hotelnewsresource.com/article68958.html
[38] http://www.visitseattle.org/About-Us/Facts-And-Figures.aspx
[39] http://www.visitseattle.org/Resources/Research/2012-VISITOR-IMPACT-TO-SEATTLE.pdf

149   25-80007-FPC   Doc 15-2   Filed 02/19/25   Entered 02/19/25 15:21:59   Pg 153 of 214

Exhibit 2 Page 154 of 214

**Kidder Mathews Real Estate Market Review 2nd Quarter 2012 Pacific Northwest[40]:**

In most Washington markets, the resurgence of lodging demand that began in 2010 continued into early 2012. Rates of occupancy have improved, and room prices are increasing. The recovery has been most rapid for upscale hotels in and near Seattle, where occupancy rates are at or near stabilized levels. Daily room rates have increased as well, but with hotel managers reluctant to push the envelope, several years will be required to restore pre-recession pricing. With improved performance and a loosening of credit restrictions, there is renewed interest in hotel acquisition and development. The pace of sales has accelerated, five hotels are under construction, and numerous projects are in the planning stage.

During the first half of 2012, Kidder Mathews analyzed 11 lodging markets in Washington. Historically, hotels in and near Seattle have achieved the highest annual occupancy rates in the state. While demand did decline during the recession, the decrease in occupancy was less severe, and the recovery more rapid, than was the case in smaller cities and outlying areas.

For hotels in peripheral markets, the recovery has been more gradual. Occupancy improved by about 2% in Kitsap and South King Counties, and by 1% or less in Eastern Washington. In the Puyallup market, where modest growth in demand was more than offset by additions to supply, the occupancy rate declined.

One bright spot outside the urban core is Bellingham, where occupancy rates remained relatively strong through the recession. This success has attracted the interest of developers: a new La Quinta Inn is out of the ground, and construction of a Spring Hill Suites is expected to begin this year.

In the urban markets, occupancy rates have been influenced by room prices. During the recession, Seattle's luxury and upscale hotels offered very significant discounts, drawing guests away from what had been more affordable alternatives.

With occupancy restored to pre-recession levels, property managers have become more aggressive, raising rack rates and limiting discounts. For the current year, market room rates are projected to increase by 6% to 8% in the urban core, and by 3% to 5% in suburban markets.

**Economy - Seattle Tourism Increased in 2012: Hotel Managers Group[41]:**

Hotel Managers Group, a local hospitality management company, has been a leader in the hospitality management industry since its founding in 1985. During the past 2+ decades, HMG has managed over 55 uniquely different full-service and focused service hotels without suffering failure or default. HMG reports an uptick in tourism despite the closure of the Washington State Tourism Office and provides information on the Washington Tourism Alliance's current marketing strategy.

---

[40] Kidder Mathews is the leading independent commercial real estate firm on the West Coast. Kidder Mathews operates nine office throughout Washington, Oregon, and North Carolina. Over 400 professionals and employees provide brokerage services, property management services, valuation and advisory services.http://www.kiddermathews.com/downloads/research/hotel-market-research-seattle-2012-2q.pdf

[41] http://www.hmghotels.com/Economy-Seattle-Tourism-Increased-2012.html

Exhibit 2 Page 155 of 214

**Tourism in Seattle and Washington State**

The tourism industry in Washington State averages $15 billion per year, and it generates $1 billion in state tax revenue. Of the state's $15 billion, $5.6 billion was from Seattle tourists. In 2011, Seattle hosted nearly 10 million visitors, and tourists in Seattle provided $145 million in tax revenue. In addition, travel-related industries in Seattle employed over 51,000 people.

**Seattle Tourism Increases in 2012**

In May 2011, the hotel occupancy percentage averaged 69.5 percent. By May 2012, that number increased to 73.3 percent. In addition, the average daily rate (ADR) charged by hotels rose from $116 to $123, which is an increase of 5.7 percent. However, the most reliable indicator in the growth of tourism is the revenue per available room (RevPAR). In May 2011, RevPAR in Seattle was $81, and in May 2012, RevPAR increased to $90, which is a one-year increase of 10 percent.

**Washington Tourism Alliance (WTA) Marketing Campaigns**

One marketing campaign sponsored by the WTA was a $6.5 million initiative to attract tourists from other local cities, including Portland, OR; San Francisco, CA; and Vancouver, BC.

Another initiative is now underway to lure international tourists to Seattle. Market research conducted by the WTA shows that Japanese and Chinese tourists are currently expressing interest in visiting Alaska. However, most of these tourists must first arrive in Seattle before departing for Alaska from the airport or the seaport.

The latest marketing initiative by the WTA is a social networking campaign. Social networking is being used as a soft sell to spike interest in Seattle and Washington State. Once the idea is planted, it is then up to the individual to take further action in planning a trip.

**Washington Tourism Alliance[42]:**

The WTA released Washington State travel impact figures which indicate that tourism in Washington State was slightly improved in 2012 over 2011 figures. Thanks to a national economic recovery, U.S. tourism grew at 5.2 percent; however, visitation to Washington State lagged behind the U.S. with just 2.1 percent growth. The state saw some 36.4 million total overnight person trips in 2012, and those visitors spent $16.9 billion, up 4.4 percent over 2011. As with the increase in visitor spending, total local and state tax receipts generated by travel spending increased 4.9 percent to just over $1 billion – the equivalent of $390 for every resident household in Washington State. Travel and tourism supported more than 153,300 jobs in 2012, up 2.7 percent, and generated earnings (payroll) of $4.7 billion.

---

[42] http://watourismalliance.com/2013/03/3rd-annual-washington-tourism-alliance-summit-and-day-in-olympia-recap/

Exhibit 2 Page 156 of 214

**Visit Seattle—Seattle Tourism Report Card Gets an A+ Record-breaking visitations and growth in spending, tax contributions and employment to be announced at the 2013 Seattle Tourism Outlook[43]:**

Tourism impact numbers released February, 2013 by Visit Seattle indicate that incremental travel and tourism growth continues and that Seattle and King County are poised for yet greater growth in 2013. Overnight visitor volumes in the city and county increased 2.9 percent in 2012 to 10.2 million - breaking the 10 million mark for the first time ever, according to the annual Economic Impacts of Travel, 2012: Seattle and King County, Washington compiled by Dean Runyan Associates for Visit Seattle.

These travelers spent $5.9 billion while visiting the city and county, an increase of 5.2 percent. Spending was up from 2011 in all categories measured – accommodations, food service, food stores, local transportation and gas, arts, entertainment, recreation, retail sales and visitor air transportation.

Travelers in 2012 paid $479 million in state and local taxes (up 5.7 percent); about 95 percent of these taxes were sales or excise taxes on goods and services purchased by visitors.

Jobs supported by travel spending also increased in 2012. There were some 53,500 travel related jobs (up 2.6 percent) in King County. This is the second straight year of tourism job growth, following a 6.8 percent decline from 2009-2010.

Seattle finished 2012 with its strongest hotel occupancy in the past decade, ranking second only to San Francisco in the Western U.S. at 78 percent. The trend may strengthen in 2013 with an improved economy, Seattle's diversified and healthy corporate business mix and an increased Washington State Convention Center booking pace. Convention business on the books for 2013's second, third and fourth quarters is up 37 percent over last year.

The Seattle Tourism Improvement Area (STIA), a dedicated source of funding for tourism marketing and promotion that imposes a $2 per night surcharge on hotel rooms at 54 downtown hotels, continues to fuel a robust leisure travel marketing program. Last year, Visit Seattle launched its highly successful 2 Days in Seattle advertising campaign aimed at key consumer travel feeder markets in the Northwest, British Columbia and California. The campaign continues in 2013 and is expected to stimulate strong interest in Seattle during the traditional fall-winter off-season period.

Air visitation has increased for the past three years at Seattle-Tacoma International Airport and new European and Asian flight service has grown some 50 percent in the past five years to catch up with demand. Last year, Emirates Airlines inaugurated Dubai-Seattle service and All Nippon Airlines started Tokyo-Seattle service. This spring, Delta Air Lines will inaugurate new Shanghai and Tokyo service to Seattle.

.

---

[43] http://www.visitseattle.org/News-Room/Press-Releases/Visit-Seattle-and-Industry-News/Seattle-Tourism-Report-Card-Gets-an-A-.aspx

Exhibit 2 Page 157 of 214

**Historical occupancy and ADR levels for the overall Seattle lodging market since 2007[44]:**



After reaching a low of 61.2 percent during the recession of 2009, occupancy increased steadily to 71.2 percent by year-end 2012. PKF Hospitality Research projects occupancy levels to increase further to 72.5 percent by year-end 2013, and then to stabilize at approximately 73 percent from 2014 to 2017.

ADR was also affected by the recession, dropping 11.0 percent between 2008 and 2009. Managers of regional hotels decreased rates further in 2010 to drive occupancy. However, rates have increased in the two years since to reach $120.34 by year-end 2012. PKF Hospitality Research projects strong rate growth of approximately 7.0 percent in 2013 and 2014, 6.0 percent in 2015, 6.0 percent in 2016, and 4.0 percent in 2017, before tapering to inflationary growth rates.

Due to their ideal location near the region's primary leisure and commercial demand generators, and to their general superiority in terms of quality and amenities, hotels in Downtown Seattle have historically achieved the highest RevPAR figures of all six submarkets. The Kent/Renton submarket, meanwhile, has achieved a RevPAR below market averages, at just 54 percent of its fair share during the previous four quarters. Occupancy for this submarket was 60.7 percent in year-end 2012, only 1.5 percentage points above 2011 levels and considerably lower than the overall market's 71.2 percent. ADR was just $76.26 that year, also below the overall market's ADR of $120.34. RevPAR has yet to reach the levels achieved prior to the recession, having decreased at a CAGR of 0.7 percent since 2008. This is due primarily to a substantial 22.5 percent drop in 2009, worse than the 19.6 percent decline experienced by the greater Seattle market.

---

[44] Feasibility Study

153    25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 157 of 214

Exhibit 2 Page 158 of 214

### D. Hotel Branding

The Company has had meeting with both Hyatt and Starwood regarding the branding of the Southport Hotel. Both have expressed an interest and have toured the property. Negotiations are underway, but branding will likely not be determined until the Project is within a year of completion (estimated as the 1st quarter of 2016).

### E. Competition

SECO Development, Inc. engaged PKF Consulting USA to conduct a market demand study of the proposed hotel. The resulting report, *Market Demand and Financial Analysis – Proposed Hotel, Renton, Washington* dated May 29, 2013 is attached as an Exhibit. In conducting the study, PKF identified and researched hotels in the Renton area that would compete most directly with the proposed Project, and interviewed several of these hotels. They additionally researched and analyzed current economic and demographic trends in the greater Renton area to determine their impact on future lodging demand; reviewed the historical performance of the Renton lodging market and the identified comparable hotels, and estimated the anticipated growth in demand for, and supply of, lodging accommodations in the competitive market area.

PKF identified two competitive markets for the Project: the primary set consists of upper midscale to upper upscale hotels located in Renton, SeaTac, and Tukwila; the secondary set consists of sample of full-service hotels in downtown Seattle and Bellevue. As hotels within the primary set will be the most competitive for demand with the Subject due to their proximity, PKF placed primary reliance on their past performance in determining the occupancy and average daily rate figures likely attainable by the Project.

PKF, based on their research, identified 12 properties (totaling 3,463 rooms) as representing the primary competitive market. Competitive properties were identified on the basis of location, room product offered, guest type, rate structure, and overall quality. They are classified as upper-midscale to upper-upscale hotels, ranging in size from 104 to 850 rooms (averaging 289) and in age from 11 to 52 years. Five of these hotels are Hilton products, two are affiliated with the InterContinental Hotels Group, three are Marriott products, one is a Radisson, and one is independent of any brand affiliation.

The majority of these properties are located by the airport in SeaTac; of the remainder, two hotels are in Renton and two are in Tukwila. The properties in Renton and Tukwila capture most of the demand from companies with local operations, such as Boeing, PACCOR, Providence Health & Services, and the Federal Aviation Administration. Properties in SeaTac (which are located adjacent to the SeaTac Airport) capture the majority of demand affiliated with airport traffic and airline crews. PKF considers the Cedarbrook Lodge to be the most comparable to the Project with regard to guestroom product and overall quality. However, the Hilton Garden Inn Seattle Renton, located 4.3 miles from the proposed site, will also be competitive with the Project for demand due to its proximity.

The tables on the following pages provide a brief summary of each of the competitive properties.

Exhibit 2 Page 159 of 214

| Summary of Hotels in the Primary Competitive Lodging Market | | | |
|---|---|---|---|
| **Property** | **Holiday Inn Seattle-Renton** | **Holiday Inn Seattle Airport** | **Hilton Seattle Airport & Conference Center** |
| |  |  |  |
| Location | Renton, WA | SeaTac, WA | SeaTac, WA |
| Distance from Subject (Miles) | 3.5 | 8.9 | 9.1 |
| Year Opened | June 1966 | December 1970 | January 1961 |
| Number of Rooms | 224 | 259 | 396 |
| Amenities | | | |
| Restaurant | Yankee Grill | Seven Hills Grill Lounge | Spencer's |
| Pool/Whirlpool | Outdoor pool & whirlpool | Indoor pool | Outdoor pool & whirlpool |
| Complimentary Breakfast | No | No | No |
| Fitness Center | Yes | Yes | Yes |
| Meeting Space | 5,000 square feet | 10,000 square feet | 40,000 square feet |
| Other | Guest laundry, business center | Guest laundry, business center | 2 business centers |
| **Property** | **Marriott Seattle Airport** | **Radisson Seattle Airport** | **Doubletree Seattle Airport** |
| |  |  |  |
| Location | SeaTac, WA | SeaTac, WA | SeaTac, WA |
| Distance from Subject (Miles) | 9.0 | 9.8 | 9.4 |
| Year Opened | January 1981 | August 1988 | June 1969 |
| Number of Rooms | 459 | 204 | 850 |
| Amenities | | | |
| Restaurant | Aqua Terra, Consummate Grind | Rbg Bar & Grill | Coffee Garden Restaurant, Espresso Cafe, Maxi's, Seaports, Seaports Lounge |
| Pool/Whirlpool | Indoor pool & whirlpool | Indoor pool | Outdoor pool & whirlpool |
| Complimentary Breakfast | No | No | No |
| Fitness Center | Yes | Yes | Two |
| Meeting Space | 18,000 square feet | 4,000 square feet | 34,000 square feet |
| Other | Sauna | Complimentary airport shuttle, business center | Complimentary airport shuttle, The Golf Club golf simulator |

57

Exhibit 2 Page 160 of 214

| Summary of Hotels in the Primary Competitive Lodging Market | | |
|---|---|---|
| **Property** | **Doubletree Guest Suites Seattle Airport Southcenter** | **Cedarbrook Lodge** | **Hilton Garden Inn Seattle Renton** |
| |  |  |  |
| Location | SeaTac, WA | SeaTac, WA | Renton, WA |
| Distance from Subject (Miles) | 7.0 | 9.2 | 4.4 |
| Year Opened | March 1980 | June 2002 | September 1998 |
| Number of Rooms | 219 | 104 | 150 |
| Amenities | | | |
| Restaurant | Atrium Bar, CHA Cyber Cafe, NW Landing | Copperleaf Restaurant & Bar | Great American Grill |
| Pool/Whirlpool | Indoor pool & whirlpool | No | Indoor pool & whirlpool |
| Complimentary Breakfast | No | Yes | No |
| Fitness Center | Yes | Yes | Yes |
| Meeting Space | 12,000 SF | 23,000 SF | 1,000 SF |
| Other | Sauna, racquetball court, business center | Complimentary airport shuttle, business center | Pavilion Pantry, business center |
| **Property** | **Courtyard Seattle SeaTac Area** | **Embassy Suites Seattle Tacoma International Airport** | **Courtyard Seattle Southcenter** |
| |  |  |  |
| Location | Tukwila, WA | SeaTac, WA | Tukwila, WA |
| Distance from Subject (Miles) | 5.7 | 5.6 | 6.5 |
| Year Opened | August 1999 | December 1990 | February 1989 |
| Number of Rooms | 211 | 238 | 149 |
| Amenities | | | |
| Restaurant | Charley's | Basil's Lounge; Basil's Kitchen | The Bistro |
| Pool/Whirlpool | Indoor pool & whirlpool | Indoor pool | Indoor pool & whirlpool |
| Complimentary Breakfast | No | Yes | No |
| Fitness Center | No | Yes | Yes |
| Meeting Space | 2,000 square feet | 6,000 square feet | 2,000 square feet |
| Other | Complimentary airport shuttle | Complimentary airport shuttle, Evening Reception, sauna | Complimentary airport shuttle |

Page break>

58

Exhibit 2 Page 161 of 214

### F.     Project MarketingStrategy

It is anticipated that the hotel components will receive support from the branding company relative to reservations, advertising and marketing in general.  More in depth marketing plans for the property will be developed as the project nears completion and the level of support from the branding company is known.

### G.     EB-5 Investor Activity

#### 1.     Projected EB-5 Investor Activity

Timing on EB-5 investor activity will depend, in part, on the timing of several related issues.  As mentioned previously, Seattle Family Regional Center will be requesting Regional Center designation so that it can sponsor this project.   Marketing would commence immediately, but until the Regional Center has been approved, no investors will file I-526 petitions. Assuming investors are identified during the approval process for the Regional Center, and that the Seattle Family Regional Center receives its designation status in October 2013, then EB-5 investors could file I-526 petitions and invest in the Project as early as October 2013.  For the following example, a 9-month period of time has been estimated for approvals. It is unlikely that each and every I-526 petition will be filed or adjudicated exactly as shown below, and accordingly, the dates shown in this section may change due to the actual timing of these events.

*Based on the above assumptions, the following timeline was estimated.  It should be noted though, that any factor taking more or less time than projected here, will consequently change all subsequent timeline estimates.  This is an estimate only.*

|      | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|------|-----|-----|-----|
| 2013 |     |     |     |     |     | (1) |     |     |      | (2) | (3) |     |
| 2014 |     |     |     |     |     |     |     |     | (5)  |     |     |     |
| 2015 |     |     | (4) |     |     |     |     |     |      |     |     | (6) |
| 2016 |     |     |     |     |     |     |     |     |      |     |     |     |

(1) RC designation request filed with USCIS

(2) Estimated designation of Regional Center

(3) First I-526 filed

(4) Last I-526 filed

(5) First I-526 approved

(6) Last I-526 approved

From aggressive marketing efforts, it is estimated that EB-5 investors will be identified starting in November 2013 and that a total of 231 investors will have been identified by the end of March 2015.  It is estimated that the first I-526 petition will be filed in November 2013 following receipt of the Regional Center's designation as an USCIS approved Regional Center. Approval of I-526 petitions is expected to begin approximately 9 months after filing.  Based on these assumptions, the flow of approved I-526 petitions is estimated as follows:

Exhibit 2 Page 162 of 214

| I-526 Filing Dates | Number of Investors | I-526 Approval Dates |
|---|---|---|
| November-13 | 50 investors | August-14 |
| December-13 | 14 investors | September-14 |
| January-14 | 12 investors | October-14 |
| February-14 | 11 investors | November-14 |
| March-14 | 12 investors | December-14 |
| April-14 | 10 investors | January-15 |
| May-14 | 12 investors | February-15 |
| June-14 | 10 investors | March-15 |
| July-14 | 12 investors | April-15 |
| August-14 | 10 investors | May-15 |
| September-14 | 12 investors | June-15 |
| October-14 | 10 investors | July-15 |
| November-14 | 12 investors | August-15 |
| December-14 | 10 investors | September-15 |
| January-15 | 12 investors | October-15 |
| February-15 | 10 investors | November-15 |
| March-15 | 12 investors | December-15 |
| Total | 231 investors | |

## 2.  Job Analysis and I-829 Petitions Forecast

All investor funds are projected to be in the Project by March 2015.  Construction is projected to be completed by December 2017, with property operations commencing immediately thereafter. Based on the economic impact study prepared by Barnhart Economic Services, all jobs should be created by the end of the second year of property operations, projected as December 2018.

For the following example, the availability of investor funding to the project was shown at the time of I-526 application.  For estimated jobs created, the Economic Impact Report prepared by Barnhart Economic Services, LLC was used for determining estimated job creation by category and year.   These job-creation numbers were shown pro-rata in the months in which the construction costs were projected for disbursement, and for jobs created as the result of operating revenues, pro-rated over 2017, with the remaining jobs shown in the first month of 2018 to reach the annual revenue volume equal to that of 2018.

As previously stated, the timing of EB-5 funds (or bridge loan) being released to the project may affect the actual dates.  The specific dates provide a tangible example from which a projection of job creation timing can be drawn.

Exhibit 2 Page 163 of 214

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | 2013 Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 14 | 64 | |
| I-526 Approvals | | | | | | | | | | | | 0 | 0 | |
| 30 Months Later | | | | | | | | | | | | | 0 | |
| Jobs Needed Current Month | | | | | | | | | | | | | 0 | |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | | | | | | |
| Jobs Created Current Month | | | | | | | | | | | | | | |
| Architectural/Engineering | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Legal/Accounting | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| New Construction | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Hotel Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Restaurant Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Parking Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| Total New Jobs/Month | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Surplus Jobs (Cumulative) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | 2014 Totals | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 12 | 11 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 10 | 133 | 197 |
| I-526 Approvals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 14 | 12 | 11 | 12 | 99 | 99 |
| 30 Months Later | | | | | | | | | | | | | 0 | 0 |
| Jobs Needed Current Month | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | |
| Jobs Created (Monthly): | | | | | | | | | | | | | | |
| Architectural/Engineering | 7.3 | 7.8 | 7.8 | 7.1 | 7.0 | 6.5 | 6.5 | 6.5 | 6.5 | 6.5 | 0.7 | 0.7 | 71.0 | 71 |
| Legal/Accounting | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 2.0 | 2 |
| New Construction | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 13.9 | 17.7 | 44.0 | 44 |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Hotel Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Restaurant Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Parking Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Total New Jobs/Month | 8.7 | 9.2 | 9.2 | 8.5 | 8.4 | 7.9 | 7.9 | 7.9 | 7.9 | 7.9 | 14.8 | 18.6 | 117.0 | 117 |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 9 | 18 | 27 | 36 | 44 | 52 | 60 | 68 | 76 | 84 | 98 | 117 | | 117 |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Surplus Jobs (Cumulative) | 9 | 18 | 27 | 36 | 44 | 52 | 60 | 68 | 76 | 84 | 98 | 117 | | 117 |

61

159

Exhibit 2 Page 164 of 214

| | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | 2015 Totals | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 12 | 10 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 34 | 231 |
| I-526 Approvals | 10 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 132 | 231 |
| 30 Months Later | | | | | | | | | | | 0 | 0 | 0 | 0 |
| Jobs Needed Current Month | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| | | | | | | | | | | | | | | |
| Jobs Created (Monthly): | | | | | | | | | | | | | | |
| Architectural/Engineering | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.8 | 0.8 | 8.0 | 79 |
| Legal/Accounting | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.0 | 3 |
| New Construction | 22.8 | 27.9 | 35.4 | 40.0 | 30.7 | 45.5 | 60.3 | 75.1 | 90.0 | 97.4 | 104.8 | 112.2 | 742.0 | 786 |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Hotel Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Restaurant Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Parking Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Total New Jobs/Month | 23.5 | 28.7 | 36.1 | 40.7 | 31.4 | 46.2 | 61.0 | 75.9 | 90.7 | 98.1 | 105.7 | 113.1 | 751.0 | 868 |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 140 | 169 | 205 | 246 | 277 | 324 | 385 | 460 | 551 | 649 | 755 | 868 | | 868 |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Surplus Jobs (Cumulative) | 140 | 169 | 205 | 246 | 277 | 324 | 385 | 460 | 551 | 649 | 755 | 868 | | 868 |

| | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | 2016 Total | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 |
| I-526 Approvals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 |
| 30 Months Later | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jobs Needed Current Month | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| | | | | | | | | | | | | | | |
| Jobs Created (Monthly): | | | | | | | | | | | | | | |
| Architectural/Engineering | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.7 | 9.0 | 88 |
| Legal/Accounting | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.0 | 4 |
| New Construction | 117.5 | 110.2 | 102.9 | 92.0 | 81.1 | 78.6 | 72.0 | 61.6 | 50.7 | 41.8 | 19.2 | 15.5 | 843.0 | 1,629 |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.4 | 4.6 | 34.0 | 34 |
| Hotel Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Restaurant Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Parking Operations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0 |
| Total New Jobs/Month | 118.3 | 111.0 | 103.7 | 92.8 | 86.1 | 83.6 | 77.0 | 66.7 | 55.7 | 46.8 | 24.4 | 20.9 | 887.0 | 1,755 |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 986 | 1,097 | 1,201 | 1,294 | 1,380 | 1,464 | 1,541 | 1,607 | 1,663 | 1,710 | 1,734 | 1,755 | | 1,755 |
| Cumulative Jobs Needed | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Surplus Jobs (Cumulative) | 986 | 1,097 | 1,201 | 1,294 | 1,464 | 1,464 | 1,541 | 1,607 | 1,663 | 1,710 | 1,734 | 1,755 | | 1,755 |

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 164 of 214

Exhibit 2 Page 165 of 214

| | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | 2017 Total | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 0 | 0 | 0 | 0 | 0 | | | | | | | | | |
| I-526 Approvals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 |
| 30 Months Later | 0 | 50 | 14 | 12 | 11 | 12 | 10 | 12 | 10 | 12 | 10 | 12 | 165 | 165 |
| Jobs Needed Current Month | 0 | 500 | 140 | 120 | 110 | 120 | 100 | 120 | 100 | 120 | 100 | 120 | 1,650 | 1,650 |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 0 | 500 | 640 | 760 | 870 | 990 | 1,090 | 1,210 | 1,310 | 1,430 | 1,530 | 1,650 | | |
| | | | | | | | | | | | | | | |
| Jobs Created (Monthly): | | | | | | | | | | | | | | |
| Architectural/Engineering | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 88 |
| Legal/Accounting | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4 |
| New Construction | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 12.0 | 1,641 |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 34 |
| Hotel Operations | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 | 316.0 | 316 |
| Restaurant Operations | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 14.2 | 170.0 | 170 |
| Parking Operations | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 1.4 | 17.0 | 17 |
| Total New Jobs/Month | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 42.9 | 515.0 | 2,270 |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 1,798 | 1,841 | 1,884 | 1,927 | 1,970 | 2,013 | 2,055 | 2,098 | 2,141 | 2,184 | 2,227 | 2,270 | | 2,270 |
| Cumulative Jobs Needed | 0 | 500 | 640 | 760 | 870 | 990 | 1,090 | 1,210 | 1,310 | 1,430 | 1,530 | 1,650 | | 1,650 |
| Surplus Jobs (Cumulative) | 1,798 | 1,341 | 1,244 | 1,167 | 1,100 | 1,023 | 965 | 888 | 831 | 754 | 697 | 620 | | 620 |

| | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | 2018 Total | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-526 Petitions Filed | 0 | 0 | 0 | 0 | 0 | | | | | | | | | |
| I-526 Approvals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 |
| 30 Months Later | 10 | 12 | 10 | 12 | 10 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 66 | 231 |
| Jobs Needed Current Month | 100 | 120 | 100 | 120 | 100 | 120 | 0 | 0 | 0 | 0 | 0 | 0 | 660 | 2,310 |
| | | | | | | | | | | | | | | |
| Cumulative Jobs Needed | 1,750 | 1,870 | 1,970 | 2,090 | 2,190 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | | |
| | | | | | | | | | | | | | | |
| Jobs Created (Monthly): | | | | | | | | | | | | | | |
| Architectural/Engineering | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 88 |
| Legal/Accounting | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4 |
| New Construction | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.0 | 0.0 | 9.0 | 1,650 |
| F, F & E | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 34 |
| Hotel Operations | 23.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23.0 | 339 |
| Restaurant Operations | 11.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 11.0 | 181 |
| Parking Operations | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 18 |
| Total New Jobs/Month | 35.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 | 0.0 | 0.0 | 44.0 | 2,314 |
| | | | | | | | | | | | | | | |
| Cumulative New Jobs | 2306 | 2307 | 2308 | 2309 | 2310 | 2310 | 2311 | 2312 | 2313 | 2314 | 2314 | 2314 | | 2,314 |
| Cumulative Jobs Needed | 1,750 | 1,870 | 1,970 | 2,090 | 2,190 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | 2,310 | | 2,310 |
| Surplus Jobs (Cumulative) | 556 | 437 | 338 | 219 | 120 | 0 | 1 | 2 | 3 | 4 | 4 | 4 | | 4 |

63

25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 165 of 214

Exhibit 2 Page 166 of 214

## VIII. Summary and Conclusion

Based on the extensive data and research contained in this business plan, it is recommended that Southport Hotel Eb-5, LP as a New Commercial Enterprise, located in the Seattle Family Regional Center district be approved as a USCIS qualified investment under the EB5 Pilot Program. Recommendation for this approval is based on the following strengths:

- Southport Hotel Eb-5, LP promotes job creation. From the economic impact analysis contained in this business plan it is clear that the proposed Project will generate 2,313 permanent new jobs, where only 2, 310 jobs are required to comply with the EB-5 regulations for 231 investors.

- SH-Eb-5's defined project is within the Census Tract 53.01King County in Seattle, Kings County, WA, part of a contiguous thirteen Census tract area that qualifies a Targeted Employment Area (TEA), with a minimum investment of $500,000 per investor.

- The economic impact of the project by the creation of 2,313 permanent new jobs through the construction and operation of the Southport Hotel is significant between 2014 and 2018. Over this period the project will generate a total of $140.11 million in household earnings, $205.32 million in value added contribution to Gross Regional Product, and $341.66 million in output or revenues within the tri-County area.

- The Petitioner has shown that it has met the requirements of 8 C.F.R §§ 204.6 as demonstrated by:

  a. The creation of new commercial enterprise

  b. Investor funds of $500,000 per investor will be clearly shown to be fully committed

  c. Investor's capital will be derived from lawful sources

  d. Each Investor's investment will create not less than 10 new, permanent fulltime jobs

  e. As Members, Investors will qualify as active participants in the management of the new commercial enterprise

In closing, it is clear that the Southport Hotel to be constructed in Renton, Washington, strongly promotes economic growth, improves regional productivity, creates a significant level of jobs and it will attract increased domestic and foreign capital into the area it serves. For these reasons, it will make a quality USCIS EB-5 Pilot Program investment and is a qualified business under EB-5 Pilot Program.

Exhibit 2 Page 167 of 214

## IX.    Contact Information

**The New Commercial Enterprise:**
Michael Christ
Southport Hotel Eb-5, LP
1083 Lake Washington Blvd. N. #50
Renton, Washington, 98056
Phone: 425.282.5833
Email: seco@secodev.com

**Immigration Counsel:**
Robert C. Divine
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee 37450
Phone: 423.752.4416

**Securities Counsel:**
Robert S. Over
Keller Rohrback Law Offices
1201 3rd Avenue, Suite 3200
Seattle, Washington 98101-3052
Phone: 206.224.7554
Email: rover@kellerrohrback.com

**Economist:**
Barnhart Economic Services, LLC
3875 Sunset Lane
Riviera Beach, FL 33404
Phone: (561) 310-3357

Exhibit 2 Page 168 of 214

## X. Addendum

### A. Sellen Construction Hard Cost Estimate

*Southport Hotel*
**Conceptual Estimate**
*Mahoney G2 Concept Scheme G; 3-23-07*

**Sellen**

May 23, 2013

| SYSTEMS | TOTAL | $/GSF | SHELL & CORE | HOTEL BUILDOUT | SITEWORK | COMMENTS |
|---|---|---|---|---|---|---|
| 100 Foundations | $2,660,699 | $8.82 | 2,660,699 | 0 | 0 | |
| 200 Substructure | $1,232,248 | $4.08 | 1,007,248 | 0 | 225,000 | Includes TESC in Sitework |
| 300 Superstructure | $9,331,006 | $30.92 | 9,331,006 | 0 | 0 | |
| 400 Exterior Closure | $10,222,596 | $33.87 | 10,222,596 | 0 | 0 | Includes balconies and vents |
| 500 Roofing | $1,964,145 | $6.51 | 1,964,145 | 0 | 0 | |
| 600 Interior Construction | $22,071,761 | $73.14 | 2,290,711 | 19,781,050 | 0 | |
| 700 Elevator Systems | $2,420,000 | $8.02 | 2,420,000 | 0 | 0 | |
| 800 Plumbing | $6,826,369 | $22.62 | 3,534,229 | 3,292,140 | 0 | |
| 800 HVAC | $5,490,311 | $18.19 | 3,076,047 | 2,414,264 | 0 | |
| 800 Fire Protection | $1,005,349 | $3.33 | 779,012 | 226,337 | 0 | |
| 900 Electrical | $7,377,703 | $24.45 | 3,243,276 | 4,134,427 | 0 | |
| 1000 General Conditions | $6,164,340 | $20.43 | 3,595,753 | 2,383,654 | 184,933 | Includes Preconstruction |
| 1050 Hoisting | $2,517,611 | $8.34 | 1,426,063 | 1,012,959 | 78,589 | |
| 1100 Equipment | $279,400 | $0.93 | 160,000 | 119,400 | 0 | |
| 1200 Sitework | $3,600,000 | $11.93 | 1,500,000 | 0 | 2,100,000 | Includes Terrace Improvements to SdeC |
| **Subtotal Direct Costs** | **$83,163,539** | **$275.57** | **$47,210,785** | **$33,364,232** | **$2,588,522** | **EXCLUDES WSST** |
| Construction Contingency @ 1.5% | $1,247,453 | $4.13 | 708,162 | 500,463 | 38,828 | |
| GC Fee | $2,532,330 | $8.39 | 1,437,568 | 1,015,941 | 78,820 | |
| **Subtotal** | **$86,943,321** | **$288.10** | **$49,356,515** | **$34,880,636** | **$2,706,170** | |
| Liability Insurance | $793,463 | $2.63 | 450,438 | 318,328 | 24,697 | |
| B & O Tax | $397,576 | $1.32 | 225,698 | 159,503 | 12,375 | |
| **Total** | **$88,134,360** | **$292.05** | **$50,032,651** | **$35,358,467** | **$2,743,242** | **EXCLUDES WSST** |
| Project GSF | 301,783 | | 301,783 | 301,783 | 70,000 | |
| Cost/SF | $292.05 | | $165.79 | $117.17 | $39.19 | |

**ALTERNATE PRICING**
1 Add Performance & Payment Bond      $477,886
2 Add Allowance for Subbonds ($70m)      $700,000

66

Exhibit 2 Page 169 of 214

## B.  Itemization of Project Costs

|  | Total Budget |
|---|---|
| **CONSTRUCTION** | |
| | |
| **Site Work** | |
| Allocation of Offsite traffic imprvmts (LW.Blvd. road, bridge, etc) | $1,000,000 |
| | |
| **Direct Construction Costs (Sellen)** | $83,163,539 |
| Construction Cont at 1.5% | $1,247,453 |
| GC Fee | $2,532,329 |
| Construction Cost Subtotal | $86,943,321 |
| B&O Taxes and Liability Ins | $1,191,039 |
| Washington State Sales Tax @ 9.5% | $8,372,764 |
| **Construction Cost Total** | **$96,507,124** |
| | |
| **Parking Cost** | |
| Parking  (353 rms x 50%= 175 stalls + 125 ballrm/restaurant stalls) | $6,088,320 |
| Washington State Sales Tax @ 9.5% | $578,390 |
| | **$6,666,710** |
| | |
| **SOFT COSTS , FF+E, OTHER COSTS, RESERVES  & WORKING CAPITAL** | |
| | |
| **Consultants** | |
| Architectural  (site studies to SEPA thru CA) | $2,515,827 |
| Architectural production of marketing materials | $100,000 |
| Architectural Reimbursable & extra services | $50,000 |
| Structural w/CA, piling | $254,921 |
| Civil | $30,000 |
| Landscape | $75,000 |
| Envelope Consultation (shop dwgs/const review) | $50,000 |
| Soils Study/Geotech Report, piling criteria | $12,000 |
| ALTA Survey, bound,topo,easements,updates | $15,000 |
| Misc Consultants; (hrdw, elevator, acousical, energy calc) | $30,000 |
| Mechanical Consultant (Criteria, Schematics, submittal rev, RFI's, job review) | $20,000 |
| Electrical Consultant (Criteria, Schematics, submittal rev, RFI's, job review, PSE coord) | $20,000 |
| Signage & Grapics design | $15,000 |
| City / Zoning Consultant | $10,000 |
| Traffic Engineer | $10,000 |
| Restaurant/Kitchen Designer | $50,000 |
| Interior design services, FF&E selection & spec Lobby & Amenity | $250,000 |
| Interior designer CA & purchase of FF&E,   Supervise installation | $250,000 |
| | |
| **Misc. Costs** | |
| Renderings & Models | $90,000 |
| Environmental Phase I | $5,000 |
| Environmental Phase II | $10,000 |
| Legal & Accounting | $250,000 |
| Structural Inspections | $275,000 |
| Geotech Field Services | $75,000 |
| Waterproofing/Envelope Inspection | $75,000 |
| Window/envelope testing | $30,000 |
| Printing, Courier Expenses | $25,000 |
| Photos/aerials | $10,000 |

Exhibit 2 Page 170 of 214

| | Total Budget |
|---|---|
| Travel & entertainment expense  Allow | $20,000 |
| Preconstruction services by GC | $0 |
| | |
| **Permits, Utility Fees and Assessments** | |
| Design Review/Preapp/Filing Fees | $5,000 |
| Building Permit/Plan Check | $831,635 |
| Restaurant/bar TI Improvement Permits | $10,000 |
| LID/Latecomer Fees/Mitigation (parks,traffic,schools) | $300,000 |
| Water Meters | $50,000 |
| Water Capacity/service Charges | $0 |
| Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | $100,000 |
| Natural Gas | $50,000 |
| Dewatering discharge fees   Allow | $25,000 |
| Sewer charges from King County  ALLOW | excluded |
| Sewer Capacity Revision Charge | excluded |
| Ongoing Site Utilities charges during const | $10,000 |
| Power Service and Transformer | $100,000 |
| Communications (net of door fees offset) | $0 |
| Restaurant, Liquor & Health, & Other Permits & Impact Fees | $10,000 |
| Bond premiums & Misc city/state licenses | $5,000 |
| | |
| **Furnishings** | $8,750,000 |
| Guest Room art | in above |
| Public Area art, plants, etc | in above |
| Laundry Equipment | in above |
| Kitchen/Bar/Restaurant/Food equipment, booths, exhaust hoods, refrigeration | in above |
| Sound & audio visual systems & equipment | in above |
| Specialty lighting | in above |
| Exercise & pool Equipment | in above |
| Tables, desks, chairs | in above |
| Registration desk equipment | in above |
| Phone & Computer systems | in above |
| Vending & Ice machines | in above |
| Display boards & screens | in above |
| Deck/Terrace furniture | in above |
| Non-code Signage, door #'s, directories & graphics | in above |
| Trash compactor & containers | in above |
| Misc office/employee/back of house   shelving & equipment | in above |
| Safety deposit boxes & safe(s) | in above |
| Van, pickup, automobile | $150,000 |
| Kitchen equipment in guest rooms | excluded |
| | |
| **Ins & Taxes** | |
| RE taxes on land during predev & construction period | $1,158,601 |
| Property Ins thru occupancy | $427,500 |
| Builders Risk Ins | $1,250,000 |
| | |
| **Developer Costs** | |
| Project Management & Administration (total cost excluding land) | $1,738,866 |
| Developer Overhead & Project Mgmt  % of hard+soft | $1,738,866 |
| | |
| **Construction Financing** | |
| Appraisal | $25,000 |

68

Exhibit 2 Page 171 of 214

|  | Total Budget |
|---|---|
| Title Ins. & Endorsements | $25,000 |
| Construction Review & Inspections | $30,000 |
| Lender Legal & Environmental Fees, & Loan Closing Costs | $20,000 |
| Construction Loan Fee | $350,000 |
| Permanent Loan Fee | $1,000,000 |
| Draw rate during 26 mo. construction period | $4,364,708 |
| **Development Loan Interest** | $250,000 |
| **Preopening and Working Capital** | $1,500,000 |
| **Reserve for shortfall** | $1,500,000 |
| **TOTAL PROJECT ESTIMATED COST** | **$134,571,760** |

69

Exhibit 2 Page 172 of 214

## C. Operating Results of Comparable Hotels

**Proposed Hotel - Renton, WA**
**Operating Results of Comparable Hotels**

| | Hotel A | | | Hotel B | | | Hotel C | | |
|---|---|---|---|---|---|---|---|---|---|
| | Ratio | Per Room | P.O.R. | Ratio | Per Room | P.O.R. | Ratio | Per Room | P.O.R. |
| **Revenues** | | | | | | | | | |
| Rooms | 64.0% | $48,030 | $177.27 | 66.2% | $50,580 | $172.96 | 74.0% | $50,314 | $195.87 |
| Food & Beverage | 31.8% | 23,854 | 88.04 | 25.2% | 19,268 | 65.89 | 20.6% | 13,967 | 54.37 |
| Garage and Parking | 0.0% | 0 | 0.00 | 4.1% | 3,102 | 10.61 | 3.8% | 2,583 | 10.06 |
| Spa | 0.0% | 0 | 0.00 | 3.3% | 2,543 | 8.70 | 0.0% | 0 | 0.00 |
| Other Operated Departments | 0.6% | 436 | 1.61 | 0.7% | 556 | 1.90 | 0.4% | 251 | 0.98 |
| Rentals and Other Income | 3.6% | 2,718 | 10.03 | 0.4% | 324 | 1.11 | 0.4% | 257 | 1.00 |
| Total Revenues | 100.0% | 75,038 | 276.96 | 100.0% | 76,373 | 261.16 | 100.0% | 67,954 | 264.55 |
| | | | | | | | | | |
| **Departmental Expenses** | | | | | | | | | |
| Rooms | 20.9% | 10,054 | 37.11 | 28.3% | 14,292 | 48.87 | 20.3% | 10,191 | 39.67 |
| Food & Beverage | 60.1% | 14,343 | 52.94 | 80.9% | 15,594 | 53.33 | 90.7% | 12,671 | 49.33 |
| Garage and Parking | 0.0% | 0 | 0.00 | 36.0% | 1,117 | 3.82 | 37.6% | 971 | 3.78 |
| Spa | 0.0% | 0 | 0.00 | 93.2% | 2,369 | 8.10 | 0.0% | 0 | 0.00 |
| Other Operated Departments | 72.3% | 316 | 1.17 | 105.2% | 585 | 2.00 | 219.9% | 552 | 2.15 |
| Total Departmental Expenses | 32.9% | 24,713 | 91.21 | 44.5% | 33,958 | 116.12 | 36.3% | 24,673 | 96.05 |
| | | | | | | | | | |
| Departmental Profit | 67.1% | 50,325 | 185.74 | 55.5% | 42,416 | 145.04 | 63.7% | 43,280 | 168.49 |
| | | | | | | | | | |
| **Undistributed Expenses** | | | | | | | | | |
| Administrative & General | 7.0% | 5,275 | 19.47 | 9.6% | 7,309 | 24.99 | 8.8% | 6,005 | 23.38 |
| Marketing (Including Franchise Fees) | 6.3% | 4,714 | 17.40 | 7.2% | 5,534 | 18.92 | 13.3% | 9,036 | 35.18 |
| Property Operation and Maintenance | 3.2% | 2,397 | 8.85 | 3.6% | 2,759 | 9.43 | 3.8% | 2,574 | 10.02 |
| Utility Costs | 3.0% | 2,215 | 8.17 | 3.2% | 2,428 | 8.30 | 2.7% | 1,865 | 7.26 |
| Total Undistributed Operating Expenses | 19.5% | 14,600 | 53.89 | 23.6% | 18,031 | 61.66 | 28.7% | 19,481 | 75.84 |
| | | | | | | | | | |
| Gross Operating Profit | 47.6% | 35,725 | 131.86 | 31.9% | 24,384 | 83.38 | 35.0% | 23,799 | 92.65 |
| | | | | | | | | | |
| Base Management Fee | 3.0% | 2,251 | 8.31 | 3.0% | 2,293 | 7.84 | 1.0% | 680 | 2.65 |
| | | | | | | | | | |
| **Fixed Expenses** | | | | | | | | | |
| Incentive Management Fee | 0.7% | 542 | 2.00 | 0.0% | 0 | 0.00 | | | |
| Property Taxes | 4.6% | 3,471 | 12.81 | 4.4% | 3,370 | 11.52 | 3.7% | 2,516 | 9.79 |
| Insurance | 1.6% | 1,238 | 4.57 | 0.8% | 606 | 2.07 | 1.4% | 939 | 3.66 |
| Total Fixed Expenses | 7.0% | 5,251 | 19.38 | 5.2% | 3,975 | 13.59 | 5.1% | 3,455 | 13.45 |
| | | | | | | | | | |
| Net Operating Income | 37.6% | 28,223 | 104.17 | 23.7% | 18,116 | 61.95 | 28.9% | 19,665 | 76.56 |
| | | | | | | | | | |
| FF&E Reserve/Capital Expenditures | 4.0% | 3,002 | 11.08 | 4.0% | 3,055 | 10.45 | 4.0% | 2,718 | 10.58 |
| | | | | | | | | | |
| Net Operating Income After Reserve | 33.6% | $25,222 | $93.09 | 19.7% | $15,061 | $51.50 | 24.9% | $16,947 | $65.98 |

Source: PKF Consulting USA

Exhibit 2 Page 173 of 214

**Proposed Hotel - Renton, WA**
Operating Results of Comparable Hotels

| | Hotel D | | | Hotel E | | | Weighted Average | | |
|---|---|---|---|---|---|---|---|---|---|
| | Ratio | Per Room | P.O.R. | Ratio | Per Room | P.O.R. | Ratio | Per Room | P.O.R. |
| **Revenues** | | | | | | | | | |
| Rooms | 67.1% | $45,219 | $158.10 | 73.1% | $53,934 | $184.08 | 68.1% | $48,555 | $174.16 |
| Food & Beverage | 27.8% | 18,719 | 65.45 | 22.2% | 16,395 | 55.96 | 26.6% | 19,003 | 68.16 |
| Garage and Parking | 3.5% | 2,335 | 8.16 | 1.8% | 1,348 | 4.60 | 2.4% | 2,305 | 8.18 |
| Spa | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 0.4% | 2,536 | 8.70 |
| Other Operated Departments | 0.9% | 597 | 2.09 | 1.0% | 724 | 2.47 | 0.7% | 516 | 1.85 |
| Rentals and Other Income | 0.8% | 524 | 1.83 | 1.8% | 1,336 | 4.56 | 1.6% | 1,148 | 4.12 |
| Total Revenues | 100.0% | 67,392 | 235.62 | 100.0% | 73,737 | 251.67 | 100.0% | 71,327 | 255.84 |
| | | | | | | | | | |
| **Departmental Expenses** | | | | | | | | | |
| Rooms | 29.0% | 13,101 | 45.80 | 28.3% | 15,276 | 52.14 | 25.4% | 12,312 | 44.15 |
| Food & Beverage | 80.9% | 15,150 | 52.97 | 71.4% | 11,702 | 39.94 | 74.0% | 14,064 | 50.44 |
| Garage and Parking | 38.0% | 888 | 3.11 | 58.8% | 792 | 2.70 | 40.0% | 921 | 3.27 |
| Spa | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 93.2% | 2,363 | 8.10 |
| Other Operated Departments | 151.7% | 906 | 3.17 | 78.1% | 566 | 1.93 | 117.6% | 607 | 2.18 |
| Total Departmental Expenses | 44.6% | 30,045 | 105.05 | 38.4% | 28,336 | 96.71 | 39.3% | 27,998 | 100.43 |
| | | | | | | | | | |
| **Departmental Profit** | 55.4% | 37,347 | 130.58 | 61.6% | 45,400 | 154.95 | 60.7% | 43,329 | 155.42 |
| | | | | | | | | | |
| **Undistributed Expenses** | | | | | | | | | |
| Administrative & General | 7.1% | 4,789 | 16.74 | 9.6% | 7,065 | 24.11 | 8.0% | 5,735 | 20.57 |
| Marketing (including Franchise Fees) | 10.5% | 7,070 | 24.72 | 6.5% | 4,821 | 16.46 | 8.7% | 6,209 | 22.27 |
| Property Operation and Maintenance | 4.6% | 3,086 | 10.79 | 3.9% | 2,856 | 9.75 | 3.9% | 2,748 | 9.86 |
| Utility Costs | 3.9% | 2,660 | 9.30 | 5.4% | 3,966 | 13.54 | 3.6% | 2,586 | 9.28 |
| Total Undistributed Operating Expenses | 26.1% | 17,605 | 61.55 | 25.4% | 18,709 | 63.85 | 24.2% | 17,278 | 61.98 |
| | | | | | | | | | |
| **Gross Operating Profit** | 29.3% | 19,742 | 69.02 | 36.2% | 26,691 | 91.10 | 36.5% | 26,051 | 93.44 |
| | | | | | | | | | |
| **Base Management Fee** | 1.0% | 665 | 2.33 | 3.0% | 2,202 | 7.51 | 2.1% | 1,507 | 5.40 |
| | | | | | | | | | |
| **Fixed Expenses** | | | | | | | | | |
| Incentive Management Fee | 0.0% | 0 | 0.00 | 0.0% | 0 | 0.00 | 0.2% | 541 | 2.00 |
| Property Taxes | 3.8% | 2,545 | 8.90 | 4.3% | 3,184 | 10.87 | 4.2% | 2,970 | 10.65 |
| Insurance | 2.4% | 1,588 | 5.55 | 0.6% | 461 | 1.57 | 1.6% | 1,106 | 3.97 |
| Total Fixed Expenses | 6.1% | 4,132 | 14.45 | 4.9% | 3,645 | 12.44 | 5.7% | 4,076 | 14.62 |
| | | | | | | | | | |
| **Net Operating Income** | 22.2% | 14,945 | 52.25 | 28.3% | 20,845 | 71.14 | 28.7% | 20,468 | 73.42 |
| | | | | | | | | | |
| **FF&E Reserve/Capital Expenditures** | 4.0% | 2,696 | 9.42 | 4.0% | 2,949 | 10.07 | 4.0% | 2,853 | 10.23 |
| | | | | | | | | | |
| **Net Operating Income After Reserve** | 18.2% | $12,249 | $42.83 | 24.3% | $17,895 | $61.08 | 24.7% | $17,615 | $63.18 |

Source: PKF Consulting USA

Exhibit 2 Page 174 of 214

# Southport Hotel Eb-5, LP
Supplement to Business Plan dated June 18, 2013

August 5, 2013

Submitted by:

Michael Christ
SECO Development, Inc.
1083 Lake Washington Blvd. N. #50
Renton, Washington, 98056
Phone: 425.282.5833

Exhibit 2 Page 175 of 214

# Southport Hotel Eb-5, LP
# Supplemental Information

On June 18, 2013 a comprehensive business plan was issued by Southport Hotel Eb-5, LP, the purpose of which was to describe the development and operation of the Southport Hotel Project which will be funded in part by EB-5 investor funds.

This supplement to the business plan for Southport Hotel Eb-5, LP is intended to be reviewed in conjunction with that business plan dated June 18, 2013 and is intended to clarify the management of the operations phase of the Southport Hotel Project.

Hotel at Southport, LLC (the "Company" or the "Owner") is the owner of the Southport Hotel Project.  As stated on page 3 of the business plan, **"All of the components above listed will be departments of the hotel and will be operated by, or on behalf of, the Owner.  There are no tenants."**

This issue is further addressed on page 11 of the business plan where it states:  "A management company may be engaged to manage the property on the Company's behalf, ***but all employees will work for the Company, and all business risk will be that of the Company, not that of the hotel management company."***

The intent of the above bolded statements in the June 18, 2013 business plan was to make it clear that the hotel, restaurant, spa, parking, and in fact all amenities at the Southport Hotel Project will be operated by the Owner.

It is still the intent of the Owner to operate all components of the Southport Hotel Project.  However, in the unlikely event the Owner later decided not to manage any component of the Southport Hotel Project, the amount of EB-5 investor funds being used to develop and operate the property would be reduced so as to retain sufficient job creation for all investors.  The alternative source of funds to replace any unsubscribed EB-5 investor funds would be an increase in traditional construction loan financing (and/or additional investment by Michael Christ and investors).

Exhibit 2 Page 176 of 214

**Exhibit D- Form of Escrow Agreement**

Exhibit 2 Page 177 of 214

# EXHIBIT D
# INTENTIONALLY
# LEFT EMPTY

# SUBSCRIPTIONS
# RECEIVED
# WITHOUT USE OF
# ESCROW

Exhibit 2 Page 178 of 214

**Exhibit E- Form of Loan Agreement [Attachments available upon request]**

Exhibit 2 Page 179 of 214

## AMENDMENT TO CONSTRUCTION LOAN AGREEMENT

This Amendment to Construction Loan Agreement (the "Amendment") is dated as of _Nov. 10th_ , 2014, and is made by and among HOTEL AT SOUTHPORT, LLC, a Washington limited liability company ("Borrower"), SOUTHPORT HOTEL Eb-5, LP ("Lender"), and SEATTLE FAMILY, LP, a Washington limited partnership ("Agent"). This Amendment amends the terms of the Loan Agreement between Borrower, Lender and Agent dated as of October 21, 2013 (the "Loan Agreement"). Capitalized terms not defined in this Amendment shall have the meaning given to them in the Loan Agreement.

For valuable consideration, the receipt of which is acknowledged, Borrower, Lender and Agent agree to modify the Loan Agreement as follows:

1.  All references to Borrower having a land lease or ground lease interest in the Land are removed. Borrower has a fee simple interest in the Land, and the Deed of Trust will encumber Borrower's fee simple interest in the Land.

2.  The Land as defined in the Loan Agreement is broadened to include all property legally described on attached Exhibit A. The Land now includes Lot 1 and Lot 4 of Southport. A portion of the Land that constitutes current Lot 4 at Southport will contain a portion of the hotel structure. Borrower is in the process of preparing, filing and processing a lot line adjustment that will modify the boundaries between Lot 1 and Lot 4, such that the primary hotel improvements will all be located on Lot 1. Concurrent with completion and recording of this lot line adjustment, Lender and Agent agree to execute a request for partial reconveyance to cause Lender's lien against newly configured Lot 4 to be released.

3.  A new Section 4.7, Subordination of Loan, is added to the Loan Agreement, and shall read as follows:

"Lender acknowledges that Borrower may obtain a senior construction loan to help finance construction of the Project. Lender also acknowledges that, following completion of construction of the Project, Borrower may obtain a permanent loan which will repay a portion of, but not all of, this Loan. In case Borrower enters into any loan described in the preceding sentences (each a "Senior Loan"), Lender agrees to subordinate this Loan to the lien of any such Senior Loan pursuant to an intercreditor or subordination agreement between Lender and Senior Lender that is approved by Lender in its reasonable discretion. Lender agrees not to withhold consent to a subordination or intercreditor agreement with Senior Lender that has customary commercial terms. This intercreditor or subordination agreement shall subordinate the lien of the Deed of Trust to the lien of the deed of trust securing the Senior Loan (the "Senior Deed of Trust"), and shall contain provisions reasonably acceptable to Lender that adequately protect Lender's interest, including provisions providing Lender notice of, and the right, but not the obligation, to cure any default by Borrower under the Senior Loan. Upon funding of a Senior Loan, provided that the Senior Lender executes an intercreditor or subordination agreement, Lender shall execute such other documents as are reasonably required by the Senior Lender, and approved by Lender in its reasonable discretion, subordinate the lien of the Loan to the lien of the Senior Loan."

Exhibit 2 Page 180 of 214

4.  A new Section 4.8, Liens and Permitted Contests, is added to the Loan Agreement, and shall read as follows:

"If any mechanic's or materialman's lien is recorded against the Project, Borrower shall cause such lien to be removed within thirty (30) days after the date of its filing. Notwithstanding the foregoing, Borrower may contest or object in good faith to the amount or validity of any lien asserted against the Project, provided that Borrower complies with the following conditions: (a) Borrower gives written notice to Lender of Borrower's intent to contest the lien and records a bond to remove the lien in the amount of 150% of the amount of the lien claim, or deposits with Lender other security satisfactory to Lender in such amount as Lender shall reasonably require, and Borrower shall have demonstrated to Lender its reasonable satisfaction that no portion of the collateral be sold or subject to foreclosure sale to satisfy such claim prior to final resolution; (b) Borrower shall promptly and diligently proceed to cause the lien claim to be settled and discharged in a manner that does not prejudice Lender or its rights hereunder; (c) if Borrower fails to diligently proceed to discharge the lien claim, then Lender may, in addition to its other rights hereunder, discharge the same by paying the amount of the claim to be due, or by recording a bond to remove lien or otherwise depositing the amount claimed or otherwise giving security for such lien claim, at Borrower's expense; and (d) Borrower shall reimburse Lender for any reasonable attorneys' fees and costs incurred by Lender in protecting its interest with respect to the lien claim."

5.  Section 8.10 of the Loan Agreement is revised to remove Thomas W. Read as Authorized Representative, and to appoint Michael P. Christ as Authorized Representative.

6.  Exhibit B to the Loan Agreement is replaced with attached Exhibit B, Exhibit D to the Loan Agreement is replaced with attached Exhibit D, and Exhibit E to the Loan Agreement is replaced with attached Exhibit E.

Except as modified by this Amendment, the terms of the Loan Agreement remain in full force and effect. In case of a conflict between the terms of this Amendment and the terms of the Loan Agreement, the terms of this Amendment shall control. This Amendment may be signed in one or more counterparts, and by facsimile copy or electronic mail copy, and each counterpart, facsimile copy and electronic mail copy so signed shall be deemed an original hereof.

**BORROWER**

HOTEL AT SOUTHPORT LLC

By      SECO DEVELOPMENT, INC., its manager

By _____
       Michael P. Christ, President

Exhibit 2 Page 181 of 214

**LENDER**

SOUTHPORT HOTEL Eb-5, LP

By      SEATTLE FAMILY, LP, its general partner

      By      SOUTHPORT HOTEL MANAGEMENT
            LLC, its general partner

            By      SECO DEVELOPMENT, INC., its
                  manager

                  By _____
                     Michael P. Christ, President


**AGENT**

SEATTLE FAMILY LP

By      SOUTHPORT HOTEL MANAGEMENT LLC, its
        general partner

      By      SECO DEVELOPMENT, INC., its manager

      By _____
         Michael P. Christ, President

A6
11/17/2014

Exhibit 2 Page 182 of 214

**CONSTRUCTION LOAN AGREEMENT**

**for a loan in the amount of**
**$115,500,000**

**MADE BY AND BETWEEN**

**Hotel at Southport,**
**a Washington limited liability company**

**as a Borrower**

**AND**

**Southport Hotel Eb-5,**
**a Washington limited partnership**

**as a Lender**

**Dated as of October 21, 2013**

Exhibit 2 Page 183 of 214

## LOAN AGREEMENT

Project commonly known as
"Southport Hotel"

THIS LOAN AGREEMENT (**"Agreement"**) dated as of October 21, 2013, is made by and among Hotel at Southport, LLC, a Washington limited liability company (**"Borrower"**), and Southport Hotel Eb-5, LP (individually, a **"Lender"** and collectively, the **"Lenders"**), a Washington limited partnership, its successors and assigns, and Seattle Family, LP, a Washington limited partnership ("Agent").

### Recitals

Borrower has applied for a loan (the **"Loan"**) in the amount of up to One Hundred Fifteen Million Five Hundred Thousand US DOLLARS ($115,500,000 USD) to finance a substantial portion of the costs of construction of the Project. Lenders are willing to make the Loan on the terms and conditions hereinafter set forth.

### Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### Article 1.
### INCORPORATION OF RECITALS AND EXHIBITS

1.1 **Incorporation of Recitals.**

The foregoing preambles and all other recitals in this Agreement are made a part of this Agreement by this reference.

1.2 **Incorporation of Exhibits**.

Exhibits A through E to this Agreement are incorporated in this Agreement and expressly made a part hereof by this reference.

### Article 2.
### DEFINITIONS

2.1 **Defined Terms**.

The following terms as used herein shall have the following meanings:

**Applicable Rates**: The rates of interest applicable to the Loan from time to time as described in Section 5.1(a).

**Appraisal**. An MAI certified appraisal of the Project performed in accordance with FIRREA and Agent's appraisal requirements by an appraiser selected and retained by Agent. Appraisal shall not include the appraisal from O'Conner Consulting Groups on May 7, 2008 (ref No. 08-175).

Exhibit 2 Page 184 of 214

**Architect**:  Shall mean MulvannyG2.

**Authorized Representative**:  As such term is defined Section 8.13.

**Budget**:  The budget for the Project attached to this Agreement as Exhibit B, specifying all costs and expenses of every kind and nature whatever to be incurred by Borrower in connection with the Project prior to the Maturity Date, as the same may be amended from time to time in accordance with this Agreement.

**Business Day**:  A day of the year on which banks are not required or authorized to close in Seattle, Washington.

**Capital Event**:  Shall mean the refinance or sale of the Improvements.  Borrower shall use its best efforts to effectuate a Capital Event within 5 – 7 years from the date the first disbursement is made on the Loan.

**Change Order**:  Any requests for changes in the Plans and Specifications (other than minor field changes involving no extra cost).

**Commitment**:  The maximum amount each Lender has agreed to lend to Borrower as part of the Loan (which amounts may be set forth below the signature line of each Lender if Lender is a signatory to this Agreement).  The Commitments in the aggregate shall in no event be less than the maximum amount of the Loan as set forth in Section 4.2.

**Construction or construction**:  The construction and equipping of the Improvements in accordance with the Plans and Specifications, and the installation of all personal property, fixtures and equipment required for the operation of the Project.

**Construction Contract(s)**:  Contracts for labor and/or materials in connection with Construction of the Improvements.

**Construction Schedule**:  A schedule establishing a timetable for completion of the Construction, showing, on a monthly basis, the anticipated progress of the Construction and also showing that the Improvements can be completed on or before the completion date.

**Deed of Trust**:  The Deed of Trust executed by Borrower as grantor in favor of Agent as beneficiary, granting a first priority lien on Borrower's fee interest in the Project.

**Default**:  Any event, circumstance or condition which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default hereunder.

**ERISA**:  The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

**Event of Default**:  As such term is defined in Section 10.1.

**FIRREA**:  The Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 185 of 214

**Gross Revenues**:  For any period, all revenues of Borrower, determined on a cash basis, derived from the ownership, operation, use, leasing and occupancy of the Project during such period; provided, however, that in no event shall Gross Revenues include (i) any loan proceeds, (ii) proceeds or payments under insurance policies (except proceeds of business interruption insurance); (iii) condemnation proceeds; or (iv) any other extraordinary items, in Agent's reasonable discretion.

**Improvements**:   One building containing a hotel and convention space consisting of approximately 301,783 square feet of enclosed area and adequate parking spaces/facilities.  Such Improvements are more particularly described in the Plans and Specifications, together with all offsite improvements and together with any existing improvements not to be demolished.

**Including or including**:  Including but not limited to.

**Internal Revenue Code**:  The Internal Revenue Code of 1986, as amended from time to time.

**Land**:  The real property legally described on Exhibit A to this Agreement, together with all rights, privileges, easements and hereditaments appertaining to the Land, to the extent such rights, privileges, easements, and hereditaments are or are deemed to be real property under the Laws of the State.

**Laws**:  Collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

**Loan Amount**:  The maximum amount of the Loan as set forth in Section 4.2 as reduced by principal payments made from time to time.

**Loan Documents**:  The collective reference to this Agreement, the documents and instruments listed in Section 4.3, and all the other documents and instruments entered into from time to time, evidencing or securing the Loan or any obligation of payment thereof or performance of Borrower's or Guarantor's obligations in connection with the transaction contemplated hereunder and any Interest Rate Agreement, each as amended.   Notwithstanding any provision of this Agreement or any other Loan Document, none of the obligations of Borrower under the Environmental Indemnity or of Guarantor under the Guaranties are secured by the Deed of Trust or any other collateral for the Loan.

**Loan Closing or Loan Closing Date**:  The date the Agent receives USCIS designation as a regional center.

**Monthly Excess Cash Flow**:  For any month, the amount by which Gross Revenues exceed the sum of (a) actual cash operating expenses and (b) actual debt service on the Loan.

**Net Cash Flow**:  The Gross Revenues reduced by (a) ordinary and necessary operating expenses actually incurred and paid with respect to the Project, (b) reasonable capital expenditures actually made with respect to the Project (other than those funded out of Loan proceeds), (c) reasonable reserves for repairs and replacements to the Project, and (d) reserves for Borrower's federal and state income taxes.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 186 of 214

**Note**:  A Promissory Note or Notes, aggregating $115,500,000 USD of the Loan Amount, executed by Borrower and payable to the order of each Lender, in the amount of its Commitment.

**Obligations**.  All obligations of Borrower under this Agreement and the other Loan Documents.

**O'Connor Consulting Group Appraisal**.  The appraisal Borrower obtained on May 7, 2008 (ref No. 08-175), a copy of which is attached hereto as Exhibit D.

**OFAC:**  Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

**OFAC Review Process:**  That certain review process established by Agent to determine if any potential transferee of any interests or any assignee of any portion of the Loan or any of their members, officers or partners are a party with whom Agent and any Lender are restricted from doing business under (i) the regulations of OFAC, including those Persons named on OFAC's Specially Designated and Blocked Persons list, or (ii) any other statute, executive order or other governmental action or list (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

**Operating Account**:  A deposit account opened and maintained by Borrower with Agent, to be utilized in the manner set forth in Section 4.2.

**Permitted Transfer**:  (i) any easements, licenses and similar conveyances made in the ordinary course of business in connection with Construction of the Improvements which have no material adverse effect on the Project, or (ii) the pledge/purchase of membership interests in Borrower.

**Plans and Specifications**:  The documents describing the Improvements to be constructed using the proceeds of this Loan attached as Exhibit E.  The Plans and Specifications submitted herewith may differ from the Improvements actually constructed.  Indeed, ***Borrower reserves the right to amend the Plans and Specifications, in its sole and absolute discretion, without notice to Lender.***

**Project**:  The collective reference to (i) all Improvements, (ii) all rights, privileges, easements and hereditaments relating or appertaining thereto, and (iii) all personal property, fixtures and equipment required or beneficial for the operation thereof.

**State**:  The state in which the Land is located.

**Transfer**:  (a) Any sale, transfer, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of (i) all or any portion of the Project or any portion of any other security for the Obligations, or (ii) all or any portion of Borrower's right, title and interest (legal or equitable) in and to the Project or any portion of any other security for the Obligations, (b) any issuance, sale, transfer, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of any ownership interest in Borrower or in any entity which directly or indirectly holds any membership interest in Borrower, or (c) any change in the identity of the manager of Borrower or in the ownership of any manager of Borrower or the admission of any new manager of Borrower.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 187 of 214

**Unavoidable Delay**:  Any delay in the construction of the Improvements, caused by natural disaster, fire, earthquake, floods, explosion, abnormal weather conditions, unforeseen site conditions, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes or lockouts for which Borrower has notified Agent in writing.

2.2      **Other Definitional Provisions**.

All terms defined in this Agreement shall have the same meanings when used in the Note, Deed of Trust, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement.

**Article 3.**
**BORROWER'S REPRESENTATIONS AND WARRANTIES**

3.1      **Representations and Warranties**.

Borrower represents and warrants to Agent and Lenders as follows, which representations and warranties shall be true in all material respects on the date of each disbursement of Loan proceeds as if made on and as of such date:

(a) Borrower (i) has a 99 year land lease with an option to purchase the Land, and (ii) is the sole owner of all portions of the Project that are not real property under the Laws of the State, free of all liens or encumbrances.

(b) No litigation or proceedings are pending, or to the best of Borrower's knowledge threatened, against Borrower, which could, if adversely determined, cause a Material Adverse Change with respect to Borrower or the Project.

(c) Borrower is a duly organized and validly existing limited liability company and has full power and authority to execute, deliver and perform all Loan Documents to which Borrower is a party, and such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower.

(d) There is no Default or Event of Default under this Agreement or the other Loan Documents.

(e) The amounts set forth in the Budget present a full and complete itemization by category of all costs, expenses and fees which Borrower reasonably expects to pay or reasonably anticipates becoming obligated to pay to complete the Construction and operate the Project (until the Project achieves breakeven operations).  Borrower is unaware of any other such costs, expenses or fees which are material and are not covered by the Budget, but maintains the right to change the budget, whether or not material, without notice to Lender or Agent.

(f) The Land is taxed separately without regard to any other property and for all purposes the Land may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

5

Exhibit 2 Page 188 of 214

(g) The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System.

(h) Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(i) Borrower uses no trade name other its actual name set forth herein.

(j) Borrower's place of formation or organization is the State of Washington.

3.2 **Survival of Representations and Warranties**.

Borrower agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement are true in all material respects as of the date hereof, will be true at the Loan Closing and at all times thereafter. Each disbursement of Loan proceeds shall be deemed to be a reaffirmation by Borrower that each of the representations and warranties is true and correct in all material respects as of the date of such disbursement.

**Article 4.**
**LOAN AND LOAN DOCUMENTS**

4.1 **Agreement to Borrow and Lend**.

Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower the Loan, for the purposes and subject to all of the terms, provisions and conditions contained in this Agreement.

4.2 **Loan Amount; Obligations to Disburse**.

(a) The maximum aggregate amount of the Loan shall not exceed One Hundred Fifteen Million Five Hundred Thousand US Dollars ($115,500,000.00 USD).

(b) Subject to satisfaction of the Conditions Precedent set out in **Error! Reference source not found.**, Lenders shall advance and Borrower shall be entitled to receive successive disbursements of the proceeds of the Loan within approximately ten (10) days after compliance with all conditions precedent thereto.

(c) Borrower shall, prior to the Closing of the Loan, open an Operating Account. Borrower authorizes Agent to disburse Loan proceeds by crediting the Operating Account.

4.3 **Loan Documents**.

Borrower agrees that it will, on or before the Loan Closing Date, execute and deliver or cause to be executed and delivered to Agent the following documents in form and substance acceptable to Agent:

(a) Promissory Note

6

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 189 of 214

(b) Deed of Trust

(c) Assignment and Subordination of Development Agreement

(d) Assignment of Construction Documents

Borrower irrevocably authorizes Agent to file such UCC financing statements as Agent determines are advisable or necessary to perfect or notify third parties of the security interests intended to be created by the Loan Documents.

4.4 **Term of the Loan**.[1]

(a) Borrower shall not be required to make any payments whatsoever on the Loan until the earlier of (i) the fifth anniversary after the first anniversary after the first advance of Loan proceeds (but only if Borrower has Net Cash Flow available for distribution) and (ii) the occurrence of a Capital Event;

(b) Borrower will begin making payments on the Loan's Interest and principal pursuant to the terms below (however, under no circumstances shall a Capital Event occur or Loan Principal payments be made before the end of conditional residence of the Lender's Limited Partners unless USCIS policy authorizes an earlier point of acceptable repayment):

   i) Beginning on the first calendar quarter after the fifth anniversary of the first Loan disbursement, or the first calendar quarter after a Capital Event, whichever is sooner, Borrower shall pay Lender, on a quarterly basis calculated from January 1, 75% Net Cash Flow until the Loan principal and Interest is repaid in full. Such payments shall be applied as follows: 25% to accrued Interest and then 75% to the principal; and

   ii) Borrower shall pay Lender's pro rata share of net proceeds from a Capital Event within 120 days of said Capital Event, calculated by the total Loan principal divided by the total cost for completing the Improvements (hard and soft costs [including working capital]), and such payments shall be first applied as follows: 25% to accrued Interest and then 75% to principal.

4.5 **Prepayments**.

Borrower shall NOT have the right to make prepayments of the Loan Principal.

4.6 **Payments**.

Borrower shall pay make all payments on Interest and principal on the tenth (10th) day of each calendar quarter.

---

[1] Since USCIS approval of this document as exemplar, Section 4.4 has been modified to clarify the restrictions on payment of principal on the loan and the timing of a Capital Event.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 190 of 214

### Article 5.
### INTEREST

5.1 **Interest Rate**.

    (a)  The outstanding principal balance of the Loan shall bear simple interest at the rate of 3% per year. Interest shall begin to accrue on March 1, 2017.

    (b)  Interest shall be calculated for the actual number of days elapsed on the basis of a 365-day year, including the first date of the applicable period to, but not including, the date of repayment.

    (c)  Unpaid Interest shall not compound under any circumstances.

### Article 6.
### BUDGET

6.1 **Budget**.

Disbursement of the Loan shall be governed by the Budget for the Project in form and substance. The Budget shall specify all costs and expenses of every kind and nature whatever to be incurred by Borrower in connection with the Project. The initial Budget is attached hereto as Exhibit B and made a part hereof. **However, Borrower maintains the right to change the Budget without notice to Lender or Agent.**

### Article 7.
### DISBURSEMENT CONDITIONS

7.1 **Disbursements**.

After the Loan Closing, disbursements of the proceeds of the Loan shall be made during Construction from time to time as Construction progresses. Such disbursements shall be made at Borrower's request.

7.2 **Documents to be Furnished for Each Disbursement**.

As a condition precedent to each disbursement of the Loan proceeds, including any initial disbursement at the Loan Closing, Borrower shall furnish or cause to be furnished to Agent the following documents covering each disbursement, in form and substance satisfactory to Agent:

    (a)  A completed Request for Payment in the form of Exhibit C attached hereto executed by the Authorized Representative;

    (b)  A completed standard AIA Form G702 and Form G703 signed by Borrower, together with conditional lien waivers from all contractors and material suppliers covering all work to be paid with the proceeds of the prior draw requests;

    (c)  Such invoices, contracts or other supporting data as Agent may require to evidence that all costs for which disbursement is sought have been incurred;

*Loan Agreement – Southport Hotel – 10/21/13*

Exhibit 2 Page 191 of 214

(d)   Paid invoices or other evidence satisfactory to Agent that fixtures and equipment have been paid for and are free of any lien or security interest therein;

(e)   Copies of any executed Change Orders on standard AIA G701 form which have not been previously furnished to Agent;

(f)   Copies of all Construction Contracts (including subcontracts) which have been executed since the last disbursement;

(g)   Satisfactory evidence that all Government Approvals obtained for development of the Project are in full force and effect;

Disbursements shall be made approximately ten (10) days after receipt of all information required by Agent to approve the requested disbursements.

7.3   **Final Disbursement for Construction**.

Lenders will make the final disbursement for the costs of Construction (including undisbursed retainage) when the following conditions have been satisfied, provided that all other conditions in this Agreement for disbursements have been satisfied:

(a)   The Improvements have been fully completed and equipped substantially in accordance with the Plans and Specifications free and clear of mechanics' liens and security interests and are ready for occupancy;

(b)   Agent shall have received and approved copies of all licenses and permits required by any Governmental Authority having jurisdiction for the occupancy of the Improvements and the operation thereof, including a certificate of occupancy from the municipality in which the Project is located (which may be a temporary certificate provided that the conditions to issuance of a permanent certificate are reasonably acceptable to Agent), or a letter from the appropriate Governmental Authority that no such certificate is issued;

(c)   Borrower shall have furnished an "as-built" survey covering the completed Improvements;

(d)   All fixtures, furnishings, furniture, equipment and other property required for the operation of the Project shall have been installed free and clear of all liens and security interests;

Agent shall have received and approved a certificate from the Architect or other evidence satisfactory to Agent dated at or about the completion date stating that (i) the Improvements have been completed substantially in accordance with the Plans and Specifications, and (ii) the Improvements as so completed comply with all applicable Laws;

**Article 8.**
**OTHER COVENANTS**

Borrower further covenants and agrees as follows:

9

Exhibit 2 Page 192 of 214

8.1 **Construction of Improvements**. The Improvements shall be constructed and fully equipped in a good and workmanlike manner with materials of high quality, substantially in accordance with the Plans and Specifications, and such construction and equipping, which has commenced, will be prosecuted with due diligence and continuity in accordance with the Construction Schedule. **However, Borrower shall have the right to alter the Plans and Specifications, in its sole and absolute discretion, without notice to Lender.**

8.2 **Inspections**.

Borrower will cooperate with Agent in arranging for inspections by representatives of Agent or Lender of the progress of Construction from time to time including an examination of (i) the Improvements, (ii) all work done, labor performed, materials furnished in and about the Improvements.

8.3 **Appraisals**.

Agent shall have the right to obtain a new or updated Appraisal of the Project from time to time. Borrower shall cooperate with Agent in this regard. Lender shall pay for any such Appraisal upon Agent's request.

8.4 **Financial Information**.

Borrower shall deliver or cause to be delivered to Agent the following:

(a) Federal income tax returns for Borrower within 30 days after timely filing; and

(b) Commencing after initial occupancy and within thirty (30) days following the end of each month, (i) monthly operating statements for the Project, certified as true, complete and correct by Borrower showing actual sources and uses of cash during the preceding month;

All financial statements shall be in a format approved in writing by Agent and shall be certified as true, complete and correct by its preparer and by Borrower. Borrower shall permit Agent or any of its agents or representatives to have access during regular business hours to examine all of Borrower's books and records regarding the development and operation of the Project.

8.5 **Lost Note**.

Upon a Lender furnishing Borrower an affidavit to such effect, Borrower shall, if any Note is mutilated, destroyed, lost or stolen, deliver to such Lender, in substitution therefor, a new note containing the same terms and conditions as the Note.

8.6 **Compliance With Laws**.

Borrower shall comply with all applicable requirements (including applicable Laws) of any Governmental Authority having jurisdiction over Borrower or the Project.

Exhibit 2 Page 193 of 214

8.7   **Furnishing Reports**.

Upon Agent's request, Borrower shall provide Agent with copies of all inspections, reports, test results and other information received by any Borrower, which in any way relate to the Project or any part thereof. Borrower shall also provide reports on construction progress and costs, and operating statements for the Project, certified by Borrower, and such other data and information concerning the Project as may be reasonably requested by Agent.

8.8   **Hold Disbursements in Trust**.

Borrower shall receive and hold in trust for the sole benefit of Agent and Lenders (and not for the benefit of any other person, including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying costs of Construction set forth in the Budget, subject to Borrower's right to amend said Budget. Borrower shall use the proceeds of the Loan solely for the payment of costs as specified in the Budget.

8.9   **Cash Distributions**.

Borrower shall not make any distributions to or for the benefit of its members, provided that after completion of Construction and achievement of breakeven operations Borrower may distribute Monthly Excess Cash Flow not needed to pay Operating Expenses, reserves, or amounts payable under the Loan Documents.

8.10   **Authorized Representative**.

Borrower hereby appoints Thomas W. Read, of Alston Courtnage & Bassetti LLP, 1420 Fifth Avenue, Suite 3650, Seattle, Washington 98101-4011, as its authorized representatives (each, an **"Authorized Representative"**) for purposes of dealing with Agent on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. Each Authorized Representative, acting alone, shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by an Authorized Representative shall be final and binding on Borrower. Agent and Lenders may rely on the authority given to an Authorized Representative until actual receipt by Agent of a duly authorized resolution substituting a different person as the Authorized Representative.

## Article 9.
## TRANSFER RESTRICTIONS

9.1   **Prohibition of Assignments and Transfers by Borrower**.

Borrower shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void.

9.2   **Prohibition of Assignments and Transfers by Lender.**

Lender shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 194 of 214

9.3     **Prohibition of Transfers in Violation of ERISA**.

In addition to the prohibitions set forth in Section 9.1 above, Borrower shall not assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of its interest or rights in this Agreement or in the Project, or attempt to do any of the foregoing or suffer any of the foregoing, nor shall any party owning a direct or indirect interest in Borrower assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of any of its rights or interest (direct or indirect) in Borrower, attempt to do any of the foregoing or suffer any of the foregoing, if such action would cause the Loan, or the exercise of any of Agent's or Lenders' rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in any Agent or any Lender being deemed in violation of any applicable provision of ERISA.

**Article 10.
DEFAULT**

10.1     **Events of Default**.

The occurrence of any one or more of the following shall constitute an **"Event of Default"** as said term is used herein:

(a) Failure of Borrower to make any payments required by Section 4.4 herein.

(b) Any Transfer in violation of Article 9.

Lender shall provide Borrower with written notice of an Event of Default and Borrower shall be given thirty (30) days to cure such default before Lender is entitled to any Remedy set forth in Section 10.2.

10.2     **Remedies**.

Upon the occurrence of any Event of Default, Agent may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a) Take possession of the Project and complete the Construction and do anything which is necessary or appropriate in its sole judgment to fulfill the obligations of Borrower under this Agreement and the other Loan Documents.

(b) Take possession and assume Borrower's land lease, with the option to purchase for the price set forth in the O'Connor Consulting Group Appraisal, under the terms and conditions of the land lease attached hereto as Exhibit F.

**Article 11.
GENERAL PROVISIONS**

11.1     **Time is of the Essence**.

Borrower agrees that time is of the essence under this Agreement.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 195 of 214

11.2 **Captions**.

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

11.3 **Modification; Waiver**.

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

11.4 **Governing Law**.

Irrespective of the place of execution and/or delivery, this Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Washington.

11.5 **Disclaimer**.

This Agreement is made for the sole benefit of Borrower, Agent and Lender, and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Agent or Lenders pursuant to this Agreement. Neither Agent nor any Lender shall be liable to any contractors, subcontractors, supplier, architect, engineer, tenant or other party for labor or services performed or materials supplied in connection with the Construction. Neither Agent nor any Lender shall be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Project. By making the Loan or taking any action pursuant to any of the Loan Documents, neither Agent nor any Lender shall be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower. No payment of funds directly to a contractor or subcontractor or provider of services be deemed to create any third-party beneficiary status or recognition of same by Agent or any Lender. Without limiting the generality of the foregoing:

(a) Neither Agent nor any Lender shall have any liability, obligation or responsibility whatsoever with respect to the Construction. Any inspections of the Construction made by or through Agent are for purposes of administration of the Loan only and Borrower is not entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the Plans and Specifications, state of completion or otherwise;

(b) Neither Agent nor any Lender undertakes or assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including matters relating to the quality, adequacy or suitability of: (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and material suppliers employed or utilized in connection with the Construction, or the workmanship of or the materials used by any of them, or (iii) the progress or course of Construction and its conformity or nonconformity with the Plans and Specifications; Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Agent or any Lender in connection with such matters is for

13

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 196 of 214

the protection of Lenders only, and neither Borrower nor any third party is entitled to rely thereon; and

(c) Neither Agent nor any Lender owes any duty of care to protect Borrower against negligent, faulty, inadequate or defective building or construction.

11.6 **Partial Invalidity; Severability**.

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.7 **Definitions Include Amendments**.

Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments and supplements thereto entered into from time to time. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

11.8 **Execution in Counterparts**.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

11.9 **Entire Agreement**.

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

11.10 **Waiver of Damages**.

In no event shall Agent or any Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Agent or any Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower waives all claims for punitive, exemplary or consequential damages.

11.11 **Jurisdiction**.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALING OF ASSETS. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A **"PROCEEDING"**), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF RENTON, COUNTY OF KING AND STATE OF WASHINGTON, AND (B) WAIVES

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 197 of 214

ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

11.12 **Notices**.

All notices required or permitted hereunder shall be in writing and shall be given to the parties as follows:

| | |
|---|---|
| If to Agent: | Seattle Family, LP<br>1083 Lake Washington Blvd N, Suite 50<br>Renton, WA 98056<br>Attn: Lisa Collins |
| If to Borrower: | Hotel at Southport, LLC<br>1083 Lake Washington Blvd N, Suite 50<br>Renton, WA 98056<br>Attn: Michael Christ |
| With a copy to: | Alston Courtnage & Bassetti LLP<br>1420 Fifth Avenue, Suite 3650<br>Seattle, Washington 98101-401<br>Attn: Thomas W. Read |

Any such notices shall be either (a) sent by certified mail, return receipt requested, in which case notice shall be deemed delivered three business days after deposit, postage prepaid in the U.S. mail, or (b) sent by a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier; or (c) served personally, in which case notice shall be deemed given on the date of such service, or (d) delivered by facsimile transmission followed by delivery by personal service or nationally recognized courier service on the next business day after facsimile transmission, in which case notice shall be deemed to have been given on the date of facsimile transmission. The above addresses may be changed by written notice to the other party; provided that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notwithstanding anything in this Agreement to the contrary, and all notices, demands, requests or other communication by and between Borrower and Lenders shall occur through Agent, and all payments required of Borrower to Lenders shall be made by Borrower to Agent.

11.13 **Waiver of Jury Trial**.

BORROWER, AGENT AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 198 of 214

AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

11.14  **Statutory Notice**.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 199 of 214

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date written above.

*"Borrower"*

**HOTEL AT SOUTHPORT LLC**

By      1 MIN LLC, its manager

      By      SECO Development, Inc., its Manager

      By: _____

         Michael P. Christ, President

*"Lender"*

**SOUTHPORT HOTEL Eb-5, LP**

By      Seattle Family, LP, its Manager

      By      Triple County, LLC, its Manager

      By: _____

         Michael P. Christ, Member

### LIST OF EXHIBITS TO LOAN AGREEMENT

| | |
|---|---|
| Exhibit A | Legal Description of Land |
| Exhibit B | Budget |
| Exhibit C | Request for Payment |
| Exhibit D | O'Connor Consulting Group's Appraisal from May 2008 |
| Exhibit E | Plans and Specifications |

17

Loan Agreement – Southport Hotel – 10/21/13

Exhibit 2 Page 200 of 214

## EXHIBIT A

### Lot 4 Legal Description

Lot 4 of City of Renton short plat number LUA-99-134-SHPL, according to the short plat recorded January 31, 2000 under recording number 20000131900006, in King County, Washington.

Exhibit 2 Page 201 of 214

**EXHIBIT B**
**to**
**Construction Loan Agreement**

**Budget**

**[See Attached]**

Exhibit 2 Page 202 of 214

**Hotel at Southport**
**Project Cost Estimate**
**As of 11/10/2014**

| Cost Code | EB-5? | Category | Description | Original Budget | Changes | Revised Budget | |
|---|---|---|---|---|---|---|---|
| | | | **CONSTRUCTION** | | | | |
| | | | **Site Work** | | | | |
| 10000.000 | Yes | NC | Offsite traffic improvements (LW.Blvd. road, bridge, etc) | 1,000,000 | 169,172 | 1,169,172 | |
| | | | **Total Site Work** | 1,000,000 | 169,172 | 1,169,172 | |
| | | | **General Contractor (Sellen Construction)** | | | | |
| | | | | | | | Est. cost of Feng Shui, Fountains, Cap, other design changes increasing the size of the |
| 20000.000 | Yes | NC | Direct Construction Costs (301,783 SF enclosed space) | 83,163,539 | 17,273,138 | 100,436,677 | hotel to 333,020 SF (Gross Floor Area) |
| 20100.000 | No | CONT | Construction Contingency at 1.5% | 1,247,453 | 259,097 | 1,506,550 | To revise construction contingency to 1.5% of Direct Construction Costs |
| 20200.000 | Yes | NC | General Contractor Fee @ 3% | 2,532,323 | 480,771 | 3,013,100 | To revise GC Fee to 3.05% of Direct Construction Costs |
| | | | Construction Cost Subtotal | 86,943,321 | 18,013,006 | 104,956,327 | |
| 20300.000 | No | TAX | B&O Taxes and Liability Insurance at 0.87% | 1,191,039 | (317,240) | 873,799 | To remove Liab. Ins. (included below) and revise B&O Tax to .471% of const costs |
| 20400.000 | No | TAX | Washington State Sales Tax @ 9.5% | 8,372,764 | 1,168,720 | 9,541,484 | To add WSST to changes and revise to 9.5% of Direct Construction Costs |
| | | | **Construction Cost Total** | 96,507,124 | 18,864,487 | 115,371,611 | |
| | | | **Parking Cost** | | | | |
| 30000.000 | Yes | NC | Parking (300 stalls) | 6,088,320 | (6,088,320) | 0 | Now included in Direct Construction Costs. |
| 30100.000 | No | TAX | Washington State Sales Tax @ 9.5% | 578,390 | (578,390) | 0 | |
| | | | **Total Parking Costs** | 6,666,710 | (6,666,710) | 0 | |
| | | | **SOFT COSTS** | | | | |
| | | | **Consultants** | | | | |
| 1010.000 | Yes | A&E | Architectural (site studies to SEPA thru CA) | 2,515,827 | (15,827) | 2,500,000 | |
| 1020.000 | Yes | A&E | Architectural production of marketing materials | 100,000 | 0 | 100,000 | |
| 1030.000 | Yes | A&E | Architectural Reimbursable & extra services | 50,000 | 0 | 50,000 | |
| 1040.000 | Yes | A&E | Structural w/CA, piling | 254,921 | 53,079 | 308,000 | |
| 1050.000 | Yes | A&E | Civil | 30,000 | 111,900 | 141,900 | |
| 1060.000 | Yes | A&E | Landscape | 75,000 | 9,700 | 84,700 | |
| 1070.000 | Yes | A&E | Envelope Consultation (shop dwgs/const review) | 50,000 | 0 | 50,000 | |
| 1080.000 | Yes | A&E | Soils Study/Geotech Report, piling criteria | 12,000 | 336,000 | 348,000 | |
| 1090.000 | Yes | A&E | ALTA Survey, bound,topo,easements,updates | 15,000 | 3,404 | 18,404 | |
| 1100.000 | Yes | A&E | Misc Consultants; (hrdw, elevator, acousical, energy calc) | 30,000 | 121,980 | 151,980 | |
| 1110.000 | Yes | A&E | Mechanical Consultant | 20,000 | 394,762 | 414,762 | |
| 1120.000 | Yes | A&E | Electrical Consultant | 20,000 | 467,256 | 487,256 | |
| 1130.000 | Yes | FFE | Signage & Graphics design | 15,000 | 0 | 15,000 | |
| 1140.000 | Yes | A&E | City / Zoning Consultant | 10,000 | 0 | 10,000 | |
| 1150.000 | Yes | A&E | Traffic Engineer | 10,000 | 3,681 | 13,681 | |
| 1160.000 | Yes | A&E | Restaurant/Kitchen Designer | 50,000 | (8,750) | 41,250 | |
| 1170.000 | Yes | A&E | Interior design services, FF&E selection & spec Lobby & Amenity | 250,000 | (35,500) | 214,500 | |
| 1180.000 | Yes | A&E | Interior designer CA & purchase of FF&E, Supervise installation | 250,000 | (250,000) | 0 | |
| | | | **Misc Costs** | | | | |
| 1200.000 | Yes | A&E | Renderings & Models | 90,000 | 0 | 90,000 | |
| 1210.000 | Yes | A&E | Environmental Phase I | 5,000 | 0 | 5,000 | |
| 1220.000 | Yes | A&E | Environmental Phase II | 10,000 | 0 | 10,000 | |
| 1230.000 | Yes | L&A | Legal & Accounting | 250,000 | 0 | 250,000 | |
| 1240.000 | Yes | A&E | Structural Inspections | 275,000 | 0 | 275,000 | |
| 1250.000 | Yes | A&E | Geotech Field Services | 75,000 | 0 | 75,000 | |
| 1260.000 | Yes | A&E | Waterproofing/Envelope Inspection | 75,000 | 0 | 75,000 | |
| 1270.000 | Yes | A&E | Window/envelope testing | 30,000 | 0 | 30,000 | |
| 1280.000 | Yes | A&E | Printing, Courier Expenses | 25,000 | (0) | 25,000 | |
| 1290.000 | Yes | A&E | Photos/aerials | 10,000 | 0 | 10,000 | |
| 1300.000 | Yes | NC | Travel & entertainment expense  Allow | 20,000 | (0) | 20,000 | |
| | | | **Permits, Utility Fees and Assessments:** | | | | |
| 1310.000 | No | FEES | Design Review/Preapp/Filing Fees | 5,000 | 0 | 5,000 | |
| 1320.000 | No | PERM | Building Permit/Plan Check | 831,635 | (0) | 831,635 | |

1 of 2

Exhibit 2 Page 203 of 214

**Hotel at Southport**
**Project Cost Estimate**
**As of 11/10/2014**

| Cost Code | EB-5? | Category | Description | Original Budget | Changes | Revised Budget | |
|---|---|---|---|---|---|---|---|
| 1330.000 | No | PERM | Restaurant/bar TI Improvement Permits | 10,000 | 0 | 10,000 | |
| 1340.000 | No | FEES | LID/Latecomer Fees/Mitigation (parks,traffic,schools) | 300,000 | 0 | 300,000 | |
| 1350.000 | No | FEES | Water Meters | 50,000 | 0 | 50,000 | |
| 1360.000 | No | PERM | Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | 100,000 | 0 | 100,000 | |
| 1370.000 | No | FEES | Natural Gas | 50,000 | 50,000 | 100,000 | |
| 1380.000 | No | FEES | Dewatering discharge fees   Allow | 25,000 | 0 | 25,000 | |
| 1390.000 | No | FEES | Ongoing Site Utilities charges during const | 10,000 | 0 | 10,000 | |
| 1400.000 | No | FEES | Power Service and Transformer | 100,000 | 100,000 | 200,000 | |
| 1410.000 | No | PERM | Restaurant, Liquor & Health, & Other Permits & Impact Fees | 10,000 | 0 | 10,000 | |
| 1420.000 | No | FEES | Bond premiums & Misc city/state licenses | 5,000 | 0 | 5,000 | |
| 1500.000 | Yes | FFE | Furnishings (Allowance) | 8,750,000 | 5,250,000 | 14,000,000 | $40K per current hotel specifications |
| 1510.000 | Yes | FFE | Van, Pickup, Automobile | 150,000 | 0 | 150,000 | |
| | | | **Insurance & Taxes:** | | | | |
| 1700.000 | No | TAX | RE taxes on land during predev & construction period | 1,158,601 | (446,147) | 712,454 | |
| 1710.000 | No | INS | Property Insurance thru occupancy | 427,500 | 632,704 | 1,060,204 | Includes financing costs |
| 1720.000 | No | INS | Builders Risk Insurance | 1,250,000 | (541,435) | 708,565 | Includes Pollution and financing costs |
| | | | **Developer Costs** | | | | |
| 1800.000 | Yes | NC | Project Management & Administration | 1,738,866 | 2,278,601 | 4,017,467 | 4% of Hard Costs per Development Agreement |
| 1810.000 | Yes | NC | Developer Overhead & Project Mgmt | 1,738,866 | (1,724,310) | 14,556 | Misc. Overhead |
| | | | **Construction Financing:** | | | | |
| 1900.000 | No | FEES | Appraisal | 25,000 | 0 | 25,000 | |
| 1910.000 | No | FEES | Title Ins. & Endorsements | 25,000 | 0 | 25,000 | |
| 1920.000 | No | FEES | Construction Review & Inspections | 30,000 | 0 | 30,000 | |
| 1930.000 | No | FEES | Lender Legal & Environmental Fees, & Loan Closing Costs | 20,000 | 0 | 20,000 | |
| 1940.000 | No | FEES | Construction Loan Fee | 350,000 | 0 | 350,000 | |
| 1950.000 | No | FEES | Permanent Loan Fee | 1,000,000 | (1,000,000) | 0 | |
| | | | **Construction Interest (net of capitalized rev)** | | | | |
| 1960.000 | No | FIN | Draw rate during 26 mo. construction period | 4,364,708 | 0 | 4,364,708 | |
| 1970.000 | No | FIN | **Development Loan Interest** | 250,000 | (250,000) | 0 | |
| 2000.000 | No | FIN | **Preopening and Working Capital** | 1,500,000 | 0 | 1,500,000 | |
| | No | CONT | Reserve for shorfall | 1,500,000 | | 1,500,000 | |
| | | | **Soft Cost Total** | 30,397,925 | 5,541,097 | 35,939,022 | |
| | | | **Total Project Costs** | 134,571,760 | 17,908,045 | 152,479,805 | |

A9
11/17/2014

25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 203 of 214

Exhibit 2 Page 204 of 214

**EXHIBIT C**
**to**
**Construction Loan Agreement**

**Request for Payment**

_____ (***"Agent"***)
_____
_____
Attn: _____
Fax: _____

RE:  Request for Disbursement of Funds
     to _____ (***"Borrower"***)

1.  Capitalized terms used but not defined herein are defined in the Construction Loan Agreement dated _____ (the "***Loan Agreement***") among Borrower, Agent and Lender.

2.  Pursuant to the Loan Agreement, Borrower requests a disbursement of the Loan as indicated on the Soft and Hard Cost Requisition attached hereto.

3.  Funds disbursed hereunder shall be applied only in payment of the costs of the Project set out on the Soft and Hard Cost Requisition attached hereto.

4.  Disbursement of Funds hereby requested is subject to the conditions set out in the Loan Agreement.

DATED this _____ day of _____, 200___.

BORROWER:

By:  _____
     Authorized Representative

Exhibit 2 Page 205 of 214

**EXHIBIT D**

**2014 Appraisal**

A10
11/17/2014

Exhibit 2 Page 206 of 214

# EXHIBIT E

## Current Plans and Specifications

Exhibit 2 Page 207 of 214

# CONFIDENTIAL

## SECOND AMENDMENT TO THE PRIVATE PLACEMENT MEMORANDUM

### DATED AS OF JUNE 23, 2015

Amending the Private Placement Memorandum dated November 13, 2013 and First Amendment
to the Private Placement Memorandum Dated November 13, 2014

SOUTHPORT HOTEL EB-5,  LP
(A Washington Limited Partnership)

**Minimum Offering of 12 Units of Limited Partnership Interest, or $6,000,000
Maximum Offering of 231 Units of Limited Partnership Interest, or US$115,500,000,
at US$500,000 per Unit**

The Private Placement Memorandum Dated November 13, 2013 (the "Private Placement Memorandum")
and First Amendment thereto Dated November 13, 2014 ("First Amendment"), are hereby amended and
supplemented as set forth below.  All capitalized terms used herein and not defined herein shall have the
meanings specified in the Private Placement Memorandum. The Private Placement Memorandum, First
Amendment, and this Second Amendment, collectively shall constitute one and the same document.

1. The General Partner has filed a certificate of amendment with the Secretary of State of
   Washington and changed its name to **Southport Management LLC** as of May 4, 2015. All
   references in the Private Placement Memorandum and supporting exhibits to "Southport Hotel
   Management LLC" are changed to "**Southport Management LLC.**"

2. The Business Plan dated June 18, 2013 and Supplement to the Business Plan dated August 5,
   2013 at **Exhibit D** are further supplemented with more current data, which includes:  (1) the
   updated hotel operations pro forma reflecting higher expected revenues (derived from pp. 34-35
   of an updated April 8, 2015 PKF study, available upon request); (2) revised budget reflecting
   increased costs from $134,571,760 to $152,479,805 (the same revised budget previously included
   as Ex. B to the Loan Agreement in **Exhibit E**); and (3) a cost disbursement timeline. As reflected
   in the revised budget, the total square footage has increased from 301,783 to 333,020 gross floor
   area to include larger common areas, ballrooms, and additional meeting space. Given that these
   revisions only tend to increase the number of jobs created by the Project, the Company deems the
   changes not material to immigration eligibility.  These additional materials are now made part of
   the Offering Materials and included behind a new **Exhibit F** to the Private Placement
   Memorandum.

1

Exhibit 2 Page 208 of 214

**Exhibit F- Supplemental Data for Business Plan**

Exhibit 2 Page 209 of 214


**PKF**
CONSULTING
USA

**Proposed Hotel – Renton, WA**
**SECO Development, Inc.**

**Proposed Hotel - Renton, WA**
Projected Operating Results
Calendar Years

| | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Units: | 333 | | 333 | | 333 | | 333 | | 333 | |
| Number of Annual Rooms Available: | 121,545 | | 121,545 | | 121,545 | | 121,545 | | 121,545 | |
| Number of Rooms Occupied: | 81,440 | | 85,080 | | 88,730 | | 89,940 | | 91,160 | |
| Annual Occupancy: | 67.0% | | 70.0% | | 73.0% | | 74.0% | | 75.0% | |
| Average Daily Rate: | $220.00 | | $236.00 | | $248.00 | | $255.00 | | $263.00 | |
| Revenue Per Available Room: | $147.40 | | $165.20 | | $181.04 | | $188.70 | | $197.25 | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| **Revenues** | | | | | | | | | | |
| Rooms | $17,917,000 | 67.4% | $20,079,000 | 66.2% | $22,005,000 | 64.7% | $22,935,000 | 64.7% | $23,975,000 | 64.7% |
| Food & Beverage | 6,912,000 | 26.0% | 8,367,000 | 27.6% | 9,987,000 | 29.4% | 10,427,000 | 29.4% | 10,885,000 | 29.4% |
| Garage and Parking | 864,000 | 3.2% | 930,000 | 3.1% | 999,000 | 2.9% | 1,043,000 | 2.9% | 1,088,000 | 2.9% |
| Spa | 477,000 | 1.8% | 492,000 | 1.6% | 506,000 | 1.5% | 522,000 | 1.5% | 537,000 | 1.5% |
| Other Operated Departments | 432,000 | 1.6% | 465,000 | 1.5% | 499,000 | 1.5% | 521,000 | 1.5% | 544,000 | 1.5% |
| Total Revenues | 26,602,000 | 100.0% | 30,333,000 | 100.0% | 33,996,000 | 100.0% | 35,448,000 | 100.0% | 37,029,000 | 100.0% |
| **Departmental Expenses** | | | | | | | | | | |
| Rooms | 4,486,000 | 25.0% | 4,718,000 | 23.5% | 4,960,000 | 22.5% | 5,144,000 | 22.4% | 5,334,000 | 22.2% |
| Food & Beverage | 5,850,000 | 84.6% | 6,572,000 | 78.5% | 7,368,000 | 73.8% | 7,651,000 | 73.4% | 7,944,000 | 73.0% |
| Garage and Parking | 346,000 | 40.0% | 372,000 | 40.0% | 399,000 | 39.9% | 417,000 | 40.0% | 435,000 | 40.0% |
| Spa | 430,000 | 90.1% | 443,000 | 90.0% | 456,000 | 90.1% | 470,000 | 90.0% | 484,000 | 90.1% |
| Other Operated Departments | 173,000 | 40.0% | 186,000 | 40.0% | 200,000 | 40.1% | 209,000 | 40.1% | 218,000 | 40.1% |
| Total Departmental Expenses | 11,285,000 | 42.4% | 12,291,000 | 40.5% | 13,383,000 | 39.4% | 13,891,000 | 39.2% | 14,415,000 | 38.9% |
| **Departmental Profit** | 15,317,000 | 57.6% | 18,042,000 | 59.5% | 20,613,000 | 60.6% | 21,557,000 | 60.8% | 22,614,000 | 61.1% |
| **Undistributed Expenses** | | | | | | | | | | |
| Administrative & General | 2,290,000 | 8.6% | 2,432,000 | 8.0% | 2,574,000 | 7.6% | 2,662,000 | 7.5% | 2,755,000 | 7.4% |
| Marketing (Including Franchise Fees) | 2,301,000 | 8.6% | 2,403,000 | 7.9% | 2,501,000 | 7.4% | 2,582,000 | 7.3% | 2,666,000 | 7.2% |
| Property Operation and Maintenance | 1,060,000 | 4.0% | 1,092,000 | 3.6% | 1,124,000 | 3.3% | 1,158,000 | 3.3% | 1,193,000 | 3.2% |
| Utility Costs | 1,025,000 | 3.9% | 1,055,000 | 3.5% | 1,087,000 | 3.2% | 1,120,000 | 3.2% | 1,153,000 | 3.1% |
| Total Undistributed Operating Expenses | 6,676,000 | 25.1% | 6,982,000 | 23.0% | 7,286,000 | 21.4% | 7,522,000 | 21.2% | 7,767,000 | 21.0% |
| **Gross Operating Profit** | 8,641,000 | 32.5% | 11,060,000 | 36.5% | 13,327,000 | 39.2% | 14,035,000 | 39.6% | 14,847,000 | 40.1% |
| **Base Management Fee** | 798,000 | 3.0% | 910,000 | 3.0% | 1,020,000 | 3.0% | 1,063,000 | 3.0% | 1,111,000 | 3.0% |
| **Fixed Expenses** | | | | | | | | | | |
| Property Taxes | 1,826,000 | 6.9% | 1,881,000 | 6.2% | 1,937,000 | 5.7% | 1,995,000 | 5.6% | 2,055,000 | 5.5% |
| Insurance | 283,000 | 1.1% | 291,000 | 1.0% | 300,000 | 0.9% | 309,000 | 0.9% | 318,000 | 0.9% |
| Total Fixed Expenses | 2,109,000 | 7.9% | 2,172,000 | 7.2% | 2,237,000 | 6.6% | 2,304,000 | 6.5% | 2,373,000 | 6.4% |
| **Net Operating Income** | 5,734,000 | 21.6% | 7,978,000 | 26.3% | 10,070,000 | 29.6% | 10,668,000 | 30.1% | 11,363,000 | 30.7% |
| **FF&E Reserve** | 532,000 | 2.0% | 910,000 | 3.0% | 1,360,000 | 4.0% | 1,418,000 | 4.0% | 1,481,000 | 4.0% |
| **Net Operating Income After Reserve** | $5,202,000 | 19.6% | $7,068,000 | 23.3% | $8,710,000 | 25.6% | $9,250,000 | 26.1% | $9,882,000 | 26.7% |

Source: **PKF Consulting USA**    Full Year of Operation

A2
6/23/2015

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 209 of 214

Exhibit 2 Page 210 of 214



**Proposed Hotel - Renton, WA**
Projected Operating Results
Calendar Years

| | 2022 | | 2023 | | 2024 | | 2025 | | 2026 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Units: | 333 | | 333 | | 333 | | 333 | | 333 | |
| Number of Annual Rooms Available: | 121,545 | | 121,545 | | 121,545 | | 121,545 | | 121,545 | |
| Number of Rooms Occupied: | 91,160 | | 91,160 | | 91,160 | | 91,160 | | 91,160 | |
| Annual Occupancy: | 75.0% | | 75.0% | | 75.0% | | 75.0% | | 75.0% | |
| Average Daily Rate: | $271.00 | | $279.00 | | $287.00 | | $296.00 | | $305.00 | |
| Revenue Per Available Room: | $203.25 | | $209.25 | | $215.25 | | $222.00 | | $228.75 | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| **Revenues** | | | | | | | | | | |
| Rooms | $24,704,000 | 64.8% | $25,434,000 | 64.7% | $26,163,000 | 64.7% | $26,983,000 | 64.7% | $27,804,000 | 64.8% |
| Food & Beverage | 11,212,000 | 29.4% | 11,548,000 | 29.4% | 11,894,000 | 29.4% | 12,251,000 | 29.4% | 12,619,000 | 29.4% |
| Garage and Parking | 1,121,000 | 2.9% | 1,155,000 | 2.9% | 1,189,000 | 2.9% | 1,225,000 | 2.9% | 1,262,000 | 2.9% |
| Spa | 553,000 | 1.4% | 570,000 | 1.5% | 587,000 | 1.5% | 605,000 | 1.5% | 623,000 | 1.5% |
| Other Operated Departments | 561,000 | 1.5% | 577,000 | 1.5% | 595,000 | 1.5% | 613,000 | 1.5% | 631,000 | 1.5% |
| Total Revenues | 38,151,000 | 100.0% | 39,284,000 | 100.0% | 40,428,000 | 100.0% | 41,677,000 | 100.0% | 42,939,000 | 100.0% |
| **Departmental Expenses** | | | | | | | | | | |
| Rooms | 5,494,000 | 22.2% | 5,658,000 | 22.2% | 5,828,000 | 22.3% | 6,003,000 | 22.2% | 6,183,000 | 22.2% |
| Food & Beverage | 8,182,000 | 73.0% | 8,428,000 | 73.0% | 8,680,000 | 73.0% | 8,941,000 | 73.0% | 9,209,000 | 73.0% |
| Garage and Parking | 448,000 | 40.0% | 462,000 | 40.0% | 476,000 | 40.0% | 490,000 | 40.0% | 505,000 | 40.0% |
| Spa | 498,000 | 90.1% | 513,000 | 90.0% | 528,000 | 89.9% | 544,000 | 89.9% | 561,000 | 90.0% |
| Other Operated Departments | 224,000 | 39.9% | 231,000 | 40.0% | 238,000 | 40.0% | 245,000 | 40.0% | 252,000 | 39.9% |
| Total Departmental Expenses | 14,846,000 | 38.9% | 15,292,000 | 38.9% | 15,750,000 | 39.0% | 16,223,000 | 38.9% | 16,710,000 | 38.9% |
| **Departmental Profit** | 23,305,000 | 61.1% | 23,992,000 | 61.1% | 24,678,000 | 61.0% | 25,454,000 | 61.1% | 26,229,000 | 61.1% |
| **Undistributed Expenses** | | | | | | | | | | |
| Administrative & General | 2,838,000 | 7.4% | 2,923,000 | 7.4% | 3,009,000 | 7.4% | 3,101,000 | 7.4% | 3,194,000 | 7.4% |
| Marketing (Including Franchise Fees) | 2,747,000 | 7.2% | 2,829,000 | 7.2% | 2,913,000 | 7.2% | 3,001,000 | 7.2% | 3,091,000 | 7.2% |
| Property Operation and Maintenance | 1,229,000 | 3.2% | 1,266,000 | 3.2% | 1,303,000 | 3.2% | 1,343,000 | 3.2% | 1,383,000 | 3.2% |
| Utility Costs | 1,188,000 | 3.1% | 1,223,000 | 3.1% | 1,260,000 | 3.1% | 1,298,000 | 3.1% | 1,337,000 | 3.1% |
| Total Undistributed Operating Expenses | 8,002,000 | 21.0% | 8,241,000 | 21.0% | 8,485,000 | 21.0% | 8,743,000 | 21.0% | 9,005,000 | 21.0% |
| **Gross Operating Profit** | 15,303,000 | 40.1% | 15,751,000 | 40.1% | 16,193,000 | 40.1% | 16,711,000 | 40.1% | 17,224,000 | 40.1% |
| **Base Management Fee** | 1,145,000 | 3.0% | 1,179,000 | 3.0% | 1,213,000 | 3.0% | 1,250,000 | 3.0% | 1,288,000 | 3.0% |
| **Fixed Expenses** | | | | | | | | | | |
| Property Taxes | 2,117,000 | 5.5% | 2,180,000 | 5.5% | 2,246,000 | 5.6% | 2,313,000 | 5.5% | 2,382,000 | 5.5% |
| Insurance | 328,000 | 0.9% | 337,000 | 0.9% | 348,000 | 0.9% | 358,000 | 0.9% | 369,000 | 0.9% |
| Total Fixed Expenses | 2,445,000 | 6.4% | 2,517,000 | 6.4% | 2,594,000 | 6.4% | 2,671,000 | 6.4% | 2,751,000 | 6.4% |
| **Net Operating Income** | 11,713,000 | 30.7% | 12,055,000 | 30.7% | 12,386,000 | 30.6% | 12,790,000 | 30.7% | 13,185,000 | 30.7% |
| **FF&E Reserve** | 1,526,000 | 4.0% | 1,571,000 | 4.0% | 1,617,000 | 4.0% | 1,667,000 | 4.0% | 1,718,000 | 4.0% |
| **Net Operating Income After Reserve** | $10,187,000 | 26.7% | $10,484,000 | 26.7% | $10,769,000 | 26.6% | $11,123,000 | 26.7% | $11,467,000 | 26.7% |

Source: PKF Consulting USA

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 210 of 214

Exhibit 2 Page 211 of 214

**Hotel at Southport**
Project Cost Estimate
As of 11/10/2014

| Cost Code | EB-5? | Category | Description | Original Budget | Changes | Revised Budget | |
|---|---|---|---|---|---|---|---|
| | | | **CONSTRUCTION** | | | | |
| | | | **Site Work** | | | | |
| 10000.000 | Yes | NC | Offsite traffic improvements (LW.Blvd. road, bridge, etc) | 1,000,000 | 169,172 | 1,169,172 | |
| | | | **Total Site Work** | **1,000,000** | **169,172** | **1,169,172** | |
| | | | **General Contractor (Sellen Construction)** | | | | Est. cost of Feng Shui, Fountains, Cap, other design changes increasing the size of the |
| 20000.000 | Yes | NC | Direct Construction Costs (301,783 SF enclosed space) | 83,163,539 | 17,273,138 | 100,436,677 | hotel to 333,020 SF (Gross Floor Area) |
| 20100.000 | No | CONT | Construction Contingency at 1.5% | 1,247,453 | 259,097 | 1,506,550 | To revise construction contingency to 1.5% of Direct Construction Costs |
| 20200.000 | Yes | NC | General Contractor Fee @ 3% | 2,532,329 | 480,771 | 3,013,100 | To revise GC Fee to 3.05% of Direct Construction Costs |
| | | | Construction Cost Subtotal | 86,943,321 | 18,013,006 | 104,956,327 | |
| 20300.000 | No | TAX | B&O Taxes and Liability Insurance @ 0.87% | 1,191,039 | (317,240) | 873,799 | To remove Liab. Ins. (included below) and revise B&O Tax to .471% of const costs |
| 20400.000 | No | TAX | Washington State Sales Tax @ 9.5% | 8,372,764 | 1,168,720 | 9,541,484 | To add WSST to changes and revise to 9.5% of Direct Construction Costs |
| | | | **Construction Cost Total** | **96,507,124** | **18,864,487** | **115,371,611** | |
| | | | **Parking Cost** | | | | |
| 30000.000 | Yes | NC | Parking (300 stalls) | 6,088,320 | (6,088,320) | 0 | Now included in Direct Construction Costs. |
| 30100.000 | No | TAX | Washington State Sales Tax @ 9.5% | 578,390 | (578,390) | 0 | |
| | | | **Total Parking Costs** | **6,666,710** | **(6,666,710)** | **0** | |
| | | | **SOFT COSTS** | | | | |
| | | | **Consultants** | | | | |
| 1010.000 | Yes | A&E | Architectural (site studies to SEPA thru CA) | 2,515,827 | (15,827) | 2,500,000 | |
| 1020.000 | Yes | A&E | Architectural production of marketing materials | 100,000 | 0 | 100,000 | |
| 1030.000 | Yes | A&E | Architectural Reimbursable & extra services | 50,000 | 0 | 50,000 | |
| 1040.000 | Yes | A&E | Structural w/CA, piling | 254,921 | 53,079 | 308,000 | |
| 1050.000 | Yes | A&E | Civil | 30,000 | 111,900 | 141,900 | |
| 1060.000 | Yes | A&E | Landscape | 75,000 | 9,700 | 84,700 | |
| 1070.000 | Yes | A&E | Envelope Consultation (shop dwgs/const review) | 50,000 | 0 | 50,000 | |
| 1080.000 | Yes | A&E | Soils Study/Geotech Report, piling criteria | 12,000 | 336,000 | 348,000 | |
| 1090.000 | Yes | A&E | ALTA Survey, bound,topo,easements,updates | 15,000 | 3,404 | 18,404 | |
| 1100.000 | Yes | A&E | Misc Consultants; (hrdw, elevator, acousical, energy calc) | 30,000 | 121,980 | 151,980 | |
| 1110.000 | Yes | A&E | Mechanical Consultant | 20,000 | 394,762 | 414,762 | |
| 1120.000 | Yes | A&E | Electrical Consultant | 20,000 | 467,256 | 487,256 | |
| 1130.000 | Yes | FFE | Signage & Grapics design | 15,000 | 0 | 15,000 | |
| 1140.000 | Yes | A&E | City / Zoning Consultant | 10,000 | 0 | 10,000 | |
| 1150.000 | Yes | A&E | Traffic Engineer | 10,000 | 3,681 | 13,681 | |
| 1160.000 | Yes | A&E | Restaurant/Kitchen Designer | 50,000 | (8,750) | 41,250 | |
| 1170.000 | Yes | A&E | Interior design services, FF&E selection & spec Lobby & Amenity | 250,000 | (35,500) | 214,500 | |
| 1180.000 | Yes | A&E | Interior designer CA & purchase of FF&E, Supervise installation | 250,000 | (250,000) | 0 | |
| | | | **Misc Costs** | | | | |
| 1200.000 | Yes | A&E | Renderings & Models | 90,000 | 0 | 90,000 | |
| 1210.000 | Yes | A&E | Environmental Phase I | 5,000 | 0 | 5,000 | |
| 1220.000 | Yes | A&E | Environmental Phase II | 10,000 | 0 | 10,000 | |
| 1230.000 | Yes | L&A | Legal & Accounting | 250,000 | 0 | 250,000 | |
| 1240.000 | Yes | A&E | Structural Inspections | 275,000 | 0 | 275,000 | |
| 1250.000 | Yes | A&E | Geotech Field Services | 75,000 | 0 | 75,000 | |
| 1260.000 | Yes | A&E | Waterproofing/Envelope Inspection | 75,000 | 0 | 75,000 | |
| 1270.000 | Yes | A&E | Window/envelope testing | 30,000 | 0 | 30,000 | |
| 1280.000 | Yes | A&E | Printing, Courier Expenses | 25,000 | (0) | 25,000 | |
| 1290.000 | Yes | A&E | Photos/aerials | 10,000 | 0 | 10,000 | |
| 1300.000 | Yes | NC | Travel & entertainment expense Allow | 20,000 | (0) | 20,000 | |
| | | | **Permits, Utility Fees and Assessments:** | | | | |
| 1310.000 | No | FEES | Design Review/Preapp/Filing Fees | 5,000 | 0 | 5,000 | |
| 1320.000 | No | PERM | Building Permit/Plan Check | 831,635 | (0) | 831,635 | |

A8
11/17/2014

A2
6/23/2015

Exhibit 2 Page 212 of 214

**Hotel at Southport**
**Project Cost Estimate**
As of 11/10/2014

| Cost Code | EB-5? | Category | Description | Original Budget | Changes | Revised Budget | |
|---|---|---|---|---|---|---|---|
| 1330.000 | No | PERM | Restaurant/bar TI Improvement Permits | 10,000 | 0 | 10,000 | |
| 1340.000 | No | FEES | LID/Latecomer Fees/Mitigation (parks,traffic,schools) | 300,000 | 0 | 300,000 | |
| 1350.000 | No | FEES | Water Meters | 50,000 | 0 | 50,000 | |
| 1360.000 | No | PERM | Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | 100,000 | 0 | 100,000 | |
| 1370.000 | No | FEES | Natural Gas | 50,000 | 50,000 | 100,000 | |
| 1380.000 | No | FEES | Dewatering discharge fees   Allow | 25,000 | 0 | 25,000 | |
| 1390.000 | No | FEES | Ongoing Site Utilities charges during const | 10,000 | 0 | 10,000 | |
| 1400.000 | No | FEES | Power Service and Transformer | 100,000 | 100,000 | 200,000 | |
| 1410.000 | No | PERM | Restaurant, Liquor & Health, & Other Permits & Impact Fees | 10,000 | 0 | 10,000 | |
| 1420.000 | No | FEES | Bond premiums & Misc city/state licenses | 5,000 | 0 | 5,000 | |
| 1500.000 | Yes | FFE | **Furnishings (Allowance)** | 8,750,000 | 5,250,000 | 14,000,000 | $40K per current hotel specifications |
| 1510.000 | Yes | FFE | Van, Pickup, Automobile | 150,000 | 0 | 150,000 | |
| | | | **Insurance & Taxes:** | | | | |
| 1700.000 | No | TAX | RE taxes on land during predev & construction period | 1,158,601 | (446,147) | 712,454 | Includes financing costs |
| 1710.000 | No | INS | Property Insurance thru occupancy | 427,500 | 632,704 | 1,060,204 | Includes financing costs |
| 1720.000 | No | INS | Builders Risk Insurance | 1,250,000 | (541,435) | 708,565 | Includes Pollution and financing costs |
| | | | **Developer Costs** | | | | |
| 1800.000 | Yes | NC | Project Management & Administration | 1,738,866 | 2,278,601 | 4,017,467 | 4% of Hard Costs per Development Agreement |
| 1810.000 | Yes | NC | Developer Overhead & Project Mgmt | 1,738,866 | (1,724,310) | 14,556 | Misc. Overhead |
| | | | **Construction Financing:** | | | | |
| 1900.000 | No | FEES | Appraisal | 25,000 | 0 | 25,000 | |
| 1910.000 | No | FEES | Title Ins. & Endorsements | 25,000 | 0 | 25,000 | |
| 1920.000 | No | FEES | Construction Review & Inspections | 30,000 | 0 | 30,000 | |
| 1930.000 | No | FEES | Lender Legal & Environmental Fees, & Loan Closing Costs | 20,000 | 0 | 20,000 | |
| 1940.000 | No | FEES | Construction Loan Fee | 350,000 | 0 | 350,000 | |
| 1950.000 | No | FEES | Permanent Loan Fee | 1,000,000 | (1,000,000) | 0 | |
| | | | **Construction Interest (net of capitalized rev)** | | | | |
| 1960.000 | No | FIN | Draw rate during 26 mo. construction period | 4,364,708 | 0 | 4,364,708 | |
| 1970.000 | No | FIN | **Development Loan Interest** | 250,000 | (250,000) | 0 | |
| 2000.000 | No | FIN | **Preopening and Working Capital** | 1,500,000 | 0 | 1,500,000 | |
| | No | CONT | **Reserve for shorfall** | 1,500,000 | 0 | 1,500,000 | |
| | | | **Soft Cost Total** | **30,397,925** | **5,541,097** | **35,939,022** | |
| | | | | | | | |
| | | | **Total Project Costs** | **134,571,760** | **17,908,045** | **152,479,805** | |

A9
11/17/2014

A2
6/23/2015

Exhibit 2 Page 213 of 214

**Hotel at Southport**
**Annual Cost Disbursement Schedule**

| | Total Budget | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **CONSTRUCTION** | | | | | | | |
| **Site Work** | | | | | | | |
| Cost of Work to date  (roads, utilities, steam plant demo) | | | | | | | |
| Allocation of Onsite final road, street lights, etc | | | | | | | |
| Offsite traffic improvements (LW.Blvd. road, bridge, etc) | 1,169,172 | 375,195 | 793,977 | 0 | 0 | 0 | 0 |
| **Total Site Work** | **1,169,172** | 375,195 | 793,977 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **General Contractor (Sellen Construction)** | | | | | | | |
| Direct Construction Costs (301,783 SF enclosed space) | 100,436,677 | 2,588,258 | 30,215,021 | 66,987,432 | 645,966 | 0 | 0 |
| Construction Contingency at 1.5% | 1,506,550 | 0 | 379,519 | 1,066,979 | 60,053 | 0 | 0 |
| General Contractor Fee | 3,013,100 | 74,527 | 919,307 | 2,005,518 | 13,749 | 0 | 0 |
| Construction Cost Subtotal | 104,956,326 | 2,662,785 | 31,513,846 | 70,059,928 | 719,767 | 0 | 0 |
| B&O Taxes and Liability Insurance | 873,799 | 41,966 | 319,297 | 508,069 | 4,467 | 0 | 0 |
| Washington State Sales Tax @ 9.5% | 9,541,484 | 266,521 | 2,935,557 | 6,305,778 | 33,629 | 0 | 0 |
| **General Contractor Cost Total** | **115,371,610** | 2,971,272 | 34,768,699 | 76,873,776 | 757,863 | 0 | 0 |
| | | | | | | | |
| **Parking Cost** | | | | | | | |
| Parking  (300 stalls) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington State Sales Tax @ 9.5% | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Parking Costs** | **0** | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **Total Hard Costs** | **116,540,782** | 3,346,467 | 35,562,676 | 76,873,776 | 757,863 | 0 | 0 |
| | | | | | | | |
| **SOFT COSTS** | | | | | | | |
| **Consultants** | | | | | | | |
| Architectural  (site studies to SEPA thru CA) | 2,500,000 | 1,199,640 | 1,015,901 | 280,000 | 4,459 | 0 | 0 |
| Architectural production of marketing materials | 100,000 | 100,000 | 0 | 0 | 0 | 0 | 0 |
| Architectural Reimbursable & extra services | 50,000 | 35,733 | 14,267 | 0 | 0 | 0 | 0 |
| Structural w/CA, piling | 308,000 | 153,450 | 154,550 | 0 | 0 | 0 | 0 |
| Civil | 141,900 | 99,940 | 41,960 | 0 | 0 | 0 | 0 |
| Landscape | 84,700 | 39,038 | 45,662 | 0 | 0 | 0 | 0 |
| Envelope Consultation (shop dwgs/const review) | 50,000 | 0 | 50,000 | 0 | 0 | 0 | 0 |
| Soils Study/Geotech Report, piling criteria | 348,000 | 64,754 | 283,246 | 0 | 0 | 0 | 0 |
| ALTA Survey, bound,topo,easements,updates | 18,404 | 18,404 | 0 | 0 | 0 | 0 | 0 |
| Misc Consultants; (hrdw, elevator, acousical, energy calc) | 151,980 | 16,979 | 127,167 | 7,834 | 0 | 0 | 0 |
| Mechanical Consultant | 414,762 | 249,949 | 162,269 | 2,544 | 0 | 0 | 0 |
| Electrical Consultant | 487,256 | 272,757 | 214,499 | 0 | 0 | 0 | 0 |
| Signage & Grapics design | 15,000 | 0 | 7,000 | 7,000 | 1,000 | 0 | 0 |
| City / Zoning Consultant | 10,000 | 10,000 | 0 | 0 | 0 | 0 | 0 |
| Traffic Engineer | 13,681 | 5,764 | 7,917 | 0 | 0 | 0 | 0 |
| Restaurant/Kitchen Designer | 41,250 | 41,250 | 0 | 0 | 0 | 0 | 0 |
| Interior design services, FF&E selection & spec Lobby & Ameni | 214,500 | 81,400 | 133,100 | 0 | 0 | 0 | 0 |
| **Misc Costs** | | | | | | | |
| Renderings & Models | 90,000 | 5,040 | 84,960 | 0 | 0 | 0 | 0 |
| Environmental Phase I | 5,000 | 0 | 0 | 5,000 | 0 | 0 | 0 |
| Environmental Phase II | 10,000 | 0 | 0 | 10,000 | 0 | 0 | 0 |
| Legal & Accounting | 250,000 | 128,727 | 106,327 | 14,947 | 0 | 0 | 0 |

A2
6/23/2015

25-80007-FPC     Doc 15-2     Filed 02/19/25     Entered 02/19/25 15:21:59     Pg 213 of 214

Exhibit 2 Page 214 of 214

**Hotel at Southport**
**Annual Cost Disbursement Schedule**

| | Total Budget | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| Structural Inspections | 275,000 | 0 | 108,656 | 166,344 | 0 | 0 | 0 |
| Geotech Field Services | 75,000 | 0 | 75,000 | 0 | 0 | 0 | 0 |
| Waterproofing/Envelope Inspection | 75,000 | 0 | 9,375 | 65,625 | 0 | 0 | 0 |
| Window/envelope testing | 30,000 | 0 | 0 | 30,000 | 0 | 0 | 0 |
| Printing, Courier Expenses | 25,000 | 1,259 | 20,609 | 3,132 | 0 | 0 | 0 |
| Photos/aerials | 10,000 | 572 | 3,850 | 5,578 | 0 | 0 | 0 |
| Travel & entertainment expense  Allow | 20,000 | 0 | 10,100 | 9,900 | 0 | 0 | 0 |
| **Permits, Utility Fees and Assessments:** | | | | | | | |
| Design Review/Preapp/Filing Fees | 5,000.00 | 5,000 | 0 | 0 | 0 | 0 | 0 |
| Building Permit/Plan Check | 831,635.00 | 360,703 | 470,932 | 0 | 0 | 0 | 0 |
| Restaurant/bar TI Improvement Permits | 10,000.00 | 0 | 0 | 10,000 | 0 | 0 | 0 |
| LID/Latecomer Fees/Mitigation (parks,traffic,schools) | 300,000.00 | 34,134 | 265,866 | 0 | 0 | 0 | 0 |
| Water Meters | 50,000.00 | 0 | 0 | 50,000 | 0 | 0 | 0 |
| Plumbing, Gas, HVAC, Fire Sprink, and Elect Permits | 100,000.00 | 10,270 | 12,800 | 76,930 | 0 | 0 | 0 |
| Natural Gas | 100,000.00 | 0 | 14,286 | 85,714 | 0 | 0 | 0 |
| Dewatering discharge fees   Allow | 25,000.00 | 0 | 25,000 | 0 | 0 | 0 | 0 |
| Ongoing Site Utilities charges during const | 10,000.00 | 541 | 4,748 | 4,711 | 0 | 0 | 0 |
| Power Service and Transformer | 200,000.00 | 200,000 | 0 | 0 | 0 | 0 | 0 |
| Restaurant, Liquor & Health, & Other Permits & Impact Fees | 10,000.00 | 0 | 0 | 10,000 | 0 | 0 | 0 |
| Bond premiums & Misc city/state licenses | 5,000.00 | 398 | 0 | 4,602 | 0 | 0 | 0 |
| **Furnishings (Allowance)** | 14,000,000 | 0 | 0 | 14,000,000 | 0 | 0 | 0 |
| Van, pickup, automobile | 150,000 | 0 | 0 | 150,000 | 0 | 0 | 0 |
| **Insurance & Taxes:** | | | | | | | |
| RE taxes on land during predev & construction period | 712,454 | 14,551 | 81,963 | 615,940 | 0 | 0 | 0 |
| Property Insurance thru occupancy | 1,060,204 | 698,228 | 361,976 | 0 | 0 | 0 | 0 |
| Builders Risk Insurance | 708,565 | 131,648 | 344,156 | 201,474 | 31,287 | 0 | 0 |
| **Developer Costs** | | | | | | | |
| Project Management & Administration | 4,017,467 | 133,859 | 1,323,243 | 2,560,366 | 0 | 0 | 0 |
| Developer Overhead & Project Mgmt | 14,556 | 14,556 | 0 | 0 | 0 | 0 | 0 |
| **Construction Financing:** | | | | | | | |
| Appraisal | 25,000 | 5,700 | 19,300 | 0 | 0 | 0 | 0 |
| Title Ins. & Endorsements | 25,000 | 1,921 | 23,079 | 0 | 0 | 0 | 0 |
| Construction Review & Inspections | 30,000 | 1,100 | 6,684 | 22,216 | 0 | 0 | 0 |
| Lender Legal & Environmental Fees, & Loan Closing Costs | 20,000 | 4,572 | 15,428 | 0 | 0 | 0 | 0 |
| Construction Loan Fee | 350,000 | 0 | 350,000 | 0 | 0 | 0 | 0 |
| **Construction Interest (net of capitalized rev)** | | | | | | | |
| Draw rate during 26 mo. construction period | 4,364,708 | 0 | 62,417 | 1,181,458 | 1,337,500 | 1,337,500 | 445,833 |
| **Preopening and Working Capital** | 1,500,000 | 0 | 0 | 0 | 1,500,000 | 0 | 0 |
| **Reserve for shorfall** | 1,500,000 | 0 | 0 | 0 | 1,500,000 | 0 | 0 |
| **Soft Cost Total** | **35,939,023** | 4,141,836 | 6,058,293 | 19,581,315 | 4,374,246 | 1,337,500 | 445,833 |
| **Total Project Costs** | **152,479,805** | 7,488,302 | 41,620,969 | 96,455,091 | 5,132,109 | 1,337,500 | 445,833 |
| **Cumulative Project Costs** | | 7,488,302 | 49,109,271 | 145,564,362 | 150,696,471 | 152,033,971 | 152,479,805 |

A2
6/23/2015

25-80007-FPC    Doc 15-2    Filed 02/19/25    Entered 02/19/25 15:21:59    Pg 214 of 214